IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| HUMC OPCO LLC, d/b/a CAREPOINT HEALTH - HOBOKEN UNIVERSITY MEDICAL CENTER | Civ. A. No. 2:16-cv-00168(KM/MAH) |
| Plaintiff, | |
| vs. | *Electronically Filed* |
| UNITED BENEFIT FUND, AETNA HEALTH INC., and OMNI ADMINISTRATORS INC., | |
| Defendants. | |

**CERTIFICATION OF MICHAEL C. McNAMARA IN SUPPORT OF
DEFENDANT AETNA HEALTH INC.'S MOTION TO DISMISS**

I, Michael C. McNamara, of full age, hereby certify as follows:

1.     I am employed by Aetna Life Insurance Company ("Aetna") in the Law and Regulatory Affairs Department as a Litigation Paralegal.

2.     The statements below are based on my personal knowledge gained through my employment with Aetna and records maintained by Aetna. This certification is offered to certify facts in support of Aetna's Motion to Dismiss.

3.     On or about February 1, 2013, Aetna contracted with Defendant Omni Administrators Inc. ("Omni") to provide joint claim administration for self-funded employee health benefits plans maintained by Defendant United Benefit Fund ("UBF"). (A true and correct copy of that agreement is attached hereto as Exhibit A).

4.     On or about February 1, 2013, Aetna contracted with Defendant UBF to provide customer administrative services to UBF's self-funded employee health benefits plan. (A true and correct copy of that agreement is attached hereto as Exhibit B).

I hereby certify that the foregoing statements made by me are true. I am aware

that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

By: _____
    Michael C. McNamara

Dated: March 9, 2016

3643066-3

# EXHIBIT

# A

# Aetna Joint Claim Administration

## Aetna-TPA Administrative Services Agreement
## JCA - 863860

This Aetna Joint Claim Administration[SM] Administrative Services Agreement ("Agreement") is made and entered into as of February 1, 2013 ("Effective Date") by and among Aetna Life Insurance Company, on behalf of itself and its affiliated health maintenance organizations ("HMOs") (collectively, "Aetna") and Omni Administrators Inc. (hereinafter "TPA") (TPA and Aetna are collectively referred to herein as the "Parties").

**WHEREAS,** TPA administers claims and provides other services to United Benefit Fund (the "Customer"), which self-funds its health benefit plans (the "Plans") for certain eligible individuals pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"); and

**WHEREAS,** Aetna and Customer have entered into an Aetna Joint Claim Administration Customer Administrative Services Agreement (the "Customer Administrative Services Agreement") of even date herewith;

**WHEREAS,** Aetna and TPA have arranged to provide administrative services for the Plans in a jointly coordinated offering, including claims administration, patient management, member and provider services and network access, all as specified in this Agreement (the "Program"); and

**WHEREAS,** Aetna has further arranged to provide integrated administration of certain of the Plans among itself and the HMOs and, if requested, has also agreed to provide certain supplemental administrative services and products not available through the HMOs.

**NOW, THEREFORE,** in consideration of the foregoing and of the mutual covenants, promises and undertakings herein, the sufficiency of which is hereby acknowledged, and intending to be legally bound hereby, the parties hereto agree as follows:

## 1.0    DEFINITIONS

When used in this Agreement, all capitalized terms shall have the following meanings:

1.1    <u>AAA</u>.  Defined in Section 15.1 of this Agreement.

1.2    <u>Aetna Services</u>.  The services of Aetna to be provided pursuant to this Agreement as described in Section 3 hereof, together with Aetna's obligations under Section 7 hereof.

1.3    <u>Affiliate</u>.  Any corporation, partnership or other legal entity directly or indirectly owned or controlled by, or which owns or controls, or which is under common ownership or control with a Party.

1.4    <u>Affiliated Party</u>.  Defined in Section 14.1.

1.5    <u>Agreement</u>.  Defined in the first paragraph of this Agreement.   This Agreement includes and incorporates by reference the attached Appendix I, Service and Fee Schedule, National Advantage Program Addendum (if applicable) and Attachments.

1.6    <u>Approved Policies</u>.  Defined in Section 5.10.1.

1.7    <u>Bank</u>.   The bank selected by Aetna on which benefit payment checks are drawn in satisfaction of a claim for Plan benefits.

1.8    <u>Claims</u>.  Defined in Section 14.1.

1.9    <u>Claims Administration</u>.  The administration, processing and payment of claims for Customer under the Plan in a jointly coordinated arrangement by Aetna and TPA, as more fully defined in Sections 3.1 and 5.1.

1.10    <u>Confidential Information</u>.  Defined in Section 11.1.

1.11    <u>Contract Rates</u>.  Defined in Section 3.6.

1.12    <u>Documentation</u>.  Defined in Section 10.1.

1.13    <u>Effective Date</u>.  Defined in the first paragraph above.

1.14    <u>ERISA</u>.  Defined in the recitals to this Agreement.

1.15    <u>HIPAA</u>.  Defined in Section 10.1.

1.16    <u>HMOs</u>.  Defined in the first paragraph above.  The HMOs include the following entities to the extent that Plan beneficiaries elect coverage under Products offered in geographic areas served by such entity: Aetna Health, Inc. (CT), Aetna Health Inc. (ME), Aetna Health Inc. (MA), Aetna Health Inc. (NH), Aetna Health Inc. (NY), Aetna Health Inc. (DE), Aetna Health Inc. (NJ), Aetna Health Inc. (PA), Aetna Health Inc. (MD), Aetna Health Inc. (FL), Aetna Health Inc. (TN), Aetna Health Inc. (GA), Aetna Health of the Carolinas Inc., Aetna Health Inc. (LA), Aetna Health Inc. (CO), Aetna Health of Illinois Inc., Aetna Health Inc. (MI), Aetna Health Inc. (MO), Aetna Health Inc. (OH), Aetna Health Inc. (OK), Aetna Health Inc. (TX), Aetna Health Inc. (AZ), Aetna Health Inc. (WA). Aetna Life Insurance Company is authorized to represent the HMOs for purposes of the execution and administration of this Agreement, including receipt of any notices to Aetna required hereunder.

1.17    <u>Indemnified Party</u>.  Defined in Section 14.4.1.

1.18    <u>Indemnifying Party</u>.  Defined in Section 14.4.1.

1.19    <u>Initial Term</u>.  Defined in Section 12.1.

1.20    <u>Members</u>.  Defined in Section 3.5.

1.21    <u>Network Services</u>.  Defined in Section 3.6.

1.22   <u>Participating Providers</u>.  Those health care providers that are contracted with Aetna or an HMO Affiliate of Aetna and that are considered "in-network" for the Program.

1.23   <u>Party</u>.  Aetna or TPA, as applicable.

1.24   <u>Permitted Parties</u>.  Defined in Section 5.10.2.

1.25   <u>Plans</u>.  Defined in the recitals to this Agreement.

1.26   <u>Products</u>.  Defined in the recitals to this Agreement.

1.27   <u>Program</u>.  Defined in the recitals to this Agreement.

1.28   <u>Provider Service Center(s)</u>.  Defined in Section 3.3.

1.29   <u>Rules</u>.  Defined in Section 15.1.

1.30   <u>Services Agreement Period</u>.  Defined in Section 12.1.

1.31   <u>Settlement Agreement</u>.  Defined in Section 5.4.

1.32   <u>Third Party Claim</u>.  Defined in Section 14.4.1.

1.33   <u>TPA Services</u>.  The services of TPA to be provided pursuant to this Agreement as described in Section 5 hereof, together with TPA's obligations under Section 7 hereof.

1.34   <u>TPA Member Service Center(s)</u>.  Defined in Section 5.2.

1.35   <u>Patient Management</u>.  The program utilized by Aetna for the Customer described in Section 3.5 below.

**2.0    Purpose and Overall Workflow**

2.1    <u>Purpose</u>.  Aetna and TPA have each separately established service agreements with the Customer to provide administrative services for the Plans.  The purpose of this Agreement is to reflect the understanding between Aetna and TPA with regard to the services to be jointly provided to the Customer by Aetna and TPA (the "JCA Services").  The JCA Services shall be comprised of the services designated in this Agreement, together with such other services as Aetna and TPA jointly agree in writing to perform, as described in Appendix I and the Service and Fee Schedule with respect to the Plan(s).  To the extent there is a conflict between this Agreement and any agreement entered into directly with the Customer, the terms of this Agreement shall prevail as between Aetna and TPA.

2.2    <u>Service Fees</u>.  Aetna shall be compensated by the TPA in accordance with the Service and Fee Schedule attached hereto.  TPA shall enter into separate compensation arrangements with the Customer for its services.  It is understood and agreed that Aetna shall have no responsibility for the payment or collection of service fees to TPA.

2.3    <u>Workflow</u>.  As more fully set forth in this Agreement, the parties mutually agree that the overall workflow for this customized three party arrangement shall be as set forth in Attachment 2.3.

**3.0    Aetna Services and Obligations**

3.1    <u>Claims Administration</u>.  Aetna will perform the following services in connection with the claims administration process:

3.1.1   <u>Claim Intake and Re-pricing; Transmission of Data</u>.  All claims will be directed to and received by Aetna.  Aetna will apply its standard Joint Claims Administration edits, re-price the claims, as appropriate, and transmit them to TPA in accordance with the performance standards set forth in Attachment 3.1.

3.1.2   <u>Provider Remittance</u>.  After claims have been fully adjudicated by TPA and transmitted back to Aetna, such claims will be processed through Aetna's provider payment system and appropriate

remittances shall be made to the providers in accordance with the performance standards set forth in Attachment 3.1. Aetna shall have no responsibility for claims determinations made by TPA.

3.2    Banking.  Whenever it is determined by TPA that benefits and related charges are payable under the Plan and such determination is communicated to Aetna, Aetna will issue a payment of such benefits and related charges on behalf of Customer.  Such plan benefit payments and related charges shall be made by check drawn by Aetna payable through the Bank or by electronic funds transfer or other reasonable transfer method.  The Customer will provide funds through its designated bank sufficient to satisfy all Plan benefits and related charges upon notice from Aetna or the Bank of the amount of payments made by Aetna.  As used herein "Plan benefits" means payments under the applicable Plan, excluding any co-payments, coinsurance or deductibles required by the Plan, as determined by TPA.  The details of the banking arrangement shall be established in the services agreement entered into between Aetna and the Customer.

3.3    Provider Service Center.  Aetna shall establish and maintain one or more service centers (the "Provider Service Center(s)"), responsible for handling calls and other correspondence from Participating Providers with respect to questions, concerns, comments, complaints, grievances and appeals relating to the Plans and Aetna's services under this Agreement.  Aetna shall make available sufficient backup support for the Provider Service Center(s) in the event of unanticipated volume or an emergency situation, which backup may be provided through alternative sites and/or personnel.  All personnel that provide services pursuant to this Agreement shall be personnel that Aetna reasonably believes to possess appropriate training and skills to provide such service with the level of care and skill required under this Agreement.

      3.3.1    Coordination with TPA.  Aetna shall involve TPA as necessary to respond to calls from Participating Providers with respect to TPA contractual requirements, particularly with regard to eligibility determinations, plan of benefit issues and claims administration issues.  The linkages between the Provider Service Center(s) and the TPA Member Service Center(s) shall be established and maintained in accordance with the requirements of Attachment 3.3.

      3.3.2    Provider Appeals.  Aetna shall be responsible for receiving, reviewing and determining any Participating Provider appeals.  To the extent any such appeals involve a reconsideration of medical necessity determinations made by TPA or any other determination within the scope of TPA's fiduciary obligations, Aetna shall coordinate with TPA to obtain TPA's final determination of such issue in accordance with TPA's fiduciary responsibilities, and Aetna shall relay that determination.

3.4    Plan Sponsor Services.  Aetna and TPA will cooperate in the provision of plan sponsor services to Customer.  Aetna will have responsibility for the following:

      3.4.1    Account Executive.  Aetna will assign an Account Executive to Customer's account.  The Account Executive will be available to assist Customer in connection with the general administration of the Plan, ongoing communications with Customer and administration and record-keeping systems for the ongoing operation of the Plans, within the scope of services provided by Aetna.  The Account Executive will also act as liaison between the TPA, the Customer and Aetna.

      3.4.2    Department of Labor Reporting.  Upon request of a Customer, Aetna will provide the Customer with information reasonably available to Aetna, within the scope of services Aetna is providing under this Agreement, which is reasonably necessary for the Customer to prepare reports for the United States Department of Internal Revenue Service and Department of Labor.

3.5    Patient Management.  Aetna will perform Patient Management services, as set forth in Attachment 3.5.  Aetna will provide TPA with reasonable access to the data stored in the system Aetna uses to record patient management interactions for members of the Plans ("Members"), to better enable TPA to fulfill its claims management and member services functions.

3.6    Network Services.  Aetna will be providing the Customer and its Members with access to Aetna's network of Participating Providers designated for the Program ("Network Services").  Participating Providers will accept payment at the rate that Aetna has negotiated for the purposes of this Agreement ("Contract Rates").

      3.6.1    Credentialing.  Aetna will establish, administer and enforce appropriate credentialing criteria for its Participating Providers in accordance with generally accepted industry standards.

3.6.2 <u>Participating Provider Information</u>.  Aetna will make participating provider information available to the Customer and TPA in accordance with its standard procedures.

3.7    <u>Plan Design</u>.  Aetna reserves the right to set a minimum plan of benefit design.    Such minimum plan design requirements shall be set forth in Attachment 3.7, which may be updated by Aetna on ninety (90) days written notice to the Customer and TPA, effective as to any Plan upon the next renewal date or effective date for such Plan.

3.8    <u>Production of I.D. Cards</u>.  Aetna will produce I.D. cards for all Members of the Plans.

3.9    <u>Record Maintenance and Retention</u>.  Aetna agrees (a) to maintain information and records relating to the Aetna Services in a current, detailed, organized and comprehensive manner and in accordance with the customary practice of third party administrators, applicable Federal and state laws, and accreditation standards; (b) that all plan participant medical records and Confidential Information shall be treated as confidential and in accordance with applicable laws; (c) to maintain such information and records for the longer of seven (7) years after the last date Participating Provider services were provided to a plan participant, or the period required by applicable law.  This Section 3.9 shall survive the termination of this Agreement, regardless of the cause of the termination.

3.10    <u>Insurance</u>.  Aetna, at its sole cost and expense, shall procure and maintain (a) managed care professional liability insurance at a minimum level of $10,000,000 per claim/$25,000,000 annual aggregate; and (b) comprehensive general liability insurance at a minimum level of $2,000,000 per claim/$2,000,000 annual aggregate.  Evidence of Aetna's insurance shall be submitted to TPA or any Customer upon written request.

3.11    <u>Right to Oversight</u>.

3.11.1    <u>Review and Audit Rights</u>.  Aetna has the right to conduct a review or audit of TPA Services in accordance with Section 5.10 hereunder.

3.11.2    <u>Correction Actions</u>.  If Aetna has reason to believe that TPA has failed to carry out TPA Services in accordance with the terms of the Agreement or Aetna's reasonable performance expectations, Aetna may take such steps, as it deems necessary, including but not limited to the following:
a.    Review or Audit TPA's performance of TPA Services upon advance notice;
b.    Require TPA to submit, within a specified time frame, a corrective action plan to address any compliance or other problems identified by Aetna; and
c.    Require TPA to implement, by a specified time, a corrective action plan approved by Aetna.
Aetna's rights under this Section 3.11.2 are in addition to all of its other rights under this Agreement and as provided in law or in equity.

**4.0   Representations and Warranties of Aetna**

4.1   <u>General Representations</u>.  Aetna represents, warrants and covenants, as applicable, that:  (a) it is, and will remain throughout the term of this Agreement, a corporation duly incorporated, validly existing  and in good standing under the laws of the State of Connecticut and duly authorized to conduct business and in good standing in each jurisdiction where such authorization is required to conduct its business or  perform the services required under this Agreement, except where the failure to be so authorized or in good standing would not impair, restrict or limit its ability to perform its obligations under this Agreement; (b) it is, and will remain throughout the term of this Agreement, in compliance with any licensing requirements for the purpose of Patient Management or any other Aetna Service; (c) this Agreement has been executed by its duly authorized representative; and (d) executing this Agreement and performing its obligations hereunder shall not cause Aetna to violate any term or covenant of any other agreement or arrangement now existing or hereinafter executed.

4.2   <u>Incentives</u>.  Aetna further represents and warrants that as of the Effective Date, and, furthermore, Aetna covenants that, throughout the term of the Agreement that: (a) compensation to persons performing Aetna Services, including but not limited to Patient Management, that is subject to this Agreement shall not contain incentives or remuneration, direct or indirect, in cash or in-kind, to those persons to make inappropriate claims denials or pending of payment; (b) it is, and will remain throughout the term of this Agreement, in compliance with any licensing requirements for the purpose of Patient Management or any other Aetna Service; and (c) compensation or remuneration to persons performing Patient Management subject to this Agreement shall not be based, directly or indirectly, on the quantity, frequency or percentage of or relating to pended claims or claims denials.

**5.0   TPA Services and Obligations**

5.1   <u>Claims Administration</u>.  TPA will perform the following services in connection with the claims administration process:

5.1.1   <u>Claims Adjudication</u>.  TPA will process and adjudicate all re-priced claims in accordance with the terms of the Plans and the requirements and performance standards set forth in Attachment 5.1.  Where the Plan contains a coordination of benefits clause, anti-duplication clause, or provision(s) reducing benefits for injuries or illnesses caused or alleged to be caused by third parties, TPA will administer all claims consistent with such provisions and any information concurrently in its possession as to duplicate coverage or the cause of the injury or illness.

5.1.2    <u>Subrogation</u>.  TPA will provide assistance to the Customer for subrogation/reimbursement services, which may be delegated to a third party of TPA's choosing.  Such services shall be provided in accordance with the provisions of Attachment 5.1.

5.1.3    <u>Coordination with Aetna</u>.  TPA will coordinate with Aetna to ensure that decisions that are appropriately taken into account in TPA claim determinations, and to communicate back to Aetna any information obtained in the claims administration process that might be relevant to future Aetna determinations for that Member.

5.1.4    <u>Transmission of Data</u>.  Once fully adjudicated, all claims will be transmitted back to Aetna in the manner and timeframes set forth in Attachment 5.1 to enable Aetna to pay the claims in a timely fashion.

5.1.5    <u>Claim Fiduciary; Administration of Appeals</u>.  The parties agree that with respect to Section 503 of ERISA, the Customer will be the "appropriate named fiduciary" of the Plan for purpose of reviewing denied claims under the Plan.  In exercising such fiduciary responsibility, the Customer will have discretionary authority to determine entitlement to Plan benefits as determined by the Plan Documents for each claim received and to construe the terms of the Plans.  As provided in Section 5.3, the Customer also has sole and complete authority to determine eligibility of persons to participate in the Plan.  It is agreed that the Customer's decisions on any claim is final and that neither TPA nor Aetna has any other ERISA fiduciary responsibility under the Plan.  As named fiduciary for member appeals, the Customer will be responsible for fully administering all aspects of the Plan with regard to member appeals, and the Customer will be responsible for all associated costs.  TPA shall enter into an agreement with the Customer specifying the foregoing.

5.1.6    <u>Defense of Claim Litigation</u>.  In the event of a legal, administrative or other action arising out of the administration, processing or determination of a claim for Plan benefits, Customer shall undertake the defense of such action and settle such action when in its reasonable judgment it appears expedient to do so.  The Customer will also pay the amount of Plan benefits included in any judgment or settlement in such action.  All other damages and expenses with respect to such defense, including the defense of the TPA and Aetna, if either is named as a party to such action, and any punitive damages, shall be the obligation of the Customer.  TPA shall enter into an agreement with the Customer specifying the foregoing.

5.1.7    Explanations of Benefits.  TPA shall be responsible for providing claimants with Explanations of Benefits (EOBs) in compliance with all applicable legal requirements, including the requirements of ERISA.  With respect to any Member who makes a request for Plan benefits which is denied on behalf of a Customer, TPA will notify said Member of the denial and of the Member's right of review of the denial in accordance with ERISA.  In order to enable Aetna to maintain consistent communications with its providers with regard to JCA claims determinations, TPA will cause the denial code wording on its member EOBs to be consistent with the corresponding wording on Aetna's provider explanations of payment.  Aetna shall disclose its standard provider explanation of payment wording to TPA at the time of implementation of this Agreement and shall keep TPA up-to-date thereafter.

5.2    Member Services.  TPA shall establish and maintain one or more dedicated service centers (the "TPA Member Service Center(s)"), responsible for handling calls and other correspondence from Members with respect to questions, concerns, comments, complaints, grievances and appeals relating to the Plans and TPA's services under this Agreement, as well as TPA's direct agreement with the Customer.  TPA shall make available sufficient backup support for the TPA Member Service Center(s) in the event of unanticipated volume or an emergency situation, which backup may be provided through alternative sites and/or personnel.  All personnel that provide services pursuant to this Agreement shall be personnel that TPA reasonably believes to possess appropriate training and skills to provide such service with the level of care and skill required under this Agreement.

5.3    Eligibility.  TPA shall take such actions as are reasonably necessary to enroll Members in the Plan and process changes to enrollment under the Plan.  Aetna shall be entitled to rely upon any enrollment information provided to it by TPA.
The Customer has the sole and complete authority and responsibility to determine eligibility of persons to participate in the Plan.  The Customer's decision on eligibility determinations is final.

5.4    Physician Settlement Agreement.  TPA understands and acknowledges that Aetna Inc., an Affiliate of Aetna, has executed a class action settlement agreement with physicians dated as of May 21, 2003 which was approved by the United States District Court for the Southern District of Florida (the "Settlement Agreement").  The Settlement Agreement requires that Aetna comply with certain disclosure, claims payment and other obligations.  In performance of TPA Services hereunder, TPA agrees to comply with the applicable terms of the Settlement Agreement as set forth in Attachment 5.4, as well as the terms of any policies and procedures created by the parties in connection with the Settlement Agreement.

5.5    Plan Sponsor Services.  Aetna and TPA will cooperate in the provision of plan sponsor services to Customer.  TPA will provide the services described in Attachment 5.5.

5.6    Department of Labor Reporting.  Upon request of Customer, TPA will provide Customer with information reasonably available to TPA, within the scope of services TPA is providing under this Agreement, which is reasonably necessary for Customer to prepare reports for the United States Department of Internal Revenue Service and Department of Labor.

5.7    Customer Default Procedures.  In the event TPA becomes aware that Customer will not fund any claims of Participating Providers, then TPA will immediately notify Aetna of this concern in writing, and shall suspend claims administration for a period of forty-eight hours to allow Aetna time to address the concern.

5.8    Record Maintenance and Retention.  TPA agrees (a) to maintain information and records relating to the TPA Services in a current, detailed, organized and comprehensive manner and in accordance with the customary practice of third party administrators, applicable federal and state laws, and accreditation standards; (b) that all plan participant medical records and Confidential Information (as defined in Section 11.1 hereof) shall be treated as confidential and in accordance with applicable laws; (c) to maintain such information and records for the longer of seven (7) years after the last date Participating Provider services were provided to a plan participant, or the period required by applicable law.  This Section 5.8 shall survive the termination of this Agreement, regardless of the cause of the termination.

5.9    Insurance.  TPA, at its sole cost and expense, shall procure and maintain (a) managed care professional liability insurance at a minimum level of $10,000,000 per claim/$25,000,000 annual aggregate; and (b) comprehensive general liability insurance at a minimum level of $2,000,000 per claim/$2,000,000 annual aggregate.  Evidence of TPA's insurance shall be submitted to Aetna or any Customer upon written request.

5.10    Consent to Oversight. TPA agrees to allow Aetna to maintain oversight of the TPA Services.  Such oversight shall at a minimum include:

5.10.1.    Upon request of Aetna, TPA shall submit to Aetna copies of TPA's written policies and procedures with respect to TPA Services.  If requested for review, such policies and procedures are subject to written approval by Aetna ("Approved Policies"). TPA agrees to provide at least thirty (30) days prior written notice of any changes to Approved Policies or to any other polices or procedures that may have a material impact on TPA Services.  Such changes shall not be implemented until Aetna approves in writing or otherwise performs a re-audit and TPA receives prior written approval of such changes by Aetna.  In addition, any systems utilized by TPA Provider Services shall operate in accordance with the Approved Policies.  TPA agrees to provide at least sixty (60) days prior written notice of any claims systems conversions or modification by TPA.  Such conversions or modifications shall not be implemented until Aetna approves in writing or otherwise performs a re-audit and TPA receives prior written approval by Aetna.

5.10.2    Permission for Aetna and/or Aetna's designated agent(s) (collectively, "Permitted Parties"), to review or audit, during regular business hours upon at least ten (10) calendar days prior written notice (or upon shorter notice in the event that Aetna determines a shorter period is necessary to ensure Aetna's compliance with applicable law), any and all documents and materials related to TPA Services. In addition Permitted Parties shall be permitted by TPA to conduct a site visit and/or audit at any site at any time where TPA performs TPA Services under the terms of this Agreement.  Any such review or audit shall be permitted during the term of this Agreement and for a period of six (6) years thereafter, with TPA and Aetna responsible for their own expenses incurred related to such audit.

5.10.3    Submission to Aetna of periodic reports, accompanied by a certification of an executive officer of TPA as to the reports' truth and accuracy, on TPA Services.  Said reports shall be provided in accordance with Attachment 5.10 and at such other times as Aetna shall request or as Aetna shall deem necessary or appropriate to ensure that TPA is fully apprised of TPA's activities.

**6.0    Representations and Warranties of TPA**

6.1    <u>General Representations</u>.  TPA represents, warrants and covenants, as applicable, that:  (a) it is, and will remain throughout the term of this Agreement, a corporation duly incorporated, validly existing  and in good standing under the laws of the State of its incorporation and duly authorized to conduct business and in good standing in each jurisdiction where such authorization is required to conduct its business or perform the services required under this Agreement, except where the failure to be so authorized or in good standing would not impair, restrict or limit its ability to perform its obligations under this Agreement; (b) it is, and will remain throughout the term of this Agreement, in compliance with any licensing requirements for the purpose of Claims Administration or any other TPA Service; (c) this Agreement has been executed by its duly authorized representative; and (d) executing this Agreement and performing its obligations hereunder shall not cause TPA to violate any term or covenant of any other agreement or arrangement now existing or hereinafter executed.

6.2    <u>Incentives</u>.  TPA further represents and warrants that as of the Effective Date, and, furthermore, TPA covenants that, throughout the term of the Agreement that: (a) compensation to persons performing TPA Services, including but not limited to Claim Management, that is subject to this Agreement shall not contain incentives or remuneration, direct or indirect, in cash or in-kind, to those persons to make inappropriate claims denials or pending of payment; and (b) compensation or remuneration to persons performing Claims Management subject to this Agreement shall not be based, directly or indirectly, on the quantity, frequency or percentage of or relating to pended claims or claims denials.

**7.0    Shared Obligations**

7.1    <u>Recovery of Overpayments</u>.  TPA and Aetna will have a general obligation to cooperate with one another with regard to the identification and recovery of overpayments of Plan benefits, and each will have the following specific obligations with respect thereto:

7.1.1    <u>TPA Obligations</u>.  If it is determined that any payment has been made to an ineligible person or if it is determined that more than the appropriate amount has been paid to a Member, TPA will undertake good faith efforts to recover the erroneous payment.  TPA will also inform Aetna promptly of any overpayments that come to its attention that have been paid to providers.

7.1.2    <u>Aetna Obligations</u>.  If it is determined that any payment has been made to a provider on behalf of an ineligible person or if it is determined that more than the appropriate amount has been paid to a provider, Aetna will undertake good faith efforts to recover the erroneous payment.  Aetna will also inform TPA

promptly of any overpayments that come to its attention that have been paid to a Member or an ineligible person.

7.1.3    <u>General</u>.  For the purpose of Sections 7.1.1 and 7.1.2, "good faith efforts" means that Aetna or TPA, as the case may be, will contact the responsible party twice via letter, phone, email or other means to try to make the recovery.  If those efforts are unsuccessful in obtaining recovery, Aetna or TPA, as the case may be, may use an outside vendor, collection agency or attorney to pursue recovery.  Overpayment recoveries made through third party vendors, collection agencies or attorneys are credited to Customer net of fees charged by them.

A Customer may not seek collection, or use a third party to seek collection, of overpayment from contracted providers, since all such recoveries are subject to the terms and provisions of the providers' contracts with Aetna. For the purpose of determining whether a provider has or has not been overpaid, the Customer will agree that the rates paid to contracting providers for covered services under the Plans shall be governed by Aetna's contracts with those providers, and shall be effective upon the loading of those Contract Rates into Aetna's systems, but no later than three (3) months after the effective date of the providers' contracts.

7.2    <u>Customer Audits</u>.  The Customer shall have certain audit rights with regard to the JCA Services.  In recognition of the apportionment of services between TPA and Aetna, particularly in recognition of the fact that TPA is performing the claims adjudication function, it is expected that most customer claims audits will be performed on the records maintained by TPA.  TPA and Aetna shall each enter into agreements with the Customer giving effect to the following audit provisions:

7.2.1    <u>Right to Audit TPA</u>.  Customer shall have the right to audit TPA's records to verify its claim determinations, subject to reasonable, mutually acceptable limitations on scope and timing.

7.2.2    <u>Right to Audit Aetna</u>.  Aetna shall not be required to make any claim records available for audit if those records are contained in the source claims adjudication systems and records maintained by TPA.  Aetna will, however, make its provider payment records available for audit to enable Customer to reconcile such payments against TPA records.  Upon request, no more frequently than once per year, Aetna will provide a Customer an electronic record of claim payments under the applicable Plans, for the purpose of verifying that such payments are consistent with the claim determinations made by TPA and communicated by TPA to Aetna.

7.2.3    <u>General</u>.  Neither Aetna nor TPA is responsible for Customer's audit fees.  All audits must be commenced within two (2) years following the period being audited.

**8.0    Service Fees; Renewals**

8.1    <u>General; Renewal</u>.  The Service Fees payable by TPA to Aetna in compensation for the Aetna Services shall be determined in accordance with the Service and Fee Schedule attached hereto.  No services other than those identified herein and in the Service and Fee Schedule are included in the Service Fees.

8.2    <u>Invoice.</u>  Aetna shall submit to TPA a statement for each month this Agreement is in effect showing the Service Fees for that month.  Customer shall pay Aetna the amount of the Service Fes no later than thirty-one (31) calendar days following the first calendar day of the month in which the services are provided (the "Payment Due Date").  Following the close of a Services Agreement Period, Aetna will prepare and submit to the Customer a report showing the Service Fees paid.

8.3    <u>Late Charges.</u>  All overdue amounts shall be subject to the late charges set forth in the Service and Fee Schedule.

**9.0    Standard of Care**

9.1    <u>TPA</u>.  TPA will discharge its obligations under this Agreement with that level of reasonable care which a similarly situated administrator of claims would exercise under similar circumstances.

9.2    <u>Aetna</u>.  Aetna will discharge its obligations under this Agreement with that level of reasonable care which a similarly situated administrator of claims would exercise under similar circumstances.

**10.0    Records**

ASA-JCA TPA                                    10

10.1 <u>Permissible Uses for Documentation</u>.  TPA and Aetna or one or their respective affiliates or authorized agents shall have the right to use all documents, records, reports, and data, including data recorded in TPA's or Aetna's data processing systems ("Documentation"), for legitimate Plan, health operations, research or public health purposes, including without limitation: claims payment and fraud prevention; preventive health, early detection and disease management programs; coordination of patient care; member education; quality improvement/management assessment; utilization review and management; design of benefit plans; provider network activities; fulfilling certain state and federal requirements; HEDIS and similar data collection and reporting; accreditation by the National Committee for Quality Assurance and other accrediting organizations; and statistical research; provided, that in all respects TPA and Aetna shall use Documentation in compliance with privacy laws and regulations, including without limitation regulations promulgated pursuant to the Health Insurance Portability and Accountability Act of 1996 ("HIPAA").

10.2 <u>Customer Access to Documentation</u>.  Upon reasonable prior written request, subject to the provisions of Sections 7.2 and 10 hereof, and as permitted by law or regulation, the benefit payment information contained in the Documentation shall be made available to Customer or, at Customer's request, to a third party designated by Customer for inspection during regular business hours at the place or places of business where it is maintained by TPA, for purposes related to the administration of the Plan.  TPA may assess a charge to recover costs in connection with documentation requests which are excessively repetitive or burdensome.  Such Documentation will be kept by TPA and Aetna for seven (7) years after the year in which a claim is paid, unless TPA or Aetna turns such Documentation over to Customer or a designee of Customer.

**11.0  Confidentiality**

11.1 <u>Confidential Information</u>.  For the purposes of this Agreement, the term "Confidential Information" shall mean any and all information, prepared by either Party, its advisors or otherwise, relating to such Party or the administration of this Agreement or the Program, including but not limited to the development of a pricing structure, non-public utilization management policies and procedures, all financial information, rate schedules, financial terms and Contract Rates.  Confidential Information does not include information which becomes publicly available or available to the receiving Party on a non-confidential basis from a source other than the disclosing Party or its advisors, provided that such information is not known by the receiving Party to be proprietary or such source is not known by the receiving Party to be bound by a confidentiality agreement with an obligation of secrecy to the disclosing Party or other party. The Parties agree that the other Party's rate and financial information shall be deemed proprietary and confidential hereunder, except as otherwise agreed to in writing by the Parties.

11.2 <u>Uses</u>.  Each Party shall not, in any manner or for any reason whatsoever, directly, or indirectly, (a) use all or any portion of the other Party's Confidential Information for any purpose other than solely for the purposes of performing pursuant to this Agreement, (b) except as set forth herein, disclose or otherwise make available in any manner or form to any person or entity all or any portion of the other Party's Confidential Information, including without limitation, for any purpose relating to the business or affairs of the other Party or any related person or entity, or (c) take any action or fail to take or abstain from taking any action the effect of which would cause the other Party's Confidential Information to be disclosed or otherwise made available in a manner inconsistent with each Party's obligations herein. Notwithstanding the foregoing, Aetna understands and acknowledges that TPA may disclose certain Confidential Information to a Customer in accordance with TPA's standard reports to the Customer, the form of such reports having been approved by Aetna.  Likewise, TPA understands and acknowledges that Aetna may disclose certain Confidential Information to a Customer in accordance with Aetna's standard reports to the Customer, the form of such reports having been approved by TPA.

11.3 <u>Disclosures</u>.  Each Party may disclose Confidential Information to its employees, contractors, agents, advisors and representatives only on a need-to-know basis, provided that such Party shall (a) direct such persons to use such information solely for the purpose described in Section 11.2 above; (b) inform such persons of the confidential nature of such information; and (c) direct and cause such persons to treat such information confidentially as required of the Parties herein.

11.4 <u>Injunctive Relief</u>.  The Parties hereby agree and acknowledge that the Parties operate in a highly competitive market; any breach of this Agreement would have an adverse financial effect on the disclosing Party and will cause irreparable harm and significant injury which will be difficult to measure with certainty or to compensate through damages, and that any remedies provided at law to the disclosing Party cannot adequately compensate such Party for the losses to be sustained by the disclosing Party in the event of a breach or violation by the receiving Party of any of the provisions of this Section 11. Accordingly, in addition to all other rights and remedies available to it, the Parties shall be entitled as a matter of right to injunctive and other equitable relief in any court of competent jurisdiction.

11.5   <u>Survival</u>.  The rights and obligations set forth in this Section 11 shall survive the termination of this Agreement.

**12.0   Term and Termination**

12.1   <u>Term</u>.  This Agreement shall commence as of the Effective Date and shall continue until the first anniversary of the Effective Date  ("Initial Term"), and thereafter shall automatically renew for additional terms of one (1) year unless terminated in accordance with Section 12.2.  The Initial Term and each such twelve (12) month period shall be a "Services Agreement Period."

12.2   <u>Termination Without Cause After Initial Term</u>.  This Agreement may be terminated by either Party at any time without cause upon one hundred eighty (180) days prior written notice.  This Agreement shall automatically terminate upon termination of the Customer Administrative Services Agreement.

12.3   <u>Termination for Cause</u>.  Without limitation of Aetna's rights under Section 12.6, this Agreement may be terminated at any time by either Party upon at least ninety (90) days prior written notice of such termination to the other Party upon default or breach by such Party of one or more of its obligations hereunder, unless such default or breach is cured within ninety (90) days of the notice of termination.

12.4   <u>Immediate Termination or Suspension by Aetna</u>.  Any of the following events may result in the immediate termination of this Agreement by Aetna upon notice to the TPA and the Customer:  (a) loss or limitation of TPA's insurance as set forth in Section 5.9 ; (b) the change in control of TPA to an entity not acceptable to Aetna; (c) the application for or consent to the appointment of a receiver, trustee, or liquidator of all or a substantial portion of TPA's assets; (d) TPA's filing of a voluntary petition in bankruptcy or admission in writing of its inability to pay its debts as they become due; (d) TPA's filing of a petition or an answer seeking reorganization  or arrangement with creditors to take advantage of any insolvency law; or (e) the failure of TPA to meet the performance guarantees for two of any four quarters.  TPA shall provide immediate notice to Aetna of any of the aforesaid events.

12.5   <u>Immediate Termination or Suspension by TPA</u>.  Any of the following events may result in the immediate termination of this Agreement by TPA upon notice to Aetna and the Customer:  (a) the change in control of Aetna to an entity not acceptable to TPA; (b) the application for or consent to the appointment of a receiver, trustee, or liquidator of all or a substantial portion of Aetna's assets; (c) Aetna's filing of a voluntary petition in bankruptcy or admission in writing of its inability to pay its debts as they become due; or (e) Aetna's filing of a petition or an answer seeking reorganization or arrangement with creditors to take advantage of any insolvency law.  Aetna shall provide immediate notice to TPA of any of the aforesaid events.

12.6   <u>Suspension or Termination by Aetna for Failure to Fund Claims or Pay Fees</u>.  Aetna shall have the right to terminate a Customer and the terms of this Agreement with respect to that Customer in accordance with the terms of Aetna's services agreement with the Customer.  In certain circumstances involving non-payment of fees or the failure to reimburse for claims, Aetna shall also have the right to suspend services for the Customer.

12.7   <u>Responsibilities upon Termination</u>.

      12.7.1   <u>Responsibilities upon Termination</u>.  Upon termination of this Agreement, Aetna and TPA will continue to perform their respective Claims Management Services for runoff claims for Plan benefits that were incurred prior to but not processed as of the termination date which are received by Aetna not more than twelve (12) months following the termination date.  The procedures and obligations described in this Agreement, to the extent applicable, shall survive the termination of this Agreement and remain in effect with respect to such claims.  Benefit payments processed by TPA and Aetna with respect to such claims which are pended or disputed will be handled to their conclusion, and the procedures and obligations described in this Agreement, to the extent applicable, shall survive the expiration of the twelve (12) month period.  Requests for benefit payments received after such twelve (12) month period will be returned to the Customer or, upon its direction, to a successor administrator at the Customer's expense.

**13.0   Relationship of the Parties**

13.1   <u>Independent Contractors</u>.  TPA and Aetna are independent contractors of the Company.  Neither Aetna nor TPA, nor such Party's respective employees and agents shall in any way be considered agents of the other Party for any purpose, nor shall such respective employees or agents hold themselves out to be agents or representatives of the other Party, nor shall this arrangement or the Program be deemed a partnership or joint venture between TPA and Aetna.

13.2    Non-Exclusivity and Network Contracting.  This Agreement is a non-exclusive agreement.  Nothing herein shall restrict either Party from contracting with the other Party for services similar to those provided pursuant to this Agreement.  Notwithstanding the foregoing, TPA, including its Affiliates, shall not directly contract with Participating Providers for the purpose of providing network access services to its Customer.  This restriction does not prohibit TPA from contracting with networks of providers through network rental vendors.  Aetna makes no guarantee and disclaims any obligation to make any specific health care providers or any particular number of health care providers available for use by Members or that any level of discounts or savings will be afforded to or realized by Customer, the Plan or members.

13.3    Nature of Services.  TPA and Aetna agree that: (i) neither Aetna nor any of its affiliates renders medical services or treatments to Members; (ii) neither TPA nor Aetna are responsible for the health care that is delivered by contracting health care providers; (iii) health care providers are solely responsible for the health care they deliver to Members; (iv) health care providers are not the agents or employees of TPA or Aetna;  and (v) the indemnification obligations of Section 14 do not apply to any portion of any liability, claim, demand, proceeding, action, cause of action, including government action, inquiry, investigation or proceeding, judgment, damage, loss and caused by the acts or omissions of health care providers with respect to Members.

13.4    Use of Name and Logo.  Neither Party shall use or otherwise produce materials mentioning the other Party nor including such Party's logo or trademark without the prior written approval of the other Party.

**14.0    Indemnification**

14.1    Indemnification by TPA.  TPA agrees to indemnify and shall hold harmless Aetna and each of its affiliates, directors, officers, employees and agents (each of the foregoing, an "Affiliated Party") against that portion of any liabilities, claims, demands, proceedings, actions, causes of action, including government actions, inquiries, investigations or proceedings, judgments, damages, losses and expenses (including reasonable attorneys' fees and costs) (collectively, "Claims") that arise from or relate to (i) the willful misconduct, criminal conduct, breach of fiduciary duty or negligence of TPA or its officers, directors, employees, subcontractors or agents in connection with the Program or with the performance of its obligations hereunder; (ii) the breach or failure of any representation, warranty or other obligation of TPA contained in this Agreement; or (iii) in connection with the release or transfer of  member-identifiable information to TPA, or a third party designated by TPA, or the use or further disclosure of such information by TPA or such third party.

14.2     Indemnification by Aetna.  Aetna agrees to indemnify and shall hold harmless TPA and each of its Affiliated Parties against that portion of any Claims that arise from or relate to (i) the willful misconduct, criminal conduct, breach of fiduciary duty or negligence of Aetna or its officers, directors, employees, subcontractors or agents in connection with the Program or with the performance of its obligations hereunder;  (ii) the breach of any representation, warranty or other obligation of Aetna contained in this Agreement; or (iii) in connection with the release or transfer of  member-identifiable information to Aetna, or a third party designated by Aetna, or the use or further disclosure of such information by Aetna or such third party.

14.3    Procedure for Asserting Indemnification Claims.

14.3.1    In order for a Party requesting indemnification  ("Indemnified Party") to be entitled to any indemnification provided for under this Agreement in respect of, arising out of or involving claim or demand by any third party against the Indemnified Party (a "Third Party Claim"), such Indemnified Party must provide the Party requested to provide the Indemnification (the "Indemnifying Party") with a written notice thereof (stating in reasonable detail the basis of such claim or demand) regarding the Third Party Claim within thirty (30) business days after receipt by such Indemnifying Party of written notice of the Third Party Claim; provided, however, that failure to give such notification shall not affect the indemnification provided hereunder except to the extent the Indemnifying Party  shall have been actually prejudiced as a result of such failure.  Thereafter, the Indemnified Party shall deliver to the Indemnifying Party, within five (5) business days after the Indemnified Party's receipt thereof, copies of all notices and documents (including court papers) received by the Indemnified Party relating to the Third Party Claim.

14.3.2    If a Third Party Claim is made against an Indemnified Party, the Indemnifying Party will be entitled to participate in the defense thereof and, if it so chooses, to assume the defense thereof with counsel selected by the Indemnifying Party .  Should the Indemnifying Party so elect to assume the defense of a Third Party Claim, the Indemnifying Party will not be liable to the Indemnified Party for legal fees and expenses subsequently incurred by the Indemnified Party in connection with the defense thereof.  If the Indemnifying Person assumes such defense, the Indemnified Party shall have the right to participate in the defense thereof

and, at its own expense, to employ counsel reasonably acceptable to the Indemnified Party, separate from the counsel employed by the Indemnifying Party, it being understood that the Indemnifying Party shall control such defense. The Indemnifying Party shall be liable for the fees and expenses of counsel employed by the Indemnified Party for any period during which the Indemnifying Party has not assumed the defense thereof (other than during any period in which the Indemnified party shall have failed to give notice of the Third Party Claim as provided above). If the Indemnifying Party chooses to defend or prosecute any Third Party Claim, all the Parties hereto shall cooperate in the defense or prosecution thereof. Such cooperation shall include the retention and (upon the Indemnifying Party's request) the provision to the Indemnifying Party of records and information which are reasonably relevant to such Third Party Claim, and making officers, directors, employees and agents of the Indemnified Party available on a mutually convenient basis to provide information, testimony at depositions, hearings or trials, and such other assistance as may be reasonably requested by the Indemnifying Party. Notwithstanding the foregoing, if a Third Party Claim is made against an Indemnified Party as to which such Indemnified Party is entitled to seek indemnification hereunder and such Indemnified Party reasonably concludes that the Indemnifying Person lacks the financial and personnel resources to vigorously defend such Indemnified Party, that the Indemnifying Party has wrongfully failed to assume the defense of the Indemnified Party, or that the Indemnifying Party is not diligently defending such Indemnified Party, then in each such case the Indemnified Party may elect to retain the defense of such Third Party Claim and will be entitled to be reimbursed promptly after submission of invoices therefore. Whether or not the Indemnifying Party shall have assumed the defense of a Third Party Claim, the Indemnified Party shall not admit any liability with respect to, or settle, compromise or discharge, such Third Party Claim without the Indemnifying Party's prior written consent (which consent shall not be unreasonably withheld or delayed). The Indemnifying Party shall not admit any liability with respect to, or settle, compromise or discharge any Third Party Claim without the Indemnified Party's prior written consent (which consent shall not be unreasonably withheld or delayed), unless such settlement involves only the payment of cash.

## 15.0   Arbitration

15.1   <u>Binding Arbitration of Certain Disputes</u>. Any controversy or claim arising out of or relating to this Agreement or the breach, termination, or validity thereof, except for temporary, preliminary, or permanent injunctive relief or any other form of equitable relief, shall be settled by binding arbitration in Hartford, CT administered by the American Arbitration Association ("AAA") and conducted by a sole arbitrator in accordance with the AAA's Commercial Arbitration Rules ("Rules"). The arbitration shall be governed by the Federal Arbitration Act, 9 U.S.C. §§ 1-16, to the exclusion of state laws inconsistent therewith or that would produce a different result, and judgment on the award rendered by the arbitrator may be entered by any court having jurisdiction thereof. Except as may be required by law or to the extent necessary in connection with a judicial challenge, or enforcement of an award, neither a Party nor the arbitrator may disclose the existence, content, record or results of an arbitration. Fourteen (14) calendar days before the hearing, the Parties will exchange and provide to the arbitrator (a) a list of witnesses they intend to call (including any experts) with a short description of the anticipated direct testimony of each witness and an estimate of the length thereof, and (b) pre-marked copies of all exhibits they intend to use at the hearing. Depositions for discovery purposes shall not be permitted. The arbitrator may award only monetary relief and is not empowered to award damages other than compensatory damages.

15.2   <u>Survival</u>. The provisions of this Section 15 shall survive expiration or termination of this Agreement, regardless of the cause giving rise thereto.

## 16.0   Subcontractors

16.1   <u>Aetna</u>. Aetna may not use any subcontractors to perform any member-facing Patient Management functions without the prior written approval of Customer and TPA. All other Aetna Services may, at Aetna's discretion, be performed directly by it or wholly or in part through a subsidiary or affiliate or under a contract with an organization of Aetna's choosing. Aetna will remain liable for all Aetna Services under this Agreement.

16.2   <u>TPA</u>. TPA may not use any subcontractors to perform any Members Services or Claims Administration Services under this Agreement without the prior written approval of Aetna. All other TPA Services may, at TPA's discretion, be performed directly by it or wholly or in part under a contract with an organization of TPA's choosing. TPA will remain liable for all TPA Services under this Agreement.

**17.0    General Provisions**

17.1    <u>HIPAA Business Associate Provisions</u>.  For purposes of HIPAA, both Aetna and TPA are "business associates" of the Customer.  As such, both parties will enter into a Business Associate Agreement with the Customer meeting the requirements of the Privacy Rules issued under HIPAA.

17.2    <u>Employee Notices</u>.  Customer agrees to furnish each Member covered by the Plan written notice, satisfactory to Aetna, that Customer has complete financial liability for the payment of Plan benefits.  Customer agrees to indemnify Aetna and hold Aetna harmless against any and all loss, damage and expense (including reasonable attorneys' fees) sustained by Aetna as a result of any failure by Customer to give such notice.

17.3    <u>Amendments</u>.  This Agreement constitutes the entire understanding of the Parties hereto and no changes, amendments or alterations shall be effective unless signed by both Parties, except as expressly provided herein.

17.4    <u>Communications</u>.  Aetna and TPA shall be entitled to rely upon any communication believed by them to be genuine and to have been signed or presented by the proper party or parties.

17.5    <u>Liability</u>.  Except with respect to Third Party Claims subject to the indemnification provisions herein, (i) any Party's liability, if any, for damages to the other Party for any cause whatsoever arising out of or related to this Agreement, and regardless of the form of the action, shall be limited to the damaged Party's actual damages; and  (ii) no Party shall be liable for any indirect, incidental, punitive, exemplary, special or consequential damages of any kind whatsoever sustained as a result of a breach of this Agreement or any action, inaction, alleged tortious conduct, or delay by the other Party.

17.6    <u>Severability</u>.  Any determination that any provision of this Agreement or any application thereof is invalid, illegal or unenforceable in any respect in any instance shall not affect the validity, legality and enforceability of such provision in any other instance, or the validity, legality or enforceability of any other provision of this Agreement.  Neither Party shall assert or claim that this Agreement or any provision hereof is void or voidable if such Party performs under this Agreement without prompt and timely written objection.

17.7    <u>Successors; Assignment</u>.  This Agreement relates solely to the provision of services set forth herein and does not apply to any other organization which succeeds to a Party's assets, by merger, acquisition or otherwise.  No Party may assign its rights or delegate its duties and obligations under this Agreement without the prior written consent of the other Parties, except that Aetna may assign this agreement to any Affiliate.  Aetna acknowledges that the some of the obligations and services of Aetna hereunder are performed by Affiliates of Aetna.

17.8    <u>Notices</u>.  Unless otherwise specified herein, any notice required to be given pursuant to the terms and provisions hereof shall be effective only if given in writing and sent by overnight delivery service with proof of receipt, or by certified mail return receipt requested.  Notices shall be sent to the following addresses (which may be changed by giving notice in conformity with this Section 17.12):

To TPA at:

and to Aetna at:                          Jesse Gunning
                                          1550 Pond Road Suite 300
                                          Mail Code F215
                                          Allentown, PA 18104

17.9    <u>Force Majeure</u>.  If either Party shall be delayed or interrupted in the performance or completion of its obligations hereunder by any act, neglect or default of the other Party, or by an embargo, war, act of terror, riot, incendiary, fire, flood, earthquake, epidemic or other calamity, act of God or of the public enemy, governmental act (including, but not restricted to, any government priority, preference, requisition, allocation, interference, restraint or seizure, or the necessity of complying with any governmental order, directive, ruling or request) then the time of completion

specified herein shall be extended for a period equivalent to the time lost as a result thereof.  This Section 17.13 shall not apply to either Party's obligations to pay any amounts owing to the other Party, or to any strike or labor dispute involving such Party or the other Party.

17.10  Survival.  In addition to those provisions which by their terms survive expiration or termination of this Agreement (e.g. 3.9, 3.13, 5.8, 5.11, 11.0, 12.7 and 15.0), Sections 10.0 and 14.0 shall survive expiration or termination of this Agreement, regardless of the cause giving rise thereto.

17.11  Mutual Drafting.  The Parties are sophisticated and have been represented by lawyers who have carefully negotiated the provisions thereof.  As a consequence, the Parties do not intend that the presumptions of any laws or rules relating to the interpretation of contracts against the drafter of any particular clause should be applied to this Agreement and therefore waive their effects.

17.12  Counterparts.  This Agreement may be executed in one or more counterparts, all of which shall be considered one and the same agreement, and shall become effective when one or more such counterparts have been signed by each of the Parties and delivered to the other Parties.

17.13  Entire Agreement.  This Agreement (including any attached Appendices, schedules and Attachments) constitutes the complete and sole contract between the Parties regarding the subject hereof and supersedes any and all prior or contemporaneous oral or written representations, communications, proposals or agreements not expressly included herein and may not be contradicted or varied by evidence of prior, contemporaneous or subsequent oral representations, communications, proposals, agreements, prior course of dealings or discussions of the Parties.  There are no oral agreements between the Parties.

17.14  Miscellaneous.  This Agreement shall be governed by and interpreted in accordance with applicable federal law, including but not limited to ERISA.  To the extent such federal law does not govern, this Agreement shall be governed by Connecticut law.  No delay or failure of either party in exercising any right hereunder shall be deemed to constitute a waiver of that right.  There are no intended third party beneficiaries of this Agreement.  The headings in this Agreement are for reference only and shall not affect the interpretation or construction of this Agreement.

**IN WITNESS WHEREOF**, the undersigned Parties have executed this Agreement by their duly authorized officers, intending to be legally bound hereby.

("CUSTOMER")

**AETNA LIFE INSURANCE COMPANY**
("AETNA")

By:

By:

_____

Name:_____

Title:_____

Mark T. Bertolini
Chairman, Chief Executive Officer and President

Date:_____

Date:_____

Address:_____

City:_____
_____

Financial Verification:__

State:_____Zp:_____

**Attachments to Aetna Joint Claim Administration**

**Agreement Number TPA 863860, between**

**Aetna Life Insurance Company**

**and**

**Omni Administrators Inc.**

Attachment 2.3

## Aetna Joint Claim Administration Workflow



*Member eligibility will also be fed to Aetna

United Benefit Fund

**Attachment 3.1**

**Aetna Claims Adjudication Performance Standards**

*Claim Intake, editing & repricing*

Providers (and, in most cases, members) will direct their claims to Aetna.  Providers will submit to Aetna in the same manner they are accustomed to for other Aetna members today.  Claims that are received via paper are scanned/keyed to create an electronic record.  Claims are identified via member eligibility (as noted below) and directed to the dedicated Aetna Joint Claim Administration claim re-pricing unit.  Here Aetna will:

- ■  Apply claim editing rules

- ■  Match to our provider file and apply to appropriate pricing, and

- ■  Check for precert (if appropriate) in which case we will indicate the appropriate necessary information on the claim

    Our system also includes additional

- ■  "Red Flag" provider editing for utilization/fraud control purposes

- ■  Review for duplicate claims (although the Plan Sponsor/TPA may wish to retain this editing function for production of member EOBs)

*File Transfer*

Aetna will send a file of re-priced and edited claims on a daily basis to the Plan sponsor/TPA.  The claim file will contain most of the information found on UB92 of HCFA forms for each new claim record processed through the prior evening's work.  Aetna's current preferred means of transfer of data between outside parties and Aetna is Tumbleweed's SecureTransport™ client, as it offers the most options and functionality.  Aetna provides this software at no cost to the customer.  Key aspects of our service include:

- ■  Daily repriced claim file sent via Secured FTP using fixed format ASCII flat files

- ■  Provider file sent via Secured FTP using fixed format ASCII flat files

- ■  Check number file (format and frequency under development)

- ■  Daily loading of the Benefit Applied file provided by the Plan Sponsor/TPA

- ■  At no cost Aetna will provide the software for the SecureTransport™ client

*Provider Payment and Remittance  - see also Provider Service Administration*

Upon receipt of the daily Benefit Applied file from the Plan Sponsor/TPA, Aetna will perform provider payment activities including:

- ■  Production of provider drafts (including bulk payments)

- ■  Production and distribution of Explanation of Provider Payments (EPP)

- ■  Claim accounting, draft reconciliation, and provider 1099 reporting.

**Attachment 3.3**

**Provider Service Center**

Communications between the Aetna Provider Service Center and TPA shall be conducted by telephone or through secure e-mail.  The secure e-mail connection shall be established in accordance with Aetna's information security standards.

If a provider contacts TPA, the Provider will be instructed to call the Aetna Provider Service Center at 1-888-MD-Aetna (1-888-632-3862).

If Aetna has questions on benefits, accumulators and/or benefit application, Aetna will contact TPA by telephone.  If TPA is not available by telephone, a secure e-mail will be sent requiring a 24 hour TAT.

**Attachment 3.5**

**Patient Management**

II.  **Aetna Health Connections<sup>SM</sup> Services:**

1.  **Utilization Management Inpatient and Outpatient Precertification:**

    **Inpatient Precertification:**  A process for collecting information prior to an inpatient confinement.  The precertification process permits eligibility verification/confirmation, determination of coverage, and communication with the physician and/or Member in advance of the procedure, service or supply.  Precertification also allows Aetna to identify Members for pre-service discharge planning and to identify and register Members for specialized programs such as Case Management and Disease Management.

    **Outpatient Precertification (not applicable to Indemnity or PPO Products):**  A process for reviewing selected ambulatory procedures, surgeries, diagnostic tests, home health care, and durable medical equipment.  The goals of this process, which may vary based on the requirements of any Aexcel Product(s) elected, are:

    a.  Assessment of the level and quality of the services provided**;**

    b.  Determination of the coverage of the proposed treatment;

    c.  Identification of care and treatment alternatives, when appropriate; and

    d.  Identification of Members for referral to specialized programs.

2.  **Utilization Management Concurrent Review:**  Concurrent review encompasses those aspects of patient management that take place during the provision of services at an inpatient level of care or during an ongoing outpatient course of treatment.

    Inpatient concurrent review is conducted telephonically or on-site at the facility where care is delivered.

    The concurrent review process includes:

    a.  Obtaining necessary information from practitioners and providers regarding the care being provided to Members;

    b.  Assessing the clinical condition of Members and the ongoing provision of medical services and treatments to determine benefit coverage;

    c.  Notifying practitioners and providers of coverage determinations in the appropriate manner and within the appropriate time frame;

    d.  Identifying continuing care needs early in the inpatient stay to facilitate discharge to the appropriate setting; and

    e.  Identifying Members for referral to covered specialty programs such as Case Management, Behavioral Health and Disease Management.

3.  **Utilization Management Discharge Planning:**  This is an interdisciplinary process that assists Members as their medical condition changes and they transition from the inpatient setting.  Discharge planning may be initiated at any stage of the Patient Management process.  Assessment of potential discharge planning needs begins at the time of notification, and coordination of discharge plans commences upon identification of post discharge needs during precertification or concurrent review.  This program may include evaluation of alternate care settings and identification of care needed after discharge.  The goal is to provide continuing quality of care and to avoid delay in discharge due to lack of outpatient support.

4.  **Utilization Management Retrospective Review:**  Retrospective review is the process of reviewing coverage requests for initial certification after the service has been provided or when the Member is no longer an inpatient or receiving the service.  Retrospective review includes making coverage determinations for the

appropriate level of service consistent with the Member's needs at the time the service was provided after confirming eligibility and the availability of benefits within the Member's benefit plan.

5. **Next Generation Case Management:**  The Aetna Case Management program is a collaborative process of assessment, planning, facilitation and advocacy for options and services to meet an individual's health needs through communication and available resources to promote quality, cost-effective outcomes.

Those Members with diagnoses and clinical situations where a specialized nurse, working with the Member and their physician, can make an impact to the course or outcome of care and/or reduce medical cost will be accepted into the program.  Case Management staff strives to enhance the Member's quality of life, support continuity of care, facilitate provision of services in the appropriate setting and manage cost and resource allocation to promote quality, cost-effective outcomes.  Case Managers collaborate with the Member, family, caregiver, physician and healthcare provider community to coordinate care, with a focus on closing gaps in the Member's care and maximizing quality outcomes.

Aetna operates two types of case management programs:

a.  <u>Complex Case Management</u> targets Members who have already experienced a health event and are likely to have care and benefit coordination needs after the event.  The objective for Case Managers is to identify care or benefit coordination needs which lead to faster/better clinical outcomes and/or reduced medical costs.

b.  <u>Proactive Case Management</u> targets Members who are misusing, over-using or under-using the health care system, leading them towards avoidable and costly health events.  This program's objective is to confirm gaps in Members' care leading to their over-use, misuse or under-use, and working with the Member and their physician to close those gaps.

6. **Infertility Case Management:**  Aetna's Infertility Case Management Program provides education and information resources for Members who are experiencing infertility.  Depending on the plan selected, the program may guide eligible Members to a select network of infertility providers for covered or non-covered services.  If the services are covered, Aetna's Infertility Management Unit issues any appropriate authorizations required under the Member's plan.

Aetna's Basic Infertility Program coordinates covered diagnostic services and treatment of the underlying medical causes of infertility, helps Members understand complex infertility treatments and helps control treatment costs through care coordination and patient education.

7. **National Medical Excellence/Institutes of Excellence Program:**  The National Medical Excellence program was created to help arrange for access to effective care for Members with particularly difficult conditions requiring transplants or complex cardiac, neurosurgical or other procedures, when the needed care is not available in a Member's service area.  The program utilizes a national network of experienced providers and facilities selected based on their volume of cases and outcomes.  The National Medical Excellence Unit provides specialized Case Management through the use of nurse case managers, each with procedure and/or disease specific training.

The Aetna **Institutes of Excellence (IOE)** transplant network was established to enhance quality standards and lower the cost of transplant care for Aetna Members.  It is made up of a select group of hospitals and transplant centers that meet quality standards for the number of transplants performed and their outcomes, as well as access criteria for Aetna Members.  IOE facilities have agreed to specific contractual terms and conditions and are selected and recognized by transplant type.  The following criteria is applied to each facility prior to being selected for the IOE network.

a.  <u>Quality</u> - enhanced organ-specific credentialing and quality standards.

b.  <u>Access</u> - the national availability of, and need for, transplant facilities on a transplant-specific basis.  Need is assessed relative to the distribution of membership and relative incidence of transplant types.

c.  <u>Cost</u> - provider contracts reflect lower negotiated rates.

8. **MedQuery[SM]:** The MedQuery program is a data-mining initiative, aimed at turning Aetna's data into information that physicians can use to improve clinical quality and patient safety. Through the program, Aetna's data is analyzed and the resulting information gives physicians access to a broader view of Aetna Member's clinical profile. The data which fuels this program includes claim history, current medical claims, pharmacy, physician encounter reports, and patient demographics. Data is mined on a weekly basis and compared with evidence-based treatment recommendations to find possible errors, gaps, omissions (meaning perhaps that certain accepted treatment regimens may be absent) or co-missions in care (meaning, for example, drug-to-drug or drug-to-disease interactions). When MedQuery identifies an Aetna Member whose data indicates that there may be an opportunity to improve care, outreach is made to the treating physician based on the apparent urgency of the situation. For customers who have elected the buy-up of MedQuery with Member Messaging feature, in certain situations outreach will be made directly to the Member by MedQuery requesting that the Member discuss with their physician, specific opportunities to improve their care.

9. **Aetna Health Connections[SM] Disease Management:** Aetna Health Connections[SM] is Aetna's new approach to medical management, and is a critical component of Aetna's ongoing commitment to improve care for Members. Most traditional medical management programs focus only on the 20% of Members who are typically in poor health and represent the majority of medical costs. Aetna Health Connections[SM] will continue to identify those Members at highest risks of deteriorating health, but expands its focus and programs to include well Members, too. Regardless of their health status, Members will find that Aetna offers programs or web-based tools to help them become more informed health consumers, more aware of their own health status, and more engaged in taking action to improve or maintain their health.

Aetna Health Connections[SM] also includes all of Aetna's existing medical management programs. However, some of the new and enhanced programs include:

   a. Enhanced Case Management Services;

   b. Redesigned and enhanced wellness offerings;

   c. A new, broadened disease management program.

Aetna Health Connections[SM] Disease Management is an enhancement to Aetna's medical/disease management spectrum and will target Members at risk for high cost who have actionable gaps in care, engage the Members at the appropriate level, and close gaps in care in order to avoid complications, improve clinical outcomes and demonstrate medical cost savings.

While traditional disease management is focused on delivering education to Members about a specific chronic condition, Aetna Health Connections[SM] focuses on the entire person with specific interventions driven by the CareEngine System.

10. **Healthy Outlook Program:** This program directs focused support and resources toward Members within a defined disease population, as determined by Aetna. The goal of this program is to provide disease management services for Members with chronic conditions, in an effort to improve health status and quality of life. This program identifies Member populations at risk for certain chronic diseases, with a focus on education for the Member and provider to maximize positive health outcomes. This program offers individual disease management focused on assisting Members to identify and address health risk factors associated with their chronic condition. It also offers Members the opportunity to order educational materials that contain information about certain chronic diseases or conditions (e.g., asthma, congestive heart failure, coronary artery disease, and diabetes).

11. **Moms-To-Babies Maternity Management Program™:** Moms-to-Babies Maternity Management Program™ offers many benefits. Through an intensive focus on prevention, early treatment and education, the program provides women with the tools to help improve pregnancy outcomes and control maternity-care costs through a variety of services - including risk identification, care coordination by obstetrical nurses and board certified OB/GYNs and Member support.

12. **Informed Health Line:** Informed Health Line (IHL) provides Members with a toll-free 24-hour/7 day health telephonic access to registered nurses experienced in providing information on a variety of health topics. The nurses can contribute to informed health care decision-making and optimal patient/provider relationships through coaching and support. The nurses cannot diagnose, prescribe treatment or give medical advice but they can provide Members with information on a broad spectrum of health issues, including self-care, prevention,

chronic conditions and complex medical situations.  Members can also access the Audio Health Library, a recorded collection of more than 2,000 health topics, available in English and Spanish.  Members can register on Aetna Navigator, our Member and consumer website, and access Healthwise Knowledgebase, another valuable resource of information on thousands of health topics.

The range of available service components are purchased according to the following categories:

a.  **Nurseline 1-800# Only.**  This includes toll-free telephone access to the Informed Health Line Nurseline.

b.  **Service Plus**.  This includes the following components:

    i.   Toll-free telephone access to the Informed Health Line Nurseline.
    ii.  Introductory program announcement letter.
    iii. Reminder postcards mailed directly to Members' homes through the year.
    iv.  Semi-annual Activity Utilization (Customer reporting) Report.

c.  **Optional Service Features**.  These features may be purchased in conjunction with the "Service Plus" package and include:

    i.   Additional introductory kit including Informed Health handbook, flyer with attached wallet cards, refrigerator magnet and package.
    ii   Annual member survey and Comprehensive Results Report which reflects outcomes, Member satisfaction and savings results.

13.  **Wellness Counseling:**  This service provides personalized decision support, educational materials, and targeted nurse outreach coaching Members to a healthier lifestyle through behavioral modification, education, and facilitation of the most effective utilization of Members' benefits.  Additionally, action plans may be developed and reviewed with Members, as appropriate.  Members are identified for participation in wellness counseling through completion of the Simple Steps To A Healthier Life health risk assessment.

14.  **Healthy Body, Healthy Weight:**  This service is a voluntary, one-year program.  Eligible Members access the program by taking the Web-based Simple Steps To A Healthier Life® health risk assessment.  Participants are categorized as low, intermediate or high-risk.  The frequency and intensity of program interactions are determined based on the Members' risk stratification and health status.

All program participants receive an initial call from an Aetna registered nurse/nutritionist who will:

a.  Provide information on nutrition, healthy menus and exercise.

b.  Review available health information resources.

c.  Provide motivational tools, including a pedometer and discounts to a participating community-based weight loss program.

d.  Identify opportunities for referral to other Aetna programs (e.g., Disease Management, Case Management, Behavioral Health).

e.  Place a follow-up call to review the participant's progress and offer support.

f.  Based on their individual risk factors and health status, participants may also receive:

    i.   Ongoing telephone outreach from and access to a weight loss therapist, to include a nutritional and "readiness-to-change" assessment.
    ii.  Additional motivational tools to encourage participation.
    iii. Regular follow ups at 3-, 6-, and 9-month intervals to monitor weight loss, medication compliance (if applicable) and adherence to recommended exercise program.

15.  **Enhanced Member Outreach Program**[SM]**:**  This is a program, which provides the Customer the option to purchase additional clinical services beyond Aetna's base patient management programs.

<u>For Customers who have elected Level One Only</u>:

Aetna will engage in outbound Member outreach calls to provide education and coaching to Members based on specific criteria. For example, nurses will contact Members by telephone before and after all scheduled overnight hospital stays (excluding maternity confinements). By reaching out to Members before and after scheduled hospital confinements, Aetna will provide Members with ways to better manage their health events, such as:

    a.   Assessment of a Member's preparedness for admission.

    b.   Evaluation for potential discharge planning needs.

    c.   Better education on how to avoid post-surgery complications through medication and treatment plan compliance.

For Customers who have elected a buy-up to Level Two (this is in addition to Level One):

Customers have the flexibility of selecting from the following 4 categories for additional outreach calls:

    a.   Frequent emergency room visits.

    b.   Pharmacy non-compliance (Aetna pharmacy data or imported pharmacy data required).

    c.   Multiple visits to multiple providers.

    d.   Non-compliant behavior (Med-Query program required).

16. **Healthy Insights Member Newsletter:** *Healthy Insights* is a newsletter that provides information to Members about Aetna's products, services and resources. It is the vehicle chosen to deliver many of Aetna's NCQA-required notices to its membership.

17. **Preventive (Health and Wellness) Mailings:** To support Aetna's customers' ongoing health and wellness strategies, Aetna sends reminders to HMO-based plan Members by mail and electronically at certain ages and stages of their lives. These reminders, which are sent at no cost to the customer, make Members aware of important regular health screenings and other preventive services. They also assist Aetna with meeting regulatory and accreditation requirements. They include:

    a.   Adolescent Immunization Reminder.

    b.   Childhood Immunization Reminder.

    c.   Preventive Reminder for Influenza and Pneumococcal Vaccines and Colorectal Cancer Screening.

    d.   Hypertension and Cholesterol Management Reminders.

    e.   Women's Health Recommended Preventive Care Guidelines (for women ages 18-39).

    f.   Women's Health Recommended Preventive Care Guidelines (for women ages 40+).

In addition, Aetna will offer the following optional Health and Wellness mailings to customers:

    a.   Women's Health Recommended Preventive Care Guidelines (for women ages 18-39 and women ages 40+). (Available to customers with PPO based plans.)

    b.   "How to Talk to Your Doctor" booklet (in English and Spanish). (Available to HMO and PPO customers.)

18. **Worksite Services:** Aetna's Worksite Services help employers engage and educate their employees about wellness at the workplace. These offerings provide turnkey solutions to support employers' overall wellness strategies, increase consumerism and promote informed-decision making. Offerings include:

    a.   Onsite Health Screenings (blood pressure, diabetes, cholesterol, DMI, etc.).

    b.   Onsite Workshops:  education on specific health conditions and diseases (cardiovascular disease, diabetes, cancer screening, etc.).

    c.   Special Awareness Campaigns:  health campaigns that can be customized to meet customer needs.

    d.   Worksite Educational Resources:  turnkey educational programs that focus on Women's Health, Men's Health and Children's Health.

**19.  Simple Steps To A Healthier Life®:**  Aetna InteliHealth Inc. ("Aetna InteliHealth"), a Delaware corporation and an indirect wholly-owned subsidiary of Aetna Inc. and an affiliate of Aetna Life Insurance Company ("Aetna") (Aetna InteliHealth and Aetna are collectively referred to as "InteliHealth"), has developed an internet-based comprehensive management information resource, known as "Simple Steps To A Healthier Life" (the "Life Program") and located at www.simplestepslife.com, to be hosted by Aetna InteliHealth and designed for the eligible employees and dependants of subscribing employers (the "Users").  The Life Program is an online service that offers advice relating to disease prevention, condition education, behavior modification and health promotion programs that may contribute to the health and productivity of employees.  The Life Program allows Users to create a health risk assessment profile that generates a personalized health action plan.  The health action plan identifies certain potential risks and directs participants to personalized programs and services encouraging healthy lifestyle changes.

Refer to Appendix B for features, system requirements and certain terms and conditions for use of this service. Customer affirms that by selecting Simple Steps To A Healthier Life® on the Service and Fee Schedule attached to and made a part of the Services Agreement, Customer agrees to the terms and conditions of use set forth in Appendix B.

**20.  Personal Health Record:**  Personal Health Record (PHR) is a collection of personal health information about an individual Member that is stored electronically.  The distinguishing feature of the PHR is that it is designed for the Member to maintain his or her own comprehensive record.  The focus is on the Member.  In a PHR developed by a health plan, health information is commonly derived from claims data that the health plan collects in the course of its plan administration activities.  Health information may be supplemented by information entered by the health plan Member.

Two distinct versions of the Aetna PHR are available:

    a.   A basic claims-based version of the PHR, *Health History Report*, will be available to all subscribers and their covered family Members through Aetna Navigator™.  The Health History Report is a centralized, online summary of a Member's health-related activity that is claims-driven only.  A subscriber cannot input additional personal health information within their Health History Report.

    b.   An optional Aetna *CareEngine*®-Powered PHR (for customers who have elected this buy-up option).  The *CareEngine*®-Powered PHR combines the basic functions of a PHR with a personalized, proactive, evidence-based messaging platform.  It is pre-populated with health information from Aetna's claims system and the Member can also input personal health information, for example questions answered in an online health assessment.  It is much more personalized than the Health History Report.  The Aetna *CareEngine*®-Powered PHR also offers:

        i.   Personalized messaging and alerts.
        ii.   Original condition-specific content developed and reviewed by doctors from the Harvard Medical School and the Aetna InteliHealth editorial team.
        iii.   Aetna's personalized, interactive health and wellness program, Simple Steps To A Healthier **Life®**.
        iv.   Informed Care Decisions, an online decision support tool that provides treatment information for many diseases and conditions.
        v.   Rewards programs to encourage Members to enter their personal information and create a more complete picture of their health.

**21.  Focused Psychiatric Review (FPR):**  This is a program which provides phone-based utilization review of inpatient behavioral health (mental health and chemical dependency) admissions intended to contain confinements to appropriate lengths, assure medical necessity and appropriateness of care, and control costs. This program includes a precertification process which collects information prior to an inpatient confinement, determination of the coverage of the proposed treatment, assessment of the level of services provided, as well as concurrent review which monitors a Member's progress after a patient is admitted.

22. **Managed Behavioral Health:** This is a set of services that includes both inpatient and outpatient care management.

    a.    Inpatient Care Management provides phone-based utilization review of inpatient behavioral health (mental health and chemical dependency) admissions intended to contain confinements to appropriate lengths, assure medical necessity and appropriateness of care, and control costs. Inpatient Care Management provides precertification, concurrent review and discharge planning of inpatient behavioral health admissions. These services also include identification of Members for referral to specialized programs such as Behavioral Health Disease Management programs, Intensive Case Management or Medical Psychiatric Case Management.

    b.    Outpatient Care Management includes precertification on a limited number of selected services. Where precertification is required, the request for services is reviewed against a set of criteria established by clinical experts and administered by trained staff, in order to determine coverage of the proposed treatment. Where precertification is not required, cases are identified for outpatient case management through the application of clinical algorithms.

23. **Intensive Case Management:** This program is designed for Members who have complex behavioral health (mental health and chemical dependency) conditions that require a specialized approach in order for care to be effective in relieving symptoms and improving the quality of their lives. Intensive Case Management is a process of identifying these high risk persons, assessing opportunities to coordinate care among multiple providers, identifying opportunities to improve treatment compliance, and facilitating coordination among support groups and supportive family members. These activities are designed to improve the individual Member's clinical condition and lower readmission rates.

24. **Medical Psychiatric Case Management:** The Medical Psychiatric Case Management program (Med Psych) is designed to help Members who have simultaneous medical and behavioral health conditions. As one condition may affect the successful treatment of the other, the need for care coordination between Medical Management nurses and Behavioral Health case managers is high. Members enrolled in this program are identified through the efforts of our medical and behavioral health case/disease managers who screen for co-morbid conditions. Additionally, enrollees can be identified through Aetna's predictive models and clinical algorithms. The Med Psych case managers provide service coordination with medical case managers as well as follow-up support for the Member.

25. **Depression Disease Management:** This program facilitates the application of evidence-based treatment intervention and enhances the cost-effective use of pharmacy benefits to maximize responses to antidepressant medication. The program consists of the following components: self-assessment for depression and co-morbid disorders; online services related to depression and its treatment; decision-support tools; and case management telephonic outreach and coordination with pharmacy, primary care physicians and behavioral health professionals to coordinate care and access to services as well as enhance compliance.

26. **Anxiety Disease Management:** This program facilitates the application of evidence-based treatment interventions and enhances the cost-effective use of pharmacy benefits to maximize management of, and recovery from, the symptoms of anxiety disorders. Members are identified for this program, using claims data and referrals and are then screened by a behavioral health professional to determine appropriate intervention. For those Members identified with chronic anxiety diagnoses and/or medical diagnoses with associated anxiety, case management may be deemed appropriate.

27. **Alcohol Disease Management:** This program varies to best meet the needs of the Member who has been identified, early in the course of the disease, the more chronic alcoholic, or an individual with another psychiatric disorder such as depression. As appropriate, clinicians with expertise in alcohol treatment reach out to the Member to provide support and education using case management and relapse prevention strategies. There can be collaboration with behavioral health providers, the primary care physician or family members and facilitated linkages for services.

28. **Psychiatric Disability Case Management:** This holistic program helps Members on disability who struggle with psychiatric problems by assessing their individual needs, coordinating appropriate treatment, and developing an effective overall case management plan. The program offers face-to-face evaluation during the first week of disability; individualized assessment and case management plan; one disability care clinician to manage the case and serve as the point of contact in coordinating care; access to specialty-trained disability

network health care professionals; support for the transition back to work and post-employment follow up with Member and physician to ensure care needs are being met.

29  **Quit Tobacco:**  This program is designated to provide helpful tools to Members who want to stop using tobacco.  Members may opt to participate in the voluntary, limited-duration program by calling a toll-free number, or by using Aetna's Navigator internet site.  The program offers Members access to telephonic counseling, educational materials, including a self-help guide, and interactive web tools.  Members who have registered for the program, completed the health assessment questionnaire and completed certain coaching sessions may also have access to the limited supply of over the counter nicotine replacement therapy items (gum, patch and lozenge).

30.  **Aetna's Rx Check:**  Rx Check is a suite of 6 rapid retrospective clinical drug utilization review programs designed to promote Member safety and increase cost-savings.  Programs generate letters to specific physicians and Members who meet program criteria informing them of opportunities to improve quality and/or save money.  The six programs are:

a.  **Acute Frequency** - A prescription filled for a multiple daily dose of a proton pump inhibitor which may be able to be controlled with a once-daily dosing.

b.  **Therapeutic Duplication** - Prescriptions filled for two medications in the same therapeutic class.

c.  **Drug Interaction** - Prescriptions filled for any of approximately sixty medication combinations that have been identified as having a "clinically significant" interaction when used together.

d.  **High Utilization** - Multiple prescriptions filled for medications that potentially may be misused.

e.  **Brand to Generic** - Prescriptions filled for brand-name medications that have A-rated generic equivalents available.

f.  **Retail to Mail** - Program will educate Members in selected plans, who fill maintenance medications at a participating retail pharmacy, of the cost savings they can realize by using Aetna Rx Home Delivery on future prescriptions.

**III.  Network Access Services:**

**A.**  Aetna shall provide Members with access to Aetna's network hospitals, physicians and other health care providers ("Network Providers") who have agreed to provide services at agreed upon rates and are participating in the Plan covering the Members (which, for any Aexcel product(s) elected, may be subject to further criteria depending on the Product model).

**B.**  Aetna reserves the right to set a minimum plan benefit design structure for in-area network claims to which Customer must comply in order to participate in Aetna's Network Program.

**C.**  Aetna will provide Customer with physician directories in an amount up to 100% of eligible Employees plus 20% of the current enrolled Employees.  Customer shall pay the costs of providing any additional directories which it requests.

**IV.  Subrogation Services:**

Aetna will provide assistance to Customer for subrogation/reimbursement services, which will be delegated to an organization of Aetna's choosing in accordance with the Section 19 of the General Conditions Addendum.  Subrogation/ reimbursement language must be included in the Customer's summary plan description (SPD) and the SPD must be finalized and available to Customer's employees before subrogation/reimbursement matters can be investigated and pursued.

Aetna or its contracted representative shall retain a percentage of any monies collected to recover reasonable expenses incurred while pursuing subrogation/reimbursement recoveries.  Reasonable expenses include but are not limited to (a) collection agency fees, (b) police and fire reports, (c) asset checks, (d) locate reports, and (e) attorneys' fees.  Aetna shall advise Customer if the pursuit of recovery requires formal litigation.  In such event, Customer shall have the option to instruct Aetna to cease further action toward recovery.

Aetna will credit net recoveries to Customer's accounting.

Aetna has the exclusive discretion: (a) to decide whether to pursue potential recoveries on subrogation/reimbursement claims; (b) to determine the reasonable methods used to pursue recoveries on such claims, subject to the proviso with respect to formal litigation above; and (c) to decide whether to accept any settlement offer relating to a subrogation/reimbursement claim.

If no monies are recovered as a result of the subrogation/reimbursement pursuit, no fees or expenses incurred by Aetna or its contracted representative for subrogation/reimbursement activities will be charged to Customer.

If Customer notifies Aetna of its election to terminate the Services provided by Aetna, all claims identified for potential subrogation/reimbursement recovery prior to the date notification of such election is received (i.e., pending claims) shall be handled to conclusion by Aetna and shall be governed by the terms of this provision, unless otherwise mutually agreed. Aetna will not investigate or handle subrogation/reimbursement cases or recoveries on any matters identified after Customer's termination date.

**Attachment 3.7**

**Plan Design Requirements**

➤ Full benefits (including BH, IOE requirement)

➤ Aetna provides the Medical Management

➤ Aetna's standard networks for the Choice POS and PPO (Open Access) products

➤ 20% differential in vs. out-of-network; at least 70% in-network benefit

➤ Key provisions/limitations, e.g.,

– Lifetime max – Unlimited (or $2M minimum)

– Preventive care – covered both in-network and out-of-network

– BH Benefits – at least 30 days in-patient and  20 days out-patient

– Transplants – no $ limits or extended waiting periods

– Commonly provided benefits included, e.g., HHC, SNF

*Attachment 3.12*
*NATIONAL ADVANTAGE PROGRAM **ADDENDUM***

The National Advantage Program ("NAP") is an addendum to the Aetna Joint Claim Administration, Aetna-TPA Administrative Services Agreement Number TPA-863860 between Aetna and TPA (as identified therein) (the "Agreement") and is incorporated into that Agreement by reference.

**National Advantage Program**

A.   Summary

NAP provides access to contracted rates for many medical claims that would otherwise be paid as billed under indemnity plans, the out-of-network portion of managed care plans, or for emergency/medically necessary services not provided within the network.  When available, these contracted rates will produce savings for the Customer.

Aetna contracts with several national third-party vendors to access their contracted rates.  In addition, a significant number of Aetna directly-contracted rates are available for members with indemnity benefits.  Aetna will access third-party vendor rates where Aetna directly-contracted rates are not available.  If no contracted rate is available, Aetna will attempt to negotiate an Ad-Hoc Rate (case specific discount) with non-NAP participating providers for certain larger claims.

B.  Claim Submission/Payment Process

Providers should bill Aetna directly for Covered Services.  The Member should not make payment at the time of service.  When the Provider submits the claim, Aetna will process it at the contracted rate (when applicable) and reflect the contracted amount in any explanation of payments.  The Member would then be responsible for any applicable coinsurance, deductible or non-covered service, based upon the plan of benefits.

II. Terms and Conditions

A.   Customer Charges For Provider Payments

Subject to the terms herein, Aetna agrees that for Covered Services rendered by a Provider for which Aetna has a) accessed a contracted rate, or b) negotiated an Ad-Hoc rate, or c) applied a Reasonable Charge Amount for facility services, the Customer shall be charged the amount paid to the Provider.  This amount shall be equal to the contracted rate, Ad-Hoc Rate, or Reasonable Charge Amount less any payments made by the Member in accordance with the Plan.

B.   Access Fees

1.   As compensation for the services provided by Aetna under NAP for savings achieved, TPA understands and agrees that the Customer shall pay an Access Fee to Aetna as described in the Service and Fee Schedule (excluding Aggregate Savings with respect to claims for which Aetna is liable for funding, e.g., claims in excess of an individual or aggregate stop loss point).

2.   Access Fees shall be paid by the Bank to Aetna via wire transfer or such other reasonable transfer method agreed upon by Aetna and the Bank.  The Customer will agree to provide funds through its designated bank sufficient to satisfy the Access Fee in accordance with the banking agreement between the Customer and the Bank, i.e., Access Fees will be included in the request from the Bank for payment/funding of claims.

3.  An Access Fee will be credited to the Customer for any Aggregate Savings subsequently reduced or eliminated for which the Customer has already paid an Access Fee.

4.  Aetna shall provide a quarterly report of Aggregate Savings and Access Fees.  Access Fees may be included with claims in other reports.

C.    Member Information Regarding National Advantage Program

For most products/plans, the Customer will inform Members of the availability of NAP, either directly or through TPA.  Further, a Customer's Plan document language defining reasonable charge or recognized charge must conform to Aetna requirements. Aetna shall provide information regarding participating Providers on DocFind®, Aetna's online provider listing, on our website at www.Aetna.com or by other comparable means.

## D.   Definitions

As used herein:

"Access Fee" means the amount(s) to be paid by Customer to Aetna for access to the savings provided under NAP.

 "Ad-Hoc Rate" means the rate which was negotiated for a specific claim in the absence of a pre-negotiated contracted rate with a Provider.

"Aggregate Savings" means the difference between (i) the amount which would have been due or otherwise paid to Providers for Covered Services without the benefit of NAP, and (ii) the amount due Providers for Covered Services as a result of NAP.

"Covered Services" means the health services subject to NAP for which charges are paid pursuant to the Plan.

"Member" means a person who is eligible for coverage as identified and specified under the terms of the Plan.

"Plan" means the portion of Customer's employee welfare benefit plan, which provides medical benefits to Members as administered by Aetna.

"Providers" means those physicians, hospitals and other health care providers whose services are available at a savings under NAP.

"Reasonable Charge Amount" means the amount determined by Aetna to be a reasonable charge for a service in the geographic area where the service was provided to the Member.

E.   Customer Acknowledgements                    TPA will obtain the Customer's written acknowledgement to the following:

1.  The NAP listing of Providers includes Providers that are (i) participating by virtue of direct contracts with Aetna and its affiliates, and (ii) participating by virtue of Aetna's contracts with unaffiliated third parties that have contracts with Providers, and provide Aetna with access to these contracted rates for the purpose of NAP.

2.  Aetna does not guarantee (a) any particular discounts or any level of discount will be made available through providers listed as participating in NAP; (b) any obligation to make any specific Providers or any particular number of Providers available for use by Plan participants.   Aetna does not credential, monitor or oversee those Providers who participate through third party contracts. Providers listed as participating in NAP may not necessarily be available or convenient.

3.  Aetna is not responsible for the acts or omissions of any provider listed as participating in NAP.  All such providers are providers in private practice, are neither agents nor employees of Aetna, and are solely responsible for the health care services they deliver.

4.  The following claim situations may not be eligible for NAP:

      - Small claims (currently certain claims below $151 and claims below $1000 for which there is no contracted rate).
      - Certain claims involving Medicare or coordination of benefits (COB).
      - Claims that have already been paid directly by the Member.

### F.    *General Provisions*

1.  Neither party shall be liable to the other for any consequential or incidental damages whatsoever.  Aetna's aggregate cumulative liability to the Customer and TPA, in the aggregate, for all losses or liabilities arising under or related to this Addendum, regardless of the form of action, shall be limited to the Access Fees actually paid to Aetna by the Customer for services rendered, provided, however, this limitation will not apply to or affect any performance standards set forth in the Agreement.

2.  The terms and conditions of this Addendum shall remain in effect for any claims incurred prior to the termination date that are administered by Aetna after the termination date.  Except as provided herein, this Addendum is subject to all of the provisions of the Agreement, provided, however, in the event of any conflict between this Addendum and the Agreement, the terms of this Addendum shall govern.

**Attachment 5.1**

**TPA Claims Adjudication Performance Standards**

Claim Administration
Turnaround Time

Guarantee: TPA will guarantee that the claim turnaround time during the guarantee period will not exceed 4 *calendar* days for 90.0% of the processed claims on a cumulative basis each year.

Definition: From the time Aetna posts the claim file to the TPA secure FTP folder to the time TPA posts the claim file back to Aetna's secure FTP folder.

Penalty and Measurement Criteria: If the cumulative year turnaround time (TAT) exceeds the day guarantee as stated above, TPA will reduce its compensation (Aetna Joint Claim Administration Fee) by an amount equal to:

| Each full day | | JCA Administration fee |
|---|---|---|
| >4 to 7 days | 2% | |
| 7 to 9 days | 4% | |
| 9 to 11 days | 6% | |
| 11 to 13 days | 8% | |
| 13 days and greater | 10% | |

There will be a maximum reduction of 10.0% of the guarantee period administrative service fees.

**Attachment 5.4**

**Physician Settlement Agreement**

The items listed below are summaries of the applicable provisions of the Settlement Agreement applicable to TPA. All summaries are subject to the more complete requirements set forth in the Settlement Agreement.

1. TPA must utilize Aetna pre-certification list for all Customers, unless variations to the pre-certification list are provided to Aetna and Aetna is able to post such revised list on Aetna website and other communication channels. (Section 7.5 of the Settlement Agreement)

2. TPA must offer a billing dispute mechanism around coding and claim editing meeting Aetna standards. (Section 7.10 of the Settlement Agreement)

3. TPA must offer a medical necessity review process meeting Aetna standards. (Section 7.11 of the Settlement Agreement)

4. TPA must recognize all valid assignments by Members of plan benefits to physicians. (Section 7.15 of the Settlement Agreement)

5. If, pursuant to utilization management, TPA certifies a proposed treatment as medically necessary, certification cannot be revoked except for fraud, erroneous or incomplete material or change in Member's health making proposed treatment inappropriate. (Section 7.25 of the Settlement Agreement)

6. Electronic claims must be processed and paid within 15 days, and paper claims within 30 days. All paper claims must be date stamped upon receipt. All electronic claims must generate an electronic acknowledgement upon receipt. Late claim interest is payable at the lesser of the prime rate and 8% per annum. (Section 7.18 of the Settlement Agreement)

7. Explanations of Benefits must include: name of and a number identifying Member, date of service, payment amount per line item, any adjustment to the invoice submitted and generic explanation in compliance with HIPAA requirements as well as address and phone number for questions regarding the claim. Must indicate any amounts physician can bill patient as "Physician may bill you" and not characterize disallowed amounts as unreasonable. (Section 7.21a of the Settlement Agreement)

8. Bundling and claim editing software must be consistent with Aetna's in all material respects (Section 7.8a of the Settlement Agreement)

9. TPA may not make routine requests for submissions of clinical records except for unlisted codes, codes appended with modifier 22, and other limited categories that Aetna determines routine review of medical records is appropriate. Not applicable in investigating fraudulent, abusive or other inappropriate billing practices. (Section 7.8c of the Settlement Agreement)

10. No automatic downcoding of E&M codes is permitted (Section 7.19 of the Settlement Agreement)

11. No modifier 51-exempt codes shall be subject to multiple procedure logic. (Section 7.20b of the Settlement Agreement)

12. "Add-on " codes shall be recognized and eligible for payment as separate codes and shall be not be subject to multiple procedure logic (Section 7.20b of the Settlement Agreement).

13. A bill containing a code for E&M appended with modifier 25 and a code for performance of non E&M, both are payable unless clinical information indicates use of modifier 25 was inappropriate. (Section 7.20b of the Settlement Agreement)

14. Codes that include supervision and interpretation shall be separately recognized and eligible for payment. TPA is not required to pay for supervision or interpretation by more than one physician. (Section 7.20b of the Settlement Agreement)

15. Other than modifier 51-exempt or "add-on", a code considered an "indented code" within the CPT code book must not be reassigned into another code unless more than one indented code under the same indentation is also submitted with respect to the same service, in which case only one such code shall be eligible for payment; provided that for indented code series contemplating that multiple codes in such series properly may be reported and billed concurrently, all such codes properly billed shall be recognized and eligible for payment.  (Section 7.20b of the Settlement Agreement)

16. A code appended with modifier 59 must be recognized and separately eligible for payment to the extent they designate a distinct or independent procedure performed on the same day by the same physician, but only to the extent that such procedures or services are not normally reported together under the particular circumstances and it would not be more appropriate to append any other CPT modifier to such code or codes.  (Section 7.20b of the Settlement Agreement)

17. Global periods for surgical procedures can be no longer than any period then designated on a national basis by CMS for such surgical procedures.  (Section 7.20b of the Settlement Agreement)

18. TPA cannot automatically change a code to one reflecting a reduced intensity of service when such CPT code is one among a series that differentiates among simple, intermediate and complex.  (Section 7.20b of the Settlement Agreement)

19. TPA must update claims editing software at least once each year to recognize any new CPT codes or any reclassification of existing CPT codes as modifier 51-exempt and cause its claim processing personnel to recognize any additions to HCPCs Level II codes promulgated by CMS since the prior annual update.  (Section 7.20b of the Settlement Agreement).

# EXHIBIT

# B

# Aetna Joint Claim Administration

## Customer Administrative Services Agreement
## JCA - 863860

This Aetna Joint Claim Administration[SM] Customer Administrative Services Agreement ("Agreement") is made and entered into as of February 1, 2013 ("Effective Date") by and between Aetna Life Insurance Company, on behalf of itself and its affiliated health maintenance organizations ("HMOs") (collectively, "Aetna") and United Benefit Fund (hereinafter "Customer").

**WHEREAS,** Customer has established a self-funded employee health benefits plan (the "Plan") for certain eligible individuals pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA") described in Appendix I to this Agreement; and

**WHEREAS,** pursuant to the Plan, Customer wishes to make available one or more coverage products offered by Aetna and the HMOs (the "Products"), as specified in Appendix I of this Agreement; and

**WHEREAS,** Aetna and *Omni Administrators Inc.* ("TPA") have arranged to provide administrative services for the Plan in a jointly coordinated offering, including claims administration, patient management, member and provider services and network access, all as specified in this Agreement (the "Program"); and

**WHEREAS,** Aetna has further arranged to provide integrated administration of the Products among itself and the HMOs and, if requested by Customer, has also agreed to provide certain supplemental administrative services and Products not available through the HMOs.

**NOW, THEREFORE,** in consideration of the foregoing and of the mutual covenants, promises and undertakings herein, the sufficiency of which is hereby acknowledged, and intending to be legally bound hereby, the Parties agree as follows:

## 1.0     DEFINITIONS

When used in this Agreement, all capitalized terms shall have the following meanings:

1.1     AAA.  Defined in Section 12.1 of this Agreement.

1.2     Aetna Services.  The services of Aetna to be provided pursuant to this Agreement as defined in Section 2.1 hereof and as described in Section 3 hereof.

1.3     Affiliate.  Any corporation, partnership or other legal entity directly or indirectly owned or controlled by, or which owns or controls, or which is under common ownership or control with a Party.

1.4     Affiliated Party.  Defined in Section 11.1.

1.5     Agreement.  Defined in the first paragraph of this Agreement.  This Agreement includes and incorporates by reference the attached Appendix I, Service and Fee Schedule, National Advantage Program Addendum and Attachments.

1.6     Bank.  The bank selected by Aetna on which benefit payment checks are drawn in satisfaction of a claim for Plan benefits.

1.7     Claims.  Defined in Section 11.1.

1.8     Confidential Information.  Defined in Section 8.1.

1.9     Documentation.  Defined in Section 13.2.

1.10    Effective Date.  Defined in first paragraph above.

1.11    ERISA.  Defined in the recitals to this Agreement.

1.12    HIPAA.  Defined in Section 3.3.

1.13    HMOs.  Defined in first paragraph above.  The HMOs include the following entities to the extent that Plan beneficiaries elect coverage under Products offered in geographic areas served by such entity: Aetna Health, Inc. (CT), Aetna Health Inc. (ME), Aetna Health Inc. (MA), Aetna Health Inc. (NH), Aetna Health Inc. (NY), Aetna Health Inc. (DE), Aetna Health Inc. (NJ), Aetna Health Inc. (PA), Aetna Health Inc. (MD), Aetna Health Inc. (FL), Aetna Health Inc. (TN), Aetna Health Inc. (GA), Aetna Health of the Carolinas Inc., Aetna Health Inc. (LA), Aetna Health Inc. (CO), Aetna Health of Illinois Inc., Aetna Health Inc. (MI), Aetna Health Inc. (MO), Aetna Health Inc. (OH), Aetna Health Inc. (OK), Aetna Health Inc. (TX), Aetna Health Inc. (AZ), Aetna Health Inc. (WA). Aetna Life Insurance Company is authorized to represent the HMOs for purposes of the execution and administration of this Agreement, including receipt of any notices to Aetna required hereunder.

1.14    Indemnified Party.  Defined in Section 11.3.1.

1.15    Indemnifying Party.  Defined in Section 11.3.1.

1.16    Initial Term.  Defined in Section 9.1.

1.17    Participating Providers.  Those health care providers that are contracted with Aetna or an HMO Affiliate of Aetna and that are considered "in-network" for the Program.

1.18    Party.  Aetna or Customer, as applicable.

1.19    Payment Due Date.  Defined in Section 4.1.

1.20    Plan.  Defined in the recitals to this Agreement.

1.21    Products.  Defined in the recitals to this Agreement.

1.22  <u>Program</u>.  Defined in the recitals to this Agreement.

1.23  <u>Rules</u>.  Defined in Section 12.1.

1.24  <u>Services Agreement Period</u>.  Defined in Section 9.1.

1.25  <u>Third Party Claim</u>.  Defined in Section 11.3.1.

1.26  <u>TPA Administrative Services Agreement</u>.  Defined in Article 2.2.

**2.0    Purpose and Overall Workflow**

2.1  <u>Purpose</u>.  Customer shall purchase, and Aetna shall provide, the services designated in this Agreement, together with such other services as Aetna agrees in writing to perform, as described in Appendix I and the Service and Fee Schedule with respect to the Plan(s) (the "Aetna Services").  At the same time, TPA will provide to Customer the services described in Article 5.0 and Section 7.1.1 of the separate Administrative Services Agreement entered into between Aetna and TPA of even date herewith (the "TPA Administrative Services Agreement"), a copy of which is attached hereto.

2.2  <u>Service Fees</u>.  Aetna shall be compensated by the TPA in accordance with the Service and Fee Schedule attached hereto. Such payments will be made pursuant to the terms of the TPA Administrative Services Agreement and the provisions of this Agreement.

2.3   <u>Workflow</u>.  As more fully set forth in this Agreement, the parties mutually agree that the overall workflow for this customized three party arrangement shall be as set forth in Attachment 2.3.

**3.0    Aetna Services and Obligations.**

3.1  <u>Aetna Services</u>.  Aetna will perform the services described in Article 3.0 and Section 7.1.2 of the TPA Administrative Services Agreement.  Aetna agrees that Article 3.0 and Section 7.1 of the TPA Administrative Services Agreement shall not be amended without Customer's express written consent.  Customer acknowledges that Aetna may utilize the services of external reviewers or contractors in performing the Aetna Services.

3.2  <u>HIPAA Business Associate Provisions</u>.  Aetna agrees to comply with the terms set forth in Attachment 3.2 with respect to the Privacy Rules issued under the Health Insurance Portability and Accountability Act of 1996 ("HIPAA").

**4.0    Customer Obligations**

4.1  <u>Aetna Service Fees; Renewals</u>**.**  The Service Fees payable by TPA on behalf of Customer to Aetna for the Aetna Services (the "Service Fees") shall be determined in accordance with the Service and Fee Schedule attached hereto. No services other than those identified herein and in the Service and Fee Schedule are included in the Service Fees. The Aetna Services and the Service Fees may be adjusted annually effective on the anniversary of the Effective Date (the "Contract Anniversary Date") by Aetna.  Aetna shall give Customer thirty (30) days prior written notice of such adjustments in Aetna Services and Service Fees.  Aetna also may adjust the Service Fees at other times in accordance with the terms and conditions of the Service and Fee Schedule.

Aetna shall submit to Customer a statement for each month this Agreement is in effect showing the Service Fees for that month.  TPA on behalf of Customer shall pay Aetna the amount of the Service Fees no later than thirty-one (31) calendar days following the first calendar day of the month in which the services are provided (the "Payment Due Date").  Customer shall be responsible for any payments TPA fails to make.

Customer shall reimburse Aetna for additional expenses incurred by Aetna and agreed to by the parties on behalf of the Plan or Customer which are necessary for the administration of the Plan, including, but not limited to, special hospital audit fees, fees paid or expenses incurred to recover Plan assets and customized printing fees, clerical listing of eligibility, Customer audits exceeding agreed upon limits and for any other services performed which are not Aetna Services under this Agreement.  The payment by Aetna on behalf of Customer of any such expenses shall constitute part of the Aetna Services hereunder, provided, however, with respect to payments made by Aetna on behalf of and at the request of the Customer to Customer's vendors, Customer shall be responsible for filing any notices, such as Form 1099 or other forms.

In circumstances where Aetna may have a contractual, claim or payment dispute with a provider, the settlement of that dispute with the provider may include a one time payment in settlement to the provider or to Aetna, or may otherwise impact future payments to providers. Aetna, in its discretion, may apportion the settlement to self-funded Plan sponsors based upon specific applicable claims, proportional membership or some other allocation methodology, after taking into account Aetna's costs including Aetna's internal costs of recovery and distribution.

All overdue amounts shall be subject to the late charges set forth in the Service and Fee Schedule.

Following the close of a Services Agreement Period, Aetna will prepare and submit to Customer a report showing the Service Fees paid.

 Since funding is provided on a checks issued basis, outstanding benefit payment checks (checks which have not been presented for payment) will be resolved, as elected by Customer, by stop payments processed at approximately 12 months from the issued date and amounts returned to Customer..

4.3    Other Customer Obligations.  Aetna shall not be responsible in any manner for any delay or error caused by the Customer's or TPA's failure to furnish accurate eligibility information in a timely fashion.  Customer should provide Aetna with all Plan documents at least thirty (30) days prior to the Effective Date or such other date as may be mutually agreed upon by the parties.  Customer shall notify Aetna in writing of any changes in Plan documents or Plan benefits at least thirty (30) days prior to the effective date of such changes.  Aetna shall have thirty (30) days following receipt of such notice to inform Customer of whether it will administer such proposed changes.  Appendix I hereto shall be deemed to be automatically modified to reflect such proposed changes if Aetna either agrees to administer the changes as proposed or fails to object to such changes within thirty (30) days of receipt of the foregoing notice.  The description of Plan benefits in Appendix I may otherwise be amended only by mutual written agreement of the parties.  Aetna may charge additional fees relating to any increase in cost to administer the Plan because of changes which Aetna agrees to administer.

Customer shall immediately provide Aetna with such information regarding administration of the Plan as Aetna may request from time to time.  Aetna is entitled to rely on the information most recently supplied by Customer and TPA in connection with the Aetna Services and its other obligations under this Agreement.  Aetna shall not be responsible for any delay or error caused by Customer's or TPA's failure to furnish correct information in a timely manner.

Customer agrees that it will provide Aetna with a copy of its Summary Plan Description (SPD), as required by ERISA, so that Aetna may reconcile any potential differences that may exist among the SPD, the description of Plan benefits in Appendix I and Aetna's internal policies and procedures.  Customer also agrees that it is responsible for satisfying any and all Plan reporting and disclosure requirements imposed by law.

4.4    Plan Design.  Aetna reserves the right to set a minimum plan of benefit design.   Such minimum plan design requirements shall be set forth in Attachment 4.4, which may be updated by Aetna on ninety (90) days written notice to Customer, effective as to the Plan upon the next renewal date of this Agreement.

4.5    Physician Settlement Agreement.  Customer understands and acknowledges that Aetna Inc., an affiliate of Aetna, has executed a class action settlement agreement with physicians dated as of May 21, 2003 which was approved by the United States District Court for the Southern District of Florida (the "Settlement Agreement").  The Settlement Agreement requires that Aetna comply with certain disclosure, claims payment and other obligations.  In performance of the TPA Services, the TPA must comply with the terms of the Settlement Agreement as set forth in Attachment 4.5, as well as the terms of any policies and procedures created by the parties in connection with the Settlement Agreement.  Customer shall not delegate any of the TPA Services to a third party without obtaining an agreement from the new service provider, enforceable by Aetna, that the new service provider will comply with the terms of the Settlement Agreement.  If Customer begins performing some or all of the TPA Services itself, Customer agrees to comply with the terms of the Settlement Agreement.

**5.0    Member Litigation.**

5.1    Fiduciary Duty.  It is understood and agreed that Customer retains complete authority and responsibility for the Plan, its operation, and the benefits provided thereunder, and that Aetna is empowered to act on behalf of Customer in connection with the Plan only to the extent expressly stated in this Agreement or as agreed to in writing by Aetna and Customer.

Customer and Aetna agree that with respect to Section 503 of the Employee Retirement Income Security Act of 1974, as amended, Customer will be the "appropriate named fiduciary" of the Plan for purpose of reviewing denied claims under the Plan. Customer also has the sole and complete authority to determine eligibility of persons to participate in the Plan. It is agreed that Aetna's responsibilities under this Agreement are ministerial and that Aetna has no other fiduciary responsibility under the Plan.

5.2    Defense of Claim Litigation. In the event of a legal, administrative or other action arising out of the administration, processing or determination of a claim for Plan benefits, Customer shall undertake the defense of such action and settle such action when in its reasonable judgment it appears expedient to do so. All damages and expenses with respect to such defense, including the defense of Aetna, if it is named as a party to such action, shall be the obligation of Customer, except to the extent provided in Section 11.

**6.0    Overpayments.**

6.1    TPA and Aetna Obligations. If it is determined that any payment has been made to an ineligible person or if it is determined that more than the appropriate amount has been paid to a Member, TPA and Aetna shall have the respective obligations set forth in Section 7.1 of the TPA Administrative Services Agreement. Section 7.1 shall not be amended without Customer's prior written consent.

6.2    General. For the purpose of Sections 7.1.1 and 7.1.2 of the TPA Administrative Services Agreement, "good faith efforts" means that Aetna or TPA, as the case may be, will contact the responsible party twice via letter, phone, email or other means to try to make the recovery. If those efforts are unsuccessful in obtaining recovery, Aetna or TPA, as the case may be, may use an outside vendor, collection agency or attorney to pursue recovery. Overpayment recoveries made through third party vendors, collection agencies or attorneys are credited to Customer net of fees charged by them.

Overpayments must be determined by direct proof of specific claims. Overpayments may not be determined by (a) indirect or inferential methods of proof, such as statistical sampling, extrapolation of error rate to the population, etc. or (b) application of software or other review processes that analyze claims in a manner different for the claim determination and payment procedures and standards used by TPA and Aetna. Except as stated in this section, Aetna has no other obligation with respect to the recovery of overpayments.

Customer may not seek collection, or use a third party to seek collection, of overpayment from contracted providers, since all such recoveries are subject to the terms and provisions of the providers' contracts with Aetna. For the purpose of determining whether a provider has or has not been overpaid, Customer agrees that the rates paid to contracting providers for covered services under the Plan shall be governed by Aetna's contracts with those providers, and shall be effective upon the loading of those Contract Rates into Aetna's systems, but no later than three (3) months after the effective date of the providers' contracts.

**7.0    Audits**

7.1    Right to Audit Aetna. In recognition of the apportionment of services between TPA and Aetna, particularly in recognition of the fact that TPA is performing the claims adjudication function, it is expected that most customer claims audits will be performed on the records maintained by TPA. Aetna shall not be required to make any claim records available for audit if those records are contained in the source claims adjudication systems and records maintained by TPA. Aetna will, however, make its provider payment records available for audit to enable Customer to reconcile such payments against TPA records. Upon request, no more frequently than once per year, Aetna will provide Customer an electronic record of claim payments under the Plan, for the purpose of verifying that such payments are consistent with the claim determinations made by TPA and communicated by TPA to Aetna. Such reports will be made available to Customer within thirty (30) days of request.

7.2    Audit Process. All audits must be commenced within two (2) years following the period being audited. Aetna is not responsible for Customer's audit fees. Customer shall pay Aetna fees for any audit which cannot be completed within a five (5) day period. In the event Customer seeks to review anything other than an electronic record of claim payments, Customer shall pay Aetna fees for any such audit which exceeds 250 claim transactions.

Customer will utilize individuals to conduct audits on its behalf who are qualified by appropriate training and experience for such work, and will perform its review in accordance with applicable law prohibiting unauthorized use or disclosure (in the audit report or otherwise) of any individually identifiable information. Customer and such

individuals will not make or retain any record of provider negotiated rates included in the audited transactions, or payment identifying information concerning treatment of drug or alcohol abuse, mental/nervous or HIV/AIDS or genetic markers, in connection with any audit. Aetna reserves the right to refuse to allow an auditor to conduct an audit in the event Aetna determines the auditor has a conflict of interest. A conflict of interest includes (but is not limited to) a situation in which the audit agent (a) is employed by an entity which is a competitor to Aetna's claims administration business; or (b) has terminated from Aetna within the past 12 months; or (c) is affiliated with a vendor subcontracted by Aetna to adjudicate claims. Determination of the nature of a conflict of interest shall be at the sole discretion of Aetna. Auditors may not be compensated on the basis of contingency fee or a percentage of overpayments identified, in accordance with the provisions of Section 8.207 through 8.209 of the International Federation of Accountant's IFAC) Code of Ethics for Professional Accountants (Revised 2004). The auditor chosen by the Company must be mutually agreeable to both Customer and Aetna.

Customer will provide reasonable advance notice of its intent to audit and will complete an Audit Request Form providing information reasonably request by Aetna. Further, Customer will provide Aetna at least four (4) weeks advance notice of the desired audit. Notification requirement may exceed four weeks for unusual audit requests. No audit may commence until (a) the auditor has satisfied Aetna's confidentiality requirements and (b) the Audit Request form is completed and executed by the Customer, the auditor and Aetna.

The sample must be based on a statistical random sampling methodology (e.g., systematic random sampling, simple random sampling, stratified random sampling).

7.3    <u>Consent to TPA Audit</u>. Customer understands and agrees that Aetna has certain review and audit rights over TPA's services relating to the Program, as set forth in the TPA Administrative Services Agreement. Customer hereby consents to any disclosures of information relating to the Program that may be required to complete such an audit, and agrees to cause TPA to comply with such audit rights. Aetna has the right, but not the obligation, to perform audits on TPA. Aetna shall have no liability to Customer for the failure to perform such an audit, or for the manner in which an audit is performed. Customer shall not delegate any of the TPA Services to a third party without affording Aetna corresponding review and audit rights over the new service provider. If Customer begins performing some or all of the TPA Services itself, Aetna shall have the same review and audit rights over Customer.

**8.0    Confidentiality**

8.1    <u>Confidential Information</u>. For the purposes of this Agreement, the term "Confidential Information" shall mean any and all information, prepared by either Party, its advisors or otherwise, relating to such Party or the administration of this Agreement or the Program, including but not limited to the development of a pricing structure, non-public utilization management policies and procedures, all financial information, rate schedules, financial terms and Contract Rates. Confidential Information does not include information which becomes publicly available or available to the receiving Party on a non-confidential basis from a source other than the disclosing Party or its advisors, provided that such information is not known by the receiving Party to be proprietary or such source is not known by the receiving Party to be bound by a confidentiality agreement with an obligation of secrecy to the disclosing Party or other party. The Parties agree that the other Party's rate and financial information shall be deemed proprietary and confidential hereunder, except as otherwise agreed to in writing by the Parties.

8.2    <u>Uses</u>. Each Party shall not, in any manner or for any reason whatsoever, directly, or indirectly, (a) use all or any portion of the other Party's Confidential Information for any purpose other than solely for the purposes of performing pursuant to this Agreement, (b) except as set forth herein, disclose or otherwise make available in any manner or form to any person or entity all or any portion of the other Party's Confidential Information, including without limitation, for any purpose relating to the business or affairs of the other Party or any related person or entity, or (c) take any action or fail to take or abstain from taking any action the effect of which would cause the other Party's Confidential Information to be disclosed or otherwise made available in a manner inconsistent with each Party's obligations herein.

8.3    <u>Disclosures</u>. Each Party may disclose Confidential Information to its employees, contractors, agents, advisors and representatives only on a need-to-know basis, provided that such Party shall (a) direct such persons to use such information solely for the purpose described in Section 8.2 above; (b) inform such persons of the confidential nature of such information; and (c) direct and cause such persons to treat such information confidentially as required of the Parties herein.

8.4    <u>Injunctive Relief</u>. The Parties hereby agree and acknowledge that the Parties operate in a highly competitive market; any breach of this Agreement would have an adverse financial effect on the disclosing Party and will cause irreparable harm and significant injury which will be difficult to measure with certainty or to compensate through damages, and

that any remedies provided at law to the disclosing Party cannot adequately compensate such Party for the losses to be sustained by the disclosing Party in the event of a breach or violation by the receiving Party of any of the provisions of this Section 8.0. Accordingly, in addition to all other rights and remedies available to it, the Parties shall be entitled as a matter of right to injunctive and other equitable relief in any court of competent jurisdiction.

8.5    <u>Survival</u>.  The rights and obligations set forth in this Section 8.0 shall survive the termination of this Agreement.

**9.0    Term and Termination**

9.1    <u>Term</u>.  This Agreement shall commence as of the Effective Date and shall continue until the first anniversary of the Effective Date ("Initial Term"), and thereafter shall automatically renew for additional terms of one (1) year, unless terminated in accordance with Sections 9.2, 9.3 or 9.6.  The Initial Term and each such twelve (12) month period thereafter shall be referred to as a "Services Agreement Period."

9.2    <u>Termination Without Cause After Initial Term</u>.  This Agreement may be terminated by either Party without cause at the end of any Services Agreement Period upon ninety (90) days prior written notice or at any other time without cause upon one hundred eighty (180) days prior written notice.

9.3    <u>Termination of TPA Administrative Services Agreement</u>.  Customer understands and agrees that Aetna cannot continue to support the Program in the manner contemplated by this Agreement if TPA ceases to provide its services under the TPA Administrative Services Agreement or in the event Aetna terminates the TPA Administrative Services Agreement.  As such, this Agreement shall be coterminous with the TPA Administrative Services Agreement.  In the event Aetna gives or receives notice of termination of the TPA Administrative Services Agreement, Aetna shall promptly provide such notice to Customer, and this Agreement shall terminate effective the same date the TPA administrative Services Agreement is terminated, without liability to Aetna.

9.4    <u>Termination for Cause</u>.  Without limitation of Aetna's rights under Section 9.6, this Agreement may be terminated at any time by either Party upon at least ninety (90) days prior written notice of such termination to the other Party upon default or breach by such Party of one or more of its obligations hereunder, unless such default or breach is cured within ninety (90) days of the notice of termination.

9.5    <u>Legal Prohibition</u>.  If any state or other jurisdiction enacts a law which prohibits the continuance of this Agreement, or an existing law is interpreted to prohibit the continuance of this Agreement, this Agreement shall terminate automatically as to such state or jurisdiction on the effective date of such law or interpretation; provided, however, that if only a portion of this Agreement is prohibited by such law, only that portion of this Agreement shall be affected, and this Agreement shall be construed in all respects as if such invalid or unenforceable provision were omitted.

9.6    <u>Suspension or Termination by Aetna for Failure to Fund Claims or Pay Fees</u>.

    9.6.1    <u>Failure to Fund Claims</u>.  If Customer fails to respond to Aetna's or the Bank's initial request to provide funds to the Bank for the payment of checks or other payments approved and recorded by Aetna, Aetna shall have the right to cease processing of benefit payment requests and suspend other Aetna Services until the requested funds have been provided.  Aetna may terminate this Agreement immediately upon transmission of notice to Customer by mail, facsimile transmission or other means of communication (including electronic mail) if (a) Customer fails to provide the requested funds within five (5) business days of written notice by Aetna, or (b) Aetna determines that Customer will not meet its obligation to provide such funds within such five (5) business days.

    9.6.2    <u>Failure to Pay Service Fees</u>.  If Customer fails to pay Service Fees to Aetna by the Payment Due Date, Aetna shall have the right to suspend Services until the Service Fees have been paid.  Aetna may terminate this Agreement immediately upon transmission of notice to Customer by mail, facsimile transmission or other means of communication (including electronic mail) if (a) Customer either fails to pay such Service Fees within five (5) business days of written notice of unpaid Service Fees by Aetna, or (b) Aetna determines that Customer will not meet its obligation to pay such Service Fees within such five (5) business days.

    9.6.3    <u>No Waivers</u>.  Any acceptance by Aetna of funds or Service Fees described in Sections 9.6.1 and 9.6.2 above, after the grace periods specified therein have elapsed, and prior to any action by Aetna to suspend the Aetna Services or terminate this Agreement, shall not constitute a waiver of Aetna's right to suspend the

Aetna Services or terminate this Agreement in accordance with this Section 9.6 with respect to any other failure of Customer to meet its obligations hereunder.

9.7     Responsibilities upon Termination.

    9.7.1     Responsibilities on Termination.  Upon termination of this Agreement, Aetna will continue to perform the Aetna Services for runoff claims for Plan benefits that were incurred prior to but not processed as of the termination date which are received by Aetna not more than twelve (12) months following the termination date.  The Service Fee for such activity is included in the Service Fees described in Section 2.2 of this Agreement.  The procedures and obligations described in this Agreement, to the extent applicable, shall survive the termination of this Agreement and remain in effect with respect to such claims.  Benefit payments processed by TPA and Aetna with respect to such claims which are pended or disputed will be handled to their conclusion, and the procedures and obligations described in this Agreement, to the extent applicable, shall survive the expiration of the twelve (12) month period.  Requests for benefit payments received after such twelve (12) month period will be returned to the Customer or, upon its direction, to a successor administrator at the Customer's expense.

**10.0     Relationship of the Parties**

10.1     Independent Contractors.  It is understood and agreed that Aetna is an agent with respect to claim payments and an independent contractor with respect to all other Aetna Services being performed pursuant to this Agreement.

10.2     Non-Exclusivity and Network Contracting.  This Agreement is a non-exclusive agreement.  Nothing herein shall restrict either Party from contracting with any other Party for services similar to those provided pursuant to this Agreement.  Notwithstanding the foregoing, Customer, including its Affiliates, shall not directly contract with Participating Providers for the purpose of providing network access services to its customers.  This restriction does not prohibit Customer from contracting with networks of providers through network rental vendors.  Aetna makes no guarantee and disclaims any obligation to make any specific health care providers or any particular number of health care providers available for use by Members or that any level of discounts or savings will be afforded to or realized by Customer, the Plan or members.

10.3     Nature of Services.  Customer and Aetna agree that: (i) neither Aetna nor any of its affiliates renders medical services or treatments to Members; (ii) neither Customer nor Aetna are responsible for the health care that is delivered by contracting health care providers; (iii) health care providers are solely responsible for the health care they deliver to Members; (iv) health care providers are not the agents or employees of Customer or Aetna;  and (v) the indemnification obligations of Section 11 do not apply to any portion of any liability, claim, demand, proceeding, action, cause of action, including government action, inquiry, investigation or proceeding, judgment, damage, loss and expense caused by the acts or omissions of health care providers with respect to Members.

10.4     Use of Name and Logo.  Neither Party shall use or otherwise produce materials mentioning the other Party nor including such Party's logo or trademark without the prior written approval of the other Party.

**11.0     Indemnification**

11.1      Indemnification by Aetna.  Aetna agrees to indemnify and shall hold harmless Customer and each of Customer's affiliates, directors, officers, employees and agents (each of the foregoing, an "Affiliated Party") against that portion of any liabilities, claims, demands, proceedings, actions, causes of action, including government actions, inquiries, investigations or proceedings, judgments, damages, losses and expenses (including reasonable attorneys' fees and costs) (collectively, "Claims") that arise from or relate to (i) the willful misconduct, criminal conduct, breach of fiduciary duty or negligence of Aetna or its officers, directors, employees, subcontractors or agents in connection with the Program or with the performance of its obligations hereunder; or (ii) the breach of any obligation of Aetna contained in this Agreement.  It is understood and agreed that TPA is not an Affiliated Party of Aetna for purposes of this Agreement.

11.2     Indemnification by Customer.  Customer agrees to indemnify and shall hold harmless Aetna and each of Aetna's Affiliated Parties against that portion of any Claims that arise from or relate to (i) the willful misconduct, criminal conduct or negligence of Customer or its officers, directors, employees, subcontractors or agents in connection with the Program or with the performance of its obligations hereunder or Customer's role as employer or Plan sponsor; (ii) taxes, assessments and penalties incurred by Aetna by reason of Plan benefit payments made or services performed

hereunder, and any interest thereon, provided that Customer shall not be required to pay any net income, franchise or other tax, however designated, based upon or measured by Aetna's net income, receipts, capital or net worth; (iii) the release or transfer by Aetna of Member-identifiable information to Customer or a third party designated by Customer, or the use or further disclosure of such information by Customer or such third party; (iv) the inclusion of third party vendor information on identification cards; or (v) the breach of any obligation of Customer contained in this Agreement.

11.3    Procedure for Asserting Indemnification Claims.

11.3.1    In order for a Party requesting indemnification  ("Indemnified Party") to be entitled to any indemnification provided for under this Agreement in respect of, arising out of or involving claim or demand by any third party against the Indemnified Party (a "Third Party Claim"), such Indemnified Party must provide the Party requested to provide the Indemnification (the "Indemnifying Party") with a written notice thereof (stating in reasonable detail the basis of such claim or demand) regarding the Third Party Claim within thirty (30) business days after receipt by such Indemnifying Party of written notice of the Third Party Claim; provided, however, that failure to give such notification shall not affect the indemnification provided hereunder except to the extent the Indemnifying Party  shall have been actually prejudiced as a result of such failure. Thereafter, the Indemnified Party shall deliver to the Indemnifying Party, within five (5) business days after the Indemnified Party's receipt thereof, copies of all notices and documents (including court papers) received by the Indemnified Party relating to the Third Party Claim.

11.3.2    If a Third Party Claim is made against an Indemnified Party, the Indemnifying Party will be entitled to participate in the defense thereof and, if it so chooses, to assume the defense thereof with counsel selected by the Indemnifying Party.  Should the Indemnifying Party so elect to assume the defense of a Third Party Claim, the Indemnifying Party will not be liable to the Indemnified Party for legal fees and expenses subsequently incurred by the Indemnified Party in connection with the defense thereof.  If the Indemnifying Person assumes such defense, the Indemnified Party shall have the right to participate in the defense thereof and, at its own expense, to employ counsel reasonably acceptable to the Indemnified Party, separate from the counsel employed by the Indemnifying Party, it being understood that the Indemnifying Party shall control such defense.  The Indemnifying Party shall be liable for the fees and expenses of counsel employed by the Indemnified Party for any period during which the Indemnifying Party has not assumed the defense thereof (other than during any period in which the Indemnified party shall have failed to give notice of the Third Party Claim as provided above).  If the Indemnifying Party chooses to defend or prosecute any Third Party Claim, all the Parties hereto shall cooperate in the defense or prosecution thereof.  Such cooperation shall include the retention and (upon the Indemnifying Party's request) the provision to the Indemnifying Party of records and information which are reasonably relevant to such Third Party Claim, and making officers, directors, employees and agents of the Indemnified Party available on a mutually convenient basis to provide information, testimony at depositions, hearings or trials, and such other assistance as may be reasonably requested by the Indemnifying Party.  Notwithstanding the foregoing, if a Third Party Claim is made against an Indemnified Party as to which such Indemnified Party is entitled to seek indemnification hereunder and such Indemnified Party reasonably concludes that the Indemnifying Person lacks the financial and personnel resources to vigorously defend such Indemnified Party, that the Indemnifying Party has wrongfully failed to assume the defense of the Indemnified Party, or that the Indemnifying Party is not diligently defending such Indemnified Party, then in each such case the Indemnified Party may elect to retain the defense of such Third Party Claim and will be entitled to be reimbursed promptly after submission of invoices therefore.  Whether or not the Indemnifying Party shall have assumed the defense of a Third Party Claim, the Indemnified Party shall not admit any liability with respect to, or settle, compromise or discharge, such Third Party Claim without the Indemnifying Party's prior written consent (which consent shall not be unreasonably withheld or delayed).  The Indemnifying Party shall not admit any liability with respect to, or settle, compromise or discharge any Third Party Claim without the Indemnified Party's prior written consent (which consent shall not be unreasonably withheld or delayed), unless such settlement involves only the payment of cash.

**12.0    Arbitration**

12.1    Binding Arbitration of Certain Disputes.  Any controversy or claim arising out of or relating to this Agreement or the breach, termination, or validity thereof, except for temporary, preliminary, or permanent injunctive relief or any other form of equitable relief, shall be settled by binding arbitration in Hartford, CT administered by the American Arbitration Association ("AAA") and conducted by a sole arbitrator in accordance with the AAA's Commercial Arbitration Rules ("Rules"). The arbitration shall be governed by the Federal Arbitration Act, 9 U.S.C. §§ 1-16, to the exclusion of state laws inconsistent therewith or that would produce a different result, and judgment on the

award rendered by the arbitrator may be entered by any court having jurisdiction thereof.  Except as may be required by law or to the extent necessary in connection with a judicial challenge, or enforcement of an award, neither a Party nor the arbitrator may disclose the existence, content, record or results of an arbitration.  Fourteen (14) calendar days before the hearing, the Parties will exchange and provide to the arbitrator (a) a list of witnesses they intend to call (including any experts) with a short description of the anticipated direct testimony of each witness and an estimate of the length thereof, and (b) pre-marked copies of all exhibits they intend to use at the hearing.  Depositions for discovery purposes shall not be permitted.  The arbitrator may award only monetary relief and is not empowered to award damages other than compensatory damages.

12.2     Survival.  The provisions of this Section 12 shall survive expiration or termination of this Agreement, regardless of the cause giving rise thereto.

**13.0    General Provisions**

13.1     Standard of Care.  Aetna will discharge its obligations under this Agreement with that level of reasonable care which a similarly situated administrator of claims would exercise under similar circumstances.

13.2     Records.  Customer acknowledges and agrees that Aetna or one of its affiliates or authorized agents shall have the right to use all documents, records, reports, and data, including data recorded in Aetna's data processing systems ("Documentation"), for legitimate Plan, health operations, research or public health purposes, including without limitation: claims payment and fraud prevention; preventive health, early detection and disease management programs; coordination of patient care; member education; quality improvement/management assessment; utilization review and management; design of benefit plans; provider network activities; fulfilling certain state and federal requirements; HEDIS and similar data collection and reporting; accreditation by the National Committee for Quality Assurance and other accrediting organizations; and statistical research; provided, that in all respects Aetna shall use Documentation in compliance with privacy laws and regulations, including without limitation regulations promulgated pursuant to HIPAA.

The Documentation will be kept by Aetna for seven (7) years after the year in which a claim is paid, unless Aetna turns such Documentation over to Customer or a designee of Customer.  Aetna will cooperate with Customer to satisfy any legal or regulatory requirements to provide access to documentation.

13.3     Employee Notices.  Customer agrees to furnish each Member covered by the Plan written notice, satisfactory to Aetna, that Customer has complete financial liability for the payment of Plan benefits.  Customer agrees to indemnify Aetna and hold Aetna harmless against any and all loss, damage and expense (including reasonable attorneys' fees) sustained by Aetna as a result of any failure by Customer to give such notice.

13.4     Advancement of Funds.  If, in the normal course of business under the Services Agreement, Aetna, or any other financial organization with which Aetna has a working arrangement, chooses to advance any funds, Customer shall reimburse Aetna or such other financial organization for such payment.  In no event shall such advances by Aetna or any another financial organization be construed as obligating Aetna or such organization to make further advances, or to assume liability of Customer for the payment of Plan benefits.

13.5     Amendments.  This Agreement constitutes the entire understanding of the Parties hereto and no changes, amendments or alterations shall be effective unless signed by both Parties, except as expressly provided herein.   Changes in medical protocols, practices and procedures are not considered amendments of this Agreement.

13.6     Communications.  Aetna and Customer shall be entitled to rely upon any communication believed by them to be genuine and to have been signed or presented by the proper party or parties.

13.7     Liability.

13.7.1     Damages.  Except with respect to Third Party Claims subject to the indemnification provisions herein, (i) any Party's liability, if any, for damages to the other Party for any cause whatsoever arising out of or related to this Agreement, and regardless of the form of the action, shall be limited to the damaged Party's actual damages; and  (ii) no Party shall be liable for any indirect, incidental, punitive, exemplary, special or consequential damages of any kind whatsoever sustained as a result of a breach of this Agreement or any action, inaction, alleged tortious conduct, or delay by the other Party.

13.7.2    <u>Dependence on Services Performed by Customer and TPA</u>.  The Program is a jointly coordinated offering, in which Aetna performs certain services, including components of claims administration, patient management, provider services and network access, and Customer and TPA performs certain other services, including components of claims administration, eligibility and member services.  Aetna's ability to discharge its obligations under the Program will be dependent on Customer's and TPA's adequate discharge of their obligations.  Aetna shall have no liability to Customer for any breaches of its obligations to Customer, including the failure to meet any performance guarantees, resulting directly or indirectly from Customer's or TPA's breach of their obligations under the Program, whether such obligations are to Aetna or to Customer.  Aetna shall have the ability to terminate this Agreement with Customer in the event either TPA fails to cure a breach within 90 days.  Aetna may also suspend its performance guarantees to Customer for so long as Customer or TPA, as the case may be, is in breach of its obligations.  No performance guarantee penalties shall be assessed while the performance guarantees are suspended.  Once the breach is cured to Aetna's reasonable satisfaction, the performance guarantees will be reinstated on a prospective basis.

13.8    <u>Severability</u>.  Any determination that any provision of this Agreement or any application thereof is invalid, illegal or unenforceable in any respect in any instance shall not affect the validity, legality and enforceability of such provision in any other instance, or the validity, legality or enforceability of any other provision of this Agreement.  Neither Party shall assert or claim that this Agreement or any provision hereof is void or voidable if such Party performs under this Agreement without prompt and timely written objection.

13.9    <u>Successors; Assignment</u>.  This Agreement relates solely to the provision of services set forth herein and does not apply to any other organization which succeeds to a Party's assets, by merger, acquisition or otherwise.  No Party may assign its rights or delegate its duties and obligations under this Agreement without the prior written consent of the other Parties, except that Aetna may assign this agreement to any Affiliate.  Aetna acknowledges that some of the obligations and services of Aetna hereunder are performed by Affiliates of Aetna.

13.10    <u>Notices</u>.  Unless otherwise specified herein, any notice required to be given pursuant to the terms and provisions hereof shall be effective only if given in writing and sent by overnight delivery service with proof of receipt, or by certified mail return receipt requested.  Notices shall be sent to the following addresses (which may be changed by giving notice in conformity with this Section 13.14):

To Aetna at:                Jesse Gunning
                            1550 Pond Road Suite 300
                            Mail Code F215
                            Allentown, PA 18104

and to Customer at:

13.11    <u>Force Majeure</u>.  If either Party shall be delayed or interrupted in the performance or completion of its obligations hereunder, by any act, neglect or default of the other Party, or by an embargo, war, act of terror, riot, incendiary, fire, flood, earthquake, epidemic or other calamity, act of God or of the public enemy, governmental act (including, but not restricted to, any government priority, preference, requisition, allocation, interference, restraint or seizure, or the necessity of complying with any governmental order, directive, ruling or request) then the time of completion specified herein shall be extended for a period equivalent to the time lost as a result thereof.  This Section 13.15 shall not apply to either Party's obligations to pay any amounts owing to the other Party, or to any strike or labor dispute involving such Party or the other Party.

13.12    <u>Survival</u>.  In addition to those provisions which by their terms survive expiration or termination of this Agreement (e.g., Sections 8.0, 9.7 and 12.0), Sections 7.3, 11.0 and 13.2 shall survive expiration or termination of this Agreement, regardless of the cause giving rise thereto.

13.13    <u>Mutual Drafting</u>.  The Parties are sophisticated and have been represented by lawyers who have carefully negotiated the provisions thereof.  As a consequence, the Parties do not intend that the presumptions of any laws or rules relating to the interpretation of contracts against the drafter of any particular clause should be applied to this Agreement and therefore waive their effects.

13.14  <u>Counterparts</u>.  This Agreement may be executed in one or more counterparts, all of which shall be considered one and the same agreement, and shall become effective when one or more such counterparts have been signed by each of the Parties and delivered to the other Parties.

13.15  <u>Entire Agreement</u>.  This Agreement (including any attached Appendices, schedules and Attachments) constitutes the complete and sole contract between the Parties regarding the subject hereof and supersedes any and all prior or contemporaneous oral or written representations, communications, proposals or agreements not expressly included herein and may not be contradicted or varied by evidence of prior, contemporaneous or subsequent oral representations, communications, proposals, agreements, prior course of dealings or discussions of the Parties.  There are no oral agreements between the Parties.

13.16  <u>Miscellaneous</u>.  This Agreement shall be governed by and interpreted in accordance with applicable federal law, including but not limited to ERISA.  To the extent such federal law does not govern, this Agreement shall be governed by Connecticut law.  No delay or failure of either party in exercising any right hereunder shall be deemed to constitute a waiver of that right.  There are no intended third party beneficiaries of this Agreement.  The headings in this Agreement are for reference only and shall not affect the interpretation or construction of this Agreement.

**IN WITNESS WHEREOF**, the undersigned Parties have executed this Agreement by their duly authorized officers, intending to be legally bound hereby.

**("CUSTOMER")**

**AETNA LIFE INSURANCE COMPANY ("AETNA")**

**By:**

**By:**

_____

Name:_____

Title:_____

Mark T. Bertolini
Chairman, Chief Executive Officer and President

Date:_____

**Date:**_____

Address:_____

City:_____

**Financial Verification:**

State:_____Zip:_____

**Attachments to Aetna Joint Claim Administration**

**Customer Administrative Services Agreement
Number JCA 863860, between**

**Aetna Life Insurance Company**

**and**

**United Benefit Fund**

Appendix I
Plan Terms

# Appendix I

# Expanded Temporary Appendix

Describing benefits payable in connection with Joint Claims Administrative Agreement JCA 863860 an agreement between

## Aetna Life Insurance Company
("Aetna")

and

United Benefit Fund
(the "Customer")

The Plan described in this Expanded Temporary Appendix is a benefit plan of the Customer. These benefits are not insured with Aetna Life Insurance Company ("Aetna") but will be paid from the Customer's funds. Until this Expanded Temporary Appendix is otherwise modified or replaced in its entirety by agreement between Aetna and the Customer:

1. Aetna will provide certain administrative services to the Plan as outlined in the Letter of Understanding signed by Aetna and attached to this Appendix I ].
2. Aetna will use the description of covered benefits, services and programs outlined in the Plan Design(s) attached to this Appendix I in the administration of the Plan, including any subsequent changes agreed to by Aetna and the Customer.
3. Further, in the administration of the Plan, Aetna will use Aetna's standard plan General Exclusions and standard Glossary definitions of terms attached to this Appendix I .

When the section entitled "Appendix Contents" of any other Appendix I issued under this contract lists a Booklet or a Summary Plan Description describing certain specific benefits applicable to any class of employees, the terms of this Appendix I shall cease to apply to those benefits for that class.

**Appendix II**
**Service and Fee Schedule**

This Service and Fee Schedule between Aetna Life Insurance Company (hereinafter "Aetna") and Special and United Benefit Fund(hereinafter "Customer") is an attachment to Services Agreement Number JCA 863860 between Aetna and Customer and is incorporated by reference therein.

Customer hereby elects to receive the Services for Products/Programs designated below.  The corresponding Service Fees effective for the period beginning February 1, 2013 and ending January 31, 2014 are specified below.  It shall be amended for future periods, in accordance with Section 4.0 Customer Obligations**,** Item 4.1 Aetna Service Fees; Renewals to reflect the Services elected and corresponding Service Fees for such periods.

## MEDICAL PRODUCTS

| Services | Aetna Choice™ POS II |
|---|---|
| I.   Administration Services | Included |
| II.  Patient Management Services | |
| Precertification | Included |
| Concurrent Review/ Discharge Planning | Included |
| Case Management | Included |
| National Medical Excellence/ Institutes of Excellence | Included |
| Behavioral Health | Not Included |
| Depression Disease Management | Not Included |
| Medical/Psychiatric High-Risk Case Management | Included |
| Focused Psychiatric Review | N/A |
| Healthy Outlook Program[2] Comprehensive | Not Included |
| Informed Health Line: 1-800 # | Included |
| IHL Materials | Not Included |
| IHL Reports | Not Included |
| Beginning Right [SM] Maternity Program | Not Included |
| Simple Steps To A Healthier Life™ | Included |
| MedQuery [SM] With Member Messaging | Not Included |
| MedQuery [SM] Without Member Messaging | Not Included |
| Weight Management Program | Included |
| Wellness Counseling | Not Included |
| Enhanced Member Outreach Program[SM] | Not Included |
| Aetna Health Connections[SM] (basic suite of services) | Not Included |
| Aetna Health Connections[SM] (basic suite of services and buy up to [healthcare handbook][and][Level Two Member outreach calls]) | Not Included |
| High Tech Radiology Program | Not Included |
| III.  Network Access Services | Included |
| Total Fee (Per Union*Participant Per Month) | $21.23 |

| | |
|---|---|
| *A person in those classes of employees, retirees, COBRA continues and any other persons within classes that are specifically described in Appendix I, including employees, retirees, COBRA continues and any other persons within classes of subsidiaries and affiliates of Customer who are reported, in writing, to Aetna for inclusion in the Services Agreement. | |
| Medical Network Discount Arrangement for: Aetna Choice™ POS II | Not Included |

| | |
|---|---|
| IV.  Aetna Subrogation Program | Not Included |
| V.  National Advantage Program (NAP) | Not Included |
| National Advantage - Facility Charge Review (NAP-FCR) | |
| National Advantage - Facility Charge Review (NAP-FCR/MBB) | |
| National Advantage - Facility Charge Review (NAP-FCR/FD) | |
| National Advantage– Itemized Bill Review(IBR) | Not Included |

Aetna also may adjust Service Fees effective as of the date on which any of the following occurs.

(1)  If, for any product, there is a:

•        15% decrease in the number of Employees from the number assumed in Aetna's quotation of October 18, 2012, i.e. 3,692 Employees for Aetna Choice™ POS II Medical or from any subsequently reset assumptions.

(2)  Change in Plan - A material change in Plan is initiated by Customer or by legislative action.

(3)  Change in Claim Administration - A material change in claim payment requirements or procedures, account structure, or any other change materially affecting the manner or cost of paying benefits.

**Late Payment Charges**
If Customer fails to provide funds on a timely basis to cover benefit payments as provided in Section 5 of the General Conditions Addendum, and/or fails to pay Service Fees on a timely basis as provided in Section 3 of such Addendum, Aetna will assess a late payment charge.  The per annum charge for 2013 will be as follows:

(i)   late funds to cover benefit payments (e.g., late wire transfers):  12% annual rate
(ii)  late payments of Service Fees:  12% annual rate

In addition, Aetna will make a charge to recover its cost of collection, including reasonable attorneys' fees.

Aetna will provide written notice to Customer of the late payment charges for subsequent years.

**Attachment 2.3**



## Aetna Joint Claim Administration Workflow

**Provider Claims**

**Aetna**
- Claim pricing
- Claim editing
- Patient Management
- Provider services & remittances
- Reporting

  Aetna's Claim System

*Daily FTP file exchange via Secure Transport*

Transmit to Plan Sponsor/TPA

Transmit back to Aetna

**Plan Sponsor/TPA**
- Member eligibility*
- Benefit determination/ application
- Member customer service

  Plan Sponsor's /TPA System

**Providers paid by Aetna**

**Member Correspondence & EOBs**

*Member eligibility will also be fed to Aetna

United Benefit Fund

## Attachment 3.2

### Health Insurance Portability and Accountability Act (HIPAA) Appendix
### Aetna as Business Associate of Customer

**THIS APPENDIX** is an attachment to the Aetna Joint Claim Administration, Customer Administrative Services Agreement Number JCA-863860, by and between Aetna and Customer (as identified therein), and is incorporated by reference therein.

In conformity with the regulations at 45 C.F.R. Parts 160-164 (the "Privacy Rules") Aetna will under the following conditions and provisions be provided access to, create and/or receive certain Protected Health Information. For purposes of this Appendix the terms Protected Health Information and PHI have the meaning assigned to the term Protected Health Information by 45 C.F.R. 160.103. PHI shall refer to protected health information that AETNA has access to, has created or has received in conjunction with the services being provided under the Agreement:

1.    Definitions.  The following terms shall have the meaning set forth below:
    (a)    C.F.R.  "C.F.R." means the Code of Federal Regulations.
    (b)    Designated Record Set. "Designated Record Set" has the meaning assigned to such term in 45 C.F.R. 164.501.
    (c)    Individual. "Individual" shall have the same meaning as the term "individual" in 45 C.F.R. 164.501 and shall include a person who qualifies as personal representative in accordance with 45 C.F.R. 164.502 (g).
    (d)    Protected Health Information "Protected Health Information" shall have the same meaning as the term "Protected Health Information", as defined by 45 C.F.R. 160.103, limited to the information created or received by Aetna from or on behalf of Customer.
    (e)    Required By Law.  "Required By Law" shall have the same meaning as the term "required by law" in 45 C.F.R. 164.501
    (f)    Secretary. "Secretary" shall mean the Secretary of the Department of Health and Human Services or his designee.

2.    Obligations and Activities of Aetna
    (a) Aetna agrees to not use or disclose Protected Health Information other than as permitted or required by this Appendix or as Required By Law.
    (b) Aetna agrees to use appropriate safeguards to prevent use or disclosure of the Protected Health Information other than as provided for by this Appendix.
    (c) Aetna agrees to mitigate, to the extent practicable, any harmful effect that is known to Aetna of a use or disclosure of Protected Health Information by Aetna in violation of the requirements of this Appendix.
    (d) Aetna agrees to report to Customer any use or disclosure of the Protected Health Information not provided for by this Appendix of which it becomes aware.

    (e) Aetna agrees to ensure that any agent, including a subcontractor, to whom it provides Protected Health Information received from, or created or received by Aetna on behalf of Customer, agrees to the same restrictions and conditions that apply through this Appendix to Aetna with respect to such information.
    (f) Aetna agrees to make internal practices, books, and records, including policies and procedures and Protected Health Information, relating to the use and disclosure of Protected Health Information received from, or created or received by Aetna on behalf of, Customer available to the Secretary, in a time and manner designated by the Secretary, for purposes of the Secretary determining Customer's compliance with the Privacy Rule.
    (g) Aetna agrees to document such disclosures of Protected Health Information and information related to such disclosures as would be required for Customer to respond to a request by an Individual for an accounting of disclosures of Protected Health Information in accordance with 45 C.F.R. 164.528.
    (h) Aetna agrees to provide to Customer, the information collected in accordance with this section, to permit Customer to respond to a request by an Individual for an accounting of disclosures of Protected Health Information in accordance with 45 C.F.R. 164.528 individual of the basis of the disclosure.
    (i) Aetna shall use commercially reasonable efforts to maintain the security of the Protected Health Information and to prevent unauthorized uses or disclosures of such Protected Health Information. If Aetna conducts any Standard Transactions on behalf of Customer, AETNA shall comply with the applicable requirements of 45 C.F.R. Part 162.

3.     Permitted Uses and Disclosures by Aetna
3.1    General Use and Disclosure

Except as otherwise limited in this Appendix, Aetna may use or disclose Protected Health Information to perform its obligations under the Agreement, provided that such use or disclosure would not violate the Privacy Rule if done by Customer or the minimum necessary policies and procedures of Customer.

## 3.2   Specific Use and Disclosure Provisions

(a) Except as otherwise limited in this Appendix, Aetna may use Protected Health Information for the proper management and administration of Aetna or to carry out the legal responsibilities of Aetna.

(b) Except as otherwise limited in this Appendix, Aetna may disclose Protected Health Information for the proper management and administration of Aetna, provided that disclosures are required by law, or Aetna obtains reasonable assurances from the person to whom the information is disclosed that it will remain confidential and used or further disclosed only as required by law or for the purpose for which it was disclosed to the person, and the person notifies Aetna of any instances of which it is aware in which the confidentiality of the information has been breached.

(c) Except as otherwise limited in this Agreement, Aetna may use Protected Health Information to provide Data Aggregation services to Customer as permitted by 42 C.F.R. 164.504(e)(2)(i)(B).

(d) Aetna may use Protected Health Information to report violations of law to appropriate Federal and State authorities, consistent with 164.502(j)(1).

## 4.   Obligations of Customer.

4.1    Provisions for Customer to Inform Aetna of Privacy Practices and Restrictions

(a) Customer shall notify Aetna of any limitation(s) in its notice of privacy practices of Customer in accordance with 45 C.F.R. § 164.520, to the extent that such limitation(s) may affect Aetna's use or disclosure of Protected Health Information.

(b) Customer shall provide Aetna with any changes in, or revocation of, permission by Individual to use or disclose Protected Health Information, to the extent that such changes affect Aetna's uses or disclosures of Protected Health Information.

4.2    Permissible Requests by Customer

Customer shall not request Aetna to use or disclose Protected Health Information in any manner that would not be permissible under the Privacy Rule if done by Customer.

5.     Term and Termination

(a) Term. The provisions of this Appendix shall take effect upon the Effective Date, and shall terminate when protections are extended to such information, in accordance with Section 5(c) of this Appendix.

(b) Termination for Cause. Without limiting the termination rights of the parties pursuant to the Agreement and upon Customer's knowledge of a material breach by Aetna, Customer shall either:

i. Provide an opportunity for Aetna to cure the breach or end the violation and terminate the Agreement, if Aetna does not cure the breach or end the violation within the time specified by Customer,

ii. Immediately terminate the Agreement, if cure of such breach is not possible;

iii. If neither termination nor cure is feasible, Customer shall report the violation to the Secretary.

(c) Effect of Termination.

The parties mutually agree that it is essential for Protected Health Information to be maintained after the expiration of the Agreement for regulatory and other business reasons. The parties further agree that it would be infeasible for Customer to maintain such records because Customer lacks the necessary system and expertise. Accordingly, Customer hereby appoints Aetna as its custodian for the safe keeping of any record-containing PHI that Aetna may determine it is appropriate to retain. Notwithstanding the expiration of the Agreement, Aetna shall extend the protections of this Appendix to such Protected Health Information, and limit further use or disclosure of the Protected Health Information to those purposes that make the return or destruction of the Protected Health Information infeasible

6.     Miscellaneous

(a) Regulatory References. A reference in this Appendix to a section in the Privacy Rule means the section as in effect or as amended, and for which compliance is required.

(b) <u>Amendment</u>. Upon the enactment of any law or regulation affecting the use or disclosure of Protected Health Information, or the publication of any decision of a court of the United States or any state relating to any such law or the publication of any interpretive policy or opinion of any governmental agency charged with the enforcement of any such law or regulation, either party may, by written notice to the other party, amend the Agreement and this Appendix in such manner as such party determines necessary to comply with such law or regulation.  If the other party disagrees with such Amendment, it shall so notify the first party in writing within thirty (30) days of the notice. If the parties are unable to agree on an Amendment within thirty (30) days thereafter, then either of the parties may terminate the Agreement on thirty (30) days written notice to the other party.

(c) <u>Survival</u>.  The respective rights and obligations of Aetna under section 5(c) of this Appendix shall survive the termination of this Appendix.

(d) <u>Interpretation</u>. Any ambiguity in this Appendix shall be resolved in favor of a meaning that permits Customer to comply with the Privacy Rule.

(e) <u>No third party beneficiary</u>. Nothing express or implied in this Appendix or in the Agreement is intended to confer, nor shall anything herein confer, upon any person other than the parties and the respective successors or assigns of the parties, any rights, remedies, obligations, or liabilities whatsoever.

(f) <u>Governing Law</u>. This Appendix shall be governed by and construed in accordance with the same internal laws as that of the Agreement

The parties hereto have executed this Appendix with the execution of the Agreement.

Attachment 3.3
# *NATIONAL ADVANTAGE PROGRAM ADDENDUM*

This National Advantage Program ("NAP") Addendum is an addendum to the Aetna Joint Claim Administration, Customer Administrative Services Agreement Number JCA-863860 by and between Aetna and Customer (as identified therein) (the "Agreement") and is incorporated into that Agreement by reference. Capitalized terms that are not otherwise defined herein shall have the meaning assigned to them in the Agreement.

I.      **National Advantage Program**

   A.   Summary

      NAP provides access to contracted rates for many medical claims that would otherwise be paid as billed under indemnity plans, the out-of-network portion of managed care plans, or for emergency/medically necessary services not provided within the network. When available, these contracted rates will produce savings for the Customer.

      Aetna contracts with several national third-party vendors to access their contracted rates. In addition, a significant number of Aetna directly-contracted rates are available for members with indemnity benefits. Aetna will access third-party vendor rates where Aetna directly-contracted rates are not available. If no contracted rate is available, Aetna will attempt to negotiate an Ad-Hoc Rate (case specific discount) with non-NAP participating providers for certain larger claims.

   B.  Claim Submission/Payment Process

      Providers should bill Aetna directly for Covered Services. The Member should not make payment at the time of service. When the Provider submits the claim, Aetna will process it at the contracted rate (when applicable) and reflect the contracted amount in any explanation of payments. The Member would then be responsible for any applicable coinsurance, deductible or non-covered service, based upon the plan of benefits.

II. Terms and Conditions

   A.   Customer Charges For Provider Payments

      Subject to the terms herein, Aetna agrees that for Covered Services rendered by a Provider for which Aetna has a) accessed a contracted rate, or b) negotiated an Ad-Hoc rate, or c) applied a Reasonable Charge Amount for facility services, the Customer shall be charged the amount paid to the Provider. This amount shall be equal to the contracted rate, Ad-Hoc Rate, or Reasonable Charge Amount less any payments made by the Member in accordance with the Plan.

   B.  Access Fees

      1.   As compensation for the services provided by Aetna under NAP for savings achieved, Customer shall pay, and shall cause TPA to remit, an Access Fee to Aetna as described in the Service and Fee Schedule (excluding Aggregate Savings with respect to claims for which Aetna is liable for funding, e.g., claims in excess of an individual or aggregate stop loss point).

      2.   Access Fees shall be paid by the Bank to Aetna via wire transfer or such other reasonable transfer method agreed upon by Aetna and the Bank. The Customer will agree to provide funds, and to cause TPA to remit such funds, through its designated bank sufficient to satisfy the Access Fee in accordance with the banking agreement between the Customer and the Bank, i.e., Access Fees will be included in the request from the Bank for payment/funding of claims.

3.  An Access Fee will be credited to the Customer for any Aggregate Savings subsequently reduced or eliminated for which the Customer has already paid an Access Fee.

4.  Aetna shall provide a quarterly report of Aggregate Savings and Access Fees.  Access Fees may be included with claims in other reports.

C.   Member Information Regarding National Advantage Program

For most products/plans, the Customer will inform Members of the availability of NAP.  Such communication may be made either directly or through the TPA.  Further, a Customer's Plan document language defining reasonable charge or recognized charge must conform to Aetna requirements. Aetna shall provide information regarding participating Providers on DocFind®, Aetna's online provider listing, on our website at www.Aetna.com or by other comparable means.

D.   Definitions

As used herein:

"Access Fee" means the amount(s) to be paid by Customer to Aetna for access to the savings provided under NAP.

"Ad-Hoc Rate" means the rate which was negotiated for a specific claim in the absence of a pre-negotiated contracted rate with a Provider.

"Aggregate Savings" means the difference between (i) the amount which would have been due or otherwise paid to Providers for Covered Services without the benefit of NAP, and (ii) the amount due Providers for Covered Services as a result of NAP.

"Covered Services" means the health services subject to NAP for which charges are paid pursuant to the Plan.

"Member" means a person who is eligible for coverage as identified and specified under the terms of the Plan.

"Plan" means the portion of Customer's employee welfare benefit plan, which provides medical benefits to Members as administered by Aetna.

"Providers" means those physicians, hospitals and other health care providers whose services are available at a savings under NAP.

"Reasonable Charge Amount" means the amount determined by Aetna to be a reasonable charge for a service in the geographic area where the service was provided to the Member.

E.   Customer Acknowledgements                Customer acknowledges the following:

1.  The NAP listing of Providers includes Providers that are (i) participating by virtue of direct contracts with Aetna and its affiliates, and (ii) participating by virtue of Aetna's contracts with unaffiliated third parties that have contracts with Providers, and provide Aetna with access to these contracted rates for the purpose of NAP.

2.  Aetna does not guarantee (a) any particular discounts or any level of discount will be made available through providers listed as participating in NAP; (b) any obligation to make any specific Providers or any particular number of Providers available for use by Plan participants.   Aetna does not credential, monitor or oversee those Providers who participate through third party contracts. Providers listed as participating in NAP may not necessarily be available or convenient.

3.  Aetna is not responsible for the acts or omissions of any provider listed as participating in NAP.  All such providers are providers in private practice, are neither agents nor employees of Aetna, and are solely responsible for the health care services they deliver.

4.  The following claim situations may not be eligible for NAP:

- Small claims (currently certain claims below $151 and claims below $1000 for which there is no contracted rate).
- Certain claims involving Medicare or coordination of benefits (COB).
- Claims that have already been paid directly by the Member.

### F.    General Provisions

1.  Neither party shall be liable to the other for any consequential or incidental damages whatsoever.  Aetna's aggregate cumulative liability to the Customer and TPA, in the aggregate, for all losses or liabilities arising under or related to this Addendum, regardless of the form of action, shall be limited to the Access Fees actually paid to Aetna by TPA for services rendered, provided, however, this limitation will not apply to or affect any performance standards set forth in the Agreement.

2.  The terms and conditions of this Addendum shall remain in effect for any claims incurred prior to the termination date that are administered by Aetna after the termination date.  Except as provided herein, this Addendum is subject to all of the provisions of the Agreement, provided, however, in the event of any conflict between this Addendum and the Agreement, the terms of this Addendum shall govern.

**Attachment 4.4**

**Plan Design Requirements**

▸ Full benefits (including Behavioral Health, Institutes of Excellence requirement)

▸ Aetna provides the Medical Management

▸ Aetna's standard networks for the following Products

    – Open Choice®

    – Open Access Aetna Select

    – Aetna Choice® POS II

    – Aetna Open Access® Elect Choice®

    – Aexcel® Aetna Choice® POS II

    – Aexcel® Aetna Open Access® Elect Choice®

    – Aexcel® Open Access Aetna Select

    – Aexcel® Open Choice®

    – Aexcel® Plus Aetna Choice® POS II

    – Aexcel® Plus Aetna Open Access® Elect Choice®

    – Aexcel® Plus Open Access Aetna Select

    – Aexcel® Plus Open Choice®

▸ 20% differential in vs. out-of-network; at least 70% in-network benefit

▸ Key provisions/limitations, e.g.,

    – Lifetime max – Unlimited (or $2M minimum)

    – Preventive care – covered both in-network and out-of-network

    – Behavioral Health Benefits – at least 30 days in-patient and  20 days out-patient

    – Transplants – no dollar limits or extended waiting periods

    – Commonly provided benefits included, e.g., Home Health Care, Skilled Nursing Facility

**Attachment 4.5**

**Aetna's Guiding Principles for Physician Relations**

The items listed below are requirements derived from Aetna's Guiding Principles for Physician Relations, which are available on the Aetna.com website  In order for Aetna to honor the Guiding Principles, which are central to the integrity of Aetna's network, it is critical that Customer and TPA comply with the following requirements:

1.  TPA and Customer must utilize Aetna pre-certification lists, unless variations to the pre-certification lists are provided to Aetna and Aetna is able to post such revised lists on Aetna's website and other communication channels.

2.  TPA and Customer must offer a billing dispute mechanism around coding and claim editing meeting Aetna standards.

3.  TPA and Customer must offer a medical necessity review process meeting Aetna standards.

4.  If, pursuant to utilization management, Aetna or TPA certifies a proposed treatment as medically necessary, certification cannot be revoked except for fraud, erroneous or incomplete material or change in Member's health making proposed treatment inappropriate.

5.  Electronic claims must be processed and paid within 15 days, and paper claims within 30 days.

6.  Bundling and claim editing software must be consistent with Aetna's in all material respects.

7.  No automatic downcoding of E&M codes is permitted.

8.  No modifier 51-exempt codes shall be subject to multiple procedure logic.

9.  "Add-on " codes shall be recognized and eligible for payment as separate codes and shall be not subject to multiple procedure logic.

10. A bill containing a code for E&M appended with modifier 25 and a code for performance of non E&M, both are payable unless clinical information indicates use of modifier 25 was inappropriate.

11. Codes that include supervision and interpretation shall be separately recognized and eligible for payment.  Customer and TPA are not required to pay for supervision or interpretation by more than one physician.

12. Other than modifier 51-exempt or "add-on", a code considered an "indented code" within the CPT code book must not be reassigned into another code unless more than one indented code under the same indentation is also submitted with respect to the same service, in which case only one such code shall be eligible for payment; provided that for indented code series contemplating that multiple codes in such series properly may be reported and billed concurrently, all such codes properly billed shall be recognized and eligible for payment.

13. A code appended with modifier 59 must be recognized and separately eligible for payment to the extent they designate a distinct or independent procedure performed on the same day by the same physician, but only to the extent that such procedures or services are not normally reported together under the particular circumstances and it would not be more appropriate to append any other CPT modifier to such code or codes.

14. Global periods for surgical procedures can be no longer than any period then designated on a national basis by CMS for such surgical procedures.

15. Customer and TPA cannot automatically change a code to one reflecting a reduced intensity of service when such CPT code is one among a series that differentiates among simple, intermediate and complex.

16. Customer and TPA must update claims editing software at least once each year to recognize any new CPT codes or any reclassification of existing CPT codes as modifier 51-exempt and cause its claim processing personnel to recognize any additions to HCPCs Level II codes promulgated by CMS since the prior annual update.