Exhibit I

2006 WL 469938

2006 WL 469938
Only the Westlaw citation is currently available.
NOT FOR PUBLICATION
United States District Court,
D. New Jersey.

Steven C. THOMPSON, Plaintiff,
v.
EVA'S VILLAGE AND SHELTERING PROGRAM,
et. al, Defendants.

No. Civ.A. 04-2548JAP.
|
Feb. 24, 2006.

**Attorneys and Law Firms**

Steven C. Thompson, Passaic, NJ, Plaintiff, pro se.

Anthony M. Juliano, Wolf, Block, Schorr & Solis-Cohen LLP, Roseland, NJ, for Defendants, Eva's Village and Sheltering Program, Derrick Williams, Gregory Anderson, Gloria Perez, Anthony McCants, and Bryant Jenkins.

Evan B. Caplan, Cozen O'Conner, Philadelphia, PA, for Defendant Narcotics Anonymous World Services, Inc. (improperly pled as World Service Organization, Inc.).

Ousmane D. Al-Misri, Newark, NJ, for Defendant Greater Paterson Area, Inc.

OPINION

PISANO, District Judge.

**\*1** Pro se Plaintiff, Steven C. Thompson, brings this action against Defendants Narcotics Anonymous World Services, Inc. ("NAWS"),[1] the Greater Paterson Area, Inc. ("Greater Paterson"), Eva's Village and Sheltering Program ("Eva's Village"), Derrick Williams, Gregory Anderson, Sister Gloria Perez, Anthony McCants, and Ronald Bryant Jenkins[2] (collectively, the "Defendants"). Jurisdiction is premised on 28 U.S.C. § 1331. Currently before the Court are Defendants' respective motions for summary judgment. Plaintiff has not formally opposed these motions.[3] The Court also considers Plaintiff's motion to amend his complaint which was filed on

February 15, 2006. For the following reasons, Plaintiff's motion for leave to amend his complaint is denied. Defendants' motions for summary judgment are granted.[4]

I. *Factual History*
Plaintiff was a sixteen-year participant in the drug recovery program, Narcotics Anonymous, or "NA."[5] During his participation in NA, Plaintiff regularly attended meetings held at Eva's Village in Paterson, New Jersey. Plaintiff attended these meetings in an effort to cure his drug addiction through the Narcotics Anonymous twelve-step self-help program.

The Narcotics Anonymous twelve-step program is a product of literature that is developed and sold by NAWS, the national organization of Narcotics Anonymous. Greater Paterson is a service organization that is permitted to use the Narcotics Anonymous name and literature to conduct local NA meetings. Greater Paterson operates twenty NA meetings in the Paterson, New Jersey area, including five meetings held at Eva's Village, a service facility that provides meals, shelter, and drug and alcohol recovery programs for people in need. Individual defendants Derrick Williams, Gregory Anderson, Sister Gloria Perez, Anthony McCants, and Ronald Bryant Jenkins are employees of Eva's Village.

Beginning in approximately the summer of 2002, Plaintiff complained to staff members at Eva's Village about what he perceived to be his "right to close a meeting with the prayer of his choice," namely, the "Lord's Prayer." Plaintiff was not permitted to close meetings with this prayer because of objections by other NA members. The Sixth Tradition of Narcotics Anonymous prohibits NA groups from endorsing any outside enterprise, such as a specific religion, in an effort to maintain the focus of meetings on recovery from addiction. Plaintiff's complaints became disruptive to the NA meetings. Accordingly, on January 29, 2003, Ronald Bryant Jenkins of Eva's Village informed Plaintiff that he was no longer welcome at NA meetings at Eva's Village.

Plaintiff returned to a NA meeting on February 12, 2003. Sister Gloria Perez, Executive Director of Eva's Village, called the Paterson Police Department to report that Plaintiff was trespassing at Eva's Village. An officer responded and removed Plaintiff from the premises. Sister Perez did not file a criminal complaint against Plaintiff; however, the officer informed Plaintiff that if he returned to Eva's Village, he would be arrested for trespassing.

2006 WL 469938

**\*2** On June 6, 2004, Plaintiff filed the instant complaint alleging that Defendants violated the following constitutional, statutory, and common law provisions by prohibiting him from conducting prayer at NA meetings and removing him from the facility allegedly because of his religious beliefs:[6] (1) First Amendment; (2) Fourteenth Amendment; (3) 42 U.S.C. § 1983; (4) 42 U.S.C. § 1985; (5) 42 U.S.C. § 2000a; (6) 18 U.S.C. § 371; (7) 18 U.S.C. § 245(b)(2)(B); (8) Federal Hate Crimes Act; (9) New Jersey Law Against Discrimination, N.J.S.A. §§ 10:5-1 *et seq.* ("NJLAD"); (10) New Jersey Hate Crimes Act, N.J.S.A. § 2C:44-3e; (11) fraud; (12) misrepresentation; (13) defamation; (14) false light; and (15) harassment.[7]

II. *Procedural History*
The procedural history in this case is extensive. Plaintiff filed a Motion for Judgment on the Pleadings or in the alternative a Motion for Summary Judgment which was denied by the Court on September 17, 2004. Plaintiff then filed numerous motions seeking the recusal or disqualification of Judge Pisano and Magistrate Judge Madeline C. Arleo, which were denied and affirmed on appeal by the United States Court of Appeals for the Third Circuit. On September 15, 2005, Defendants filed motions for summary judgment arguing that Plaintiff's claims were barred by the New Jersey Charitable Immunity Act, N.J.S.A. § 2A:53A-7 (2005). By letter order dated November 10, 2005, the Court denied Defendants' motions because the New Jersey Charitable Immunity Act did not apply to Plaintiff's non-negligence claims. In its November 10, 2005 letter order, the Court also denied Plaintiff's Cross-Motion for Summary Judgment. The Court permitted Defendants to file motions for summary judgment that addressed the validity of the various non-negligence causes of action alleged by Plaintiff. Plaintiff moved to amend his complaint.

III. *Motion to Amend Complaint*
On February 15, 2006, while the instant motions for summary judgment were pending, Plaintiff filed a motion to amend his complaint pursuant to Fed.R.Civ.P. 15. Plaintiff claims that amendment of his complaint is warranted because Plaintiff wishes to add a party, add new claims, dismiss a claim, correct certain errors in the pleadings, and discuss purported changes in the law and purported "new evidence."

Pursuant to Rule 15(a), a party may amend his pleading once as a matter of course at any time before a responsive pleading is served. This provision does not apply to this case because Defendants filed answers to Plaintiff's complaint on October 6, 2004, December 2, 2004, and June 14, 2005. Accordingly, Plaintiff may only amend his complaint if he either receives written consent of his adversaries, which Plaintiff does not have,[8] or leave of Court. Although leave to amend should be "freely given," a district court may deny a motion to amend if it is apparent from the record that (1) the moving party has demonstrated undue delay, bad faith or dilatory motives; (2) the amendment would be futile; or (3) the amendment would prejudice the other party. *See, e.g., Hill v. City of Scranton,* 411 F.3d 118, 134 (3d Cir.2005).

**\*3** The Court denies Plaintiff's motion because his proposed amendments are untimely, substantially prejudice the Defendants, and are futile. First, Plaintiff unduly delayed in filing his proposed amended complaint, which was filed over one and one-half years after his original complaint was filed on June 6, 2004. Plaintiff provides no valid reason for this delay. Further, the Court's review of Plaintiff's proposed amended complaint reveals that it essentially recites the same facts and arguments presented in his original complaint. *See Hill,* 411 F.3d at 134 (affirming district court's denial of leave to amend where rather than explaining the cause of her delay in proposing amendments, plaintiff devoted most of her brief to re-arguing her original claims).

To the extent he sets forth any new facts, it is clear that Plaintiff was aware of such facts, as well as the existence of William ("Bobby") Singletary, the individual Plaintiff wishes to add as a defendant, at the time he originally filed this lawsuit. *See Duffy v. Charles Schwab & Co., Inc.,* No. CIV.A. 98-4595, 2001 WL 1104689, at \*1-2 (D.N.J. Sept. 4, 2001) (denying leave to amend under Rule 15(a) and noting that plaintiffs were aware of the facts relating to their amended claims at the time they originally filed their complaint). In fact, Plaintiff specifically mentions Mr. Singletary and discusses his conduct in his original complaint.

Moreover, the Court finds that granting Plaintiff's motion to amend his complaint would significantly prejudice the Defendants because it would require Defendants to have to amend their motions for summary judgment or file additional dispositive motions in this matter. Further, Defendants would be forced to expend additional cost and preparation in defending against Plaintiff's accusations. *See Duffy,* 2001 WL 1104689, at \*1-3 (denying leave to amend because such would prejudice the defendant where summary judgment motions were pending and allowing amendment would result in increased cost, preparation, and motion practice).

2006 WL 469938

Further, Plaintiff's proposed amendments would ultimately be futile. The new evidence and changes in law that Plaintiff relies on are irrelevant to this case and do not change the ultimate outcome. *See Oran v. Stafford,* 226 F.3d 275, 291 (3d Cir.2000) (affirming district court's denial of leave to amend where plaintiff's additional allegations were essentially irrelevant to the disposition of the matter). Additionally, a review of Plaintiff's proposed new causes of action reveals that Plaintiff provides no specific facts to sustain legally sufficient claims for a violation of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 *et seq.;* a violation of the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq.;* negligence; promissory estoppel; abuse of process; intentional infliction of emotional distress; and intentional interference with his membership in NA. *See Oran,* 226 F.3d at 291 ("Futility is governed by the same standard of legal insufficiency that applies under rule 12(b)(6)."); *Boerger v. Commerce Ins. Services,* No. Civ. 04-1337, 2005 WL 3235009, at *3 (D.N.J. Nov. 28, 2005) (stating that if the proposed amendment is frivolous or states a claim that is legally insufficient on its face, the court may deny leave to amend). Thus, the Court denies Plaintiff's motion to amend his complaint.

## IV. *Motions for Summary Judgment*

### A. *Legal Standard*
**\*4** A court shall grant summary judgment under Rule 56(c) of the Federal Rules of Civil Procedure "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The substantive law identifies which facts are critical or "material." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

On a summary judgment motion, the moving party must show, first, that no genuine issue of material fact exists. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). The burden then shifts to the non-moving party to present evidence that a genuine, fact issue compels a trial. *Id.* at 324. In so presenting, the non-moving party must offer specific facts that establish a genuine issue of material fact, not just "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586-87 (1986).

The Court must consider all facts and their logical inferences in the light most favorable to the non-moving party. *Pollock v. American Tel. & Tel. Long Lines,* 794 F.2d 860, 864 (3d Cir.1986). The Court shall not "weigh the evidence and determine the truth of the matter," but need determine only whether a genuine issue necessitates a trial. *Anderson,* 477 U.S. at 249. If the non-moving party fails to demonstrate proof beyond a "mere scintilla" of evidence that a genuine issue of material fact exists, then the Court must grant summary judgment. *Big Apple BMW v. BMW of North America,* 974 F.2d 1358, 1363 (3d Cir.1992).

### B. *First Amendment, Fourteenth Amendment, and 42 U.S.C. § 1983 Claims*
Plaintiff alleges that Defendants violated Plaintiff's First Amendment rights of free speech, religion, and assembly, as well as the Equal Protection Clause of the Fourteenth Amendment, by denying Plaintiff the opportunity to close NA meetings with the prayer of his choice and subsequently preventing him from attending NA meetings at Eva's Village.

Plaintiff further alleges that Defendants' conduct violated his civil rights pursuant to 42 U.S.C. § 1983 (2006). To state a claim under § 1983, Plaintiff must establish that he was deprived of a right secured by the Constitution or laws of the United States and that the alleged deprivation was committed under color of state law. 42 U.S.C. § 1983; *Am. Mfrs. Mut. Ins. Co. v. Sullivan,* 526 U.S. 40, 49-50 (1999).

In order for Plaintiff to establish that Defendants violated the First Amendment, Fourteenth Amendment, or § 1983, Plaintiff must show that the alleged discriminatory conduct involved state action. *See, e.g., Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 929 (1982) (stating that the Fourteenth Amendment has a state action requirement); *Versarge v. Twp. of Clinton, N.J.,* 984 F.2d 1359, 1363 (3d Cir.1993) (indicating that state action is required to trigger application of the First Amendment (citing *New York Times Co. v. Sullivan,* 376 U.S. 254, 265 (1964))); *see also Am. Mfrs Mut. Ins. Co.,* 526 U.S. at 50 ("Like the state-action requirement of the Fourteenth Amendment, the under-color-of-state-law element of § 1983 excludes from its reach merely private conduct, no matter how discriminatory or wrongful." (citation omitted)). If the conduct satisfies this state action requirement, it also constitutes action "under color of state law" for § 1983 purposes. *Id.* at 295 n. 2 (citing *Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 935 (1982)).

**\*5** Defendants are undisputably private entities and individuals. Accordingly, their private conduct will only satisfy the state action requirement if there is such a close connection between the seemingly private behavior and the state action that the behavior " 'may be fairly treated

as that of the State itself." ' *Brentwood Academy v. Tenn. Secondary School Athletic Assoc.,* 531 U.S. 288, 295 (2001) (quoting *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 351 (1974)).[10]

Plaintiff fails to satisfy the state action requirement. First, Plaintiff fails to allege that NAWS or Greater Paterson had *any* connection to a state official or entity, let alone the type of close connection that would justify a suit against these defendants for constitutional violations.

Furthermore, Plaintiff's claim that Eva's Village and its employees violated his rights under the constitution and § 1983 also fails because Plaintiff has not established the requisite state action. Plaintiff's sole "state action" allegation is that Sister Perez of Eva's Village called the Paterson Police Department on February 12, 2003 to report Plaintiff for trespassing after employees at Eva's Village told Plaintiff not to return to the facility. An officer responded to the call and removed Plaintiff from the premises. This allegation is insufficient to establish state action or a deprivation of Plaintiff's rights under color of state law. *See Ginsberg v. Healey Car & Truck Leasing, Inc.,* 189 F.3d 268, 271-73 (2d Cir.1999) (holding that a private citizen's act of seeking assistance of the police in quelling a disturbance by a customer did not establish state action); *Johns v.. Home Depot U.S.A., Inc.,* 221 F.R.D. 400, 404-05 (S.D.N.Y.2004) (same); *Liwer v. Hair Anew,* No. 99-Civ. 11117, 2000 WL 223828, at *2 (S.D.N.Y. Feb. 25, 2000); ("Even assuming, arguendo, that defendant called the police for assistance, this does not mean that defendant so closely aligned itself with state actors as to come within the purview of § 1983).[11] To hold otherwise would render private citizens open to constitutional and § 1983 liability every time they called the police for legitimate assistance. Plaintiff has provided no evidence to support his bare assertions that the phone call to the police was anything other than a legitimate request for help.

Accordingly, Plaintiff's First Amendment, Fourteenth Amendment, and § 1983 claims are dismissed.

## C. *Claims Pursuant to 42 U.S.C. § 1985*

Plaintiff alleges that Defendants violated 42 U.S.C. § 1985(3), which prohibits conspiracies to deprive an individual of the "equal protection of the laws, or of equal privileges and immunities under the laws." 42 U.S.C. § 1985(3). Because § 1985(3) does not provide its own substantive rights, the rights vindicated by this section must be found elsewhere. *See United Brotherhood of Carpenters and Joiners of Am., Local 610, AFL-CIO et al. v. Scott,* 463 U.S. 825, 833 (1983). In support of his §

1985(3) claim, Plaintiff alleges a conspiracy to violate his First and Fourteenth Amendment rights. Thus, Plaintiff must show state involvement in the alleged conspiracy. *Id.* at 831-32; *see also Volunteer Medical Clinic, Inc. v. Operation Rescue,* 948 F.2d 218, 226 (6ᵗʰ Cir.1991) (stating that where a § 1985(3) claim is based on a conspiracy to violate rights secured under the First and Fourteenth Amendments, the complainant must show state involvement in the conspiracy); *Hauptmann v. Wilentz,* 570 F.Supp. 351, 385 (D.N.J.1983) ( "[W]hen the alleged conspiracy is aimed at interfering with rights that are by definition rights only against state interference ... the plaintiff in a § 1985(3) suit must establish that the conspiracy contemplated state involvement."). As stated in section IV.B. above, Plaintiff has not shown such state action and accordingly, his § 1985(3) claims are dismissed.

## D. *Claims Pursuant to 42 U.S.C. § 2000a*

**\*6** Plaintiff asserts that Defendants violated Title II of the Civil Rights Act, codified at 42 U.S.C. § 2000a by discriminating against him in denying him access to Eva's Village on the basis of his religious beliefs.[12] Section 2000a prohibits discrimination on the basis of, among other things, religion, in denying a person access to a place of public accommodation. 42 U.S.C. § 2000a.

The Court initially notes that it is skeptical that Eva's Village is a place of public accommodation for purposes of 42 U.S.C. § 2000a because it may not have the requisite ties to interstate commerce. *See, e.g., United States v. Landsdowne Swim Club,* 894 F.2d 83, 86 (3d Cir.1990) ("Under [42 U.S.C. § 2000a] a place of public accommodation has two elements: first, it must be one of the statutorily enumerated categories of establishments that serve the public ... second, its operations must affect commerce."); *Marsh v. Delaware State University,* No. Civ.A. 05-00087JJF, 2006 WL 141680, at *5 (D. Del Jan. 19, 2006) ("Section 2000a of Title II of the Civil Rights Act, creates a private cause of action to remedy discrimination in public accommodations affecting interstate commerce."). However, the parties did not brief this issue. Accordingly, the Court presumes that Eva's Village is a place of public accommodation.

In any event, Plaintiff's § 2000a claims against NAWS and Greater Paterson are dismissed because there is no dispute that neither of these Defendants prevented Plaintiff from attending NA meetings at Eva's Village. Instead, Plaintiff alleges that employees of Eva's Village prohibited Plaintiff from attending such meetings.

Furthermore, with respect to Eva's Village and its

Thompson v. Eva's Village and Sheltering Program, Not Reported in F.Supp.2d (2006)

2006 WL 469938

employees, Plaintiff's claims are dismissed because the record in this case is devoid of any evidence that Plaintiff was discriminated against based on his religious beliefs. *See McAllister v. Greyhound Lines, Inc.,* No. CIV.A. 96-2225, 1997 WL 642994, at *7-8 (D.N.J. Oct. 7, 1997) (granting summary judgment on plaintiff's Title II claim where the record was "devoid of any evidence that [plaintiffs] were discriminated against"). Although Plaintiff conclusorily states numerous times that he was discriminated against because of his religious beliefs, Plaintiff presents no facts to support these assertions. While Plaintiff's insistence on closing NA meetings with the prayer of his choice undoubtedly instigated the chain of events giving rise to his ban and removal from Eva's Village, there is no evidence to suggest that his removal was for anything other than his disruptive behavior after being informed he could not close the meeting with the "Lord's Prayer." Accordingly, Plaintiff's claim of religious discrimination pursuant to 42 U.S.C. § 2000a is dismissed.

E. *Claims Pursuant to 18 U.S.C. §§ 371 & 245(b)(2)(B)*
Plaintiff claims that Defendants violated 18 U.S.C. §§ 371 and 245(b)(2)(B) by conspiring to commit an offense against the United States and conspiring against Plaintiff to deprive him of his constitutional and civil rights. Sections 371 and 245(b)(2)(B) are federal criminal statutes and thus they do not convey a private right of action. *See, e.g., Maier v. Phillips,* No. 99-7120, 2000 WL 234453, at *2 (2d Cir. Feb. 1, 2000) (dismissing claim brought pursuant to 18 U.S.C. § 371 because § 371 is a criminal statute that affords no private right of action); *Fechter v. Shiroky,* No. 04-16047, 1995 WL 377155 at *4 (9th Cir. June 23, 1995) (affirming dismissal of § 245 claims because, as a criminal statute, there is no private right of action); *Rockefeller v. U.S. Court of Appeals Office, For The Tenth Circuit Judges,* 248 F.Supp.2d 17, 23 (D.D.C.2003) (dismissing plaintiff's § 371 claims because there is no private right of action); *John's Insulation, Inc. v. Siska Const. Co., Inc.,* 774 F.Supp. 156, 163 (S.D.N.Y.1991) (finding that § 245 does not create a private right of action for damages). Accordingly, since Plaintiff does not have the right to bring claims pursuant to 18 U.S.C. §§ 371 and 245(b)(2)(B), such claims are dismissed.

F. *Claims Pursuant to the "Federal Hate Crimes Statute"*
**\*7** Plaintiff alleges that Defendants engaged in acts which violated the "Federal Hate Crimes Act;" however, Plaintiff fails to specify which federal statute Defendants allegedly violated. Thus, Plaintiff fails to state a claim for relief. To the extent that Plaintiff is referring to 18 U.S.C. § 245(b)(2)(B), this claim is dismissed for the reasons stated in section IV.E. above.

G. *New Jersey State Law Claims*
Since the Court has dismissed all of the federal claims in this action over which it had original jurisdiction, the Court declines to exercise supplemental jurisdiction over Plaintiff's New Jersey state law claims. 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over a claim ... if the district court has dismissed all claims over which it has original jurisdiction."); *see also Jerrytone v. Musto,* No. 04-4145, 2006 WL 162656, at *6 (3d Cir. Jan. 23, 2006) (affirming district court's decision not to exercise supplemental jurisdiction over plaintiff's state law claims pursuant to § 1367(c)(3) after court granted summary judgment in favor of defendant on all of plaintiff's federal claims).

V. *Conclusion*
In conclusion, for the reasons stated above, the Court denies Plaintiff's motion to amend his complaint. The Court also grants Defendants' motions for summary judgment on all of Plaintiff's federal claims and, pursuant to 28 U.S.C. § 1367, declines to exercise supplemental jurisdiction over Plaintiff's New Jersey state law claims. Accordingly, Plaintiff's complaint is dismissed and this matter is hereby closed. An appropriate order accompanies this opinion.

**All Citations**

Not Reported in F.Supp.2d, 2006 WL 469938

Footnotes

1    Narcotics Anonymous World Services, Inc. was improperly pled as World Service Organization, Inc.

2    Ronald Bryant Jenkins was improperly pled as Bryant Jenkins.

WESTLAW    © 2016 Thomson Reuters. No claim to original U.S. Government Works.    5

3    Plaintiff's original response to Defendants' motions for summary judgment was due on January 13, 2006. Plaintiff requested, and was granted, two extensions of this date. By order dated February 3, 2006, the Court emphasized that if Plaintiff did not file his brief by February 8, 2006, which gave him almost two months to respond to the motions, the Court would treat the motions as unopposed. Plaintiff did not file his brief by February 8, 2006. He claims, first, that he did not receive timely notice of the Court's order. Despite this claim of untimely notice, as of the date of this opinion, Plaintiff has not filed a formal opposition to these motions. Further, Plaintiff continues to claim that he needs more time to oppose these motions; however, during the two months he had to oppose these motions, Plaintiff managed to inundate the Court with four lengthy motions and at least seven voluminous letters.

      Plaintiff's most recent letter, dated February 17, 2006, while apparently in response to a February 14, 2006 letter submitted to the Court by NAWS, contains various statements in response to Defendants' motions for summary judgment. Even though this submission is untimely and in violation of the Court's February 3, 2006 order, the Court will again accommodate Plaintiff by taking into account his letter in ruling on these motions.

4    The Court decides these motions without oral argument as permitted by Fed.R.Civ.P. 78.

5    In his February 17, 2006 letter to the Court, Plaintiff claims that he did not attend NA meetings at Eva's Village and "at no time was [Plaintiff] affiliated with Eva's Village." This statement is completely contradictory to allegations in Plaintiff's complaint and the evidence in the record. Further, it is absurd considering Plaintiff's participation in NA meetings at Eva's Village is the subject of this lawsuit.

6    Although Plaintiff makes reference to his race, African-American, and a purported disability, Plaintiff provides no evidence that his race or alleged disability played any role in the events giving rise to this lawsuit.

7    The Court delineated Plaintiff's alleged causes of action in its November 10, 2005 letter order.

8    Defendant NAWS submitted a letter to the Court on February 14, 2006 vehemently objecting to Plaintiff's proposed amendments to his complaint.

9    Although none of the Defendants filed substantive motions objecting to Plaintiff's proposed amended complaint, given the protracted history of this case and in the interests of judicial economy and the Court's need to manage its own docket, the Court adjudicate's Plaintiff's motion to amend without substantive responses from Defendants.

10    There is no evidence that Defendants perform government functions, that they were coerced to perform such functions, or that Defendants operate in significant interdependence with the state. *See, e.g., Bailey v. Harleysville Nat. Bank & Trust Co.,* No. Civ. A. 02-1541, 2005 WL 2012024, at *3 (E.D.Pa. Aug. 22, 2005). The Court also notes that Plaintiff has not even named any state official or entity as a defendant in his complaint.

11    The holdings in *Ginsberg, Johns,* and *Liwer* dealt specifically with the "under color of state law" requirement in § 1983 claims. The Court sees no reason why the principles of these cases should not be applied to its analysis of both the § 1983 and constitutional claims posited by Plaintiff in this matter.

12    Plaintiff cannot claim that he was improperly denied access to NA or Greater Paterson under Title II because both of those organizations lack a fixed situs. *See Clegg v. Cult Awareness Network,* 18 F.3d 752, 755-56 (9th Cir.1994) (indicating that Title II of Civil Rights Act requires that plaintiff show that the organization is connected to a particular location in order for the organization to be a place of public accommodation under the Act); *Welsh v. Boy Scouts of Am.,* 993 F.2d 1267, 1269-70 (7th Cir.1993) (affirming district court's conclusion that Boy Scouts of America was not a place of public accommodation under Title II of the Civil Rights Act because it was a membership organization that lacked a close connection to a particular site or facility).

**End of Document**    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

**Thompson v. Eva's Village and Sheltering Program, Not Reported in F.Supp.2d (2006)**

2006 WL 469938

Exhibit J

Merrick v. UnitedHealth Group Incorporated, --- F.Supp.3d ---- (2016)

2016 WL 1229616, 61 Employee Benefits Cas. 1662

2016 WL 1229616
United States District Court,
S.D. New York.

Timothy Merrick, D.C. d/b/a Alive & Well Chiropractic, Joshua I. Kantor, D.C., Jason Piken, D.C. d/b/a Innate Chiropractic of Manhattan, and Craig Fishel, D.C., on behalf of themselves and all others similarly situated, Plaintiffs,
v.
UnitedHealth Group Incorporated, UnitedHealthcare, Inc., UnitedHealthcare Services, Inc., Optum Inc., and OptumHealth, Inc., Defendants.

14 Civ. 8071 (ER)
|
Signed March 25, 2016

**Synopsis**

**Background:** Out-of-network and in-network providers of chiropractic services brought putative class action against healthcare insurer, as putative plan and/or claims administrator of healthcare plans, claiming that insurer violated the Employee Retirement Income Security Act (ERISA) by approving payment of claims, but then reversing previously made benefit determinations and offsetting amounts previously paid, after the claims determination period had ended. After in-network provider was required to participate in arbitration, 127 F.Supp.3d 138, insurer move to dismiss out-of-network providers claims for failure to state a claim.

**Holdings:** The District Court, Ramos, J., held that:

[1] in a matter of first impression, an unambiguous anti-assignment provision in an ERISA-governed healthcare plan is valid and enforcible;

[2] insurer was not estopped from enforcing anti-assignment provision against providers; and

[3] insurer did not waive anti-assignment provision.

Motion granted.

West Headnotes (13)

[1]    **Labor and Employment**
       Parties in general; standing
       **Labor and Employment**
       Parties in general; standing

       ERISA limits the class of individuals who can sue to recover benefits due, enforce rights, or clarify rights to future benefits to those individuals who are participants or beneficiaries of a benefits plan. Employee Retirement Income Security Act of 1974 § 502, 29 U.S.C.A. § 1132(a)(1)(B).

       Cases that cite this headnote

[2]    **Labor and Employment**
       Parties in general; standing

       The assignees of beneficiaries to an ERISA-governed insurance plan have standing to sue under ERISA. Employee Retirement Income Security Act of 1974, § 2 et seq., 29 U.S.C.A. § 1001 et seq.

       Cases that cite this headnote

[3]    **Federal Courts**
       Pension and benefit plans

       The validity of assignments for ERISA purposes is a question of federal common law. Employee Retirement Income Security Act of 1974, § 2 et seq., 29 U.S.C.A. § 1001 et seq.

       Cases that cite this headnote

[4]    **Labor and Employment**
       Anti-alienation

       To determine whether contract language

Merrick v. UnitedHealth Group Incorporated, --- F.Supp.3d ---- (2016)

2016 WL 1229616, 61 Employee Benefits Cas. 1662

prohibits assignment to a healthcare provider, courts apply traditional principles of contract interpretation and interpret ERISA plans in an ordinary and popular sense as would a person of average intelligence and experience. Employee Retirement Income Security Act of 1974, § 2 et seq., 29 U.S.C.A. § 1001 et seq.

Cases that cite this headnote

[5]    **Federal Courts**
🔑 Pension and benefit plans
**Labor and Employment**
🔑 Interpretation of Plan

Because the rules of contract law apply to ERISA plans, a court must not rewrite, under the guise of interpretation, a term of the contract when the term is clear and unambiguous; however, courts may draw inspiration from state law in discerning the content of federal common law to the extent that state law is not inconsistent with the federal policies underlying ERISA. Employee Retirement Income Security Act of 1974, § 2 et seq., 29 U.S.C.A. § 1001 et seq.

Cases that cite this headnote

[6]    **Labor and Employment**
🔑 Anti-alienation

An unambiguous anti-assignment provision in an ERISA-governed healthcare plan is valid and enforcible. Employee Retirement Income Security Act of 1974, § 2 et seq., 29 U.S.C.A. § 1001 et seq.

Cases that cite this headnote

[7]    **Labor and Employment**
🔑 Anti-alienation

Claim and plan administrator's alleged pattern and practice of directly paying out-of-network chiropractors for services provided to

beneficiaries of ERISA plans did not estop administrator from claiming that the plan's anti-assignment provision prohibited chiropractor's from bring claims seeking to recover benefits due or enjoin any act or practice of administrator, as the assignee of the beneficiaries, where there were no allegations of intentional inducement or deception by administrator, or any conduct that might be considered beyond the ordinary, and the ERISA plans authorized direct payments to providers. Employee Retirement Income Security Act of 1974 §§ 502, 502, 29 U.S.C.A. §§ 1132(a)(1)(B), 1132(a)(3).

Cases that cite this headnote

[8]    **Labor and Employment**
🔑 Estoppel of plan to deny eligibility or coverage

To establish estoppel in an ERISA action, a party must sufficiently allege: (1) a promise; (2) reliance on the promise; (3) injury caused by the reliance; and (4) an injustice if the promise is not enforced, and facts sufficient to satisfy an extraordinary circumstances requirement. Employee Retirement Income Security Act of 1974, § 2 et seq., 29 U.S.C.A. § 1001 et seq.

Cases that cite this headnote

[9]    **Estoppel**
🔑 Nature and elements of waiver

Waiver arises when a party has voluntarily or intentionally relinquished a known right.

Cases that cite this headnote

[10]    **Labor and Employment**
🔑 Anti-alienation

Claim and plan administrator's direct payments to out-of-network providers of chiropractic

Merrick v. UnitedHealth Group Incorporated, --- F.Supp.3d ---- (2016)

2016 WL 1229616, 61 Employee Benefits Cas. 1662

services and communications requesting documentation and reimbursement of payments did not constitute voluntary or intentional relinquishment of the anti-assignment provision of an ERISA healthcare plan, and thus providers lacked statutory standing as an assignee of beneficiaries seeking to bring ERISA claims seeking to recover benefits due or enjoin any act or practice of administrator, where direct payments were permitted by the terms of the ERISA plan, and the communications contained no reference to the anti-assignment provision. Employee Retirement Income Security Act of 1974 §§ 502, 502, 29 U.S.C.A. §§ 1132(a)(1)(B), 1132(a)(3).

Cases that cite this headnote

[11]    **Labor and Employment**
        👉 Plain meaning

Unambiguous language in an ERISA plan must be interpreted and enforced according to its plain meaning and when the language of an ERISA plan is unambiguous, the court will not read additional terms into the contract. Employee Retirement Income Security Act of 1974, § 2 et seq., 29 U.S.C.A. § 1001 et seq.

Cases that cite this headnote

[12]    **Labor and Employment**
        👉 Interpretation of Plan

Language in an ERISA plan is ambiguous when it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire agreement. Employee Retirement Income Security Act of 1974, § 2 et seq., 29 U.S.C.A. § 1001 et seq.

Cases that cite this headnote

[13]    **Federal Civil Procedure**
        👉 Form and sufficiency of amendment; futility

Amendment is generally not warranted absent some indication as to what plaintiffs might add to their complaint in order to make it viable.

Cases that cite this headnote

**Attorneys and Law Firms**

Peter R. Kahana, Russell David Paul, Berger & Montague, P.C., Philadelphia, PA, Richard J. Quadrino, Quadrino Law Group P.C., Melville, NY, Steven Lawrence Bloch, Bailey & Glasser, LLP, West Conshohocken, PA, for Plaintiffs.

Brian David Boyle, Gregory Frederick Jacob, Meaghan Vergow, O'Melveny & Myers LLP, Washington, DC, Danielle Carim Gray, Sloane Ackerman, O'Melveny & Myers, LLP (NYC), New York, NY, for Defendants.

*OPINION AND ORDER*

Ramos, D.J.

**\*1** Four Chiropractors, Timothy Merrick, D.C. ("Merrick"), Joshua Kantor D.C. ("Kantor"), Jason Piken, D.C. ("Piken"), and Craig Fishel D.C. ("Fishel," and collectively "Plaintiffs"), assert a class action on behalf of themselves and others similarly situated, against UnitedHealth Group Incorporated, UnitedHealthcare, Inc., UnitedHealthcare Services, Inc., Optum, Inc., and OptumHealth, Inc. (collectively, "Defendants" or "United"), asserting violations of the Employee Retirement Income Security Act of 1974 ("ERISA"). In the instant motion, United moves to dismiss Kantor, Piken, and Fishel. For the reasons set forth below, United's motion is GRANTED.

**I. Factual Background**[1]
Plaintiffs are healthcare providers licensed to provide chiropractic services in New York. Am. Compl. ¶¶ 1, 4–6. Plaintiffs provide healthcare services to patients covered under United healthcare plans governed by ERISA ("Covered Patients"). *Id.* ¶¶ 1, 14, 19, 53. Three Plaintiffs,

2016 WL 1229616, 61 Employee Benefits Cas. 1662

Kantor, Piken, and Fishel, are "out-of-network providers," while Merrick is an "in-network" healthcare provider. *Id.* ¶ 19. "An 'out-of-network' provider has no contract with United," while "[a]n 'in-network' provider is a provider who has entered into a contractual agreement with United ... under which the provider has agreed to accept reduced benefits under the Plans for providing healthcare services to Covered [Patients] ('Provider Agreements')." *Id.* ¶ 18. The instant motion involves only the out-of-network Plaintiffs. According to Plaintiffs, Covered Patients routinely authorize them, as providers, to receive payments from United. *Id.* ¶ 65–69, 97–101, 142–148. As a result, Plaintiffs bill directly to and receive payments directly from United for services provided to Covered Patients. *Id.* ¶¶ 19, 67–69, 99–101, 146–148.

UnitedHealth Group Incorporated is a health care company incorporated in Delaware. *Id.* ¶ 7. UnitedHealthcare, Inc., UnitedHealthcare Services, Inc., Optum, Inc., and OptumHealth, Inc., doing business as OptumHealth Care Solutions Inc., are wholly owned subsidiaries of UnitedHealth Group Incorporated. *Id.* ¶¶ 8–11. Plaintiffs allege that United is a Plan and/or Claims Administrator as defined by ERISA, and is therefore, responsible for determining whether a given claim is covered under the healthcare plans and effectuating payment for any covered services. *Id.* ¶¶ 7, 17.

Plaintiffs assert putative class action claims against United for purported violations of the ERISA claims regulation, 29 C.F.R. § 2560.503–1 ("Claims Regulation"). *Id.* ¶ 46. According to Plaintiffs, when a Plan or Claim Administrator renders an initial decision on claims, "meaning the decision rendered before any appeal of a claim determination," the Claims Regulation requires claimant, in this case Plaintiffs, to be notified of an "adverse benefit determination"[2] made by the Plan "no[ ] later than 30 days after receipt of the claim." *Id.* ¶ 25 (citing 29 C.F.R. § 2560.503–1(f)(2)(iii)(B)). This time period "may be extended one time by the plan for up to 15 days, provided the plan administrator determines such an extension is necessary ... and notifies the claimant, prior to the expiration of the initial 30–day period[.]" *Id.* Plaintiffs claim that United originally "voluntarily paid ... benefits within the required time limits set out in the Claims Regulation" but then reversed its initial benefit determination on numerous occasions after the thirty-day time period passed, and, without requesting an extension, requested that Plaintiffs refund the amount allegedly overpaid by United for these benefits. *Id.* ¶¶ 1, 60–62, 187. Specifically, Plaintiffs allege that United sent them letters requesting patient's clinical records after the thirty-day period had passed, and then recouped the allegedly overpaid amounts when Plaintiffs declined to

provide clinical records on the basis that United could no longer question the claims. *Id.* ¶¶ 60, 62, 73–69, 105–120, 152–165. United allegedly recouped the overpaid amounts by offsetting these amounts from approved claim payments owed to the same providers for services provided to different patients under different healthcare plans. *Id.* ¶¶ 62, 91, 96, 116, 120, 160, 165, 187. Plaintiffs assert that United's recoupment of previously paid claims amount to an "Adverse Benefit Determination" as defined in the Claims Regulation. *Id.* ¶¶ 26, 169, 173.

**\*2** Plaintiffs allege that they have standing to sue for ERISA benefits as plan designated beneficiaries (asserting "rights to receive benefits as expressly designated pursuant to the terms of" the plan), or as assignees asserting ERISA claims on behalf of Covered Patients as participant designated beneficiaries (asserting rights transferred by their patients), or assignees of their patients (same). *Id.* ¶¶ 54–59. Specifically at issue in the instant motion are Covered Patients' alleged assignments of their ERISA benefits to out-of-network Plaintiffs, Kantor, Piken and Fishel, samples of which are attached to the Amended Complaint. *See id.* ¶¶ 65 ("I ... assign directly to Dr. Kantor all insurance benefits, if any, otherwise payable to me for services rendered...."); 66; 97 ("I ... assign directly to Dr. [Piken] all insurance benefits, if any, otherwise payable to me for services rendered...."); 98; 142 ("I hereby convey to [Dr. Fishel] ... any claim, chose in action, or other right I may have to such insurance and/or employee health care benefit coverage...."); 143 ("I hereby authorize payment to be made directly to Dr. Craig Fishel D.C., P.C. of all benefits which may be due and payable under insurance coverage for the above named patient...."); 144 ("I authorize and request my insurance company to pay directly to the chiropractic group [Dr. Fishel] insurance benefits otherwise payable to me ...."); *see also id.* Exs. 5–7 (alleged assignments by Kantor's patients); 8–12 (same from Piken's patients); 18–21 (same from Fishel's patients). In other words, Plaintiffs claim that, as a result of the forgoing assignments, they are entitled to sue United for "benefits" under the plan. However, the applicable healthcare plans contain the following prohibition on assignments:

> You may not assign your Benefits under the Policy to a non-Network provider without our consent. When an assignment is not obtained, we will send the reimbursement directly to you (the Subscriber) for you to reimburse them upon receipt of their bill. We may, however, in our discretion, pay a non-Network provider

directly for services rendered to you. In the case of any such assignment of Benefits or payment to a non-Network provider, we reserve the right to offset Benefits to be paid to the provider by any amounts that the provider owes us.

Am. Compl. Ex. 1 at 66; *see also* Ex. 2 at 67; Ex. 3 at 67; Ex. 4 at 68.[3] Plaintiffs do not allege that they sought United's consent to their assignments. Instead, Plaintiffs assert that United's course of conduct, including making payments directly to Plaintiffs, may be interpreted as United's consent or alternatively, as evidence that United waived, or is estopped from relying on, the anti-assignment provision. *Id.* ¶¶ 68–72; 100–104; 147–151.

Pursuant to ERISA Section 502(a)(1)(B),[4] Plaintiffs request declaratory relief that (a) Defendants have no legal authority, after the time set forth in the Claims Regulation, to reverse benefit determinations it previously made, (b) "cannot recoup monies that have been previously paid [,]" and (c) future payments owed by United for covered services "shall not be reduced—or offset—by any amounts" past the time period allotted in the Claims Regulation. *Id.* ¶¶ 192–194. Plaintiffs also request monetary judgment and reimbursement under Section 502(a)(1)(B), for "all amounts ... taken from Plaintiffs ... *via* offsetting." *Id.* ¶ 195. Pursuant to Section 502(a)(3),[5] Plaintiffs request injunctive relief enjoining United from reversing previously made benefit determinations and offsetting amounts previously paid in violation of the Claims Regulation or, alternatively, requiring United to comply with the Claims Regulation. *Id.* ¶¶ 197–200.

## II. Procedural Background

**\*3** On October 7, 2014, Plaintiffs filed their Complaint against United. Doc. 2. At a conference held before this Court on January 22, 2015, United was granted leave to file motions to compel arbitration of Plaintiff Merrick's claims and to dismiss the claims of the other three out-of-network Plaintiffs. On February 27, 2015, United filed the two motions.[6] Docs. 41, 43. On April 29, 2015, Plaintiffs filed an Amended Complaint. Docs. 52. At a conference held before this Court on June 24, 2015, United was granted leave to file the instant motion to dismiss the out-of-network Plaintiffs' claims.[7]

## III. Legal Standard

When ruling on a motion to dismiss pursuant to the Federal Rule of Civil Procedure 12(b)(6), the court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Nielsen v. Rabin,* 746 F.3d 58, 62 (2d Cir.2014); *Koch,* 699 F.3d at 145. The court is not required to credit "mere conclusory statements" or "threadbare recitals of the elements of a cause of action." *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (citing *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)); *see also id.* at 681, 129 S.Ct. 1937 (citing *Twombly,* 550 U.S. at 551, 127 S.Ct. 1955). "To survive a motion to dismiss, a complaint must contain sufficient factual matter ... to 'state a claim to relief that is plausible on its face.' " *Id.* at 678, 129 S.Ct. 1937 (quoting *Twombly,* 550 U.S. at 570, 127 S.Ct. 1955). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly,* 550 U.S. at 556, 127 S.Ct. 1955). More specifically, the plaintiff must allege sufficient facts to show "more than a sheer possibility that a defendant has acted unlawfully." *Id.* If the plaintiff has not "nudged [his] claims across the line from conceivable to plausible, [the] complaint must be dismissed." *Twombly,* 550 U.S. at 570, 127 S.Ct. 1955; *Iqbal,* 556 U.S. at 680, 129 S.Ct. 1937.

The question in a Rule 12 motion to dismiss " 'is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims.' " *Sikhs for Justice v. Nath,* 893 F.Supp.2d 598, 615 (S.D.N.Y.2012) (quoting *Villager Pond, Inc. v. Town of Darien,* 56 F.3d 375, 378 (2d Cir.1995)). "[T]he purpose of Federal Rule of Civil Procedure 12(b)(6) 'is to test, in a streamlined fashion, the formal sufficiency of the plaintiff's statement of a claim for relief without resolving a contest regarding its substantive merits,' " and without regard for the weight of the evidence that might be offered in support of Plaintiffs' claims. *Halebian v. Berv,* 644 F.3d 122, 130 (2d Cir.2011) (quoting *Global Network Commc'ns, Inc. v. City of New York,* 458 F.3d 150, 155 (2d Cir.2006)).

## IV. Discussion

### a. Plaintiffs' Standing to Bring ERISA Claims

[1]"Section 502(a)(1)(B) limits the class of individuals who can sue to recover benefits due, enforce rights, or clarify rights to future benefits to those individuals who are 'participants' or 'beneficiaries' of a benefits plan."

Merrick v. UnitedHealth Group Incorporated, --- F.Supp.3d ---- (2016)

2016 WL 1229616, 61 Employee Benefits Cas. 1662

*Simon v. Gen. Elec. Co.,* 263 F.3d 176, 176 (2d Cir.2001) (per curiam). Individuals that may sue under Section 502(a)(3) are similarly limited to "participants" and "beneficiaries."[8] *See* 29 U.S.C. § 1132(a)(3). Under ERISA, a "beneficiary" is defined as "a person designated by a participant, or by the terms of an employee benefit plan, who is or may become entitled to a benefit thereunder." 29 U.S.C. § 1002(8). Likewise, a "participant" is defined as "any employee or former employee ... who is or may become eligible to receive a benefit of any type from an employee benefit plan." *Id.* at § 1002(7). Only the parties enumerated in Section 502 may sue directly for relief. *Simon,* 263 F.3d at 177 (citing *Franchise Tax Bd. v. Constr. Laborers Vacation Trust for S. Cal.,* 463 U.S. 1, 27, 103 S.Ct. 2841, 77 L.Ed.2d 420 (1983); *Chemung Canal Trust Co. v. Sovran Bank/Maryland,* 939 F.2d 12, 14 (2d Cir.1991)). However, the Second Circuit has "joined the Fifth, Sixth, Seventh, and Ninth circuits in carving out a narrow exception to the ERISA standing requirements," which "grants standing only to healthcare providers to whom a beneficiary has assigned his claim in exchange for health care." *Simon,* 263 F.3d at 178 (internal citations omitted); *I.V. Services of Am., Inc. v. Trustees of Am. Consulting Eng'rs Council Ins. Trust Fund,* 136 F.3d 114, 117 n. 2 (2d Cir.1998) ("We agree with our sister circuits that, under federal common law, the assignees of beneficiaries to an ERISA-governed insurance plan have standing to sue under ERISA."); *Mbody Minimally Invasive Surgery, P.C. v. Empire Healthchoice HMO, Inc.,* No. 13 Civ. 6551(TPG), 2014 WL 4058321, at *3 (S.D.N.Y. Aug. 15, 2014) ("It is well-established in this Circuit that the assignees of beneficiaries to an ERISA-governed insurance plan have standing to sue under ERISA."), *reconsideration denied,* No. 13 Civ. 6551(TPG), 2015 WL 798082 (S.D.N.Y. Feb. 25, 2015). Plaintiffs assert that they have standing to bring these ERISA claims as statutory beneficiaries and as assignees of their patient's benefits. Am. Compl. ¶¶ 54–58. United, unsurprisingly, disagrees.[9]

### i. Statutory Beneficiaries

**\*4** Plaintiffs contend that they are statutory beneficiaries with the authority to bring ERISA claims because they are designated under the plan to receive payment directly from United for services provided to Covered Patients. *See* Am. Compl. ¶ 54. The Second Circuit, however, recently held that "[h]ealthcare providers are not 'beneficiaries' of an ERISA welfare plan by virtue of their ... their entitlement to payment[,]" *Rojas v. Cigna Health and Life Ins. Co.,* 793 F.3d 253, 259 (2d Cir.2015), finding that " 'beneficiary' as it is used in ERISA, does not without more encompass healthcare providers." *Id.* at 257. The court was "persuaded that Congress did not intend to include doctors in the category of 'beneficiaries,' " explaining that " '[b]eneficiary,' clearly refers to those individuals who share in the benefits of coverage—medical services and supplies covered under their health care policy" and that a provider's "right to payment" under the plan "does not a beneficiary make." *Id.* Accordingly, Plaintiffs' argument that they have standing to sue United as a plan designated beneficiary fails.[10]

### ii. Beneficiaries By Assignment

**[2]** As stated, "[i]t is well-established in this Circuit that 'the assignees of beneficiaries to an ERISA-governed insurance plan have standing to sue under ERISA.' " *Mbody Minimally Invasive Surgery, P.C.,* 2014 WL 4058321, at *3 (citing *I.V. Servs. of Am., Inc.,* 136 F.3d at 117 n. 2); *see also Simon,* 263 F.3d at 178. Plaintiffs claim that they obtained valid assignments from their patients in exchange for the provision of healthcare services and thus, have standing to sue. Am. Compl. ¶¶ 54–58. However, the applicable healthcare plans contain an anti-assignment provision that bar assignments made without the consent of United: "You may not assign your Benefits under the Policy to a non-Network provider without our consent." *See id.* Ex. 1 at 66, Ex. 2 at 67 (same), Ex. 3 at 67 (same), Ex. 4 at 68 (same). Accordingly, the Court must determine the effect of such a provision on the validity of Plaintiffs' purported assignments.

**[3] [4] [5]** "[T]he validity of assignments for ERISA purposes is a question of federal common law[.]" *Weisenthal v. United Health Care Ins. Co. of New York,* No. 07 Civ. 0945(LAP), 2007 WL 4292039, at *4 (S.D.N.Y. Nov. 29, 2007) (citing *I.V. Servs.,* 136 F.3d at 117 n. 2); *see also Devlin v. Empire Blue Cross and Blue Shield,* 274 F.3d 76, 85 n. 5 (2d Cir.2001) ("in ERISA cases, state law does not control. Instead, general common law principles apply."); *Schonholz v. Long Is. Jewish Med. Ctr.,* 87 F.3d 72, 79 (2d Cir.1996) ("ERISA is a federal law regime for regulating employee benefits designed to eliminate the threat of conflicting state and local regulation of benefit plans .... We are not bound by New York law").[11] To determine "whether contract language prohibits assignment to a healthcare provider, courts apply traditional principles of contract interpretation" and "interpret ERISA plans in an ordinary and popular sense as would a person of average intelligence and

experience." *Neuroaxis Neurosurgical Assoc., PC v. Costco Wholesale Co.,* 919 F.Supp.2d 345, 352 (S.D.N.Y.2013) (citing *Critchlow v. First UNUM Life Ins. Co. of Am.,* 378 F.3d 246, 256 (2d Cir.2004)); *Am. Psychiatric Assoc.,* 50 F.Supp.3d at 163 (courts "apply traditional principles of contract interpretation to anti-assignment provisions."). Because the "rules of contract law [apply] to ERISA plans, a court must not rewrite, under the guise of interpretation, a term of the contract when the term is clear and unambiguous." *Neuroaxis Neurosurgical Assoc.,* 919 F.Supp.2d at 352 (quoting *Burke v. PriceWaterHouseCoopers LLP Long Term Disability Plan,* 572 F.3d 76, 81 (2d Cir.2009)). Courts, however, may "draw inspiration from state law" "in discerning the content of federal common law ... to the extent that state law is not inconsistent with the federal policies underlying ERISA." *Id.* at 351.

**\*5** The Second Circuit has not yet spoken on the effect of assignments made in violation of anti-assignment provisions in ERISA plans. Other Circuit Courts, however, have concluded that where an ERISA-governed plan contains an unambiguous anti-assignment provision, assignments under that plan are invalid. *See Physicians Multispecialty Grp. v. Health Care Plan of Horton Homes, Inc.,* 371 F.3d 1291, 1295 (11th Cir.2004) ("we are persuaded by the reasoning of the majority of federal courts that have concluded that an assignment is ineffectual if the plan contains an unambiguous anti-assignment provision"); *LeTourneau Lifelike Orthotics & Prosthetics, Inc. v. Wal–Mart Stores, Inc.,* 298 F.3d 348, 349, 352 (5th Cir.2002) ("Applying universally recognized canons of contract interpretation to the plain wording of the instant anti-assignment clause[,]" which stated "[e]xcept as permitted by the Plan or as required by state Medicaid law, no attempted assignments of benefits will be recognized by the Plan," "leads inexorably to the conclusion that any purported assignment of benefits ... would be void."); *City of Hope Nat. Med. Ctr. v. HealthPlus, Inc.,* 156 F.3d 223, 229 (1st Cir.1998) ("Consistent with the other circuits which have addressed this issue, we hold that ERISA leaves the assignability or non-assignability of health care benefits under ERISA-regulated welfare plans to the negotiations of the contracting parties.... [S]traightforward language in an ERISA-regulated insurance policy should be given its natural meaning."); *Davidowitz v. Delta Dental Plan of California, Inc.,* 946 F.2d 1476, 1481 (9th Cir.1991) ("conclud[ing] that ERISA welfare plan payments are not assignable in the face of an express non-assignment clause in the plan.").

District courts in this Circuit have followed this reasoning and, applying federal common law, have found that

"where plan language unambiguously prohibits assignment, an attempted assignment will be ineffectual ... [and] ... a healthcare provider who has attempted to obtain an assignment in contravention of a plan's terms is not entitled to recover under ERISA." *Neuroaxis Neurosurgical Assoc.,* 919 F.Supp.2d at 351–52; *see also Mbody Minimally Invasive Surgery, P.C.,* 2014 WL 4058321, at *3 (finding the anti-assignment provision, which stated that "any attempt to assign benefits or payments for benefits will be void" was unambiguous and thus, the plaintiffs' alleged assignments were invalid); *Am. Psychiatric Assoc.,* 50 F.Supp.3d at 162–63, 164 n. 4 ("[i]t appears that the anti-assignment provisions in the ... healthcare plans," which "prohibit assignment [of] ... the right 'to receive benefits under the Benefit Program' and ... [to] 'rights, benefits or obligations,' " "may preclude this type of assignment, because ERISA instructs courts to enforce strictly the terms of plans and an assignee cannot *collect* unless he establishes that the assignment comports with the plan." (emphasis in original)).

The *Neuroaxis* decision is particularly instructive because it upheld an anti-assignment clause that is substantially similar to the clause here. Compare *Neuroaxis Neurosurgical Assoc.,* 919 F.Supp.2d at 353 ("[a] covered person may assign his or her right to receive plan benefits to a health care provider only with the consent of the benefits administrator, in its sole discretion, except as may be required by applicable law" (the "Consent Clause")), *with* Am. Compl. Ex. 1 at 66 ("You may not assign your Benefits under the Policy to a non-Network provider without our consent.").[12] The *Neuroaxis* court found that "[t]he plain meaning of the Consent Clause[ ] is that assignments are prohibited without the consent of the administrator" and that in the absence of consent the clause unambiguously prohibited assignments. *Id.* at 354, 356. The *Neuroaxis* court also rejected the argument urged by Plaintiffs here—"that the breach of anti-assignment clause [ ] by the Plan members entitles the defendants to damages from the Plan members, but does not affect the validity of the assignments to" the plaintiffs. *Id.* at 356 (internal quotations omitted). The court explained that this argument "relies on the principle under New York law that covenants not to assign [are treated] as personal covenants ..., unless the language of the covenant clearly indicates a stronger intent[,]" while "federal courts routinely enforce anti-assignment clauses in ERISA-governed welfare plans." *Id.* The *Neuroaxis* court concluded that if consent was not obtained, the assignments would be void based on the plain meaning of the Consent Clause. See *id.*[13]

**\*6** [6]The anti-assignment provision here is similarly unambiguous. Accordingly, the patients' assignments to

Plaintiffs are void pursuant to the unambiguous language of the provision. This does not end the inquiry, however. Plaintiffs may yet have standing if United waived or is estopped from relying on the provision.

### iii. Enforceability of the Anti–Assignment Provision

According to Plaintiffs, United's long-standing pattern and practice of directly paying Plaintiffs for services provided under the plans is sufficient to show that United consented to the assignments, or is estopped from or waived its reliance on the anti-assignment clause. Pls.' Opp'n at 10–11. Plaintiffs allege that "[e]ach out-of-network Plaintiff directly submitted the claims electronically or *via* a claim form to United, and United routinely paid the Plaintiffs directly." Pls.' Opp'n at 11; Am. Compl. ¶¶ 67–69, 99–101, 146–148. Plaintiffs also allege that United sent Plaintiffs letters requesting that they provide documentation to support previously paid claims, which Plaintiffs refused to comply with on the basis that United had no legal right to make such requests beyond the Claims Regulation thirty-day time period. *See* Am. Comp. ¶¶ 73–74, 82, 105–106, 152. After Plaintiffs' refusal, United reiterated its requests, notified Plaintiffs that it considered payments for undocumented services to be overpayments, and requested Plaintiffs refund the allegedly overpaid amounts. *Id.* ¶¶ 62, 75–88, 107–110, 116, 153–157, 160. United then recouped the allegedly overpaid amounts by offsetting these amounts from approved claim payments owed to the same providers for services provided to different patients under different healthcare plans. *Id.* ¶¶ 62, 91, 116, 160. United does not dispute these facts but instead contends that these actions cannot be interpreted as its consent or waiver, and do not require that it be estopped from relying on the anti-assignment provision. Defs.' R. Mem. at 4. The Court finds that United is neither estopped from enforcing the anti-assignment provision, nor waived its rights over it.

Although the Second Circuit has not yet addressed whether a healthcare company may be estopped from relying on or waive its right to enforce an anti-assignment provision, it has found the equitable doctrines of estoppel and waiver are applicable to ERISA actions. *See Ludwig v. NYNEX Serv. Co., a wholly owned subsidiary of NYNEX Corp.,* 838 F.Supp. 769, 793 (S.D.N.Y.1993) (noting that the Second Circuit Court has recognized that principles of estoppel can apply in ERISA actions under "extraordinary circumstances" (citing *Lee v. Burkhart,* 991 F.2d 1004, 1009 (2d Cir.1993)); *Lauder v. First Unum Life Ins. Co.,* 284 F.3d 375, 382 (2d Cir.2002)

(finding "that waiver applies in the particular situation presented by this ERISA case" where the defendant "knew of [the plaintiff's] claim of disability, chose not to investigate it, and chose not to challenge it"); *Ludwig,* 838 F.Supp. at 796 ("the doctrine of waiver is applicable to ERISA cases as a matter of federal common law" (citing *Masella v. Blue Cross & Blue Shield,* 936 F.2d 98, 107–08 (2d Cir.1991)); *see also Mbody Minimally Invasive Surgery, P.C.,* 2014 WL 4058321, at *3 ("estoppel can only be applied in the ERISA context in 'extraordinary circumstances.' "); *Neuroaxis Neurosurgical Assoc., PC,* 919 F.Supp.2d at 355.

### 1. Estoppel

\*7 [7] [8]To establish estoppel in an ERISA action, a party must sufficiently allege "(1) a promise, (2) reliance on the promise, (3) injury caused by the reliance, and (4) an injustice if the promise is not enforced, and, as stated, must adduce [ ] ... facts sufficient to [satisfy an] 'extraordinary circumstances' requirement as well." *Panecassio v. Unisource Worldwide, Inc.,* 532 F.3d 101, 109 (2d Cir.2008) (alterations in original) (internal quotations omitted); *see also Neuroaxis Neurosurgical Assoc., PC,* 919 F.Supp.2d at 355. Plaintiffs here have not alleged "extraordinary circumstances" necessary to invoke estoppel relief. While the "Second Circuit has not enunciated what facts are required for 'extraordinary circumstances,' " *Kosswig v. Timken Co.,* No. 06 Civ. 499(PCD), 2007 WL 2320537, at *10 (D.Conn. Aug. 10, 2007), courts have found that "intentional inducement and deception" and "[w]ritten or oral interpretation of an ambiguous term may ... satisfy this requirement where circumstances are 'beyond the ordinary[,]' " such as "where an employer promises severance benefits to persuade an employee to retire and then reneges." *Ramos v. SEIU Local 74 Welfare Fund,* No. 01 Civ. 2700 (SAS), 20002 WL 519731, at *6 (S.D.N.Y. Apr. 5, 2002) (citing *Schonholz,* 87 F.3d at 78; *Devlin v. Transportation Communications,* 173 F.3d 94, 102 (2d Cir.1999)). Here, however, Plaintiffs fail to allege intentional inducement or deception by United or any other conduct that may be considered "beyond the ordinary." In fact, in *Mbody Minimally Invasive Surgery, P.C.,* 2014 WL 4058321, at *3, the court found that it is entirely routine for a health insurance company to pay a healthcare provider directly for services rendered under the plan. Accordingly, Plaintiffs have not sufficiently alleged that United should be estopped from relying on the anti-assignment provision to void Plaintiffs' assignments, and thus their standing.[14]

Moreover, the plain language of the anti-assignment

provision allows United, in its discretion, to pay out-of-Network providers directly even where no valid assignment exists. *See* Am. Compl. Ex. 1 at 66. The fact that United made direct payments to Plaintiffs, as it was explicitly authorized to do under the plan, does not estop it from raising the anti-assignment provision to challenge Plaintiffs' standing. *See Neuroaxis Neurosurgical Assoc., PC,* 919 F.Supp.2d at 355–56 (finding that "[p]rior payments to healthcare providers do not create a viable estoppel claim ... where ERISA plans unambiguously prohibit assignments." (citing *Riverview Health Inst. LLC,* 601 F.3d at 521)); *Renfrew Ctr. v. Blue Cross and Blue Shield of Cent. New York, Inc.,* No. 94 Civ. 1527(RSP)(GJD), 1997 WL 204309, at *4 (N.D.N.Y. Apr. 10, 1997) ("[the defendant's] retention of discretion to make direct payment is in no way inconsistent with disallowing patient assignment.... It is untenable to read this direct payment provision as undermining the very anti-assignment clause that makes [the defendant's] direct payment discretion meaningful."); *see also Mbody Minimally Invasive Surgery, P.C.,* 2014 WL 4058321, at *3.[15]

## 2. Waiver

**\*8** [9] [10]"Waiver arises when a party has voluntarily or intentionally relinquished a known right." *Ludwig,* 838 F.Supp. at 796; *see also Beth Israel Med. Ctr. v. Horizon Blue Cross and Blue Shield of New Jersey, Inc.,* 448 F.3d 573, 585 (2d Cir.2006) ("waiver of a contract right must be proved to be intentional, the defense of waiver requires a clear manifestation of an intent by plaintiff to relinquish her known right and mere silence, oversight or thoughtlessness in failing to object to a breach of the contract will not support a finding of waiver."); *Marvel Entertainment Group, Inc. v. ARP Films, Inc.,* 684 F.Supp. 818, 821 (S.D.N.Y.1988) ("a stipulation against assignment may be waived or modified by a course of business dealings."). Here, Plaintiffs' argument that United waived the anti-assignment provision by its direct payment to Plaintiffs also fails because United was explicitly permitted to pay Plaintiffs directly under the plan in its discretion. *See Mbody Minimally Invasive Surgery, P.C.,* 2014 WL 4058321, at *3 (rejecting the plaintiff's argument that the defendants waived the anti-assignment provision by providing direct payment to the plaintiffs because "[h]ealth insurance companies routinely make direct payments to healthcare providers without waiving anti-assignment provisions."); *Advanced Orthopedics and Sports Medicine v. Blue Cross Blue Shield of Mass.,* No. 14 Civ. 7280(FLW), 2015 WL 4430488, at *7 (D.N.J. July 20, 2015) (finding "a direct

payment does not constitute a waiver of the anti-assignment clause" where "the terms of the Plan permit direct payment to healthcare providers").

[11] [12]"[U]nambiguous language in an ERISA plan must be interpreted and enforced according to its plain meaning [and w]hen the language of an ERISA plan is unambiguous, [the court] will not read additional terms into the contract." *Connors v. Conn. General Life Ins. Co.,* 272 F.3d 127, 137 (2d Cir.2001); *see also CIGNA Life Ins. Co. of New York v. Gambuti,* No. 09 Civ. 10147(KMK), 2011 WL 3424106, at *3 (S.D.N.Y. Jan. 3, 2011), *report and recommendation adopted,* No. 09 Civ. 10147(RO), 2011 WL 3370351 (S.D.N.Y. Aug. 2, 2011). Language "is ambiguous when it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire ... agreement." *Critchlow,* 378 F.3d at 256. To find that United implicitly waived the anti-assignment provision by acting pursuant to the direct payment provision is to create an ambiguity where none exists. *See Aviation W. Charters, Inc. v. United Healthcare Ins. Co.,* No. 14 Civ. (00338) (PHX)(NVW), 2014 WL 5814232, at *3 (D.Ariz. Nov. 10, 2014) ("The provision states that any assignment requires United's consent and, without an assignment, United may choose to pay the claim through the beneficiary or directly to the non-Network provider."); *but see Premier Health Ctr., P.C. v. UnitedHealth Group,* No. 11 Civ. 425(ES), 2014 WL 4271970, at *15 (D.N.J. Aug. 28, 2014) ("Defendants are correct that a direct payment of benefits to a non-network provider and a subsequent repayment demand for all or some of those benefits is completely consistent with the language of United's anti-assignment provisions.... This language merely makes clear that United may, in its discretion, unilaterally waive the anti-assignment provision and pay benefits directly to the provider."), *reconsideration denied,* No. 11 Civ. 425(ES), 2014 WL 7073439 (D.N.J. Dec. 15, 2014).

The Court acknowledges that other courts in this District have interpreted facts and language similar to that at issue here as establishing consent, estoppel, and/or waiver. *See Neuroaxis Neurosurgical Assoc., PC v. Cigna Healthcare of New York, Inc.,* No. 11 Civ. 8517(BSJ)(AJP), 2012 WL 4840807, at *3 (S.D.N.Y. Oct. 4, 2012) (finding that the defendant's "long-standing pattern and practice of direct payment to [the plaintiff] is sufficient to show its consent to [the plaintiff's] assignments" notwithstanding the plan's anti-assignment provision); *Biomed Pharm., Inc. v. Oxford Health Plans (N.Y.), Inc.,* No. 10 Civ. 7427(JSR), 2011 WL 803097, at *5 (S.D.N.Y. Feb. 18, 2011) (finding the defendant was "estopped from relying on the anti-assignment provision in light of [their] own

long-term pattern and practice of accepting and paying on [the plaintiff's] direct billing" because the plan "either expressly authorizes patients to assign their claims to healthcare providers without [the defendant's] consent, or, at the very least, creates an ambiguity within the contract that should be construed against the drafter."); *Protocare of Metro. N.Y., Inc. v. Mut. Ass'n Adm'rs, Inc.,* 866 F.Supp. 757, 761–62 (S.D.N.Y.1994) ("[a]lthough the Plan does contain an anti-assignment provision, it also provides for the possibility of direct payment to the health care provider [and i]f the Plan had intended to prevent all assignments ... then it would not have preserved the discretion to pay [the plaintiff] directly.").[16] However, the Court finds more persuasive those decision that give effect to the plain language of anti-assignment provisions.

**\*9** Beyond direct payments to Plaintiffs, a closer question is whether United's communications with Plaintiffs requesting documentation and eventual reimbursement is sufficient to allege waiver.[17] Plaintiffs do not affirmatively allege that United failed to raise the anti-assignment provision in its post-payment communications with Plaintiffs, which may in and of itself be reason to grant United's motion. *See Care First Surgical Center v. ILWU–PMA Welfare Plan,* No. 14 Civ. 1480(MMM), 2014 WL 6603761 at \*20 (C.D.Cal. July 28, 2014). However, United's letters attached to Plaintiffs' Opposition[18] include no reference to the anti-assignment provision; nor do Plaintiffs' descriptions of United's communications with them. *See* Am. Compl. ¶¶ 73, 75, 77–88, 105, 107, 109–112, 115, 152, 153, 155–157. Even if United never raised the anti-assignment provision, nothing in these communications plausibly suggests that United intended to waive its right under the provision. *See Mbody Minimally Invasive Surgery, P.C.,* 2014 WL 4058321, at \*3 ("That defendants did not raise the anti-assignment provision at the time they denied or reduced payment is irrelevant because the anti-assignment provision was not a factor [in] determining the payment amount. Plaintiffs' argument is simply another way of re-arguing that defendants waived the anti-assignment provision by making direct payments to plaintiffs—an argument courts have repeatedly rejected."). As alleged, the dispute between the parties giving rise to the post-payment communications implicates only payments made to Plaintiffs, allowed under the plan, and United's ability to audit and recoup these payments. While United requested documentation to support its previous payments and ultimately recouped payments from Plaintiffs for their failure to comply, nothing about these requests suggest that Plaintiffs were being treated as assignees of their patients' benefits rather than as providers United has the discretion to pay directly.[19]

However, some courts outside of this District have reached a different conclusion based on the parties "course of dealing." *See DeMaria,* 2015 WL 3460997, at \*8 (D.N.J. June 1, 2015); *Premier Health Ctr., P.C. v. UnitedHealth Group,* No. 11 Civ. 425(ES), 2012 WL 1135608, at \*2 (D.N.J. Apr. 4, 2012); *Gregory Surgical Services, LLC v. Horizon Blue Cross Blue Shield of New Jersey, Inc.,* No. 06 Civ. (0462) (JAG), 2007 WL 4570323, at \*4 (D.N.J. Dec. 26, 2007). In *Premier Health,* the plaintiffs made similar allegations to those raised here—that the defendants, United and its subsidiaries, engaged in improper post-payment auditing of previously paid claims and demanded repayment for alleged overpayments in violation of the procedures established by ERISA. 2012 WL 1135608, at \*2. When the defendants moved to dismiss the complaint based on, *inter alia,* the plaintiffs' lack of statutory standing pursuant to the anti-assignment provision, the plaintiffs contended that the defendants had waived or were estopped from asserting the provision based on their course of conduct towards the plaintiffs. *Id.* at \*3, \*9. The court found that under New Jersey law, which states that "an anti-assignment clause may be waived by ... a course of dealing, or even passive conduct," that the defendants waived the anti-assignment provision through its course of conduct, which went "beyond direct reimbursement for medical services" and involved "regular interaction between United and Premier prior to and after claim forms were submitted, without mention of United's invocation of the anti-assignment clause ... includ[ing]: letters from [United's subsidiary] notifying Premier of overpayments, demanding a refund, and notifying Premier of the proper procedure to dispute [its] decision; telephone calls between [United's subsidiary] and Premier about Premier's appeals; and communications with Premier via e-mail regarding recoupments for the overpayments." *Id.* at \*9–10 (citing *Gregory Surgical Services, LLC,* 2007 WL 4570323, at \*4).

**\*10** As a preliminary matter, *Premier Health* applied New Jersey law, not federal common law, which as discussed above requires giving effect to the plain language of the plan. *See* 2012 WL 1135608, at \*9; *see also DeMaria,* 2015 WL 3460997, at \*8; *Gregory Surgical Services, LLC,* 2007 WL 4570323, at \*3. Moreover, by Plaintiffs' own reckoning, Fishel and Kantor did not engage in the appeals process—Plaintiffs simply denied United's request for information and filed this suit to challenge United's post-payment audit practices. *See* Am. Compl. ¶¶ 65–96, 142–165. While Piken appealed some of the alleged overpayments identified by United, the only allegations regarding the parties' communications were that United acknowledged an appeal was filed but determined that "the overpayment refund request remains

valid." *Id.* ¶¶ 111, 112. To the extent that the *Premier Health* court's decision would remain the same had the plaintiffs in that case not engaged in the appeals process, this Court respectfully disagrees for the reasons already discussed *supra. See also Aviation W. Charters, Inc.,* 2014 WL 5814232, at *3 (finding on summary judgment that "Plaintiff has submitted no evidence of United's alleged actions constituting waiver" because the "other actions [beyond direct payment and communications] claimed to be inconsistent with intent to enforce the anti-assignment provision .... appear to be communications made regarding claims made by Plaintiff, payments made to Plaintiff, and recoupment from Plaintiff, which likely would not show that United dealt with Plaintiff as though it were 'standing in the shoes' of the Beneficiary.").

Accordingly, the Court finds that United did not waive, nor is United estopped from relying on the anti-assignment provision. Because the anti-assignment provision is valid and enforceable, Plaintiffs lack statutory standing to bring these claims, and thus United's motion to dismiss is GRANTED.[20]

### b. Leave to Amend

[13]United requested in its opening brief that the Court grant its motion with prejudice. Pls.' Mem. at 1, 2, 25; *see also* Pls.' R. at 1. Plaintiffs, in response, did not request leave to amend in the event the Court granted United's motion, nor did Plaintiffs suggest that any additional allegations that may be added to the Amended Complaint would address United's challenges. *See* Pls.' Opp'n Mem. Amendment is generally "not warranted absent some

indication as to what appellants might add to their complaint in order to make it viable." *Shemian v. Research In Motion Ltd.,* 570 Fed.Appx. 32, 37 (2d Cir.2014) (summary order); *Porat v. Lincoln Towers Community Ass'n,* 464 F.3d 274, 276 (2d Cir.2006) ("Especially given that plaintiff's counsel did not advise the district court how the complaint's defects could be cured, upon all the facts of this case we find no abuse of discretion and decline to remand for repleading."); *but see Laborers Local 17 Health and Ben. Fund v. Philip Morris, Inc.,* 26 F.Supp.2d 593, 605 (S.D.N.Y.1998) ("where the possibility exists that the defect can be cured, leave to amend at least once should normally be granted unless doing so would prejudice the defendant." (citing *Oliver Schools, Inc. v. Foley,* 930 F.2d 248, 253 (2d Cir.1991)). The Court grants United's motion with prejudice.

### V. Conclusion

For the reasons set forth above, United's motion to dismiss is GRANTED with prejudice. The Clerk of the Court is respectfully directed to terminate the motion, Doc. 63, and to close the case.

It is SO ORDERED.

### All Citations

--- F.Supp.3d ----, 2016 WL 1229616, 61 Employee Benefits Cas. 1662

### Footnotes

1       The following factual background is based on the allegations in the Amended Complaint, Doc. 52, which the Court accepts as true for purposes of the instant motion. *See Koch v. Christie's Int'l PLC,* 699 F.3d 141, 145 (2d Cir.2012). In addition, the Court considers documents incorporated by reference and any documents that Plaintiffs relied upon in bringing the instant action. *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98 (2d Cir.2007) (citing *Rothman v. Gregor,* 220 F.3d 81, 88 (2d Cir.2000)).

2       The Claims Regulation defines "Adverse Benefit Determination," in relevant part, as:
        [A] denial, reduction, or termination of, or a failure to provide or make payment (in whole or in part) for, a benefit, including any such denial, reduction, or termination, or failure to provide or make payment that is based on a determination of a participant's or beneficiary's eligibility to participate in a plan....
        *Id.* ¶ 26 (citing 29 C.F.R. § 2560.503–1(m)(4)).

3       Plaintiffs represent that the plans attached to the Amended Complaint, *see* Am. Compl. Exs. 1–4, are "sample plans" and "the fully-insured and self-insured ERISA-governed United Administered Plans at issue in this matter are similar or identical in their salient features to the four samples annexed hereto." *Id.* ¶ 23.

2016 WL 1229616, 61 Employee Benefits Cas. 1662

4    Section 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), states: "A civil action may be brought by a participant or beneficiary to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."

5    Section 502(a)(3), 29 U.S.C. § 1132(a)(3), states: "A civil action may be brought by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan[.]"

6    On August 31, 2015, the Court granted United's motion to compel arbitration of Plaintiff Merrick's claims and stayed Merrick's action. Doc. 67.

7    By Order dated July 27, 2015, United's motion to dismiss the original Complaint was terminated. Doc. 65.

8    Section 502(a)(3) also includes "fiduciary" as a class of individuals that may sue under that section, *see* 29 U.S.C. § 1132(a)(3), however, Plaintiffs do not assert standing on this basis.

9    United does not claim that Plaintiffs lack Article III standing, but instead asserts that Plaintiffs lack statutory standing to bring a claim for ERISA benefits. *See Am. Psychiatric Assoc. v. Anthem Health Plans,* 50 F.Supp.3d 157, 165 n. 6 (D.Conn.2014) (distinguishing between a challenge to the plaintiff's statutory standing and Article III standing); *see also Griffin v. Gen. Mills, Inc.,* No. 15 Civ. 12157, ——Fed.Appx. ——, ——, 2015 WL 9466979, at *2 (11th Cir. Dec. 29, 2015) ("Although courts have long applied the label of 'statutory standing' to the basis for decisions such as the district court's here, that [the plaintiff] lacked standing under ERISA, the Supreme Court has cautioned that this label is 'misleading' because the court is not deciding whether there is subject matter jurisdiction but rather whether the plaintiff 'has a cause of action under the statute).' Put differently, we understand the district court's decision that [the plaintiff] lacked statutory standing to be a determination that she failed to state a claim under Federal Rule of Civil Procedure 12(b)(6)." (citing *Lexmark Int'l, Inc. v. Static Control Components, Inc.,* —— U.S. ——, 134 S.Ct. 1377, 1387 n. 4, 188 L.Ed.2d 392 (2014)).

10   Plaintiffs suggest that this Court can ignore the clear holding of *Rojas,* 793 F.3d at 259, in favor of the Circuit's prior ruling in *Montefiore Med. Ctr. v. Teamsters Local 272,* 642 F.3d 321, 329–30 (2d Cir.2011). Plaintiffs, however, are incorrect in their assertion that these decisions are inconsistent. *Rojas* found that providers are not plan designated beneficiaries where the plan provides that they may receive, but are not guaranteed, direct payments because the term "benefit" refers to "medical services and supplies," not payment. 793 F.3d at 257, 259; *see also Grasso Enterprises, LLC v. Express Scripts, Inc.,* 809 F.3d 1033, 1040–41 (8th Cir.2016) (citing *Rojas* approvingly); *Pa. Chiropractic Ass'n v. Indep. Hosp. Indem. Plan, Inc.,* 802 F.3d 926, 929 (7th Cir.2015) (same). *Montefiore* recognized that where a healthcare provider obtains a valid assignment it may pursue ERISA benefit claims as a beneficiary by assignment but does not discuss a providers' ability to bring an action as a statutory beneficiary. 642 F.3d at 329–30. Accordingly, the presumption that "[w]here a second panel's decision seems to contradict the first, and there is no basis on which to distinguish the two cases, we have no choice but to follow the rule announced by the first panel" is inapplicable. *Tanasi v. New All. Bank,* 786 F.3d 195, 200 n. 6 (2d Cir.2015), *as amended* (May 21, 2015), *cert. denied,* —— U.S. ——, 136 S.Ct. 979, —— L.Ed.2d —— (2016). Additionally, after Plaintiffs submitted their memorandum in opposition to United's motion ("Opposition"), the Second Circuit voted to deny *en banc* review of the *Rojas* decision. No. 14 Civ. 3455 (2d Cir. Sept. 24, 2015) (Doc. 173).

11   Plaintiffs imply that New York law governs the validity of these assignments and that pursuant to New York law the assignments here are valid because "anti-assignment clauses do not render assignments void absent words specifically stating an assignment is 'void.' " Pls.' Opp'n at 10 (citing *Pravin Banker Assoc., Ltd. v. Banco Popular Del Peru,* 109 F.3d 850, 856 (2d Cir.1997); *Mosdos Chofetz Chaim, Inc. v. RBS Citizens, N.A.,* 14 F.Supp.3d 191, 226 (S.D.N.Y.2014)). In *Pravin,* the Second Circuit held that "[u]nder New York law, only *express* limitations on assignability are enforceable. [T]o reveal the intent necessary to preclude the power to assign, or cause an assignment violative of contractual provisions to be wholly void, [a contractual] clause must contain express provisions that any assignment shall be void or invalid if not made in a certain specified way." 109 F.3d at 856 (emphasis and alterations in original); *see also Mosdos Chofetz Chaim, Inc.,* 14 F.Supp.3d at 226–27 ("Under New York law, an assignment is valid even where an agreement generally prohibits assignments, unless the agreement specifies that an assignment would be invalid or void .... a contract lacks the requisite clear, definite, and appropriate language when it 'contain[s] no provision that the assignment made without consent should be void, ... that an assignee would acquire no rights by reason of such assignment, [or] that the contractor shall not be required to recognize or accept any such assignment." (internal quotations and citations omitted)); *Semente v. Empire Healthchoice Assur., Inc.,* No. 14 Civ. 5823(DRH)(SIL), ——F.Supp.3d ——, ——, 2015 WL 7953939, at *3 (E.D.N.Y. Dec. 4, 2015) (finding that an anti-assignment provision

2016 WL 1229616, 61 Employee Benefits Cas. 1662

in an ERISA plan stating, "[a]ssignment of benefits to a non-network provider is not permitted," did not void such assignments because the "clause at issue here does not contain a definite declaration of the invalidity of an assignment").

The Court notes that neither *Pravin* nor *Mosdos* involved ERISA claims. While *Semente* did involve ERISA claims, both parties agreed that New York law governed the plan, and, therefore, the court did not analyze the anti-assignment provisions at issue there by reference to federal common law. —— F.Supp.3d at ——, —— n. 3, 2015 WL 7953939, at *3, *3 n. 3.

12    Plaintiffs contend that *Neuroaxis* is less persuasive because it "failed to consider the Second Circuit's decision in *Pravin*." Pls.' Opp'n at 10 n.12. However, the *Neuroaxis* court's purported "failure" to address the *Pravin* decision is entirely consistent with the requirement that federal common law, not New York law, governs ERISA actions.

13    Instead of finding the assignments void, however, the *Neuroaxis* court granted the plaintiff's request to take discovery to determine whether the plaintiffs sought and received consent even though "[t]he plaintiff ha[d] offered no evidence that consent was requested or received for any assignment[.]" *Id.* at 354. Here, however, Plaintiffs do not allege that they sought and received consent and do not request discovery to determine whether such consent was sought and received. Instead, Plaintiffs contend that United's direct payment to and course of conduct with Plaintiffs establishes that United consented to the assignments, or waived or is estopped from relying on the anti-assignment provision as a matter of law.

14    The plan documents, which Plaintiffs attach to their Amended Complaint, *see* Exs. 1–4, further supports Plaintiffs inability to establish estoppel because United's actions allegedly supporting Plaintiffs' estoppel argument are expressly authorized by the plans. *See Riverview Health Inst. LLC v. Med. Mut. of Ohio*, 601 F.3d 505, 521 (6th Cir.2010) (denying the plaintiffs leave to amend their complaint to add a federal estoppel claim because the "[p]rinciples of estoppel ... cannot be applied to vary the terms of unambiguous plan documents .... estoppel requires reasonable or justifiable reliance by the party asserting the estoppel [and a] ... party's reliance can seldom, if ever, be reasonable or justifiable if it is inconsistent with the clear and unambiguous terms of plan documents available to or furnished to the party" (internal citations and quotations omitted)).

15    Plaintiffs reliance on *Lutheran Med. Ctr. of Omaha, Neb. v Contractors, Laborers, Teamsters and Eng'rs Health and Welfare Plan*, 25 F.3d 616, 619 (8th Cir.1994) *abrogated on other grounds by Martin v. Arkansas Blue Cross and Blue Shield*, 299 F.3d 966 (8th Cir.2002), is misplaced. There, the Eighth Circuit found that in addition to the defendant paying providers directly for several years, the Summary Plan Description stated "that a participant 'may assign benefits to a hospital or doctor, if you wish[,]' " which together established that "the Plan's actual practice is not in conformity with its strict anti-assignment provision." Here, Plaintiffs have identified no similar provision allowing assignment without consent.

16    District courts outside of this Circuit have likewise reached different outcomes. *See, e.g., Advanced Orthopedics and Sports Medicine*, 2015 WL 4430488, at *7 (finding "a direct payment does not constitute a waiver of the anti-assignment clause" (citing *Mbody Minimally Invasive Surgery, P.C.*, 2014 WL 4058321, at *3)); *Aviation W. Charters, Inc.*, 2014 WL 5814232, at *3 (rejecting the plaintiff's argument on summary judgment that "United waived its right to enforce the anti-assignment provision by making direct payment to Plaintiff and by communicating directly with Plaintiff"); *but see DeMaria v. Horizon Healthcare Services, Inc.*, No. 11 Civ. 7298(WJM), 2015 WL 3460997, at *8 (D.N.J. June 1, 2015) (applying New Jersey contract law and finding that "a party may waive an anti-assignment provision via a course of dealing that renders the anti-assignment provision inequitable."); *Productive MD, LLC v. Aetna Health, Inc.*, 969 F.Supp.2d 901, 922–23 (M.D.Tenn.2013) (finding on a motion to dismiss the defendant was estopped from relying on the anti-assignment provision where the defendant "was on notice that [the plaintiff] sought payment pursuant to a patient assignment, [the plaintiff] was not privy to and had no legal right to access the underlying plan terms" while the defendant "possessed the underlying plans (and therefore knew their terms), ... denied [the plaintiff's] technical component claims ... for reasons other than validity of assignment ... *paid* the physicians who sought payment ... pursuant to assignments from the same patients ... [and] regularly paid [the plaintiff's] claims made pursuant to patient assignments.") (emphasis in original).

17    Unlike estoppel, courts have not required "extraordinary circumstances" to find waiver.

18    Plaintiffs attach two of United's letters to Kantor requesting medical records and recoupment. Declaration of Richard J. Quadrino in Support of Pls.' Mem. in Opp'n to Defs.' Mot. to Dismiss ("Quadrino Decl.") ¶¶ 2, 4, Exs. 1, 3. Plaintiffs also attach Piken's response, through counsel, to a letter from United substantial similar to the one sent to Kantor. *Id.* ¶ 3, Ex. 2. Plaintiffs represent that United's letters to Kantor requesting medical records and recoupment "contain the same language" or "are identical" as the letters sent to other Plaintiffs. *Id.* ¶¶ 2, 4. Plaintiffs also represent that Piken's

response letter to United is "similar in content" as Plaintiffs' other letters sent to United. *Id.* ¶ 3.

[19]    Nor do Plaintiffs' responses suggest that they were acting as assignees. Quadrino Decl. Ex. 2. While Plaintiffs' letters discuss Plaintiffs' ability to bring an ERISA action pursuant to Section 502 for United's purported violation of the Claims Regulation and recoupment of alleged overpayments, this does not plausibly allege that Plaintiffs' were asserting their rights as assignees for two reasons. *First,* according to the letter from Piken's counsel, United never responded to counsel's previous letters and mere silence may not establish waiver. *See id.* ("We have been repeatedly informing Optum, through letters to you on behalf of various clients of our firm, that our clients object to such audits and we have fully explained our client's legal positions, grounded in ERISA. No response was ever received from you or from anyone else whom you stated your [sic] forwarded our letters to."); *see also* Am. Compl. ¶¶ 90 ("Defendants refused to and failed to produce any of the requested documents or data requested" in counsel's letter), 114 (same), 159 (same). The only allegation that United responded to counsel's letter—"Optum responded ... stating that because Dr. Piken did not submit the medical records requested, Defendants determined that the paid services at issue were 'not documented' and, therefore, Dr. Piken must repay to Defendants the payments he received for those services[,]" Am. Compl. ¶ 115—is, as already stated, insufficient to establish that United intended to waive its rights. *Second,* the letter asserts Dr. Piken's rights, not the patient's rights. *See id.* (asserting that United's purported violations of the Claims Regulation "has triggered numerous *rights of Dr. Piken,* including the right to obtain various types of documentation ...") (emphasis added).

[20]    Because the Court finds Plaintiffs do not have statutory standing to bring the claims asserted in the Amended Complaint, the Court need not address United's other arguments for dismissal, including that United is not a proper defendant in the action or that United's post-payment audit practice is lawful under the Claims Regulation.

---

**End of Document**                                        © 2016 Thomson Reuters. No claim to original U.S. Government Works.

Exhibit K

Moore ex rel. Moore v. Woman to Woman Obstetrics &..., Not Reported in A.3d...

2013 WL 4080947

2013 WL 4080947
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES
BEFORE CITING.

Superior Court of New Jersey,
Appellate Division.

Koral MOORE, a minor by and through her
Guardians ad Litem, Monica & Kevin MOORE,
and Monica & Kevin Moore, Individually,
Plaintiffs–Respondents,
v.
WOMAN TO WOMAN OBSTETRICS &
GYNECOLOGY, L.L.C., and Lisa Vernon, M .D.,
Defendants,
and
Carlos Fernandez, M.D., and Premier Perinatal,
L.L.C., Defendants–Appellants.

Argued Sept. 12, 2012.
|
Decided Aug. 14, 2013.

On appeal from Superior Court of New Jersey, Law
Division, Ocean County, Docket No. L–1558–09.

**Attorneys and Law Firms**

Joel I. Fishbein argued the cause for appellants (Spector,
Gadon & Rosen, P.C., and Hardin, Kundla, McKeon &
Poletto, P.A., attorneys; Mr. Fishbein and Janet L.
Poletto, on the brief).

Marc C. Johnson argued the cause for respondents (Weiss
& Paarz, attorneys; Mr. Johnson, on the brief).

Before Judges FUENTES, GRALL and HAYDEN.

**Opinion**

PER CURIAM.

**\*1** This case is before us for the second time. Defendants
Carlos Fernandez, M.D., and Premier Perinatal, L.L.C.,
appeal from the September 30, 2011 Law Division order
that denied their motion to compel arbitration of plaintiffs
Monica[1] and Kevin Moore and their daughter Koral
Moore's medical malpractice complaint. For the reasons
that follow, we reverse the denial of arbitration as to
Monica and Koral and affirm as to Kevin.

I.

The facts and procedural history relevant to the first
appeal are contained in our earlier opinion, *Moore v.
Woman to Woman Obstetrics & Gynecology, L.L.C.,* 416
*N.J.Super.* 30 (App.Div.2010). Briefly stated, Monica's
doctor, defendant Lisa Vernon, practicing with defendant
Woman to Woman Obstetrics, L.L.C., referred Monica,
then forty-four years old, to defendants Carlos Fernandez,
M.D. and Premier Perinatal, L.L.C. (Premier), due to her
high-risk pregnancy based on her age.[2] On her first visit to
Dr. Fernandez's office, Monica signed an arbitration
agreement on behalf of herself and her spouse and unborn
child, which covered all past and future claims for
medical diagnosis and treatment. Subsequently, plaintiffs
filed a complaint against all four defendants alleging
medical malpractice due to Koral being born with Downs
Syndrome.

Based on the arbitration agreement, the initial motion
judge granted defendants' summary judgment motion and
entered an order compelling arbitration of plaintiffs'
claims against Fernandez and Premier and dismissing the
complaint against them without prejudice. In *Moore,* we
held that while the arbitration agreement was not per se
unenforceable, *id.* at 35, defendants were not entitled to
summary judgment on the question of whether it was
unconscionable. *Id.* at 45–46. We reversed the order
granting summary judgment and remanded to the trial
court for further proceedings. *Id.* at 46.

After the remand, the parties engaged in substantial
discovery, including depositions of Monica, Kevin, Dr.
Fernandez, and two of Premier's office staff. Defendants
then filed a motion to compel arbitration. A different
motion judge found the arbitration agreement was clear
and unambiguous but rejected defendants' argument that
the *Moore* appellate panel "got [it] wrong" in
characterizing it as a contract of adhesion. Based upon
defendants' failure to provide Monica a copy of the
agreement, thus depriving her of attorney review and an
opportunity to rescind the contract, he concluded that the
agreement was unenforceable as it was procedurally
unconscionable. Because he concluded that the agreement
was not binding on Monica, the judge did not reach the
issue of whether she had bound her co-plaintiffs, Kevin
and Koral, to participate in binding arbitration. This
appeal followed.

The relevant facts developed during discovery are not in

2013 WL 4080947

dispute. The record reveals that Monica had an initial appointment at Premier with Dr. Fernandez, a high-risk pregnancy specialist, for an ultrasound. Monica was a high school graduate who had taken some college courses and worked as an engineering technician at a federal government facility. She brought to the appointment a family member and four children. Upon her arrival, the staff gave her a clipboard and a stack of about twelve sheets of paper concerning insurance, financial, medical history, and privacy rights.[3] The staff member showed her where to sign and where to fill out her information. She arrived early at Premier and had enough time to fill out the forms. Monica recalled filling out paperwork but had no specific recollection of the arbitration agreement. She acknowledged, based upon her signature on the agreement, that she signed it. She did not receive a copy of the arbitration agreement to keep. Monica did not recall noticing any signs posted about the arbitration agreement. Neither the doctor nor the staff discussed the substance of the arbitration agreement with her.

**\*2** The staff reported that it was office policy at that time not to give a patient a copy of the arbitration agreement unless she asked. According to the staff, all patients were given a letter from the doctor's insurance company, explaining the arbitration policy and providing a phone number to call if a patient had a question about the agreement. The staff's practice was to show all patients a list of doctors in the area who did not require their patients to consent to arbitration, but Monica did not recall viewing such a list. A notice posted on the wall in the waiting room informed patients that "[o]ur insurance company requires all patients to sign a mutual arbitration agreement. This helps to control our insurance costs and patient fees." Dr. Fernandez stated that if a person declined to sign the arbitration agreement, he would still treat her.

The arbitration agreement was four pages long, with paragraph headings and certain other statements in bold and capitalized in twelve-point font. The agreement stated in relevant part:

ARBITRATION AGREEMENT FOR CLAIMS ARISING OUT OF OR RLATED TO MEDICAL CARE AND TREATMENT

....

1. AGREEMENT TO ARBITRATE CLAIMS REGARDING FURTRE CARE AND TREATMENT

(a) Patient and the Medical Care Provider agree that any controversy arising between them ... shall be resolved only by binding arbitration conducted in accordance with the provision of this Agreement.

(b) The Patient's agreement to submit any and all such claims to binding arbitration shall be binding on the Patient, his or her spouse, the Patient's children (born or unborn)....

3. WAIVER OF RIGHT TO JURY TRIAL

The Patient and the Medical Care Provider acknowledge that by agreeing to resolve any and all claims and controversies arising out of future care and treatment and past care and treatment by binding arbitration, they are abandoning their constitutional right to have such claims or controversies resolved by a jury in a court of law....

8. RIGHT TO COUNSEL

The Patient acknowledges that this Agreement is a legal document with binding consequences and that the Patient has been afforded the right to consult with an attorney prior to entering into this Agreement. The Medical Care Provider expressly encourages the Patient to consult with an attorney before entering into this Agreement.

9. MISCELLANEOUS ITEMS

....

(e) **Patient's Right to Rescind Agreement.** The Patient acknowledges that, notwithstanding the Patient's execution of this Agreement, the Patient retains the right to cancel and rescind the Agreement within 15 days of the date of execution by providing written notice to the Medical Care Provider. Such notice shall be provided by returning a copy of this Agreement to the Medical Care Provider with the word "cancelled" written across the first page thereof and signed by the Patient.

In the agreement, Monica acknowledged twice that the staff had provided the names of other doctors in the area who did not require her to sign an arbitration agreement but that, since she desired Dr. Fernandez to treat her, she was entering into the agreement. In addition, above and below the signature line in bold-face type, notice was twice given that by signing the document she gave up her "right to a jury trial." The agreement also contained a severability clause.

II.

Moore ex rel. Moore v. Woman to Woman Obstetrics &..., Not Reported in A.3d...

2013 WL 4080947

**\*3** On appeal, defendants argue that arbitration should be compelled because prevailing federal and State laws and case precedent clearly favor arbitration, and that this particular arbitration agreement must be enforced because plaintiffs did not sustain their burden that the arbitration agreement was a contract of adhesion or that it was procedurally or substantively unconscionable. They also argue that as the agreement is binding on Monica, it is also binding on Kevin and Koral. Conversely, plaintiffs argue that under basic contract law the arbitration agreement is unconscionable and unenforceable.

We begin by reviewing some well-established applicable legal principles. " '[W]hether the parties have a valid arbitration agreement at all' is a 'gateway' question that requires judicial resolution." *Muhammad v. Cnty. Bank of Rehoboth Beach, Del.,* 189 *N.J.* 1, 12 (2006). We consider the interpretation of an arbitration clause, which is a matter of contract construction, de novo. *Coast Auto. Grp., Ltd. v. Withum Smith & Brown,* 413 *N.J.Super.* 363, 369 (App.Div.2010). The burden of proving the defense of unconscionability is on the party challenging the enforceability of the agreement. *Martindale v. Sandvik, Inc.,* 173 *N.J.* 76, 91 (2002).

The Federal Arbitration Act (FAA), 9 *U.S.C.A.* §§ 1–16, demonstrated "a national policy favoring arbitration," *Southland Corp. v. Keating,* 465 *U.S.* 1, 10, 104 *S.Ct.* 852, 858, 79 *L.* Ed.2d 1, 12 (1984), and provided that "a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction ... shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 *U.S.C.A.* § 2. This section "reflects both 'a liberal federal policy favoring arbitration,' and 'the fundamental principle that arbitration is a matter of contract.' " *NAACP of Camden Cnty. E. v. Foulke Mgmt. Corp.,* 421 *N.J.Super.* 404, 424 (App.Div.2011) (internal citations omitted). "The substantive protection of the FAA applies irrespective of whether arbitrability is raised in federal or state court." *Martindale, supra,* 173 *N.J.* at 84.

Similarly, New Jersey law favors arbitration agreements. "The 2003 [New Jersey] Arbitration Act, *N.J.S.A.* 2A:23B–1 to –32, 'continues our State's long-standing policy to favor voluntary arbitration as a means of dispute resolution.' " *EPIX Holding Corp. v. Marsh & McLennan Cos., Inc.,* 410 *N.J.Super.* 453, 471 n. 7 (App.Div.2009) (quoting *Block v. Plosia,* 390 *N.J.Super.* 543, 551 (App.Div.2007)). Under the Act, an agreement to arbitrate "is valid, enforceable, and irrevocable except upon a ground that exists at law or in equity for the revocation of a contract." *N.J.S.A.* 2A:23B–6(a). All parties agree that the subject arbitration agreement is governed by the FAA and applicable New Jersey laws.

**\*4** "An agreement relating to arbitration should thus be read liberally to find arbitrability if reasonably possible." *Jansen v. Solomon Smith Barney, Inc.,* 342 *N.J.Super.* 254, 257 (App.Div.2001). Where certain clauses in an arbitration agreement are unconscionable or otherwise unenforceable, those parts may be excised from the otherwise valid agreement. *See Ruszala v. Brookdale Living Cmtys., Inc.,* 415 *N.J.Super.* 272, 300 (App.Div.2010). "Severability is only an option if striking the unenforceable portions of an agreement leaves behind a clear residue that is manifestly consistent with the 'central purpose' of the contracting parties, and that is capable of enforcement." *NAACP of Camden Cnty. E., supra,* 421 *N.J.Super.* at 437 (quoting *Jacob v. Norris, McLaughlin & Marcus,* 128 *N.J.* 10, 33 (1992)).

As in any contract, when parties enter into an arbitration agreement, "only those issues may be arbitrated which the parties have agreed shall be." *Garfinkel v. Morristown Obstetrics & Gynecology Assocs., P.A.,* 168 *N.J.* 124, 132 (2001). We consider the intentions of the parties "as reflected in the four corners of the written instrument" in determining a written contract's validity. *Leodori v. CIGNA Corp.,* 175 *N.J.* 293, 302, *cert. denied,* 540 *U.S.* 938, 124 *S.Ct.* 74, 157 *L.* Ed.2d 250 (2003). Thus, courts examine arbitration provisions "on a case-by-case basis." *Rockel v. Cherry Hill Dodge,* 368 *N.J.Super.* 577, 580 (App.Div.), *certif. denied,* 181 *N.J.* 545 (2004).

"In determining whether a contract is unconscionable, courts have focused on two factors: '(1) unfairness in the formation of the contract; and (2) excessively disproportionate terms.' " *Delta Funding Corp. v. Harris,* 189 *N.J.* 28, 55 (2006) (Zazzali, J., concurring in part and dissenting in part) (quoting *Sitogum Holdings, Inc. v. Ropes,* 352 *N.J.Super.* 555, 564 (Ch. Div.2002)). "The first factor—procedural unconscionability—can include a variety of inadequacies, such as age, literacy, lack of sophistication, hidden or unduly complex contract terms, bargaining tactics, and the particular setting existing during the contract formation process." *Ibid.* "The second factor—substantive unconscionability—simply suggests the exchange of obligations so one-sided as to shock the court's conscience." *Ibid.* This determination is made "using a sliding scale analysis," considering "the way in which the contract was formed and, further, whether enforcement of the contract implicates matters of public interest." *Stelluti v. Casapenn Enters., L.L.C.,* 203 *N.J.* 286, 301 (2010).

WESTLAW    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

Moore ex rel. Moore v. Woman to Woman Obstetrics &..., Not Reported in A.3d...

2013 WL 4080947

III.

On appeal, defendants argue initially that the U.S. Supreme Court's holding, made subsequent to our opinion in *Moore,* in *AT & T Mobility, L.L.C. v. Concepcion,* 563 U.S. 1740, 131 S.Ct. 1740, 179 L. Ed.2d 742 (2011), prohibits the consideration of the unconscionability defense that plaintiffs raise here. We disagree.

**\*5** In *AT & T Mobility,* the Court made clear that the FAA still "permits agreements to arbitrate to be invalidated by 'generally applicable contract defenses, such as fraud, duress, or unconscionability,' but not by defenses that apply only to arbitration or that derive their meaning from the fact that an agreement to arbitrate is at issue." 563 U.S. at ——, 131 S.Ct. at 1746, 179 L. Ed.2d at 751 (citation omitted). We have recently held that *AT & T Mobility* did not alter the basic premise that "an agreement to arbitrate must be the product of mutual assent, as determined under customary principles of contract law." *NAACP of Camden Cnty. E., supra,* 421 N.J.Super. at 424. We further emphasized: "in the aftermath of *AT & T Mobility,* state courts remain free to decline to enforce an arbitration provision by invoking traditional legal doctrines governing the formation of a contract and its interpretation." *Id.* at 428. In this case, we are satisfied that plaintiffs invoked, and the court utilized, standard legal principles applicable to all contracts in raising the defense of unconscionability.

Defendants next argue that, based on the full record developed in discovery since the remand, our prior conclusion in *Moore* that the arbitration was a contract of adhesion was erroneous. Again, we disagree.

As we previously stated:

Contracts of adhesion are unique. The essential nature of a contract of adhesion is that it is presented on a take-it-or-leave-it basis, commonly in a standardized printed form, without opportunity for the adhering party to negotiate except perhaps on a few particulars. A contract of adhesion is a contract where one party must accept or reject the contract. Such a contract does not result from the consent of that party.

[*Moore, supra,* 416 N.J.Super. at 38 (internal citations and quotation marks omitted) ].

The facts here show that the agreement meets the above description of a contract of adhesion. Monica received the four-page standardized form arbitration agreement with several other forms from the staff to be filled out before seeing the doctor. Other forms Monica signed on her first office visit indicated that she was not obliged to provide information, but the arbitration agreement form did not state that she did not have to sign it. The office had a notice on its wall which stated that its insurance carrier required the mutual arbitration agreements. The document contained no suggestion that its terms were negotiable.

Defendants contend that the provisions allowing cancellation of the agreement within fifteen days and advising the signer to consult an attorney before signing demonstrated that the agreement was not a "take-it-or-leave it" contract. This argument ignores the fact that Monica was not provided with a copy of the contract, rendering these provisions illusory. Nor does Dr. Fernandez' deposition statement that he would have treated her if she declined to sign the agreement change the coercive nature of the agreement since this information was not conveyed to her by the doctor, his staff, the posted sign, or the agreement itself. Thus, the agreement was a contract of adhesion. *See Ruszala,* 415 N.J.Super. at 295–96.

**\*6** Upon such a finding, the next step is to engage in a "sharpened inquiry" concerning unconscionability by applying four *Rudbart*[4] factors to determine the enforceability of the agreement. *Muhammad, supra,* 189 N.J. at 15. These factors include "the subject matter of the contract, the parties' relative bargaining positions, the degree of economic compulsion motivating the 'adhering' party, and the public interests affected by the contract." *Rudbart, supra,* 127 N.J. at 356.

The first factor—the subject matter—here involves the provision of medical services for a high-risk pregnancy. The Arbitration Act provides that an arbitration agreement may cover "any existing or subsequent controversy." *N.J.S.A.* 2A:23B–6. We previously found that the provision of medical services is amenable to arbitration agreements. *Moore, supra,* 416 N.J.Super. at 44–46. *See also Ruszala, supra,* 415 N.J.Super. at 279 (finding arbitration agreement covering nursing home residents not unconscionable). Arbitration has long been considered a "favored means of dispute resolution," *Hojnowski v. Vans Skate Park,* 187 N.J. 323, 342 (2006), and we discern no inherent harm to the doctor/patient relationship that flows from the agreement to substitute one forum for another in the event of future claims.

Consideration of the second factor—the parties' relative bargaining power—leads to the conclusion that the bargaining power was unequal here. Defendants had specialized knowledge and skill that Monica needed, thus giving them more bargaining power. Defendants' failure to give Monica a copy of the agreement, thereby preventing her from showing it to her attorney and

Moore ex rel. Moore v. Woman to Woman Obstetrics &..., Not Reported in A.3d...

2013 WL 4080947

cancelling it within fifteen days, created an additional inequality in the parties' respective bargaining power. On the other hand, to the extent that, as Monica acknowledged in signing the arbitration agreement, there were other doctors in the area that did not require the patient to enter into an arbitration agreement, defendants' bargaining power was reduced. Most importantly, unequal bargaining power alone does not preclude enforcement of a contract of adhesion. *Young v. Prudential Ins. Co., 297 N.J.Super.* 605, 620, *certif. denied,* 149 *N.J.* 408 (1997).

It is undisputed that the third factor—economic compulsion—did not come into consideration here. Monica, who has health insurance covering much of the costs of defendants' services, does not argue that she entered into the agreement due to any economic pressure. Finally, as previously discussed, public policy favors arbitration agreements, including in health care settings. *Moore, supra,* 416 *N.J.Super.* at 45;. Reviewing the arbitration agreement as a whole in light of the *Rudbart* factors, we conclude that it is generally enforceable. We do not find significant inadequacies due to Monica's "age, literacy, lack of sophistication," the agreement's "hidden or unduly complex contract terms," the defendants' "bargaining tactics, and the particular setting existing during the contract formation process" that lead us to find "overwhelming procedural unconscionability." *Sitogun Holdings, supra,* 352 *N.J.Super.* at 564–65. Consequently, we conclude that the arbitration agreement is enforceable against Monica.

**\*7** However, we noted previously that a provision[5] in the agreement appeared to be "overreaching." *Moore, supra,* 416 *N.J.Super.* at 45. In the agreement, Monica purported to bind her spouse and unborn child to arbitration and to waive their separate rights to a jury trial. First, we recognize that a parent may bind an unborn child to arbitrate future tort claims, based upon the principle that a parent can bind a minor child to such arbitration. *Hojnowski, supra,* 187 *N.J.* at 343 (citation omitted) ("[I]f a parent has the authority to bring and conduct a lawsuit on behalf of the child, he or she has the same authority to choose arbitration as the litigation forum."). Both in utero and after their birth, parents have the right to make medical decisions for their children. *See Draper v. Jasionowski,* 372 *N.J.Super.* 368, 373 (App.Div.2004). A child may sue for medical malpractice occurring while he or she was in utero, including for not providing the mother the information for her to make an informed decision to terminate the pregnancy. *Id.* at 379. Similarly, as the medical decision maker for the fetus in utero, the parent has the right to choose the forum for any tort as a result of that medical treatment. *Cf. Pietrelli v. Peacock,* 16 *Cal.Rptr.*2d 688, 690–91 (Ct.App.1993); *McKinstry v.*

*Valley Obstetrics–Gynecology Clinic, P.C.,* 405 *N.W.*2d 88, 99 (Mich.1987) (holding that a mother may bind her unborn child to arbitration as neither a fetus in utero nor a minor child has the capacity to contract for medical care on his or her own behalf). Accordingly, as we held previously, Monica did have the authority to agree to arbitration on Koral's behalf.

We reach a different conclusion concerning Monica's ability to waive Kevin's right to a jury trial and bind him to arbitrate all future claims. Our Supreme Court has recently emphasized "the importance of ensuring that a party has actually waived its right to initiate a claim in court in favor of submitting to binding arbitration." *Hirsch v. Amper Fin. Servs., L.L.C.,* ——N.J. ——, —— (2013) (slip op. 24). We noted that the individual claim asserted by Kevin as Koral's father was not derivative of Monica's claim. *Moore, supra,* 416 *N.J.Super.* at 45 (citing *Procanik v. Cillo,* 97 *N.J.* 339, 348 (1984)). As the United States Supreme Court long ago observed, "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *United Steelworkers of Am. v. Warriors & Gulf Navigation Co.,* 363 *U.S.* 574, 582, 80 *S.Ct.* 1347, 1353, 4 *L. Ed.*2d 1409, 1417 (1960). A party cannot be forced to arbitrate if he or his representative did not willingly manifest his or her agreement to be bound by the arbitration agreement. *See Nuclear Electric Ins. Ltd. v. Cent. Power & Light Co.,* 926 *F.Supp.* 428, 434 (S .D.N.Y.1996); *Restatement (Second) of Contracts §§ 163* comment a, 174 comment a (1981).

**\*8** Agency relationships can serve as the basis for compelling arbitration. *Hirsch, supra,* —— *N.J.* at —— (slip op. 21) (citing *Alfano v. BDO Seidman, L.L.P.,* 393 *N.J.Super.* 560, 569–70 (App.Div.2007). While a spouse may appoint his or her spouse as an agent, "[n]either husband nor wife by virtue of the relation has power to act as agent for the other." *Restatement (Second) of Agency § 22* comment b (1958). Defendants cannot point to anything in the record demonstrating that Kevin appointed Monica his agent or gave her the authority to waive his right to a jury trial and bind him to the arbitration agreement. Instead, the record reflects that Kevin did not read, sign, or even know about the arbitration agreement, and had no knowledge of the right to rescind that agreement. He did not attend the office visit and the staff did not ask Monica if she had the authority from her husband to sign the agreement on his behalf. Monica was using her own health insurance, not Kevin's.

Defendants rely on *Trocki Plastic Surgery Ctr. v. Bartkowski,* 344 *N.J.Super.* 399, 403 (App.Div.2001),

Moore ex rel. Moore v. Woman to Woman Obstetrics &..., Not Reported in A.3d...

2013 WL 4080947

*certif. denied,* 171 *N.J.* 338 (2002), where we held a father responsible to pay a bill that his wife signed for when he attended the doctor's visit with his wife, provided his health insurance information, and the reimbursement check from the insurance company was in his name. However, defendants' reliance on *Trocki* is misplaced as the facts differ completely from this case. We also reject as without factual support in the record defendants' contention that allowing Kevin to decline to waive his rights and refuse to submit to arbitration in any way interferes with Monica's well-recognized right to control her own body. Accordingly, we conclude that the provision purporting to agree to arbitrate on behalf of her spouse was unenforceable against Kevin. Hence, it must be severed from the arbitration agreement. *Ruszala, supra,* 415 *N.J.Super.* at 300; *Muhammad, supra,* 189 *N.J.* at 26.

Under the totality of circumstances in this case, based upon the more complete record developed on remand, defendants were entitled to enforce the arbitration agreement against Monica and Koral, because the arbitration agreement, as excised, was not unconscionable.

The order denying defendants' motion to compel arbitration for plaintiffs' medical malpractice claims is hereby reversed as to Monica and Koral. We affirm the denial of defendants' motion to compel Kevin to arbitrate his individual claims. The matter is remanded for further proceedings.

**All Citations**

Not Reported in A.3d, 2013 WL 4080947

Footnotes

[1]    All three plaintiffs have the same last name. When we refer to them individually, we will refer to them by their first name, meaning no disrespect.

[2]    Since only Dr. Fernandez and Premier moved for arbitration, we henceforth will refer to these two parties collectively as "defendants", unless otherwise noted.

[3]    These consisted of a patient registration, a financial responsibility form, an authorization for release of information, the arbitration agreement, a medical history form, and a privacy rights form.

[4]    *Rudbart v. N. Jersey Dist. Water Supply Comm'n,* 127 *N.J.* 344 (1992).

[5]    In *Moore, supra,* 416 *N.J.Super.* at 46, we also pointed out another provision involving a "one-sided waiver of rights," for claims against medical care providers who are not parties to the agreement. However, this provision is not an issue on appeal, as the other such providers have not sought to use this provision.

**End of Document**    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

Exhibit L

In re Coven, Not Reported in F.Supp.2d (2007)

2007 WL 1160332

2007 WL 1160332
Only the Westlaw citation is currently available.
NOT FOR PUBLICATION
United States District Court,
D. New Jersey.

In re Lawrence S. COVEN, et al., Debtors.
First American Title Insurance Company, et al.,
Appellants,
v.
Lawrence S. Coven, et al., Appellees.

Bankruptcy No. 04-24703 (RTL).
|
Adv. Proc. No. 04-2512 (RTL).
|
Civil Action No. 06-4323 (MLC).
|
April 17, 2007.

**Attorneys and Law Firms**

Stephen McNally, Jennifer Lynn Neilio, Harvey &
Pennington, PC, Cherry Hill, NJ, for Appellants.

Barry W. Frost, Brian W. Hofmeister, Teich Groh, PC,
Trenton, NJ, for Appellees.

**MEMORANDUM OPINION**

MARY L. COOPER, United States District Judge.

**\*1** Janet B. Coven ("Janet") and her husband, Lawrence
S. Coven ("Lawrence", and together with Janet, the
"Covens"), jointly filed a voluntary bankruptcy petition
under chapter 7 of the United States Bankruptcy Code, 11
U.S.C. § ("Section") 101, et seq. ("Bankruptcy Code"), on
April 29, 2004. (Bankr.No. 04-24703, dkt. entry no. 1,
Pet.) First American Title Insurance Company ("First
American") and Couch Braunsdorf Title Agency ("Couch
Braunsdorf", and together with First American,
"Appellants") brought an adversary proceeding against
the Covens seeking a judgment, *inter alia*, (1) declaring
that the Covens' debts arising from Appellants' cross
claims for contribution and indemnification in a separate
adversary proceeding are nondischargeable under
Sections 523(a)(2)(A), 523(a)(4), and 523(a)(6), (2)
declaring that the Covens' debt arising from First

American's subrogation claim is nondischargeable under
Sections 523(a)(4) and 523(a)(6), and (3) denying the
Covens a discharge pursuant to Sections 727(a)(2) and
727(a)(5). (Bankr.Adv. Proc. 04-2512, dkt. entry no. 14,
Am. Compl.)

The Bankruptcy Court entered an order in a separate
adversary proceeding denying Lawrence a discharge.
(Appellant Br., at 4.) Thus, Appellants determined that it
was not necessary for them to proceed against Lawrence
in their adversary proceeding. (*Id.*) The Bankruptcy Court
held a several day hearing in early April 2006 on
Appellants' remaining claims against Janet. (*Id.*) During
the hearing, Appellants voluntarily dismissed their
nondischargeability claims under Sections 523(a)(2)(A),
523(a)(4), and 523(a)(6). (*See id.*; Appellee App., at
CA784.) Thereafter, the Bankruptcy Court entered an
Order for Judgment on August 18, 2006 ("8-18-06
Order") finding "no cause of action" against Janet under
Sections 727(a)(2) and 727(a)(5) and granting Janet a
discharge pursuant to Section 727(a). (Bankr.Adv. Proc.
04-2512, dkt. entry no. 50, 8-18-06 Ord.) Appellants now
appeal from the 8-18-06 Order. For the reasons stated
herein, the Court will affirm the 8-18-06 Order.

**BACKGROUND**

**I. The Commerce Bank Loans**
Lawrence obtained a loan from Commerce Bank
("Commerce") in the principal amount of $1,200,000 on
August 30, 2000 ("8-30-00 Loan"). (Appellant Br., at 5;
Appellee Br., at 7.) The 8-30-00 Loan was secured by a
mortgage on the Covens' residence. (Appellant Br., at 5;
Appellee Br., at 8.) First American, through its agent,
Couch Braunsdorf, was to issue title insurance in
connection with the loan. (Appellee Br., at 8.) However,
that mortgage was not recorded. (*Id.*; Appellant Br., at 5.)
Janet asserts that she did not attend the closing of the
8-30-00 Loan, but authorized Lawrence to sign
documents pertaining to the residence on her behalf
through a power of attorney. (Appellant Br., at 5;
Appellee Br., at 8.)

Lawrence obtained a second loan from Commerce on
November 16, 2000 in the principal amount of $770,000
("11-16-00 Loan"). (Appellant Br., at 5-6.) The 11-16-00
Loan was also secured by a mortgage on the Covens'
residence, as well as mortgages on commercial properties
located at (1) 314 Route 22 West, Suites B, E, F, and G,
Green Brook, New Jersey ("Green Brook Offices"), (2)

429 Central Avenue, New Providence, New Jersey ("New Providence Property"), and (3) 1330 Howe Lane, North Brunswick, New Jersey ("North Brunswick Property"). (Appellant Br., at 5-6; Appellee Br ., at 9.) At the closing of the 11-16-00 Loan, Janet learned that Lawrence had incurred credit card debt and other obligations in both of their names without her knowledge. (Appellant Br., at 6-7; Appellee Br., at 10.) Lawrence assured Janet that some of the credit card debt was for expenses related to his legal practice, which would later be reimbursed. (Appellee Br., at 10; *see* Appellant Br., at 7.)

**\*2** Janet signed a number of documents at the closing of the 11-16-00 Loan, including the mortgage, Settlement Statement, and Guaranty of Payment. (Appellant Br., at 7.) The mortgage was recorded against the Covens' residence and the Green Brook Offices. (Appellee Br., at 10.) However, the mortgage was not recorded against the New Providence Property and possibly the North Brunswick Property. (*Id.*)

## II. Lawrence's Fraudulent Conduct

### A. The Fallon Refinancing

Lawrence represented Peter and Patricia Fallon in the refinancing of the mortgage on their residence in the fall of 2001. (Appellant Br., at 7.) Instead of using the funds obtained from the refinancing to satisfy the existing mortgage on the Fallons' residence, Lawrence used the funds to pay off certain obligations of a corporation he solely owned. (*Id.*) Lawrence then concealed his misuse of the refinancing funds by making payments on the Fallons' original mortgage. (*Id.*) Nevertheless, Peter Fallon later discovered that Lawrence had not satisfied the existing mortgage with the proceeds of the refinancing, and required the Covens to secure repayment of that mortgage by issuing a mortgage on the Covens' residence dated May 24, 2002. (*Id.* at 7-8.) Peter later required the Covens to sign an additional mortgage secured by their residence dated April 30, 2003, which further ensured repayment of the Fallons' original mortgage. (*Id.* at 8.)

### B. The Costanzo and Diana Refinancings

Lawrence also represented Michael Costanzo, an associate in his law office, and Mark and Susan Diana in mortgage refinancing transactions. (*Id.* at 8-9.) As with the Fallons, Lawrence retained the proceeds of these refinancings instead of satisfying the existing mortgages for Costanzo or the Dianas. (*Id.*) Costanzo informed Janet about Lawrence's misuse of his refinancing proceeds in the spring of 2002. (*Id.* at 8.)

### C. Lawrence's Consent to Disbarment

The New Jersey State Bar Association charged Lawrence with ethics violations in January 2002. (Appellee Br., at 11; Appellee App., at CA244.) The charges arose from Lawrence's failure to disburse the proceeds of a real estate transaction through an IOLTA client trust account. (Appellee App., at CA243.) Lawrence consented to disbarment on advice of counsel in March of 2002. (Appellee Br., at 11; Appellee App., at CA242.)

## III. The Property Transfers

### A. The Transfer of the Covens' Residence

The Covens transferred their residence to Lawrence's mother, Maria Coven ("Maria"), on May 1, 2002.[i] (Appellee Br., at 12; Appellant Br., at 10.) Lawrence, on behalf of Maria, refinanced the mortgage on the residence with First National Bank of Arizona ("FNBA"). (Appellant Br., at 11; Appellee Br., at 13.) Specifically, FNBA issued a loan to Maria on April 25, 2003 in the principal amount of $1,050,350, which was secured by a mortgage on the Covens' residence ("4-25-03 Loan"). (Appellant Br., at 11; Appellee Br., at 13.) In order to obtain the 4-25-03 Loan, Lawrence induced Commerce to issue payoff letters for the 11-16-00 Loan and the arrears on the 8-30-00 Loan by fraudulently representing that Maria was refinancing the mortgage on her own residence and the proceeds of such refinance would be given to Lawrence to pay off the 11-16-00 Loan and bring the 8-30-00 Loan current. (Appellant Br., at 11; Appellee Br., at 13.) The Covens used the proceeds of the 4-25-03 Loan to (1) satisfy the remaining balance of the 11-16-00 Loan, (2) bring the 8-30-00 Loan current, and (3) pay a portion of the balance due on the Fallons' original mortgage, which should have been satisfied in connection with their refinancing. (Appellant Br., at 12; Appellee Br., at 13.) Accordingly, Commerce released its liens on the Covens' residence and the various commercial properties securing the 11-16-00 Loan. (Appellee Br., at 13.) After this refinancing, the Covens made no further payments to Commerce. (Appellant Br., at 16.) Janet did not attend the closing of the 4-25-03 Loan. (Appellee Br., at 13.)

**\*3** Lawrence, on behalf of Maria, arranged a subsequent refinancing of the Covens' residence through Greenpoint Mortgage Funding, Inc., and thus, Maria obtained a loan for more than $1,300,000. (*Id.* at 14; Appellant Br., at 12-13.) The proceeds of this refinancing transaction were used to (1) satisfy the FNBA mortgage, and (2) payoff the remaining balance of the Fallons' mortgage. (Appellants

Br., at 12; Appellee Br., at 14.)

### B. The Transfer of the New Providence Property

The Covens transferred the New Providence Property in December of 2002 to Maria, in consideration of $1. (*Id.* at 11; Appellant Br., at 14.) In connection with the transfer, Janet signed an Affidavit of Title stating that there were no other liens on the property. (Appellant Br., at 14.) The unrecorded Commerce mortgage securing the 11-16-00 Loan was not referenced on the affidavit. (*Id.*) Lawrence arranged for Maria to refinance United Trust Bank's existing mortgage on the New Providence Property dated May 10, 1996 ("1996 Mortgage") with Option One Mortgage Corporation. (*Id.;* Appellee Br., at 11-12.) Specifically, Maria obtained a loan for more than $262,000 secured by a mortgage on the New Providence Property. (Appellant Br., at 14; Appellee Br., at 12.) Lawrence did not use the refinancing proceeds to satisfy the 1996 Mortgage. (Appellants Br., at 15; Appellee Br., at 12.) Instead, Lawrence used the proceeds to pay off the Dianas' original mortgage, which Lawrence should have paid off with the proceeds of the Dianas' refinancing. (Appellant Br., at 15; *see* Appellee Br., at 12.) Janet made subsequent payments on the 1996 Mortgage, but she claims "she thought she was making payments on account of another business loan [Lawrence] had taken to finance his law firm practice." (Appellee Br., at 12; *see* Appellant Br., at 15.)

### C. The Transfer of the North Brunswick Property and Green Brook Offices

The Covens transferred the New Brunswick Property to Maria for the stated consideration of $425,000. (Appellant Br., at 13; *see* Appellee Br., at 14.). Moreover, Lawrence transferred the Greenbrook Offices to Maria for the stated consideration of $250,000. (Appellant Br., at 13; *see* Appellee Br., at 14.) Lawrence arranged for Maria to obtain loans from Bayonne Community Bank totaling approximately 500,000 to partially finance the purchase of these two properties. (Appellant Br., at 13-14; Appellee Br., at 14 .) The loans were secured by mortgages on the New Brunswick Property and the Greenbrook Offices. (Appellee Br., at 14.) The proceeds of the loans were used to satisfy the remaining balance of the Costanzo mortgage. (Appellant Br., at 13.) Further, Lawrence received $31,541.53 and Michael Costanzo received $5,882.61. (*Id.* at 14.) Maria made no additional payments toward the stated purchase price of these properties. (*Id.* at 13.)

### IV. The Commerce Action

Commerce commenced a foreclosure action with respect to the Covens' residence in the fall of 2003. (Appellant Br., at 16.) During the foreclosure proceedings, Commerce discovered that (1) the mortgage securing the 8-24-00 Loan was not recorded, (2) title to the Covens' residence had been transferred to Maria, and (3) there were a number of liens on the Covens' residence. (*Id.*) Thus, Commerce brought an action against Lawrence, Janet, Maria, and Appellants on February 18, 2004 in the Superior Court of New Jersey ("Commerce Action"). (*Id.;* Appellee Br., at 14-15.) Maria died in March 2004, and Commerce amended the complaint to add her estate as a defendant. (Appellant Br., at 16; Appellee Br., at 15.) Commerce alleged that Appellants had a duty to indemnify it for all losses incurred as a result of the Covens' fraudulent conduct under a Closing Service Letter issued by First American on August 24, 2000 in connection with the 8-24-00 Loan. (Appellee Br., at 17.) First American filed an answer and cross-claimed for contribution and indemnification against the other defendants. (*Id.* at 17; Appellee Br., at 15.) Appellants entered into a settlement agreement with Commerce pursuant to which Commerce released all claims it had against Appellants in exchange for $275,000. (Appellant Br., at 17; Appellee Br., at 15.) Appellants contend that they acquired subrogation rights with respect to the Covens as a result of the settlement. (Appellant Br., at 17.)

### V. The Bankruptcy Court's August 17, 2006 Opinion

**\*4** The Bankruptcy Court, after conducting a hearing over the course of several days, concluded that Appellants had not proven their objections to Janet's discharge by a preponderance of the evidence. (Bankr.Adv. Proc. 04-2512, dkt. entry no. 49, 8-17-06 Mem. Op., at 2.) The Bankruptcy Court noted that Janet played no part in Lawrence's scheme to hinder, delay, and defraud Commerce. (*Id.* at 23.) The court also noted that Janet questioned Lawrence on several occasions, but was always assured that he had everything under control. (*Id.* at 24.) Also, the court accepted Janet's testimony as credible and true, and determined that

> Janet was a victim of Lawrence's duplicity. He lied or concealed from her the truth about his credit card debt, the reason for his disbarment, his misappropriation of client funds, his failure to satisfy the mortgage on the New Providence Property, his knowledge that Commerce Bank's

In re Coven, Not Reported in F.Supp.2d (2007)

2007 WL 1160332

mortgages were not recorded, and his diversion of funds in every transaction. He signed her name to mortgages, checks, credit card applications and credit card charges without her knowledge or authorization.

(*Id.*)

The Bankruptcy Court acknowledged that Janet claimed she had no knowledge of Lawrence's fraudulent scheme and that she only executed documents at Lawrence's directions because she believed she was assisting him in satisfying his debts. (*Id.* at 25.) Thus, with respect to Appellants' claim that Janet should not receive a discharge pursuant to Section 727(a)(2)(A), the Bankruptcy Court concluded, *inter alia,* that (1) Janet did not play an active role in the fraud Lawrence perpetrated, (2) "the evidence shows that Janet believed her actions were part of a course of action to realize equity in the properties and be able to refinance and legitimately pay off creditors of Lawrence", (3) more than the existence of a marital relationship must be shown before one spouse will be denied a discharge based on the conduct of the other spouse, and (4) there is no evidence that Janet signed any documents with the intent to either hinder, delay, or defraud any creditor, including Commerce. (*Id.* at 28-31.)

The Bankruptcy Court also held, with respect to Appellants' claim that Janet's discharge should be denied under Section 727(a)(5), that Appellants failed to meet their burden of proof under this section. (*Id.* at 34.) Specifically, the court determined that Janet satisfactorily explained that she (1) signed deeds at Lawrence's request while he handled the remainder of the transactions, (2) believed that the Covens were transferring title to their residence and the North Brunswick Property to Maria to gain money to pay off Lawrence's debts, and (3) did not know that there would be equity in the transferred properties or that funds would go unaccounted. (*Id.* at 34.) Lastly, the Bankruptcy Court determined that Appellants were not creditors of Janet by virtue of subrogation, contribution, or indemnification rights, and thus, they lacked standing to object to Janet obtaining a discharge. (*Id.* 33.)

## DISCUSSION

### I. Jurisdiction and Standard of Review

**\*5** A district court has appellate jurisdiction over a bankruptcy court's final judgments, orders, and decrees. 28 U.S.C. § 158(a). A district court reviews a bankruptcy court's "legal determination de novo, its factual findings for clear error[,] and its exercise of discretion for an abuse thereof." *In re Rashid,* 210 F.3d 201, 205 (3d Cir.2000); *see* Fed. R.Bankr.P. 8013 ("On appeal the district court ... may affirm, modify, or reverse a bankruptcy judge's judgment, order, or decree or remand with instructions for further proceedings. Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous.") Also, the Court, when addressing mixed questions of law and fact, divides the questions into their respective components and applies the appropriate standard to each. *In re Brown,* 951 F.2d 564, 567 (3d Cir.1991).

### II. Legal Standards[2]

Section 727(a) provides exceptions to the general rule that bankruptcy debtors are entitled to a discharge of their debts. *Rosen v. Bezner,* 996 F.2d 1527, 1531 (3d Cir.1993). The section is construed liberally in favor of the debtor because "[c]ompletely denying a debtor his discharge, as opposed to avoiding a transfer or declining to discharge an individual debt pursuant to § 523, is an extreme step and should not be taken lightly." *Id.; see* Wachovia Bank, N.A. v. Spitko *(In re Spitko),* 357 B.R. 272, 298 (E.D.Pa.2006) (noting that denial of a debtor's discharge is a harsh sanction). Nevertheless, if the debtor has been dishonest with the creditors or the Court, denial of discharge is appropriate, notwithstanding that the underlying goal of federal bankruptcy law is to provide the debtor with a fresh start. *In re Spitko,* 357 B.R. at 298.

A party objecting to discharge bears the burden of proving those objections by a preponderance of the evidence. *Id.; Pyramid Tech. Corp. v. Cook (In re Cook),* 146 B.R. 934, 940 (Bankr.E.D.Pa.1992); *see* Grogan v. Garner, 498 U.S. 279, 286-87 (1991) (determining that preponderance of the evidence is the appropriate burden of proof governing the applicability of the Bankruptcy Code's nondischargeability provisions). The Court has discretion in determining whether to grant the debtor a discharge. *In re Cook,* 146 B.R. at 940.

### A. Section 727(a)(2)(A)

Section 727(a)(2)(A) requires the Court to grant a bankruptcy debtor a discharge unless:

the debtor, with intent to hinder, delay, or defraud a creditor ... has transferred, removed, destroyed,

mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed-

(A) property of the debtor, within one year before the date of the filing of the petition[.]

11 U.S.C. § 727(a)(2)(A). Thus, a party seeking to bar a debtor's discharge pursuant to Section 727(a)(2)(A) must show (1) a disposition of property, such as a transfer or concealment, in which the debtor has a direct proprietary interest, (2) the debtor's subjective intent to hinder, delay, or defraud a creditor or the bankruptcy trustee through such disposition, and (3) such disposition and the debtor's subjective intent occurred within the one year period preceding the filing of the bankruptcy petition. *In re Spitko,* 357 B.R. at 299; *see Rosen,* 996 F.2d at 1531 (noting that the party seeking discharge under Section 727(a)(2)(A) must show that during the one year period preceding the filing of the bankruptcy petition, the debtor committed one of the acts listed in that section with the requisite intent).

**\*6** A fraudulent concealment may arise when the debtor transfers property to a third party but retains control or a beneficial interest in such property. *In re Spitko,* 357 B.R. at 300; *see Rosen,* 996 F.2d at 1532 ("In a situation involving a transfer of title coupled with retention of the benefits of ownership, there may, indeed, be a concealment of property."). Moreover, under the continuous concealment doctrine, the Court may find that a concealment occurred during the one year period preceding the bankruptcy filing "even if the initial act of concealment took place before this one year period as long as the debtor allowed the property to remain concealed into the critical year." *Rosen,* 996 F.2d at 1531; *In re Spitko,* 357 B.R. at 300 (stating that under the continuous concealment doctrine, a debtor is denied a discharge "even if he initially concealed property before the one-year pre-bankruptcy period began where the concealment and requisite intent to defraud continued into that one-year period").

The requisite intent to hinder, delay, or defraud a creditor may be inferred from circumstantial evidence or the debtor's course of conduct. *In re Spitko,* 357 B.R. at 301. Accordingly, the Court may find the requisite intent where the transfer at issue was gratuitous or made to the debtor's relative. *Id.* Moreover, there are certain "badges of fraud", which strongly suggest that the debtor intended to hinder, delay, or defraud a creditor or the bankruptcy trustee. *Id.* These "badges" include:

(1) a close relationship between the transferor and the transferee; (2)

that the transfer was in anticipation of a pending suit; (3) that the transferor Debtor was insolvent or in poor financial condition at the time; (4) that all or substantially all of the Debtor's property was transferred; (5) that the transfer so completely depleted the Debtor's assets that the creditor has been hindered or delayed in recovering any part of the judgment; and (6) that the Debtor received inadequate consideration for the transfer.

*Id.* Thus, a bankruptcy court must consider the totality of the circumstances in determining whether denial of discharge is warranted under Section 727(a)(2)(A). *See id.*

**B. Section 727(a)(5)**
Section 727(a)(5) requires the Court to grant the debtor a discharge, unless the debtor "has failed to explain satisfactorily ... any loss of assets or deficiency of assets to meet the debtor's liabilities." 11 U.S.C. § 727(a)(5). Under this section,

the plaintiff has the initial burden of identifying the assets in question by appropriate allegations in the complaint and showing that the debtor at one time had the assets but they are no longer available for the debtor's creditors. The plaintiff must introduce more than merely an allegation that the debtor has failed to explain losses, e.g., the objector must produce some evidence of the disappearance of substantial assets or of an unusual transaction which disposed of assets. There is no requirement, however, that the plaintiff show that the debtor acted fraudulently or intentionally.

**\*7** *Riehm v. Park (In re Park),* 272 B.R. 323, 332 (Bankr.D.N.J.2001) (internal citations and quotations omitted); *see In re Spitko,* 357 B.R. at 318 (explaining that the party seeking the discharge denial under Section 727(a)(5) bears the initial burden of proving that the debtor has not adequately explained any loss or deficiency of assets). This section does not require the plaintiff to show that the debtor acted with any particular state of

mind. *See Spencer v. Blanchard,* 201 B.R. 108, 120 (Bankr.E.D.Pa.1996). Once the plaintiff meets this burden, the burden shifts to the debtor to satisfactorily explain the loss or deficiency. *In re Spitko,* 357 B.R. at 318-19; *Ehle v. Brien (In re Brien),* 208 B.R. 255, 258 (1st Cir.B.A.P.1997).

The determination of what constitutes a "satisfactory" explanation is a matter of discretion for the court. *PNC Bank v. Buzzelli (In re Buzzelli),* 246 B.R. 75, 117 (Bankr.W.D.Pa.2000). A "satisfactory" explanation is one that convinces the bankruptcy judge. *Chalik v. Moorefield (In re Chalik),* 748 F.2d 616, 619 (11th Cir.1984); *In re Cook,* 146 B.R. at 941 (stating that the debtor must render some convincing explanation for the loss of assets to preserve the discharge). "Although the explanation need not be far-reaching and comprehensive, it must consist of more than a 'vague, indefinite, and uncorroborated hodgepodge of financial transactions.' " *In re Spitko,* 357 B.R. at 319; *see In re Chalik,* 748 F.2d at 619 (noting that vague and indefinite explanations unsupported by documentation are unsatisfactory). Further, "for purposes of a § 727(a)(5) inquiry, the court is not concerned with whether the disposition of the assets was proper under the Bankruptcy Code, but rather only whether the explanation satisfactorily describes what happened to the assets." *In re Spitko,* 257 B.R. at 319-20. Thus, courts ultimately must focus on the truth, detail, and completeness of the debtor's explanation. *Id.* at 319; *see In re Cook,* 146 B.R. at 942 (noting that the court must have "some sense that it is dealing with more than an unreliable remake of reality, custom-made to comport with current exigencies").

## III. Legal Standards Applied Here

### A. Appellants' Section 727(a)(2)(A) Objection
Appellants argue that the Bankruptcy Court "disregarded the overt actions of Janet Coven which were key components to [Lawrence's] fraudulent scheme. Instead the Bankruptcy Court took Janet at her word when she claimed ignorance, despite evidence that she lied as to her knowledge of her husband's actions." (Appellant Br., at 20.) Appellants note that Janet discovered that Lawrence had incurred obligations without her knowledge at the closing of the 11-16-00 Loan, and later learned in March of 2002 that Lawrence would be surrendering his law license because he fabricated a deposit slip. (*Id.* at 24-25.)

Appellants further note that Janet signed the deeds transferring the Covens' residence, the New Brunswick Property, and the New Providence Property to Maria and executed Affidavits of Title in connection with these transfers, which failed to acknowledge Commerce's liens on the properties. (*Id.* at 28-30.) Thus, Appellants contend that "there is no way Janet Coven could believe that her signing of deeds and affidavits and the writing of checks were innocent acts, given her past experience with her husband." (*Id.* at 33.) Appellants further contend that the Bankruptcy Court erred by failing to (1) consider the "badges of fraud" in determining whether Janet acted with intent to hinder, delay, or defraud a creditor, (2) consider the pertinent facts, (3) hold Janet accountable for Lawrence's actions because she blindly signed documents at his request and should have known that he would use them for an inappropriate purpose, and (4) find that Janet remained intentionally ignorant of Lawrence's actions. (*Id.* at 33-34, 36-39.)

**\*8** Janet, in contrast, argues that the Bankruptcy Court did not err in concluding that Appellants failed to establish that she acted with the intent required by Section 727(a)(2)(A). (Appellee Br., at 18.) Janet notes that, although the North Brunswick property was transferred to Maria within the one year period preceding the filing of her bankruptcy petition, the Covens' residence and the New Providence Property were transferred before this time period. (*Id* . at 20.) Thus, Janet asserts that the transfer of the residence and the New Providence Property can only provide a basis for objecting to her discharge under the continuous concealment doctrine, which requires the debtor to retain a secret interest in the property following transfer. (*Id.* at 20-21.) Janet asserts, however, that (1) "there are no allegations that [she] retained a secret interest in any of the three (3) Properties transferred to Maria", and (2) Appellants have not alleged or presented any evidence indicating that any party concealed the properties Janet transferred to Maria. (*Id.* at 21.)

Janet also asserts that the Bankruptcy Court made specific findings regarding the numerous documents entered into evidence, and the credibility of the testimony before concluding that Appellants had not sustained their burden of showing that she signed the deeds transferring the properties to Maria with the intent to defraud creditors. (*Id.* at 22.) Further, Janet asserts that the Bankruptcy Court did consider each of the "badges of fraud" in its opinion. (*Id.* at 23.) Accordingly, Janet contends that "the Bankruptcy Court properly concluded that [Appellants] offered no evidence of an intent on the part of [Janet] to hinder, delay or defraud Commerce Bank." (*Id.*) Finally, Janet contends that the fraudulent intent of one spouse cannot be imputed to the other spouse simply because he or she benefitted from and knew about the spouse's misconduct. (*Id.* at 24.) Therefore, Janet asserts that "there is a glaring absence of any evidence of an improper intent by [her] in making the transfers." (*Id.* at 25.)

The Bankruptcy Court, after conducting an evidentiary hearing over the course of several days in early April 2006, entered the 8-18-06 Order finding "no cause of action" under Section 727(a)(2) and 727(a)(5) and granting Janet a discharge. (Bankr.Adv. Proc. 04-2512, dkt. entry no. 50, 8-18-06 Ord.) This Court finds, based on the evidence in the record, that it was not clearly erroneous for the Bankruptcy Court to accept Janet's testimony as credible and conclude that she "has not played an active role in any of the fraud perpetrated by her husband." (Id., dkt. entry no. 49, 8-17-06 Mem. Op., at 28.) At the closing of the 11-16-00 Loan, Janet learned that Lawrence had incurred joint debt without her knowledge. (Appellant Br., at 6-7; Appellee Br., at 10.) However, Janet stated that when she questioned Lawrence about the undisclosed obligations he told her "he always paid it off. And not to worry about it, that you know, the refinance is taking care of everything, don't worry about it." (Dkt. entry no. 10, Appellant App., at A-109.) She also testified that (1) she did not know that she and Lawrence were conveying property to Maria for only $1, but instead believed Maria would obtain a mortgage on the property and pay Commerce, (2) although she made payments on the mortgage on the New Providence Property that should have been satisfied when the property was refinanced, she made such payments at Lawrence's request without knowing what obligation the mortgage secured, (3) in April 2003, Commerce had stopped calling her, and thus, she believed their mortgage securing the 8-30-00 Loan had been satisfied, (4) when she confronted Lawrence after learning that he had not paid off the Fallon and Costanzo mortgages in connection with their refinancings, he told her, "I had a problem and I will take care of it", and (5) she questioned Lawrence frequently about how he would remedy the defalcations once they were brought to her attention. (Id. at A-131, A-137, A-144-A145, A-217, A-221.)

**\*9** Lawrence testified, inter alia, that he (1) did not discuss the circumstances surrounding his decision to consent to disbarment with Janet, (2) signed Janet's name on the mortgage securing the 8-30-00 Loan, and (3) gave Janet a coupon booklet for a mortgage that should have already been satisfied and instructed her to make the required mortgage payments, but "[s]he didn't understand anything other than I told her those had to be paid." (Id. at A-16, A-95, A-259.) Additionally, the Commerce representative who handled Lawrence's loans stated that he spoke with Janet several times about the loan delinquencies, but they "never really had extensive conversations about the payments. It was more, she was serving as a conduit of information to get the message to [Lawrence] ." (Id. at A-52.) Thus, this Court finds that the

Bankruptcy Court did not err in concluding that the evidence did not establish that Janet signed any documents or transferred any property with the requisite intent to hinder, delay, or defraud a creditor, including Commerce. (See Bankr.Adv. Proc. 04-2512, dkt. entry no. 49, 8-17-06 Mem. Op.)

The Bankruptcy Court considered the testimony of numerous witnesses as well as the documents submitted into evidence, before concluding, in its discretion, that "Janet believed her actions were part of a course of action to realize equity in the properties and to be able to refinance and legitimately pay off creditors of Lawrence." (See id. at 29.) Accordingly, although the "badges of fraud" discussed above suggest that Lawrence acted with the requisite intent, they have no applicability to Janet, who simply executed documents and transferred properties at Lawrence's direction because she was misled into believing that he was extracting equity from such properties to legitimately satisfy obligations. Similarly, the continuous concealment doctrine is inapplicable here because Appellants have not alleged that Janet concealed any property interest, but instead argue that she transferred property for nominal consideration with the intent to defraud, hinder, or delay Commerce. See Rosen, 996 F.2d at 1532 (noting that continuous concealment doctrine applies to concealment of a property interest, not concealment of a transfer). Accordingly, because the Covens transferred their residence in May of 2002 and the New Providence Property in December of 2002, before the one year period preceding the filing of the Covens' bankruptcy petition, these transfers cannot form the basis of a Section 727(a)(2)(A) objection to discharge. See 11 U.S.C. § 727(a)(2)(A).

The Court finds that the Bankruptcy Court did not abuse its discretion in concluding that Lawrence's fraudulent intent should not be imputed to Janet. (See Bankr.Adv. Proc. 04-2512, dkt. entry no. 49, 8-17-06 Mem. Op., at 29-31.) Janet did not have a business relationship with Lawrence. See Agribank, FCB v. Gordon, No. 01-374-4, 2002 U.S. Dist. LEXIS 26436, at \*15-\*17 (M.D .Ga. Sept. 18, 2002) (listing cases where courts (1) imputed fraudulent intent from an agent to the bankruptcy debtor in business or commercial context, (2) imputed fraudulent intend to a principal who knew or should have known of its agent's fraudulent intent, and (3) refused to impute fraudulent intent from one partner to another).

**\*10** Janet executed transaction documents and made mortgage payments at Lawrence's direction without having any knowledge that she was participating in his fraudulent scheme. See Allison v. Crescentia (In re

*Allison), 960 F.2d 481, 485 (5th Cir.1992)* (noting that "agency theory has been applied to impute the fraudulent acts of one spouse to the other in cases in which the other spouse was involved in a business or scheme" but determining that wife's debts were dischargeable because there was no evidence linking wife to husband's fraudulent acts or plans); *Gordon,* 2002 U.S. Dist. LEXIS 26436, at *19 (noting that some courts refuse to impute intent from one spouse to the other spouse, who had little or no involvement in the wrongdoing, and stating "most courts make a distinction between spouses who are involved in a business or partnership and spouses who are not operating a business, and generally hold that intent will not be imputed from one spouse to the other in the absence of a business relationship"); *In re Tara of N. Hills,* 116 B.R. 455, 462 (E.D.N.C.1989) (noting that a wife is not the agent of her husband "simply by force of the marital relationship"); *Agribank, FCB v. Gordon,* 293 B.R. 817, 825 (Bankr.M.D.Ga.2003) (determining, on remand from district court, that husband's intent to defraud a creditor could not be imputed to wife who did not know about the false financial information, and thus, wife's obligations to the creditor were dischargeable under Section 523); *Chios v. Klein (In re Klein),* 58 B.R. 397, 398 (Bankr.E.D.Pa.1986) (refusing to find certain debts of wife nondischargeable under Section 523(a)(2)(B) even though she executed certain material documents because there was no evidence to impute husband's intent to wife). Thus, the Bankruptcy Court did not err in refusing to impute Lawrence's fraudulent intent to Janet. Therefore, this Court finds that the Bankruptcy Court did not abuse its discretion in determining that Janet should not be denied a discharge under Section 727(a)(2)(A) because Appellants have not sufficiently demonstrated that she acted with the requisite intent to hinder, delay, or defraud a creditor. (*See* Bankr.Adv. Proc. 04-2512, dkt. entry no. 49, 8-17-06 Mem. Op., 27-31.) *See In re Cook,* 146 B.R. at 940.

**B. Appellants' Section 727(a)(5) Objection**

Appellants note that Lawrence was denied a discharge because he failed to explain (1) the excess equity in the properties he and Janet transferred to Maria, and (2) what he did with the $31, 541, 53 proceeds he received from the refinancing of the New Brunswick Property. (Appellant Br., at 41.) Appellants argue that Janet also not explained the loss of such funds, and thus, she should be denied a discharge under Section 727(a)(5). (*Id.*) Specifically, Appellants contend that the 8-18-06 Order should be reversed because:

> The loss of assets is the excess value that should have been received when the [New Brunswick] Property was transferred to [Maria]. That property was owned by Janet Coven as much as it was owned by [Lawrence] Coven. There has been no satisfactory explanation and, therefore, a discharge should be denied to Janet Coven pursuant to 727(a)(5).

**\*11** (*Id.* at 42.) However, Janet contends that the Bankruptcy Court correctly concluded that she (1) did not receive any excess loan proceeds, (2) was a victim of her husband's fraudulent scheme, and (3) had nothing to do with the disposition of loan proceeds, and thus, was unaware that certain funds had not been accounted for. (Appellee Br., at 32.)

Appellants have produced some evidence of the disappearance of substantial assets, including the excess equity in the properties transferred to Maria and the loan proceeds Lawrence received in connection with the New Brunswick Property refinancing. *See In re Park,* 272 B.R. at 332. However, Janet has explained that she simply executed documents at Lawrence's request and allowed him to handle the remainder of the transactions. Thus, the Bankruptcy Court, in its discretion, determined that Janet's explanation was satisfactory and concluded that Appellants had not met their ultimate burden of proof under Section 727(a)(5). (*See* Bankr.Adv. Proc. 04-2512, dkt. entry no. 49, 8-17-06 Mem. Op., at 34.) *See In re Buzzelli,* 246 B.R. at 117 (stating that what constitutes a "satisfactory" explanation is a matter of discretion for the court); *In re Chalik,* 748 F.2d at 619 (stating that a "satisfactory" explanation is one that convinces the bankruptcy judge). In light of the evidence discussed *supra,* this Court finds that the Bankruptcy Court did not err in accepting Janet's explanation that she has no knowledge of the excess equity in the transferred properties or the loan proceeds Lawrence received because she too was a victim of Lawrence's fraudulent scheme. (Appellee Br., at 18.) Accordingly, this Court finds that the Bankruptcy Court did not abuse its discretion in determining that Janet's explanation was credible, and thus, concluding that she should not be denied a discharge under Section 727(a)(5).[3]

**CONCLUSION**

The Court, for the reasons stated *supra,* concludes that Appellants have failed to demonstrate that the Bankruptcy

2007 WL 1160332

Court erred in entering the 8-18-06 Order and granting Janet a discharge pursuant to Section 727(a). The Court will issue an appropriate order.

**All Citations**

Not Reported in F.Supp.2d, 2007 WL 1160332

## Footnotes

1    The deed transferring the Covens' residence to Maria is dated May 1, 2001. However, Lawrence testified that the date is a mistake because the deed was actually executed on May 1, 2002. (Appellee Br ., at 12; Appellee App., at CA239.)

2    The Covens' bankruptcy case was commenced prior to the effective date of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005. *See* 109 P.L. 8, 119 Stat. 23 (2005). Section 727, which is discussed in this Legal Standards section, was amended in that Act.

3    The Court notes that Appellants also argue that the Bankruptcy Court erred in concluding that First American was not a creditor of Janet, and thus, did not have standing to object to her discharge. (Appellant Br., at 42-47; *see* Bankr.Adv. Proc. 04-2512, dkt. entry no. 49, 8-17-06 Mem. Op., at 31-33.) *See* 11 U.S.C. § 727(c)(1) (stating that only the trustee or a "creditor" of the debtor may object to the debtor receiving a discharge under Section 727(a)). However, because this Court finds that the Bankruptcy Court did not abuse its discretion in determining that Appellants did not meet their burden of proving their objections to Janet's discharge, the Court need not address whether Appellants had standing to commence this denial of discharge action in the first instance.

---

**End of Document**                                    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

# Exhibit M

Drzala v. Horizon Blue Cross Blue Shield, Slip Copy (2016)

2016 WL 2932545

2016 WL 2932545
Only the Westlaw citation is currently available.
United States District Court,
D. New Jersey.

Mark Drzala, MD on assignment of Louis V.
v.
Horizon Blue Cross Blue Shield and Anthem Blue
Cross Blue Shield of Ohio.

Civil Action No. 15-8392
|
Signed 05/18/2016

**LETTER ORDER AND OPINION**

JOHN MICHAEL VAZQUEZ, United States District
Judge

*1 Dear Litigants:
The Court has reviewed Defendant Horizon Blue Cross
Blue Shield ("Horizon") and Defendant Anthem Blue
Cross Blue Shield of Ohio's ("Anthem," collectively
"Defendants") Motions to Dismiss pursuant to Rule 12 of
the Federal Rules of Civil Procedure. For the reasons
stated below, the motions are granted in part and denied
in part. Specifically, the motions to dismiss with respect
to Counts I, III and IV are granted and those counts are
dismissed with prejudice. As to the sole remaining count,
Count II, the motion is denied without prejudice.

This case concerns Defendants' alleged failure to
reimburse Plaintiff Mark Drzala ("Drzala" or "Plaintiff")
for the medical procedures he performed on Defendants'
insured, Louis V. Plaintiff originally filed a Complaint on
October 5, 2015, against Defendants in New Jersey
Superior Court. D.E. 1, Ex. A. In his Complaint, Plaintiff
asserted four causes of action: Count I – Breach of
Contract, Count II – Failure to Make all Payments
Pursuant to Member's Plan under 29 U.S.C. §
1132(a)(1)(B), Count III – Breach of Fiduciary Duty and
Co-Fiduciary Duty under 29 U.S.C. § 1132(a)(3), 29
U.S.C. § 1104(a)(1) and 29 U.S.C. § 1105(a), and Count
IV – Failure to Establish/Maintain Reasonable Claim
Procedures under 29 C.F.R. 2560.503-1. On December 2,
2015, Defendants removed the matter to this Court. D.E.

1. Defendants now move to dismiss Plaintiff s Complaint.
D.E. 9; D.E. 17.

On May 5, 2016, the Court held oral argument on these
motions. D.E. 41. Defendants allege that Plaintiff's
Breach of Contract claim is preempted by the Employee
Retirement Income Security Act ("ERISA"). Defendants
further allege that the anti-assignment provision contained
within the Siemens Benefits Plan (the "Plan")[1] prevents
assignment from Louis V to Dr. Drzala, and therefore
Plaintiff lacks standing to bring these claims.
Additionally, Defendants take issue with the duplicative
relief requested in Count II and Count III. Defendants
further allege that equitable relief is the only remedy
available under Count III, and that Plaintiff fails to
sufficiently state the type of equitable relief he seeks.
Defendants also allege that Count IV does not contain a
private right of action and should therefore be dismissed.
Defendant Horizon separately alleges that because it does
not administer the Plan at issue, it is not a "fiduciary"
under ERISA and the Complaint should be dismissed
against it in the entirety.

Plaintiff voluntarily dismissed Count I on May 4, 2016.
D.E. 39. Plaintiff argues, however, that the
anti-assignment clause in the Plan is ambiguous and
thereby void.[2] Further, Plaintiff argues that Count III
should not be dismissed at this early stage of the
proceedings, and distinguishes Defendants' cases cited in
favor of a dismissal of Count IV.[3] Lastly, Plaintiff argues
that Horizon's status as a fiduciary is fact-specific,
requiring discovery, and that dismissal at this point would
be premature.

*2 The facts of this matter derive from Plaintiff's
Complaint, the exhibits attached thereto, as well as the
exhibits attached to each party's motion papers. See
Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.,
998 F.2d 1192, 1196 (3d Cir. 1993) ("[A] court may
consider an undisputedly authentic document that a
defendant attaches as an exhibit to a motion to dismiss if
the plaintiff s claims are based on the document."). The
additional documents considered by the Court are the
Plan, the assignment at issue, and documents related to
the internal benefits' appeal. Louis V, during the relevant
time, was enrolled in the Plan which is administered by
Defendants Horizon and Anthem. D.E. l, Ex. A ¶ 14.
Plaintiff Drzala, a healthcare provider, performed spinal
surgery on Louis V on or about April 23, 2013. D.E. 1,
Ex. A ¶¶ 5-6. Plaintiff then requested reimbursement, in
the amount of $249,435.00, for the medical services
rendered to Louis V. D.E. 1, Ex. A ¶ 8. Subsequently,
Plaintiff was partially denied reimbursement. D.E. 1, Ex.

A ¶ 9. After going through the administrative appeals process maintained by Defendants, Plaintiff maintains he was underpaid in the amount of $224,751.35. D.E. 1, Ex. A ¶¶ 10-16. Plaintiff received an assignment of benefits from Louis V in order to bring this claim under ERISA. D.E. 1, Ex. A ¶ 7.[4] Plaintiff therefore brings the present action to recover the outstanding balance. D.E. 1, Ex. A ¶ 17.

Defendant Anthem brings its Motion to Dismiss under Rule 12(b)(1) for lack of subject matter jurisdiction and under Rule 12(b)(6) for failure to state a claim upon which relief can be granted. D.E. 9 at 4; Defendant Horizon limits its motion to 12(b)(6). D.E. 17 at 7-8. A motion to dismiss based on standing is usually brought pursuant to Rule 12(b)(1). See N. Jersey Brain & Spine Ctr. v. Aetna, Inc., 801 F.3d 369, 371 n.3 (3d Cir. 2015) ("Ordinarily, Rule 12(b)(1) governs motions to dismiss for lack of standing, as standing is a jurisdictional matter."). However, in cases where a party claims derivative standing to sue under ERISA § 502(a), it is a statutory limitation, and thus non-jurisdictional and properly brought under Rule 12(b)(6). See Cohen v. Horizon Blue Cross Blue Shield of N.J., No. 15-4525, 2015 WL 6082299, at *1 (D.N.J. Oct. 15, 2015). Regardless, "a motion for lack of statutory standing is effectively the same whether it comes under Rule 12(b)(1) or 12(b)(6)." N. Jersey Brain & Spine Ctr., 801 F.3d at 371 n.3. Therefore, this Court will analyze the entirety of Defendants' Motions pursuant to Rule 12(b)(6).

To withstand a motion to dismiss under Rule 12(b)(6), a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). A complaint is plausible on its face when there is enough factual content "that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). Although the plausibility standard "does not impose a probability requirement, it does require a pleading to show more than a sheer possibility that a defendant has acted unlawfully." Connelly v. Lane Const. Corp., 809 F.3d 780, 786 (3d Cir. 2016) (internal quotation marks and citations omitted). As a result, a plaintiff must "allege sufficient facts to raise a reasonable expectation that discovery will uncover proof of her claims." Id. at 789.

In evaluating the sufficiency of a complaint, district courts must accept all factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff. Phillips v. Cty. of Allegheny, 515 F.3d 224, 231 (3d Cir. 2008). A court, however, is "not compelled to accept unwarranted inferences, unsupported conclusions or legal conclusions disguised as factual allegations." Baraka v. McGreevey, 481 F.3d 187, 211 (3d Cir. 2007). If, after viewing the allegations in the complaint most favorable to the plaintiff it appears that no relief could be granted under any set of facts consistent with the allegations, a court must dismiss the complaint for failure to state a claim. DeFazio v. Leading Edge Recovery Sols., No. 10-2945, 2010 WL 5146765, at *1 (D.N.J. Dec. 13, 2010).

**\*3** Defendants' primary argument is that the Plan contains an anti-assignment clause and therefore the assignment from Louis V to Plaintiff Drzala is invalid. Here, the anti-assignment clause states: "Generally, your benefit from any Plan may not be assigned, sold, transferred, or pledged to anyone else." D.E. 9, Ex. A at 180. ERISA's civil enforcement provision provides that "[a] civil action may be brought ... by a *participant* or *beneficiary* ... to recover benefits due him under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B) (emphasis added). As a result, standing is generally limited to "participants" and "beneficiaries." Id.; see Pascack Valley Hosp., Inc. v. Local 464A UFCW Welfare Reimbursement Plan, 388 F.3d 393, 400 (3d Cir. 2004). The Third Circuit has determined that an assignment of benefits in the ERISA context is permissible. See N. Jersey Brain & Spine Ctr., 801 F.3d at 372. Therefore, "[h]ealthcare providers that are neither participants nor beneficiaries in their own right may obtain derivative standing by assignment from a plan participant or beneficiary." Id.

Thus, while assignment clauses are permissible, the question in this matter is whether an anti-assignment clause effectively voids any attempted assignment. In the Third Circuit, it remains an open issue as to whether anti-assignment clauses contained in healthcare plans are enforceable. See Advanced Orthopedics & Sports Med. v. Blue Cross Blue Shield of Mass., 2015 WL 4430488, at *4 (D.N.J. July 20, 2015) (noting that the Third Circuit has not yet addressed the issue of anti-assignment clauses in the ERISA context); Neurological Surgery Assocs. P.A. v. Aetna Life Ins. Co., No. 12-5600, 2014 WL 2510555, at *2-3 (D.N.J. June 4, 2014) (noting that while the Third Circuit has not addressed the question of anti-assignment clauses in ERISA plans, the majority position appears to permit them). Most courts that have addressed this issue (both within and outside this Circuit) have found anti-assignment clauses to be enforceable, provided the clause is unambiguous. See e.g., Davidowitz v. Delta Dental Plan of Cal., Inc., 946 F.2d 1476, 1478 (9th Cir. 1991) (enforceable where intent is clear); Cohen v. Indep. Blue Cross, 820 F. Supp. 2d 594, 605 (D.N.J. 2011) (noting that most courts have found that "unambiguous

Drzala v. Horizon Blue Cross Blue Shield, Slip Copy (2016)

2016 WL 2932545

anti-assignment provisions in group health care plans are valid"); *Briglia v. Horizon Healthcare Servs., Inc.*, No. 03-6033, 2005 WL 1140687, at *4 (D.N.J. May 13, 2005) (collecting "a number of federal and state courts [which] have found that unambiguous anti-assignment provisions in group health care plans are valid"). Thus, a prerequisite to a valid anti-assignment provision is unambiguity. *See Physicians Multispecialty Grp. v. Health Care Plan of Horton Homes, Inc.*, 371 F.3d 1291, 1295 (11th Cir. 2004) (adopting the reasoning of "the majority of federal courts that have concluded that an assignment is ineffectual if the plan contains an *unambiguous* anti-assignment provision") (emphasis added); *Advanced Orthopedics & Sports Med.*, 2015 WL 4430488, at *5-6 (noting that the clause is not ambiguous and reaffirming the conclusion that "*unambiguous* anti-assignment clauses in the ERISA context are valid") (emphasis added).

A term is ambiguous where the language "is susceptible to more than one reasonable interpretation." *In re Unisys Corp. Retiree Med. Benefits ERISA Litig.*, 58 F.3d 896, 903 (3d Cir. 1995). In determining whether a particular clause in a plan document is ambiguous, courts must first look to the plain language of the document. *Id.* at 902. If the plain language is clear on its face, then the terms of the plan control and courts may not look to other evidence. *See Taylor v. Cont'l Grp. Change in Control Severance Pay Plan*, 933 F.2d 1227, 1234 (3d Cir. 1991). However, if the language lends itself to more than one reasonable interpretation, then courts may look to extrinsic evidence to resolve any ambiguities. *See id.* at 1232 ("When an ERISA plan is ambiguous, ascertaining its meaning requires examining many factors, which may include considering how the plan was understood by its beneficiaries."). Thus, when a term in a contract is sufficiently ambiguous, it creates a triable issue of fact. *Id.* at 1234 (finding the term "successor" ambiguous and reversing the District Court's granting of summary judgment in order to permit introduction of extrinsic evidence); *Briglia*, 2010 WL 4226512, at *5 ("[T]he interpretation of ambiguous plan provisions is a question of fact.") (internal citations omitted).

**\*4** As noted, the anti-assignment clause in this matter states: "Generally, your benefit from any Plan may not be assigned, sold, transferred, or pledged to anyone else." D.E. 9, Ex. A at 180. The term "generally" is not defined in the Plan. "In interpreting the provisions of an ERISA plan, terms must be given their plain meanings." *Briglia*, 2010 WL 4226512, at *4. Determining a term's plain meaning often involves consulting the dictionary definition of the term. *See e.g.*, *Nat'l Credit Union Admin. Bd. v. Nomura Home Equity Loan, Inc.*, 764 F.3d 1199, 1227 (10th Cir. 2014) ("Courts often begin an ordinary

meaning analyses by consulting contemporary dictionary definitions"); *Util. Workers Union of Am., Local 601 v. Public Serv. Elec. & Gas Co.*, No. 07-2378, 2009 WL 331421, at *8 (looking to the dictionary to determine the plain language of an agreement). The term "generally" is given three definitions by the Random House unabridged dictionary: "1. usually; commonly; ordinarily ... 2. with respect to the larger part; for the most part ... 3. without reference to or disregarding particular persons, things, situations, etc., that may be an exception." *Random House Dictionary of the English Language* 795 (2d ed. 1987). The plain meaning of this term is clear: "generally" means most of the time (but not always) and necessarily implies exceptions. The parties themselves at oral argument agreed that the word "generally" implies the existence of exceptions.[5] Thus, the word "generally" is unambiguous. However, "generally" inherently implicates an exception or exceptions. Unfortunately, the "exceptions" here are undefined, thereby creating ambiguity in the anti-assignment clause. The specific exceptions that apply here are subject to more than one reasonable interpretation. While Defendant Anthem asked this Court to read in the exception of requiring prior approval before assignment, there is no evidence as to why this exception should be presumptively read in to the clause. *See* Oral Arg. Tr. at 8:6-9. In fact, Anthem's reading of this exception in to the clause while Plaintiff divined no such particular exception further highlights the difficulty in interpreting the anti-assignment provision in Anthem and Horizon's favor as a matter of law.[6]

Other examples in this District in which the court found an anti-assignment provision unambiguous are significantly more detailed and clear. For example, in *Advanced Orthopedics & Sports Medicine v. Blue Cross Blue Shield of Massachusetts*, Judge Wolfson found an anti-assignment provision in an ERISA plan to be unambiguous. 2015 WL 4430488, at *5-6. The anti-assignment clause stated:

> You cannot assign any benefit or monies due from this health plan to any person, corporation, or other organization without Blue Cross and Blue Shield's written consent. Any assignment by you will be void. Assignment means the transfer of your rights to the benefits provided by this health plan to another person or organization.

2015 WL 4430488, at *3. The clause in *Advanced Orthopedics* not only defines the instances in which a

Drzala v. Horizon Blue Cross Blue Shield, Slip Copy (2016)

2016 WL 2932545

beneficiary *can* assign (in the case of written consent), but also provides for the result if an improper assignment does, in fact, occur (it will be void). The anti-assignment provision in *Advanced Orthopedics* also has the additional benefit of explicitly defining what an assignment is. The clause in this case, on the other hand, has the modifier "generally," is followed by no clear exceptions, and does not contain any provision explaining what occurs in the case of an assignment. Because the term "generally" necessarily implies exceptions, and the reader of the plan is left guessing as to what those exceptions are, the Court does not find this clause unambiguous as a matter of law.[7]

**\*5** Defendant Horizon raises an additional argument that it is not a "fiduciary" as defined by ERISA and therefore should be dismissed. D.E. 17 at 12-14. Under ERISA,

> a person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

29 U.S.C. § 1002(21)(A). ERISA defines "fiduciary" in "*functional* terms of control and authority over the plan." *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 262 (1993) (emphasis in original). This functional definition expands the universe of persons subject to fiduciary duties. *Id.* Thus, the definition of a fiduciary under ERISA is broadly construed. *Edmonson v. Lincoln Nat. Life Ins. Co.*, 725 F.3d 406, 413 (3d Cir. 2013).

Horizon alleges that Plaintiff's Complaint "does not articulate any facts (contrary to *Iqbal* and *Twombly*) explaining how Horizon, specifically, acted as a fiduciary under ERISA in connection with the underlying claims." D.E. 17 at 13. Horizon argues that it performed no fiduciary role in this case and, instead, merely acted in a non-discretionary role. Horizon may well be correct, but it would require the Court to engage in fact-finding beyond that which is permissible at this stage of the matter. At this stage it is not the Court's task to determine whether

Horizon is actually an administrator or fiduciary of the Plan. *See Prof'l Orthopedic Assocs., PA v. Excellus Blue Cross Blue Shield*, No. 14-6950, 2015 WL 4387981, at \*10 (D.N.J. July 15, 2015). Instead, the Court "must determine whether Plaintiffs have pled sufficient facts to support the plausible inference that [Defendant] exercised control over the administration of benefits with regards to [Plaintiff]." *Id.* This standard sets a low bar, taking the facts pleaded as true and requiring only a *plausible inference* that Defendant exercised control or authority over the Plan's benefits.

Here, Plaintiff alleges that Defendants were acting as fiduciaries under ERISA because they "acted with discretionary authority or control to deny the payment and to manage the administration of the employee benefit plan." D.E. 1, Ex. A ¶ 40. Additionally, Plaintiff alleges that "Defendant Horizon is the Claims Administrator" for the applicable Plan. D.E. 1, Ex. A ¶ 14. This claim is supported by documents attached to the Complaint. *See* D.E. 1, Ex. C. The Third Circuit has held that plan administrators assume the role of fiduciary under ERISA. *Hozier v. Midwest Fasteners, Inc.*, 908 F.2d 1155, 1158 (3d Cir. 1990). Taking these facts as true, they create at least a plausible inference that Defendant Horizon exercised sufficient control to qualify as a fiduciary, sufficient to meet the *Iqbal/Twombly* pleading standard.

Courts have consistently held that "[t]he determination of whether a person is a fiduciary is fact-based, and cannot be determined in a motion to dismiss." *Rispler v. Sol Splitz Co., Inc.*, No. 04-1323, 2007 WL 192651, at \*4 (E.D.N.Y. June 6, 2007); *see e.g.*, *Beye v. Horizon Blue Cross Blue Shield of N.J.*, 568 F. Supp. 2d 556, 576 (D.N.J. 2008) ("Because the determination of whether a party is an ERISA fiduciary is a 'functional' one" the determination will not typically be resolved at the motion to dismiss stage.") (internal citations omitted). Due to the fact-intensive nature of the inquiry as to fiduciary status under ERISA, the Court cannot say as a matter of law that Horizon is not a fiduciary at this early stage of the proceeding. Horizon's motion is therefore denied.

**\*6** Defendants next contend that Count III seeks duplicative relief to Count II, and only permits equitable remedies, which Plaintiff does not specify in his pleadings. D.E. 9 at 7-8; D.E. 17 at 18-20. Defendants thus set forth two bases on which to dismiss Count III. The first is that Count III cannot survive in light of Count II as it is improperly duplicative. *See Varity Corp. v. Howe*, 516 U.S. 489, 515 (1996). The second is that Plaintiff has insufficiently pled equitable relief, the only relief available pursuant to Count III. *See Mertens*, 508 U.S. at 255-56 (finding ERISA § 502(a)(3) to only allow

Drzala v. Horizon Blue Cross Blue Shield, Slip Copy (2016)

2016 WL 2932545

for traditional equitable restitution).[8] In response, Plaintiff argues that Count III should survive at least until the conclusion of factual discovery in order to be able to adequately ascertain the available relief. D.E. 25 at 14-15. Normally, the Court would not dismiss Count III at this stage, but Plaintiff's Counsel candidly admitted at oral argument that he could not think of any equitable relief Plaintiff would seek if successful on this Count. *See* Oral Arg. Tr. at 5:2-3. Accordingly, the Court will dismiss Count III.

Defendants final argument is in respect to Count IV: Failure to Maintain Reasonable Claims Procedures under 29 C.F.R. 2560.503-1, which Defendants allege does not permit a private right of action.[9] Judge Linares' opinion in *Cohen v. Horizon Blue Cross Blue Shield of New Jersey*, 2013 WL 5780815 (D.N.J. Oct. 25, 2013), is instructive on this point. In *Cohen*, Plaintiffs alleged that Defendant Horizon was liable for failing "to provide a full and fair review" of their claims and failing "to make necessary disclosures in accordance with 29 U.S.C. § 1133." *Id.* at *8. Citing to the Third Circuit, Judge Linares concluded that § 503 sets forth basic requirements governing ERISA plans, but does not provide for its own cause of action. *Id.* at *9 (citing *Miller v. Am. Airlines, Inc.*, 632 F.3d 837, 850-51 (3d Cir. 2011)). This is in line with the Supreme Court's reasoning in its opinion in *Massachusetts Mutual Life Insurance Company v. Russell*, where the Court held that "there really is nothing at all in the statutory text to support the conclusion that such a delay [in the plan processing] gives rise to a private right of action for compensatory or punitive relief." 473 U.S. 134, 144 (1985).

While the courts in both *Massachusetts Mutual* and

*Cohen* were analyzing procedures claims under 29 U.S.C. § 1133, there is no distinction between ERISA procedures claims brought directly under ERISA § 1133 and those brought pursuant to the applicable regulation. *See e.g.*, *Walter*, 949 F.2d at 310 (finding that even though defendant violated C.F.R. § 2560.503.1, "ERISA does not provide a private cause of action for damages to compensate a petitioner for delay"); *Varney v. Verizon Commc'ns, Inc.*, No. 07-695, 2013 WL 1345211, at *16 (E.D.N.Y. Mar. 1, 2013) (dismissing Plaintiff's allegation that Defendants failed to comply with proper claims procedure brought under both 29 U.S.C. § 1133 and 29 C.F.R. 2560.503(l)(f)(l) because "failure to comply with ERISA regulations does not give rise to a private of action"); *Ranke v. Sanofi-Synthelabo, Inc.*, No. 04-1618, 2004 WL 2473282, at *7 (E.D. Pa. Nov. 2, 2004) ("Plaintiffs cannot seek to impose § 502(c) penalties for violation of a regulation, 29 C.F.R. 2560.503-(l)(h)(iii), especially one imposing requirements on plans rather than administrators."). Accordingly, Plaintiff's Count IV is dismissed.

**7 In sum, Defendants' Motions to Dismiss are granted as they pertain to Count I, Count III and Count IV, and those counts are dismissed with prejudice. As to Count II, the motions are denied without prejudice.

**SO ORDERED.**

**All Citations**

Slip Copy, 2016 WL 2932545

Footnotes

1    The Plan is attached to Defendant Anthem's Motion to Dismiss and is titled: "Siemens Corporation Group Insurance and Flexible Benefits Program." D.E. 9, Ex. A. Louis V was a member of the Plan during the relevant period.

2    Plaintiff also argues waiver as to the anti-assignment clause. Because the Court is denying the motion as to Count II for the reasons stated herein, Plaintiff's argument concerning waiver is not addressed. Nevertheless, since the issue of waiver is a fact-sensitive issue, the parties may take discovery on the issue of waiver of the anti-assignment provision. *See Atlantic Orthopaedic Ass. v. Blue Cross & Blue Shield of Tex.*, No. 15-1854, 2016 WL 889562, at *5 (D.N.J. Mar. 7, 2016) (finding the issue of waiver to be "fact-intesive" and allowing parties to explore the issue further in discovery).

3    Plaintiff conceded at oral argument that he did not have any legal authority indicating that Count IV permits a private right of action. *See* Oral Arg. Tr. at 3:8-9.

4    Although the Complaint is not clear as to the timing of the assignment, the assignment itself demonstrates that it was executed after the appeals process began. *See* D.E. 1, Ex. B. According to Defendants, the assignment occurred after the appeals process concluded, and according to the documents, Defendants appear to be correct. *See* D.E. 17 at 11; D.E. 1, Ex. B. However, the supporting documentation in the appeals process likewise reflects that Plaintiff Drzala was an active participant and provided material information to Defendants from the outset.

Drzala v. Horizon Blue Cross Blue Shield, Slip Copy (2016)

2016 WL 2932545

5    Defendant Anthem conceded that "Generally would be absent a special circumstance." Oral Arg. Tr. at 8:5-6. Plaintiff interprets generally to mean "in most cases but not all ... always room for exceptions." Oral Arg. Tr. at 17:6-10. Defendant Horizon agrees with Plaintiff's definition, "that generally means in most cases, subject to a few exceptions." Oral Arg. Tr. at 21:14-16.

6    Defendant Horizon cites *Rothschild v. Foremost Insurance Company* for the proposition that "courts are not afforded the luxury to change the language of the insurance policy to create ambiguity." *See* D.E. 17 at 10 (citing *Rothschild v. Foremost Ins. Co.*, 653 F. Supp. 2d 526, 532 (D.N.J. 2009)). The Court agrees with this statement but finds that this goes against Horizon's argument. The Court cannot rewrite the clause by removing the term "generally" and thus eliminating any ambiguity the term creates.

7    Defendant Horizon raises an additional argument that the assignment is invalid due to timing. D.E. 17 at 11-12. Specifically, Horizon alleges that since the assignment was made after the claims review process began, it is invalid as a matter of law. This argument is different than the position that the anti-assignment provision in the Plan precluded the assignment to Plaintiff in the first place. Instead, Horizon focuses on the *timing* of the assignment, arguing that because the assignment came after the internal appeals process, the assignment is invalid. Contract rights and duties are generally assignable and delegable. *See Citibank, N.A. v. Tele/Resources, Inc.*, 724 F.2d 266, 268 (2d Cir. 1983). In *re Merck & Co., Inc. Securities, Derivative & ERISA Litigation*, the court held that a post-filing assignment was valid. No. 05-5060, 2015 WL 3823912 (D.N.J. June 19, 2015). There, Plaintiffs received an assignment to the rights in the underlying securities after the initiation of the lawsuit. *Id.* at *2. While Defendants claimed that Plaintiffs lacked Article III standing at the outset of the suit, the court refused to "elevate technicalities over substance." *Id.* at *3. Finding that there was "no question that the real parties in interest when the suit was filed have since authorized the Challenged Plaintiffs to pursue this lawsuit on their behalf," the court refused to grant the Defendants' motion for summary judgment and found the assignment valid. *Id.* at *5. Here, Defendant Horizon alleges that the assignment, while made prior to the onset of litigation, was nonetheless too late since the administrative appeals process had already concluded. D.E. 17 at 11-12. The Court does not find this argument persuasive. Defendant Horizon cites to Judge Hayden's opinion in *Center for Orthopedics & Sports Medicine v. Horizon* in support of its argument. No. 13-1963, 2015 WL 5770385, at *5 (D.N.J. Sep. 30, 2015). However, in *Center for Orthopedics & Sports Medicine*, the case was denied at the summary judgment stage. The Court will therefore deny the motions without prejudice, so the parties can raise the issue of the timing of the assignment at the summary judgment stage. The Court notes that Horizon has not shown that it was materially prejudiced by the timing of the assignment, other than to claim so in a conclusory fashion. Based on the documents reviewed by the Court in relation to the current motion, there does not appear to have been any material prejudice to either Horizon or Anthem based on the timing of this assignment because Plaintiff Drzala was actively involved in the process from the outset. D.E. 1, Ex. A.

8    Plaintiff's bring Count III, Breach of Fiduciary Duty and Co-Fiduciary Duty, under 29 U.S.C. § 1132(a)(3) (codified at § 502(a)(3)), 29 U.S.C. § 1104(a)(1) and 29 U.S.C. § 1105(a). § 1104 provides that "a fiduciary shall discharge his duties with respect to a plan solely in the interests of the participants and beneficiaries." 29 U.S.C. § 1104. § 1105 provides for co-fiduciary duty under specific circumstances. *See* 29 U.S.C. § 1105. § 1132 provides for civil remedies for an ERISA violation, including § 1104 and § 1105. *See Horvath v. Keystone Health Plan E., Inc.*, 333 F.3d 450, 456 (3d Cir. 2003) (Participants and beneficiaries may "seek [ +] to utilize the enforcement provisions contained in § 502(a)(3), 29 U.S.C. § 1132(a)(3), in order to remedy an alleged violation of the fiduciary duties imposed by § 1104, 29 U.S.C. § 1104"). Therefore, none of these statutes permit recovery of non-equitable remedies.

9    ERISA claims procedure is governed by ERISA § 502(a) (codified as 29 U.S.C. § 1132(a)) and § 503 (codified as 29 U.S.C. § 1133). 29 C.F.R. 2560.503-1 was promulgated by the Secretary of Labor pursuant to 29 U.S.C. § 1133, which grants the Secretary of Labor the authority to promulgate regulations regarding notice provisions to beneficiaries whose claims have been denied as well as providing beneficiaries an opportunity to participate in the review process. *See Walter v. Int'l Ass'n of Machinists Pension Fund*, 949 F.2d 310, 315-16 (10th Cir. 1991).

---

**End of Document**                                    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

Exhibit N



GREGORY KEEVER, et al., Plaintiffs, v. NCR PENSION PLAN, et al., Defendants.

**Case No. 3:15-cv-196**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF OHIO, WESTERN DIVISION**

*2015 U.S. Dist. LEXIS 169019*

**December 15, 2015, Decided**
**December 17, 2015, Filed**

**COUNSEL:** [*1] For Mr. Gregory Keever, Diana Shank, Pamela Melton, Deborah Shaw, Estate of Leona Keever, Plaintiffs: Robert L Guehl, LEAD ATTORNEY, Guehl Law Offices, Dayton, OH.

For NCR Pension Plan, Fidelity Workplace Servicess LLC, Defendants: Jack Frederick Fuchs, Thompson Hine LLP - 1, Cincinnati, OH.

**JUDGES:** WALTER H. RICE, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** WALTER H. RICE

**OPINION**

DECISION AND ENTRY SUSTAINING IN PART DEFENDANT NCR PENSION PLAN'S MOTION TO DISMISS PURSUANT TO *FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6)*, OR IN THE ALTERNATIVE, TO TRANSFER PURSUANT TO *28 U.S.C. § 1404(a)*; TRANSFERRING CASE TO UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF GEORGIA; TERMINATION ENTRY

Plaintiffs Gregory Keever, Diana Shank, Pamela Melton, and Debra Shaw, together with the Estate of their mother, Lovena Keever, filed suit in the Court of Common Pleas of Montgomery County, against NCR Pension Plan, Fidelity Workplace Services LLC, and Principal Life Insurance Company, alleging breach of contract, unfair and deceptive trade practices, bad faith, a violation of the Ohio Consumer Sales Practices Act, and tortious interference with inheritance.

With the consent of the other defendants, NCR Pension Plan removed the case to federal court, alleging that Plaintiffs' claims are completely [*2] preempted by the *Employee Retirement Income Security Act of 1974* ("ERISA"). Doc. #1. This matter is currently before the Court on Defendant's Motion to Dismiss Pursuant to *Federal Rule of Civil Procedure 12(b)(6)*, or in the Alternative, to Transfer Pursuant to *28 U.S.C. § 1404(a)*. Doc. #4.

**I. Background and Procedural History**

Lovena Keever's husband, James, worked for NCR Corporation for approximately 35 years before retiring in 1985. He was a participant in the NCR Pension Plan. When he passed away in 2009, Lovena, who was designated as his beneficiary, began receiving monthly pension payments of $1,879.38. In June of 2014, she received an email, offering her the option to instead receive a lump sum benefit of $106,153.16, to be paid in November of 2014. She accepted the offer, and was notified that her election became final on August 29, 2014. Mrs. Keever passed away just weeks later, on September 19, 2014.

When her children attempted to collect the lump sum benefit, Defendants informed them that their mother's lump sum benefit election was cancelled because she had died prior to November 1, 2014, the "Benefit Commencement Date." Therefore, her children were ineligible to receive the lump sum payment. They later discovered that this provision, [*3] whereby the lump sum election would be cancelled if the recipient died prior to November 1, 2014, was not added to the Pension Plan until December 11, 2014, months after Mrs. Keever's

2015 U.S. Dist. LEXIS 169019, *

election was supposedly "final," and approximately one month after her children first inquired about collecting the lump sum benefit.

Plaintiffs filed suit in state court, asserting five state law claims. Defendants removed the case to federal court on the basis of federal question jurisdiction, alleging that Plaintiffs' claims were all completely preempted by ERISA. Doc. #1. Defendant NCR Pension Plan then filed a Motion to Dismiss Pursuant to *Federal Rule of Civil Procedure 12(b)(6)*, or in the Alternative, to Transfer Pursuant to *28 U.S.C. § 1404(a)*.[1] Doc. #4. It argues that because the Pension Plan contains a forum-selection clause directing all litigation to be filed in the United States District Court for the Northern District of Georgia, this Court should either dismiss the case or transfer it there. In the event this Court finds that the forum-selection clause is unenforceable, Defendant argues that the claims must nevertheless be dismissed because they are preempted by ERISA, and because Plaintiffs failed to exhaust administrative remedies prior to filing [*4] suit.

> 1   Defendant Fidelity Workplace Services, LLC has joined in the motion. Doc. #5. Plaintiffs voluntarily dismissed all claims against Defendant Principal Life Insurance Company on June 11, 2015. Doc. #7.

In response, Plaintiffs argue that this Court lacks subject matter jurisdiction and that removal was improper. They therefore urge the Court to remand the case to state court. They maintain that, because they are not proper "claimants" under ERISA, they lack standing to bring an ERISA claim, and that, as a result, their state law claims cannot be preempted. According to Plaintiffs, if their claims are deemed preempted, they would be left without a remedy. Plaintiffs further argue that, because the forum-selection clause is against public policy, the Court should refuse to transfer this case to the Northern District of Georgia. In the event that this Court retains jurisdiction, Plaintiffs argue that the Court should find that they have already stated a proper cause of action under ERISA, and should not have to exhaust a futile administrative appeal process prior to proceeding with discovery. Doc. #10.

In its reply brief, Defendant argues that Plaintiffs' request for remand is untimely, [*5] and meritless, given that the claims are preempted by ERISA. Defendant also argues that the Estate stands in the shoes of Mrs. Keever, and therefore has standing to pursue an ERISA claim. Defendant maintains that the forum selection clause is enforceable, mandating transfer to the Northern District of Georgia. in the alternative, Defendant argues that the Court should dismiss the claims without preju-

dice to allow the Estate to exhaust the Plan's administrative process. Doc. #11.

## II. Removal Was Proper

The Court's first task is to decide whether Defendant NCR Pension Plan properly removed the case to federal court. If the case was improperly removed, this Court lacks jurisdiction to take any further action, and must remand the case to state court. If removal was proper, the Court must determine whether the forum selection clause is enforceable, and whether dismissal or transfer is warranted.

A defendant may remove a case from state court to federal court only when the federal district court has "original jurisdiction" over that claim. *28 U.S.C. § 1441(a)*. District courts have original jurisdiction over "all civil actions arising under the Constitution, laws, or treaties of the United States." *28 U.S.C. § 1331*. "[A] cause [*6] of action arises under federal law only when the plaintiff's well-pleaded complaint raises issues of federal law." *Metropolitan Life Ins. Co. v. Taylor, 481 U.S. 58, 63, 107 S. Ct. 1542, 95 L. Ed. 2d 55 (1987)*.

Here, Plaintiffs have asserted five claims based on *state* law: (1) breach of contract; (2) unfair and deceptive trade practices; (3) bad faith; (4) a violation of the Ohio Consumer Sales Practices Act; and (5) tortious interference with inheritance. Defendant argues, however that, because these state law claims are completely preempted by ERISA, removal is proper.

"Complete preemption is a narrow exception to the well-pleaded complaint rule." The doctrine applies "in situations where Congress has indicated an intent to occupy the field so completely that any ostensibly state law claim is in fact a federal claim for purposes of arising-under jurisdiction." *AmSouth Bank v. Dale, 386 F.3d 763, 776 (6th Cir. 2004)*.

*Section 502(a)(1)(B) of ERISA* is one of those narrow exceptions. *Id.* That subsection, concerning employee benefit plans, is codified as follows: "A civil action may be brought--(1) by a participant or beneficiary-- . . . (B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." *29 U.S.C. § 1132(a)(1)(B)*.

A claim cannot be completely preempted [*7] unless it is "capable of being characterized as an ERISA enforcement action" under this subsection. *Huisjack v. Medco Health Solutions, Inc., 492 F. Supp.2d 839, 849 (S.D. Ohio 2007)*. If a claim is completely preempted, it is "re-characterized as a viable federal claim, actionable in federal court," and subject to removal. *Ackerman v. Fortis Benefits Ins. Co., 254 F. Supp.2d 792, 817 (S.D.*

Ohio 2003). *See also Gardner v. Heartland Indus. Partners, LP, 715 F.3d 609, 613 (6th Cir. 2013)* (noting that, if a state law claim falls within the scope of *§ 1132(a)(1)(B)*, it is deemed to be a federal claim for purposes of removal).[2]

> 2   ERISA broadly preempts all state laws that "relate to any employee benefit plan." *29 U.S.C. § 1144(a)*. This type of traditional preemption is often raised as a federal defense to claims in state court. However, for purposes of removal jurisdiction, it is not enough that a state law claim "relates to" an employee benefit plan and is preempted under *§ 1144(a)*. In order to be completely preempted, and subject to removal, the claim must also fall within the scope of *§ 1132(a)(1)(B). Gardner, 715 F.3d at 612-13. See also Wright v. Gen. Motors Corp., 262 F.3d 610, 613 (6th Cir. 2001)* (noting that removal is proper only "when the action is to recover benefits, enforce rights or clarify future benefits under an ERISA plan.").

"It is not the label placed on a state law claim that determines whether it is preempted, but whether in essence such a claim is for the recovery of an ERISA plan benefit." *Cromwell v. Equicor-Equitable HCA Corp., 944 F.2d 1272, 1276 (6th Cir. 1991)*. A claim is deemed to fall within the scope of *§ 1132(a)(1)(B)* if: (1) [*8] "the individual is entitled to such coverage only because of the terms of an ERISA-regulated employee benefit plan"; and (2) "where no legal duty (state or federal) independent of ERISA or the plan terms is violated," *Aetna Health Inc. v. Davila, 542 U.S. 200, 210, 124 S. Ct. 2488, 159 L. Ed. 2d 312 (2004)*.

In Count I of the Complaint, Plaintiffs allege that Mrs. Keever entered into a contract with NCR when she accepted the offer to convert her monthly annuity into a lump sum payment of $106,153.16. She received a notice indicating that her election became final on August 29, 2014. Plaintiffs--Mrs. Keever's estate and her surviving heirs--allege that NCR breached the contract when it wrongfully refused to pay them the lump sum, and that they suffered damages as a result of the breach. They seek compensatory damages in the amount of the lump sum allegedly owed. Doc. #1-2, PageID##29-30.

These allegations fall within the scope of *§ 1132(a)(1)(B)*. Plaintiffs are attempting to recover the lump sum benefit that their mother elected to receive in lieu of monthly payments under the NCR Pension Plan, which is an ERISA-regulated employee benefit plan. Moreover, under the circumstances presented here, it cannot be said that the legal duty that was allegedly breached, *i.e.*, NCR Pension Plan's duty [*9] to pay the lump sum benefit, is "independent of ERISA or the plan

terms." *Davila, 542 U.S. at 210*. The NCR Pension Plan specifically provides for the option of the lump sum payment. Doc. #1-7, PageID##263-67.[3]

> 3   The Court rejects Plaintiffs' argument that, because the offer of the lump sum payout came from "NCR Corporation" as opposed to the "NCR Pension Plan," the relevant legal duty is independent of ERISA or the terms of the NCR Pension Plan. NCR established the NCR Pension Plan, and reserved the right to amend it. *See* Doc. #1-7, PageID##61, 124. In 2014, NCR chose to amend the Plan to include the option of a lump sum payout. *Id.* at PageID##263-67. Notably, according to the Complaint, the offer letter sent to Mrs. Keever stated, "NCR is making an offer for you to receive your benefit *under the NCR Pension Plan* as a lump sum payment in November 2014," and, after she accepted the lump sum payment offer, the confirmation email she received stated, "you have made an election *for your pension benefit*." Doc. #1-2, PageID#25 (emphasis added).

Courts have repeatedly held that breach of contract claims, similar to the one asserted here, are the functional equivalent of an action to recover benefits due under the terms [*10] of an employee benefit plan, and are therefore completely preempted by ERISA. *See Huisjack, 492 F. Supp.2d at 849* (citing *Ackerman, 254 F. Supp.2d at 818)); Cromwell, 944 F.2d at 1277; Richie v. Hartford Life and Accident Ins. Co., No. 2:09-cv-604, 2010 U.S. Dist. LEXIS 30279, 2010 WL 785354, at *6 (S.D. Ohio Mar. 5, 2010)*.

Plaintiffs deny that their breach of contract claim is completely preempted. They note that only "participants" and "beneficiaries" have standing to sue under *§ 1132(a)(1)(B)*. They then argue that, because neither Mrs. Keever's Estate nor her heirs are "participants" or "beneficiaries," as those terms are defined in *29 U.S.C. §1002(7) and (8)*, they would lack standing to bring an action under *§ 1132(a)(1)(B)*.[4] They further contend that, because they lack standing to bring an ERISA claim, their state law claims cannot be deemed preempted by ERISA, and removal from state court was improper.

> 4   A federal regulation, *29 C.F.R. § 2560.503-1(g)(1)(iv)*, requires plan administrators who make an "adverse benefit determination" to inform the claimant of the plan's review procedures and her right to sue. Citing *Mirza v. Insurance Administrator of America, Inc., 800 F.3d 129 (3d Cir. 2015)* as "informative," Plaintiffs argue that Defendant's failure to comply with this regulation, when responding to Plaintiff Diane

2015 U.S. Dist. LEXIS 169019, *

Shank's inquiry about the availability of the lump sum benefit, indicates that, at that time, Defendant did not believe that she was a "beneficiary" under the NCR Pension Plan. Plaintiffs [*11] then argue that such a belief would be inconsistent with Defendant's claim that removal is proper because the claims are completely preempted by ERISA. As Defendant notes, however, this regulation does not come into play until a participant or beneficiary has actually filed a claim for benefits. Since Plaintiffs have not done that, Defendant's failure to comply with the regulation is irrelevant.

The Court rejects these arguments, because Plaintiffs do have standing to pursue a claim for benefits under *§ 1132(a)(1)(B)*. ERISA defines a "beneficiary" as "a person designated by a participant, or by the terms of an employee benefit plan, who is or may become entitled to a benefit thereunder." *29 U.S.C. § 1002(8)*. It is undisputed that Mrs. Keever was a "beneficiary," designated by her husband, who was a "participant" in the NCR Pension Plan.

As such, Mrs. Keever's estate now stands in her shoes and is entitled to pursue a claim under *§ 1132(a)(1)(B)*. As one court has noted, even though ERISA "does not address the question of an estate's standing where it is not a designated beneficiary," there is no basis for concluding that Congress intended to preclude the estate from bringing an action which the participant or beneficiary could have [*12] brought if still alive. "To hold otherwise would frustrate ERISA's intent." *Sanders v. Int'l Soc'y for Performance Improvement, 740 A.2d 34, 36-37 (D.C. 1999). See also Tolton v. Am. Biodyne, Inc., 48 F.3d 937, 941* (6th Cir. '1995) ("plaintiffs, who brought this action as representatives of Tolton's estate, have standing under ERISA").

In addition, Mrs. Keever's surviving heirs could be deemed to have derivative standing to sue. *See Scott v. Regions Bank, 702 F. Supp.2d 921, 929-30 (E.D. Tenn. 2010)* (holding that granting derivative standing to successor-in-interest to the plan participant or beneficiary promotes ERISA's goal of protecting the interests of participants and their beneficiaries).

Moreover, even if Plaintiffs lacked statutory standing to pursue a claim for benefits under *§ 1132(a)(1)(B)*, this would not necessarily deprive the federal court of subject matter jurisdiction. In *Arbaugh v. Y & H Corp., 546 U.S. 500, 516, 126 S. Ct. 1235, 163 L. Ed. 2d 1097 (2006)*, the Supreme Court stated that "when Congress does not rank a statutory limitation on coverage as jurisdictional, courts should treat the restriction as nonjurisdictional in character." There is no indication that Congress intended an individual's status as a "participant" or

"beneficiary" to be a jurisdictional requirement of a claim for benefits under *§ 1132(a)(1)(B)*.

As explained in *Leeson v. Transamerica Disability Income Plan, 671 F.3d 969 (9th Cir. 2012)*, an individual's status as a "participant" or "beneficiary" is "not a prerequisite for subject matter jurisdiction," but merely [*13] a "substantive element of his [ERISA] claim." *Id. at 971*. ERISA's statutory definitions of "participant" and "beneficiary" serve "to identify those plaintiffs who may be entitled to relief, not to limit the authority of federal courts to adjudicate claims under ERISA." *Id. at 978. See also Daft v. Advest, Inc., 658 F.3d 583, 593 (6th Cir. 2011)* (relying on *Arbaugh* to conclude that "the existence of an ERISA plan is not a jurisdictional prerequisite").

The Court concludes that Plaintiffs' breach of contract claim is completely preempted by ERISA, because it is, in essence, a claim for recovery of benefits due under the terms of an ERISA-governed employee benefit plan. Because it states a claim arising under federal law, removal was proper.

The Court notes that, to the extent that Plaintiff's four tort claims are so related to the breach of contract claim that they form part of the same case or controversy, the federal court can exercise supplemental jurisdiction over them as well. *See 28 U.S.C. § 1367(a)*. Nevertheless, this Court does not reach the question of whether Plaintiff's tort claims "relate to" an employee benefit plan governed by ERISA, and are therefore preempted by *§ 1144(a)*. At this juncture, the Court holds only that Defendant properly removed the case to federal court because [*14] the breach of contract claim is completely preempted by ERISA.

### III. Forum Selection Clause is Enforceable, and Transfer is Appropriate

Paragraph 8.9 of the NCR Pension Plan states:

> Effective on and after February 11, 2011, any claim or action filed in court or any other tribunal in connection with the Plan by or on behalf of a Participant or beneficiary shall only be brought or filed in the United States District Court for the Northern District of Georgia.

Doc. #1-7, PageID#118.

Plaintiffs argue that this forum-selection clause is unenforceable because it was not a "bargained for" provision, and is contrary to public policy. In support, Plaintiffs rely on Judge Clay's dissenting opinion in *Smith v. Aegon Companies Pension Plan, 769 F.3d 922 (6th Cir.*

2015 U.S. Dist. LEXIS 169019, *

*2014)*, *petition for cert. filed*, 83 U.S.L.W. 3768 (U.S. Mar. 13, 2015) (No. 14-1168, 14A682), in which he argued that a unilaterally-added forum-selection clause, which required the plaintiffs to travel to a distant venue to litigate their claims, contravened the purpose and policy of ERISA. *Id. at 935-36*.

This Court, however, is bound by the majority opinion in *Smith*. The majority noted that forum-selection clauses are "presumptively valid and enforceable" even when they are "not the product of an arms-length transaction." *Id. at 930*. The majority held that the forum-selection clause in that [*15] ERISA-governed pension plan, which required all lawsuits to be brought in federal court in Cedar Rapids, Iowa, was valid and enforceable. *Id. at 930-33*. Plaintiffs have failed to establish any basis for distinguishing NCR Pension Plan's forum-selection clause from the one at issue in *Smith*. The Court therefore concludes that it is enforceable.

Having determined that the forum-selection clause is enforceable, the Court must decide whether to dismiss Plaintiffs' claims under *Federal Rule of Civil Procedure 12(b)(6)*, or to transfer the case to the United States District Court for the Northern District of Georgia under *28 U.S.C. § 1404(a)*. *Section 1404(a)* provides that "Nor the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented."

In *Atlantic Marine Construction Co. v. U.S. District Court for the Western District of Texas, 134 S. Ct. 568, 580, 187 L. Ed. 2d 487 (2013)*, the Supreme Court held that, "the appropriate way to enforce a forum-selection clause" is to transfer the case to the proper district court under *28 U.S.C. § 1404(a)*. *Id. at 580* ("*Section 1404(a)* is merely a codification of the doctrine of *forum non conveniens* for the subset of cases in which the transferee forum is within the federal court system; in such cases, Congress has replaced the traditional [*16] remedy of outright dismissal with transfer.").

Given that the parties did not address the question of whether dismissal under *Rule 12(b)(6)* was available as an alternate means of enforcing a forum-selection clause, the Court skirted this question in *Atlantic Marine*. *Id. at 581*. Because this issue was not resolved, the Sixth Circuit, in *Smith*, held that the district court did not abuse its

discretion in dismissing the case under *Rule 12(b)(6)* instead of transferring it. *769 F.3d at 933-34*.

In reliance on *Smith*, Defendant urges the Court to dismiss this case rather than transfer it. Nevertheless, given the Supreme Court's express holding that *§1404(a)* is the appropriate mechanism for enforcing a forum selection clause, the Court finds that this is preferable, and better serves the interests of justice. Accordingly, the Court TRANSFERS the above-captioned case to the United States District Court for the Northern District of Georgia.

**IV. Scope of Decision and Entry**

This Court's Decision and Entry is narrow and limited in scope. It has determined only that: (1) this case was properly removed to federal court because Plaintiffs' breach of contract claim is completely preempted by ERISA; and (2) the forum-selection clause contained in the NCR Pension Plan is enforceable, [*17] justifying transfer of this case to the United States District Court for the Northern District of Georgia.

Given the fact that venue properly lies elsewhere, this Court leaves it to the transferee court to decide the other issues raised by the parties in their briefs, including, but not limited to: (1) whether Plaintiffs' tort claims are preempted by ERISA; and (2) the appropriate course of action, given Plaintiffs' failure to exhaust administrative remedies under the terms of the NCR Pension Plan.

**V. Conclusion**

For the reasons set forth above, Defendant's Motion to Dismiss Pursuant to *Federal Rule of Civil Procedure 12(b)(6)*, or in the Alternative, to Transfer Pursuant to *28 U.S.C. § 1404(a)*, Doc. #4, is SUSTAINED IN PART.

The Clerk of Court is directed to TRANSFER the above-captioned case to the United States District Court for the Northern District of Georgia, and to TERMINATE it upon the docket records of the United States District Court for the Southern District of Ohio, Western Division, at Dayton.

Date: December 15, 2015

/s/ Walter H. Rice

WALTER H. RICE

UNITED STATES DISTRICT JUDGE

Exhibit O

KeyCite Yellow Flag - Negative Treatment
Disagreed With by MHA, LLC v. Aetna Health, Inc., D.N.J.,
February 7, 2013

2012 WL 1135608
Only the Westlaw citation is currently available.
NOT FOR PUBLICATION
United States District Court,
D. New Jersey.

PREMIER HEALTH CENTER, P.C., et al.,
Plaintiff,
v.
UNITEDHEALTH GROUP, et al., Defendants.

Civil Action No. 11–425 (ES).
|
April 4, 2012.

**Attorneys and Law Firms**

John W. Leardi, Paul D. Werner, Vincent Norman
Buttaci, Buttaci & Leardi, LLC, Princeton, NJ, James E.
Cecchi, Lindsey H. Taylor, Carella Byrne Cecchi Olstein
Brody & Agnello, P.C., Roseland, NJ, Julie Diane Miller,
Complex Litigation Group LLC, Highland Park, IL, for
Plaintiff.

Thomas R. Curtin, George C. Jones, Graham Curtin, PA,
Morristown, NJ, Robert Alan White, Morgan, Lewis &
Bockius, LLP, Princeton, NJ, for Defendants.

*AMENDED OPINION*

SALAS, District Judge.

**\*1** Defendants UnitedHealth Group, UnitedHealthcare
Services, Inc., OptumHealth Care Solutions, Inc., Health
Net of the Northeast, Inc., and Health Net of New York,
Inc., (collectively "Defendants") seek dismissal of
Plaintiffs' Amended Complaint (AC, D.E.15) for lack of
standing under Fed.R.Civ.P. 12(b)(1), and for having
failed to state a claim upon which relief can be granted
pursuant to Fed.R.Civ.P. 12(b)(6). (*See* Health Net
Moving Br., D.E. 29 at 7–8; United Moving Br., D.E. 31
at 8).[1] The Court has considered the briefs submitted in
support of and in opposition to the present motion, and
decides the matter without oral argument pursuant to
Fed.R.Civ.P. 78(b). For the reasons set forth below,

Health Net's motion to dismiss (D.E.29) is GRANTED in
part and DENIED in part. United and Optum's motion to
dismiss (D.E.31) is DENIED.

**I. Jurisdiction**
Plaintiffs bring this Complaint under the Employee
Retirement Income Security Act of 1974 ("ERISA"), as
amended, 29 U.S.C. § 1001, *et seq.* (AC ¶ 1).
Accordingly, this Court retains subject matter jurisdiction
over this matter pursuant to 28 U.S.C. § 1331 and 29
U.S.C. § 1132(e)(1). *See Tomasko v. Weinstock*, 255 F.
App'x 676, 679 (3d Cir.2007).

**II. Background**

**A. Parties**

**i. Plaintiffs**
Plaintiff Premier Health Center, P.C. ("Premier") is a
New Jersey corporation that provides health care services
to individuals insured by United. (AC ¶ 2, 6). Premier has
its patients execute written assignments, in which they
agree that it may bill and receive payments directly from
United. (*Id.*).

Judson G. Sprandel, II, D.C. ("Sprandel") is a licensed
Doctor of Chiropractic who practices in Canton, Ohio,
and, as an in-network provider, provides services to
United insureds. (*Id.* ¶ 2, 8).

Brian Hicks is a licensed Doctor of Chiropractic who
practices in Bixby, Oklahoma, and, as in in-network
provider, provides services to United insureds. (*Id.* ¶ 9).

Plaintiff Tri3, headquartered in Wauconda, Illinois, is a
health care facility that provides durable medical
equipment to United insureds pursuant to prescriptions
from the insureds' health care providers. (*Id.* ¶ 10).

Plaintiff Beverly Hills Surgical Center is a licensed
surgical center with offices in Beverly Hills, California,
that provides health care services as an out-of-network
provider to numerous United insureds.

Jeremy Rodgers is a licensed chiropractic radiologist and
board-certified athletic trainer who practices in Louisville,
Colorado and provides services to numerous United
insureds as an in-network provider. (*Id.* ¶ 13).

Amy O'Donnell is a licensed Chiropractic Physician who

2012 WL 1135608

works as an Integrative Chiropractor in Cos Cob, Connecticut, and has provided services to numerous United insureds as an in-network and, currently, an out-of-network provider. (*Id.* ¶ 14).

The above individual Plaintiffs (collectively, "Plaintiffs") are suing Defendants UnitedHealth Group, UnitedHealthcare Services, Inc., OptumHealth Care Solutions, Inc., Health Net of the Northeast, Inc., and Health Net of New York, Inc. on their own behalf and as representatives of a putative class for alleged violations of ERISA. (*Id.* ¶¶ 2–4).

**\*2** Plaintiffs Congress of Chiropractic State Associations (COCSA), American Chiropractic Association (ACA), Ohio State Chiropractic Association (OSCA), and Missouri State Chiropractic Association (MSCA) (collectively, "Associations") are membership organizations that serve the interests of chiropractic physicians. (*Id.* ¶¶ 15–20). They bring this action in a representational capacity on behalf of their members who are health care providers who have provided services to United insureds and have been injured by Defendants' alleged violations of ERISA. (*Id.* ¶ 19).

### ii. Defendants
UnitedHealth Group is a corporation organized and existing under the laws of Minnesota, which issues and administers health care plans around the country through its various wholly owned and controlled subsidiaries, including Defendant United HealthCare Services Inc. (*Id.* ¶ 21). Defendant Optum is one of UnitedHealth Group's wholly-owned and controlled subsidiaries, headquartered in Golden Valley, Minnesota. (*Id.*).

Defendant Health Net of the Northeast, Inc., which is headquartered in Shelton, Connecticut, provides administrative services to a number of subsidiaries of UnitedHealth Group, including Defendant Health Net of New York, Inc., Health Net Insurance of New York, Inc., Health Net of New Jersey, Inc., and Health Net of Connecticut, Inc. (*Id.* ¶ 22). Defendant Health Net of New York, Inc. is also based in Shelton, Connecticut. (*Id.*). The assets of Health Net of the Northeast Inc., including its various licensed subsidiaries, such as Health Net of New York Inc., were acquired by UnitedHealth Group in December 2009. (*Id.*) UnitedHealth Group now wholly owns and controls Health Net of New York, Inc. (*Id.*).

### iii. Plaintiffs' Amended Complaint
United provides its members with a Summary Plan Description ("SPD"), a document designed to describe in layperson's language the material terms, conditions, and limitations of the health care plan. (*Id.* ¶ 90). The full details of the plan, which are summarized in the SPD, are contained in the Evidence of Coverage ("EOC") that governs each member's health plan. (*Id.*).

After performing its services, pursuant to the assignment of benefits form, Premier submits a claim to United[2] who will then make payment to Premier on the claim. Occasionally, United will engage in post-payment audits of benefit payments. (*Id.* ¶¶ 3, 23). Following the post-payment audit process, United determined that they had erroneously made overpayments to the Plaintiffs and demanded repayment. (*Id.* ¶ 3). Plaintiffs allege that United "took steps to coerce the Individual Plaintiffs and other Class members to return the alleged overpayments, including by withholding payments from new and unrelated services and applying them to the alleged debt, or by filing invalid lawsuits seeking to compel repayment." (*Id.*).

Plaintiffs further allege that many of the United Plans at issue are governed by ERISA, "which establishes strict rules and procedures that United or other entities that administer ERISA plans must comply with." (*Id.* ¶ 4). Furthermore, "ERISA sets forth specific steps that must be followed when an insurer such as United makes an 'adverse benefit determination' by denying or reducing benefits, including by providing a 'full and fair review' of the decision." (*Id.*). "By making a retroactive determination that a previously paid benefit was, in fact, paid improperly, an insurer makes an adverse benefit determination under ERISA." (*Id.*). Plaintiff avers that "United has violated ERISA by making its retroactive adverse benefit determinations without complying with ERISA['s] requirements." (*Id.*).

**\*3** On January 24, 2011, Plaintiffs filed a complaint in the United States District Court for the District of New Jersey. On April 22, 2011, Plaintiffs filed an Amended Complaint, which is the subject of Defendants' United and Health Net motions to dismiss. The parties have submitted their respective briefs and the Defendants' motions are now ripe for this Court's adjudication.

### III. Legal Standards

### A. 12(b)(1)
A motion to dismiss for lack of standing is properly brought pursuant to Fed.R.Civ.P. 12(b)(1) because standing is a jurisdictional matter. *See St. Thomas–St. John Hotel & Tourism Ass'n v. Gov't of the U.S. V.I.*, 218

2012 WL 1135608

F.3d 232, 240 (3d Cir.2000) ("The issue of standing is jurisdictional."); *Kauffman v. Dreyfus Fund, Inc.,* 434 F.2d 727, 733 (3d Cir.1970) ("[W]e must not confuse requirements necessary to state a cause of action ... with the prerequisites of standing.").

Pursuant to Rule 12(b)(1), the Court must accept as true all material allegations set forth in the complaint, and must construe those facts in favor of the nonmoving party. *See Warth v. Seldin,* 422 U.S. 490, 501, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975); *Storino v. Borough of Point Pleasant Beach,* 322 F.3d 293, 296 (3d Cir.2003). On a motion to dismiss for lack of standing, the plaintiff " 'bears the burden of establishing' the elements of standing, and 'each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.,* with the manner and degree of evidence required at the successive stages of the litigation.' " *FOCUS v. Allegheny Cnty. Ct. Com. Pl.,* 75 F.3d 834, 838 (3d Cir.1996) (quoting *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)).

**B. 12(b)(6)**
On a motion to dismiss pursuant to Rule 12(b)(6), "courts are required to accept all well pleaded allegations in the complaint as true and draw all reasonable inferences in favor of the non-moving party." *Phillips v. Cnty. of Allegheny,* 515 F.3d 224, 234 (3d Cir.2008); *Burrell v. DFS Servs., LLC,* 753 F.Supp.2d 438, 440 n. 1 (D.N.J.2010) (holding that contradictory factual assertions on the part of defendants must be ignored). Courts must "determine whether, under any reasonable reading of the complaint, the Plaintiff may be entitled to relief." *Pinker v. Roche Holding Ltd. .,* 292 F.3d 361, 374 n. 7 (3d Cir.2002). But, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). Determining whether the allegations in a complaint are "plausible" is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1950, 173 L.Ed.2d 868 (2009). "Courts are not required to credit bald assertions or legal conclusions draped in the guise of factual allegations." *McCargo v. Hall,* No. 11–553, 2011 WL 6725613, *1 (D.N.J.2011) (citing *In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1429 (3d Cir.1997)). A pleading that offers "labels and conclusions" or a "formulaic recitation of the elements of a cause of action will not do." *Iqbal,* 129 S.Ct. at 1949 (citations omitted). Additionally, in evaluating a plaintiff's claims, generally

"a court looks only to the facts alleged in the complaint and its attachments without reference to other parts of the record." *Jordan v. Fox, Rothschild, O'Brien & Frankel,* 20 F.3d 1250, 1261 (3d Cir.1994).

**\*4** "As a general matter, a district court ruling on a motion to dismiss may not consider matters extraneous to the pleadings. However, an exception to the general rule is that a document *integral to or explicitly relied* upon in the complaint may be considered without converting the motion [to dismiss] into one for summary judgment." *DiFronzo v. Chiovero,* 406 F. App'x 605, 607 (3d Cir.2011) (citing *In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1426 (3d Cir.1997) (alteration and emphasis in original)). Any further expansion beyond the pleading, however, may require conversion of the motion into one for summary judgment.

In *Twombly,* the Supreme Court set forth the "plausibility" standard for overcoming a motion to dismiss. It refined this approach in *Iqbal.* A complaint satisfies the plausibility standard when the factual pleadings "allow [ ] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 129 S.Ct. at 1949 (citing *Twombly,* 550 U .S. at 556). This standard requires showing "more than a sheer possibility that a defendant has acted unlawfully." *Id.* A complaint that pleads facts " 'merely consistent with a defendant's liability, stops short of the line between possibility and plausibility of entitlement of relief.' " *Id.* (quoting *Twombly,* 550 U.S. at 557).

With these standards in mind, the Court analyzes the parties' arguments for dismissal.

**IV. Analysis**

**1. Standing for Premier's ERISA Claims**

**a. Whether Proof of Actual Assignments is Required**
Health Net contends that, as a threshold matter, Premier lacks standing to sue under ERISA for two reasons: (1) Premier is not a participant or beneficiary of the United plan or (2) they have not provided proof of an actual, valid assignment of benefits. (*See* Health Net Moving Br. at 8–10). Health Net argues that the language submitted by Plaintiffs in their Amended Complaint is insufficient to establish derivative standing. (*Id.* at 8). Specifically, Defendants contend that Plaintiffs need proof of an actual assignment signed by a patient of one of the providers, and here, Plaintiffs only offer excerpted language from a standard form. (*Id.* at 8–9). Similarly, United argues that Count II of Plaintiffs' Amended Complaint, which

challenges OptumHealth's utilization review program, fails to state a cause of action for benefits under ERISA because Plaintiffs "do not allege that any patient executed a valid assignment of a claim for benefits that was denied because of the program's requirements." (United Moving Br. at 2). Thus, according to United, Count II must be dismissed in its entirety. (*Id.*). And because there is no underlying ERISA violation as a matter of law, "Count IV also must be dismissed to the extent it seeks equitable relief under ERISA § 502(a)(3), § 29 U.S.C. § 1132(a)(3), based on the utilization review process." (*Id.*).

**\*5** By contrast, Plaintiffs argue that proof of an actual assignment is unnecessary in order to establish standing. (Pl. Opp. Br. re: United, D.E. 56 at 11). Relying on *Nat'l Renal Alliance, LLC v. Blue Cross & Blue Shield of Ga.,* 598 F.Supp.2d 1344, 1362 (N.D.Ga.2009), Plaintiffs argue that providing excerpted language from a standard form is sufficient to establish proof of assignment and therefore derivative standing. (*Id.*).

Under ERISA's § 502(a) civil enforcement provision, standing is generally "limited to participants and beneficiaries." *Pascack Valley Hosp. Inc. v. Local 464A UFCW Welfare Reimbursement Plan,* 388 F.3d 393, 400 (3d Cir.2004); 29 U.S.C. § 1132(a)(1)(B). The Third Circuit has not addressed the question of whether a health care provider may obtain standing to sue under § 502 by assignment from a plan participant or beneficiary. *See Pascack Valley,* 388 F.3d at 401 n. 7; *Cmty. Med. Ctr. v. Local 464A UFCW Welfare Reimbursement Plan,* 143 F. App'x 433, 435 (3d Cir.2005). However, the Third Circuit has acknowledged that "almost every circuit that has addressed the issue has ruled that a health care provider can assert a claim under § 502(a) when a beneficiary or participant has assigned to the provider the individual's benefits under the plan." *Pascack Valley,* 388 F.3d at 401. Since *Pascack Valley,* courts in this district have interpreted the Third Circuit's statements as an indirect affirmation of derivative standing for health care providers. *See, e.g., Zahl v. Cigna Corp.,* No. 09–1527, 2010 WL 1372318, at *2 (D.N.J. Mar.31, 2010) ("It is settled in this District that Zahl, as an assignee of these rights, stands in the shoes of his patients and may sue on their behalf to collect unpaid benefits."); *Glen Ridge Surgicenter, LLC v. Horizon Blue Cross Blue Shield of N.J., Inc.,* No. 08–6160, 2009 WL 3233427 at *4 (D.N.J. Sept.30, 2009) (implicitly accepting that an ambulatory surgical center has standing to sue under ERISA as a valid assignee); *N. Jersey Ctr. for Surgery, P.A. v. Horizon Blue Cross Blue Shield of N.J., Inc.,* No. 07–4812, 2008 WL 4371754, at *3 (D.N.J. Sept.18, 2008); *Gregory Surgical Serv., LLC v. Horizon Blue Cross Blue Shield of N.J., Inc.,* No. 06–0462, 2007 WL 4570323, at *3 (D.N.J.

Dec.26, 2007); *Wayne Surgical Ctr., LLC v. Concentra Preferred Sys., Inc.,* No. 06–928, 2007 WL 2416428, at *4 (D.N.J. Aug.20, 2007) (finding that a health care provider has standing to sue under ERISA as a valid assignee).

Plaintiffs are not participants or beneficiaries of an ERISA plan and therefore, on their own, do not have standing to bring suit. *Pascack Valley,* 388 F.3d at 400. However, Plaintiffs argue, and Defendants do not dispute, that as an assignee of a plan participant (the health plan subscribers), Plaintiffs would have derivative standing to sue under § 502(a). (*See* Pl. Opp. Br. re: Health Net at 18–19; Pl. Opp. Br. re: Health Net at 10 & n. 3). In this case, that requires Plaintiffs to prove the existence of a valid assignment. In the absence of proof of an express valid assignment, Plaintiffs would not have standing to bring the claims and therefore this matter would be dismissed. *Cmty. Med. Center,* 143 F. App'x at 436 ("failure to establish that an appropriate assignment exists is fatal to standing").

**\*6** The Court in *Sportscare of America, P.C. v. Multiplan, Inc.,* No. 10–04414, 2011 WL 500195 (D.N.J. Feb. 10, 2011), dealt with circumstances similar to those presented here. In that case the Court adopted a Magistrate Judge's recommendation that the Court deny plaintiff's motion for remand, finding that plaintiff's claims are sufficient to establish ERISA claims for federal jurisdiction. *See id.* at * 1; *see also Sportscare of America, P.C. v. Multiplan, Inc.,* No. 10–4414, 2011 WL 223724, at *4 (D.N.J. January 24, 2011). In their complaint, plaintiffs only provided the following statement with regard to the existence of assignments: "At all times mentioned herein the plaintiff was out-of-network and did not have a contract with any of the defendants therefore entitling the plaintiff to be paid for services rendered to individual insureds through the use of assignment of benefits documents or through patient reimbursement." *Id.* at *3 (citation omitted). Plaintiff in that case alleged that defendant was required to provide proof of actual assignments in order to establish subject matter jurisdiction under ERISA in federal court. *Id.* The court disagreed, and found plaintiff's pleading conclusively established the existence of federal jurisdiction. *Id.* The court determined that the actual existence of assignments was irrelevant for the purposes of Plaintiff's remand motion. *Id.* at *4. It noted that "all well-pleaded allegations in [the] complaint are assumed true in determining existence of federal subject matter jurisdiction." *Id.* (citing *Goosby v. Osser,* 409 U.S. 512, 521 n. 7, 93 S.Ct. 854, 35 L.Ed.2d 36 (1973)). Most importantly, the court held that "Defendants need not attach the assignments to their notice of removal or

supply them with their briefs. Plaintiff has unequivocally alleged that assignments exist and has pleaded that it is relying on them to support its right to recovery. Nothing further is required." *Id.*

The Court finds Judge Martini's decision persuasive. Accordingly, the reasoning that motivated Judge Martini's decision in *Sportscare* guides this Court's reasoning in grappling with the standing issue presented here.

In this case, Plaintiffs provide the following language in their Amended Complaint as proof of assignment of benefits:

> The standard "Assignment of Benefits Form" that Premier Health has its patients sign states:
>
> I hereby instruct and direct [United or Health Net] Insurance Company to pay by check made out and mailed out to: Premier Health Center, P.C., 385 Prospect Ave., 1Fl., Hackensack, NJ 07601, Or
>
> If my current policy prohibits direct payment to doctor, I hereby also instruct and direct you to make out the check to me and mail it as follows: [to same address]
>
> For the professional or expense benefits allowable, and otherwise payable to me under my current insurance policy as payment toward the total charges for the professional services rendered. THIS IS A DIRECT ASSIGNMENT OF MY RIGHTS AND BENEFITS UNDER THIS POLICY. This payment will not exceed my indebtedness to the above-mentioned assignee, and I have agreed to pay, in a current manner, any balance of said professional service charges over and above this insurance payment.

**\*7** (AC ¶ 7). The Court finds this evidence sufficient to establish derivative standing by assignment at this stage of the litigation. While Plaintiffs do not indicate from which assignment form this language was taken, or which of their patients actually signed the form, providing that level of specificity is unnecessary for the following two reasons. First, the Court accepts all well pleaded allegations in the Amended Complaint as true. *Phillips,* 515 F.3d at 234. Second, under the holding of *Sportscare,* Defendants need not attach the assignments to their Amended Complaint or briefs. *Sportscare,* 2011 WL 223724, at *4. Plaintiffs have clearly alleged that assignments exist and have pleaded that they are relying on them to support their right to recovery. *Id.* Nothing more is required. *Id.*

Accordingly, this Court concludes that the standard form

language provided by Plaintiffs is sufficient to establish derivative standing by assignment to bring their ERISA claims.

**b. Whether the "Assignment" is Actually a Direction of Payment**

Next, the Health Net Defendants argue that the language provided by Plaintiffs in the Amended Complaint is not an assignment of benefits but merely a direction of payment. (Health Net Moving Br. at 10).

Having reviewed the standard form language submitted by Plaintiffs, the Court finds that the language provided by Plaintiffs clearly demonstrates, at the very least, an assignment of a right to reimbursement. (AC ¶ 7). The plain language of the form indicates that the assignor is asking the insurance company to make "direct payment to [the] doctor." (*Id.*). In other words, the assignor is vesting in the assignee (the provider) the right to receive payment for "the total charges for the professional services rendered." (*Id.*). The assertion "[t]his is a direct assignment of my rights and benefits under the policy" is, at the very least, informed by the statements before and after it discussing payment to the provider for services rendered. (*Id.*). While it is unclear whether the subscribers intended to assign all of their rights under ERISA, the Court does not have to make such a determination because the Court is concerned here only with the right to reimbursement, attempted recoupments of overpayments, and United's interference with the payment or reimbursement process. It is enough that the assignor assigned his or her right to reimbursement to the provider.

Defendants' arguments that the forms cannot be assignments of benefits because the forms do not sufficiently describe the member's rights under ERISA and the language in the "standard" form is not clear and unequivocal, are unavailing. (Health Net Moving Br. at 15). First, Defendants do not cite to any law to support these contentions. Second, the courts in this district that have found valid assignments of benefits have often been provided with less specificity than what Plaintiffs submitted in their Amended Complaint. *See, e.g., Sportscare,* 2011 WL 223724, at *3 ("At all times mentioned herein the plaintiff was out-of-network and did not have a contract with any of the defendants therefore entitling the plaintiff to be paid for services rendered to individual insureds through the use of assignment of benefits documents or through patient reimbursement."). Accordingly, this Court concludes that the standard form language provided by Plaintiffs is not a direction of payment but an assignment of the right to reimbursement.

**c. Whether the Assignments Include the Right to Pursue Litigation**

**\*8** Having found that the United subscribers assigned their rights to reimbursement to the provider-Plaintiffs, the Court next considers whether a right to reimbursement necessarily includes the right to pursue litigation in order to enforce that right. Defendants believe that while the assignment forms may allow the health care providers to seek reimbursement for the services they provide, such assignment does not include a right to pursue litigation on behalf of the assignor or patient. (*Id.* at 13). Defendants' arguments are misplaced.

In *Wayne Surgical* the court considered whether an assignment of the right to seek reimbursement for medical services includes the right to pursue litigation to enforce those rights under a plan. The court explained that "numerous circuit courts to have considered the standing-by-assignment issue have 'held that a health care provider can assert a claim under § 502(a) where a beneficiary or participant has assigned to the provider that individual's right to benefits under the plan.' " *Wayne Surgical,* 2007 WL 2416428, at \*4. The court was persuaded by the Fifth Circuit's reasoning in *Tango Transport v. Healthcare Financial Services,* 322 F.3d 888 (5th Cir.2003), in which the court held that it was "nonsensical for an original health care provider assignee to receive both welfare benefits and the right to enforce them via derivative standing, but a subsequent assignee can receive only the benefits, but not the right to enforce them." *Wayne Surgical,* 2007 WL 2416428, at \*4 (quoting *Tango Transport,* 322 F.3d at 893). In light of the reasoning set forth in *Tango Transport,* the court held it would be "illogical to recognize that [plaintiff] WSC as a valid assignee has a right to receive the benefit of direct reimbursement from its patients' insurers but cannot enforce this right." *Id.*

Similarly, here, as the Court has already determined, the language provided by Plaintiffs indicates an assignment of a right to reimbursement. As this District has previously held, such a right must logically include the ability to seek judicial enforcement of that right. *Wayne Surgical,* 2007 WL 2416428, at \*4; *but see Cooper Hosp. Univ. Med. Ctr. v. Seafarers Health and Benefits Plan,* 2007 WL 2793372, at \*3 (D.N.J. Sept.25, 2007).[3]

Based on the foregoing, the Court finds that the assignments of right to reimbursement signed by the Plan participants and beneficiaries do provide Plaintiffs with an accompanying right to sue in this Court, *i.e.,* derivative standing, under ERISA.

**d. Enforceability of Anti–Assignment Provisions**

The Court next determines whether anti-assignment provisions in the EOC for this plan are enforceable. Premier argues that even assuming this Court were to find the anti-assignment provisions enforceable, Defendants waived such provision and are estopped from raising it based on their past dealings and course of conduct. (Pl. Opp. Br. re: Health Net at 23–24).

**\*9** The Third Circuit has not ruled on whether anti-assignment provisions in health care plans are enforceable, *Glen Ridge,* 2009 WL 3233427, at \*4. Further complicating the issue is the fact that New Jersey's district courts are split on the issue. Some courts in this district have found that the presence of a clear, unambiguous anti-assignment provision is valid and enforceable. *Wayne Surgical,* 2007 WL 2416428, at \*4; *Briglia v. Horizon Healthcare Svcs., Inc.,* No. 03–6033, 2005 WL 1140687, at \*4–5 (D.N.J. May 13, 2005); *Cohen v. Independence Blue Cross,* No. 10–4910, 2011 WL 5040706, at \*8 (D.N.J. Oct.24, 2011).[4] However, at least one court has refused to recognize the validity of an anti-assignment provision, reasoning that "it would be illogical ... to be a valid reimbursement assignee but not [be able] to judicially enforce that right." *Ambulatory Surgical Ctr. Of N.J. v. Horizon Healthcare Servs,* No. 07–2538, 2008 U.S. Dist. LEXIS 13370, at \*8 (D.N.J. Feb 21, 2008). Thus, the presence of an anti-assignment provision in the United plans at issue could negate Premier's standing to sue United.

Notwithstanding, Plaintiffs assert that even if ERISA permits the enforceability of anti-assignment provisions, United should be precluded—under theories of equitable estoppel and waiver by course of dealing—from enforcing the anti-assignment provision. (Pl. Opp. Br. re: Health Net at 23–24). Plaintiffs argue that "Health Net waived its right to challenge the validity of any assignments due to its direct payments to [Premier Health Center] and the manner in which it treated its claims." (*Id.* at 23) (pointing generally to facts alleged and the assignment language provided in paragraphs 6, 7, and 27–34 of the Amended Complaint).

Under New Jersey contract law, "[w]aiver is the intentional relinquishment of a known right. Waiver must be voluntary and there must be a clear act showing the intent to waive the right. Furthermore, waiver presupposes a full knowledge of the right and an intentional surrender." *Gregory Surgical Serv., LLC v. Horizon Blue Cross Blue Shield of N.J., Inc.,* No. 06–0462, 2007 WL 4570323, at \*2 (D.N.J. June 1, 2006) (citing *Cnty. of Morris v. Fauver,* 153 N.J. 80, 707 A.2d

958, 970 (N.J.1998)). Moreover, courts have held that "an anti-assignment clause may be waived by a written instrument, a course of dealing, or even passive conduct, *i.e.,* taking no action to invalidate the assignment vis-à-vis the assignee." *Id.* (citing *Garden State Bldgs., L.P. v. First Fid. Bank, N.A.,* 305 N.J.Super. 510, 702 A.2d 1315, 1322 (N.J.Super.Ct.App.Div.1997) (finding that New Jersey does recognize waiver of anti-assignment provisions)).

Plaintiffs argue that United and Health Net waived the anti-assignment clause by the above-mentioned course of dealing. (Pl. Opp. Br. re: United at 14; Pl. Opp. Br. re: Health Net at 22). United contends that its direct payment of reimbursements to Premier conforms to the terms of the plans at issue and thus cannot constitute a waiver. (United Reply Br., D.E. 62 at 17).

**\*10** The court in *Gregory Surgical,* 2007 WL 4570323, at \*2 dealt with allegations of course of dealing similar to those presented here. In that case, plaintiff argued that the defendant's actions constituted a waiver of the anti-assignment provisions, based upon a course of conduct which, according to the court, included: "discussions of patient coverage under health care policies, direct submission of claim forms, direct reimbursement of medical costs, and engagement in appeal processes." *Id.* at \*4. Defendant Horizon argued—as Defendants do here—that direct payment of reimbursements to plaintiff were within the terms of the plans at issue and thus could not constitute a waiver. *Id.* The court reasoned that although defendant's direct payments to plaintiff would not constitute a waiver if authorized under the plans at issue, the complaint alleged "a course of conduct beyond direct reimbursement for medical services." *Id.* at \*9. Indeed, plaintiff's complaint described "regular interaction between Horizon and GSS prior to and after claim forms are submitted, without mention of Horizon's invocation of the anti-assignment clause." *Id.* at \*4. Such actions impeded defendant's ability to rely on the anti-assignment provision to challenge plaintiff's standing. *Id.* Accordingly, the court held that defendant's actions with regard to plaintiff constituted a waiver of any right to enforce the anti-assignment provision.

Similarly, here, the Amended Complaint alleges a course of conduct beyond direct reimbursement for medical services. Indeed, the Amended Complaint describes regular interaction between United and Premier prior to and after claim forms were submitted, without mention of United's invocation of the anti-assignment clause. (*See* AC ¶¶ 6–7, 13–20, 27–34). Such conduct includes: letters from Health Net notifying Premier of overpayments, demanding a refund, and notifying Premier of the proper

procedure to dispute Health Net's decision (*id.* ¶ 27–28); telephone calls between Health Net and Premier about Premier's appeals (*id.* ¶ 31); and communications with Premier via e-mail regarding recoupments for the overpayments. (*Id.* ¶ 32–33). Such actions impede United or Health Net's ability to rely on the anti-assignment provision to challenge Premier's standing. *See Gregory Surgical,* 2007 WL 4570323, at \*3 (quoting *Garden State Bldgs.,* 702 A.2d at 1322 ("[A]n anti-assignment clause may be waived by ... a course of dealing, or even passive conduct, i.e., taking no action to invalidate the assignment vis-à-vis the assignee.")).

In light of the above, the Court finds that based upon Defendants' course of conduct with Plaintiffs, Defendants have waived any right to enforce the anti-assignment provision. Therefore, Plaintiffs have met their burden to establish standing to sue under ERISA.

**2. United and Health Net's Remaining Arguments Against the non-Association Plaintiffs**
**\*11** Having determined that Premier alleged sufficient facts in its Amended Complaint to support ERISA standing, this Court will now turn to United and Health Net's remaining arguments seeking dismissal.

**a. Whether the Claims Against the Health Net Defendants Are Sufficiently Pleaded Under Fed.R.Civ.P. 12(b)(6)**
Health Net argues that Plaintiffs assert each cause of action against "United," effectively lumping all defendants together as "United" and making all of them responsible for the allegations against UnitedHealth. (Health Net Moving Br. at 22). For example, Plaintiffs do not name either of the Health Net Defendants in Counts I through IV or in the request for relief—they only refer to "United" (and twice to Optum). (*See* AC ¶¶ 145–173). Plaintiffs "do not connect their limited allegations about Health Net to any theory sufficient to support treating all defendants collectively in their causes of action." (Health Net Moving Br. at 22–23). Health Net argues that such "general pleadings do not put each Health Net defendant on notice of the claims that are asserted against it." (*Id.* at 23, 702 A.2d 1315). Specifically, Plaintiffs do not explain how Health Net of the Northeast's provision of administrative services to UnitedHealth would make it liable for United's actions. (*Id.*). Health Net contends that the Amended Complaint fails to explain how UnitedHealth's acquisition of Health Net creates any liability for Health Net based on United's actions. Further, Plaintiffs have failed to show sufficient facts to plausibly

2012 WL 1135608

conclude that Health Net acted as an ERISA fiduciary. (*Id.*).

The Amended Complaint mentions Health Net (usually referring collectively to Health Net of New York and Health Net of the Northeast) several times throughout the Amended Complaint. Specifically, Plaintiffs allege the following:

> United (including Optum and the Health Net Defendants, acting in their own names) engaged in numerous post-payment audits and have improperly recouped or otherwise sought to recover payments from, or improperly denied coverage for services provided by, many Providers, including the Individual Plaintiffs, in violation of ERISA. Moreover, United and OptumHealth have imposed various policies in violation of ERISA designed to reduce or deny coverage for health care services, as detailed herein. (AC ¶ 23).
>
> Due to the manner in which Defendants function with respect to their United Plans, they are all functional ERISA fiduciaries and, as such, must comply with fiduciary standards. Moreover, in making coverage determinations relating to their United Insureds, Defendants must comply with the terms and conditions of the applicable health care plans and otherwise must comply with ERISA and its underlying regulations. (*id.* ¶ 24, 702 A.2d 1315).
>
> Due to the role United (or the Health Net Defendants) played in administering the United Plans that provided the insurance to the patients whose claims were subsequently determined to be overpaid, including making coverage and benefit decisions and deciding appeals, it acted as a fiduciary under ERISA. Under ERISA, United cannot deny coverage for such services unless the applicable health care plan expressly includes an exclusion specifying that such services are not covered benefits. (*id.* ¶ 88, 702 A.2d 1315).

**\*12** In addition, Plaintiffs specifically identify actions taken by Health Net of New York to obtain refunds, deny appeals and begin recoupments, which Plaintiffs believe make Health Net liable under ERISA. (*See id.* ¶¶ 27–34) (discussing letters from Health Net of New York to Premier denying the appeal, demanding refunds and beginning the recoupments).

In their Opposition Brief, Plaintiffs provide some clarification as to the claims against Health Net:

> To be clear, PHC is the only individual plaintiff asserting claims against Health Net ... [on the basis of] Health Net's recoupment

activities. Additionally, the Association Plaintiffs assert claims against Health Net on behalf of their respective memberships, seeking prospective injunctive relief [.] That said, even assuming various scrivener's errors have resulted in Health Net being inadvertently "lumped" into allegations pertaining to United (which has acquired all of Health Net's operations in the northeast part of the United States, including in New Jersey, New York and Connecticut), the allegations relating directly to Health Net's recoupments from PHC are more than adequate to put Health Net on notice of the claims asserted against it[.]

(Pl. Opp. Br. re: Health Net at 3 n. 4). Two conclusions can be drawn from the statement above and the allegations from the Amended Complaint reiterated before it. First, Plaintiffs admit that the claims raised against Health Net are based entirely on the facts alleged in paragraphs 27–34 of the Amended Complaint. (*Id.*) ("the allegations relating directly to Health Net's recoupments from PHC are more than adequate to put Health Net on notice of the claims asserted against it"). Importantly, those facts appear to only be alleged against Health Net of New York. Defendant does not appear to deny that the allegations in these paragraphs are sufficiently pled. Taking the facts alleged in those paragraphs as true, and taking into consideration Plaintiff's admission, the Court finds that the claims raised by Premier against Health Net of New York—the only claims against Health Net by Plaintiff's own admission—are sufficiently pled. The claims identify the Defendant (Health Net of New York), when the alleged conduct occurred (January 6—March 16, 2010), and what exactly Health Net of New York allegedly did that would make it liable for an ERISA violation (unwarranted denial of appeals, inappropriate recoupment measures, and violation of Plaintiffs' ERISA rights). (*See* AC ¶¶ 27–34).

Second, as Defendant argues, there are insufficient allegations to support any claim against Health Net of the Northeast. (Health Net Moving Br. at 27). Plaintiff's allegation that "due to the manner in which Defendants function with respect to their United Plans, they are all functional ERISA fiduciaries" is too vague. (AC ¶ 24). Further, Plaintiffs treat the two Health Net Defendants inconsistently throughout the Amended Complaint. In

some instances, they are lumped together with the other Defendants and referred to collectively as "United" or "Defendants." In other instances, they are referred to as "Health Net" even though they are two separate entities and only one—Health Net of New York—is referred to with any specificity in the allegations. The Court finds that any claims against Health Net of the Northeast are insufficiently pled because Plaintiffs never specifically refer to Health Net of the Northeast in the Amended Complaint and therefore that individual entity is not put on notice of what particular conduct would make it liable under ERISA. *Iqbal,* 129 S.Ct. at 1949 (citing *Twombly,* 550 U.S. at 556) (factual pleadings must "allow[ ] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged" and a complaint that pleads facts " 'merely consistent with a defendant's liability, stops short of the line between possibility and plausibility of entitlement of relief' ").

**b. Whether Plaintiffs can Maintain their Claims against Health Net in Light of § 503**
**\*13** Health Net next argues that "Plaintiffs' claim in Count III, alleging that Defendants violated § 503—and therefore cannot sue under § 502(a)(3)—by failing to provide a 'full and fair review' of denied claims, fails as a matter of law" because that claim "is properly brought against the benefit plan allegedly responsible for the benefits sought, not against third parties that process the claims." (Health Net Moving Br at 26). According to Health Net, § 503 applies only to an "employee benefit plan"—not to third parties such as Health Net who merely process claims for benefits. (*Id.*). Put another way, § 503 imposes duties on the plan, and not on the plan administrator. (*Id.*).

Conversely, Plaintiffs argue that Health Net "mistakenly posits" that Plaintiffs cannot sustain a claim against Health Net under § 502(a)(3). (Pl. Opp. Br. re: Health Net at 2). According to Plaintiffs, they are not seeking to impose liability on Health Net under § 502(a)(3) for failing to provide a full and fair review of denied claims. (*Id.*). Rather, Plaintiffs are seeking equitable relief under § 502(a)(3), asking the Court to enjoin Health Net from pursuing any of its repayment demands "(and returning any funds it has recouped from Premier and members of the putative class)" until it has first fully complied with ERISA. (*Id.* at 2–3). Further, ERISA does not explicitly limit the class of defendants in a § 502(a)(3) action. (*Id.* at 2, 31–33). In response, Defendants argue that Plaintiff's clarification about the relief it seeks under § 502(a)(3) is irrelevant because Plaintiffs must first establish that § 503 imposes liability upon third parties like Health Net. (Health Net Reply Br. at 11).

Section 503 of ERISA requires that every employee benefit plan must "afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim." 29 U.S.C. § 1133. "Although § 502 provides the private right of action to bring a claim to recover benefits due, § 503 sets forth the basic requirements governing ERISA plans." *Miller v. Am. Airlines, Inc. .,* 632 F.3d 837, 850–51 (3d Cir.2011). "A plan that does not satisfy the minimum procedural requirements of § 503 and its regulations operates in violation of ERISA." *Id.* at 851.

Plaintiffs have not provided any evidence or argument explaining why § 503 imposes liability on Health Net of New York.[5] They have simply alleged that Health Net of the Northeast provides administrative services to United. (AC ¶ 22). Providing administrative services is not the same as being a Plan Administrator, as the latter is a term of art and specifically defined under ERISA. *See Groves v. Modified Retirement Plan for Hourly Paid Employees of Johns Manville Corp.,* 803 F.2d 109, 116 (3d Cir.1986) (The word "plan administrator" is a "term[ ] of art under ERISA. [It is] defined ... as 'the person specifically so designated by the terms of the instrument under which the plan is operated.' ") (citations omitted). Nor have Plaintiffs provided any documentation that identifies Health Net as the plan administrator or plan sponsor. *See* 29 U.S.C. § 1002(16)(i)-(ii). Indeed, Plaintiffs specifically identify United as the plan administrator. (*See* AC ¶¶ 90, 91, 95, 163). Thus, Plaintiffs have not provided any evidence or argument explaining why § 503 imposes liability on Health Net of New York.

**\*14** Accordingly, Count III against Health Net of New York is dismissed.

**e. Miscellaneous Arguments by United**
Next, United argues that Count IV of the Amended Complaint, seeking equitable relief under ERISA, must be dismissed on several grounds. Each of these is addressed in turn.

First, United argues that Plaintiffs Rodgers and O'Donnell may not properly seek injunctive relief under § 502(a)(3) since they are no longer part of the OptumHealth network and therefore cannot show a non-speculative threat that they will again experience injury as a result of the alleged wrongdoing. (United Moving Br. at 13–14). United contends that, because they are ONET providers, neither they nor their patients are subject to any "preauthorization" requirements any longer. (*Id.* at 14).

2012 WL 1135608

"It follows that they cannot establish any risk of future injury if the 'preauthorization' process is not enjoined." (*Id.*). Further, United argues that Plaintiffs cannot satisfy the requirement that any risk of injury they may face will be redressed by an injunction because the continued existence and use of UnitedHealth's "preauthorization" process is completely irrelevant to these plaintiffs. (*Id.*).

These arguments are flawed. United ignores the fact that Plaintiffs are bringing the pre-authorization claims as assignees of their patients who are still associated with United or Optum. Therefore, Plaintiffs' patients may again experience injury as a result of United's preauthorization process and violations of ERISA and are thus entitled to request injunctive relief to prevent United from continuing its alleged wrongdoing. *See Horvath v. Keystone Health Plan E., Inc.,* 333 F.3d 450 (3d Cir.2003) (noting that "the actual or threatened injury required by Art. III may exist solely by virtue of statutes creating legal rights" and finding that ERISA created certain rights in the non-provider plaintiff, and that plaintiff "need not demonstrate actual harm in order to have standing to seek injunctive relief" under ERISA). To that end, the Court finds that the out-of-network providers may seek injunctive relief under § 502(a)(3).

Next, United argues—relying on cases from other circuits and tangentially related United States Supreme Court cases—that the disgorgement remedy Plaintiffs seek in Count IV is neither appropriate nor equitable "since ERISA exists not to remedy the purported business injuries [such as loss of income and patients] of providers but to ensure that the terms of patients' plans are enforced." (United Moving Br. at 14–15) (citation omitted). These economic losses are the result of Rodgers and O'Donnell deciding to leave the network and become ONET providers—they are not tied to any violations of ERISA. (*Id.* at 14–15). United's argument is misguided.

In Count IV, Plaintiffs seek the following relief:

> Plaintiffs seek appropriate declaratory and injunctive relief (1) to enjoin United from pursuing its efforts to coerce recoupment or otherwise compel payment and, further, to order United to return any funds it has received or withheld from the Individual Plaintiffs and members of the Class as a result of its recoupment efforts, and (2) to enjoin United from applying the Optum policies which violate ERISA and disgorge profits

it has earned through improper benefit denials.

**\*15** (AC ¶ 173). Based on a plain and literal reading of Claim IV's request for relief, Plaintiffs do not appear to be referring to economic losses resulting from Rodgers' and O'Donnell's having to leave the network. Rather, it appears Plaintiffs are seeking disgorgement of profits earned from money kept from the beneficiaries of the plan (and their assignees in this case). Such a request for disgorgement does appear to be available to Plaintiffs. *See Fotta v. Trustees of United Mine Workers of Am., Health & Retirement Fund of 1974,* 165 F.3d 209, 214 (3d Cir.1998) ("We therefore hold that a beneficiary of an ERISA plan may bring an action for interest on *delayed* benefits payments under section 502(a)(3)(B) of ERISA.") (emphasis added); *Skretvedt v. E.I. DuPont De Nemours,* 372 F.3d 193, 214 & n. 28 (3d Cir.2004) ("[W]e need look no further than the ERISA plans that withheld Skretvedt's benefits for several years and profited with respect to the withholding of those benefits.... Skretvedt has sufficiently identified specific funds traceable to the defendant ERISA plans that belong in good conscience to him."; "Indeed, as several circuit courts have noted, the Senate Finance Committee, in its report on ERISA, specifically contemplated that 'appropriate equitable relief' under § 502(a)(3)(B) would include, '[f]or example, ... a constructive trust [to] be imposed on the plan assets[.]' ") (citations omitted). Accordingly, the Court finds that Plaintiffs may seek disgorgement in Claim IV because they are not seeking damages for economic injury but rather a return of payments and accumulated interest.

**3. Whether the Associational Plaintiffs Have Standing**
Finally, both Health Net and United argue that the Association Plaintiffs—the Congress of Chiropractic State Associations, American Chiropractic Association, Ohio State Chiropractic Association, and Missouri State Chiropractic Association—lack standing because the claims they assert and the relief they seek require their members to personally participate in this case. (*See* Health Net Moving Br. at 27; United Moving Br. at 16).[6]

United and Health Net identify several potential problems with allowing the Associations to proceed on behalf of their members. Defendants argue—relying on cases from the Northern District of Illinois and Southern District of Florida—that "variations between the claims" require the participation of individual members of the Associations. (United Moving Br. at 16).

Plaintiffs explain that the Associations seek only

2012 WL 1135608

injunctive relief on behalf of the members of the Associations. (*See* Pl. Opp. Br. re: Health Net at 20) ("The Association Plaintiffs are seeking injunctive relief on behalf of their members, and, in so doing, their claims focus on reforming the improper practices United has engaged in that force providers to reduce the services they offer to subscribers."); (Pl. Opp. Br. re: United at 34 n. 18) ("To the extent the FAC could be read to allow the Association Plaintiffs to pursue monetary damages, the Association Plaintiffs confirm here that they are limiting their claims to injunctive relief.").

**\*16** An association must satisfy a three-prong test in order to establish standing. It must prove that: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Pa. Psychiatric Soc. v. Green Spring Health Services, Inc.,* 280 F.3d 278, 283 (3d Cir.2002) (citing *Hunt v. Wash. State Apple Adver. Comm'n,* 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977)). "The need for some individual participation, however, does not necessarily bar associational standing under this third criterion." *Hosp. Council v. City of Pittsburgh,* 949 F.2d 83, 89–90 (3d Cir.1991).

Relying almost completely on case law from other jurisdictions, Defendants argue that Plaintiffs cannot prove the third element because the claims they assert and the relief they seek require a fact-intensive inquiry that necessitates their members to personally participate in this case. (United Moving Br. at 16–19).

The Third Circuit was presented with a similar argument in *Pennsylvania Psychiatric.* In that case, a professional psychiatrist association alleged that the managed health care organizations "impaired the quality of health care provided by psychiatrists to their patients by refusing to authorize necessary psychiatric treatment, excessively burdening the reimbursement process and impeding other vital care." *Pa. Psychiatric,* 280 F.3d at 280. The plaintiff associations contended that the managed health care organizations refused to

> [A]uthorize and provide reimbursement for medically necessary mental health treatment; interfered with patients' care by permitting non-psychiatrists to make psychiatric treatment decisions; violated Provider Agreements by improperly terminating relationships with

certain psychiatrists; and breached the contractual duties of good faith and fair dealing by failing to timely pay psychiatrists and by referring patients to inconvenient treatment locations, thereby depriving some patients access to treatment.

*Id.* at 282. The principal issue presented to the court was whether the Pennsylvania Psychiatric Society's requests for declaratory and injunctive relief would require an inappropriate level of individual participation so as to make standing unavailable to the Society. *Id.* at 280. The defendants argued that the medical coverage decisions on psychiatric care and substance abuse services were fact-intensive inquiries. *Id.* at 285. Specifically, the defendants asserted that "the examination of medical care determinations will demand significant individual participation." *Id.*

While the Third Circuit agreed that "conferring associational standing would be improper for claims requiring a fact-intensive-individual inquiry," it noted that the Society maintained that "the heart of its complaint involves systemic policy violations that will make extensive individual participation unnecessary." *Id.* at 286. The Society contended that the methods defendants used for making decisions—"*e.g.,* authorizing or denying mental health services, credentialing physicians, and reimbursement"—constituted challenges to alleged practices "that may be established with sample testimony, which may not involve specific, factually intensive, individual medical care determinations." *Id.* For that reason, the Third Circuit remanded the case to the district court with the instruction that the associations be allowed to proceed on associational standing. *Id.* at 287. Importantly, while the court questioned whether plaintiffs could establish these claims with limited individual participation, it noted that "on a motion to dismiss for lack of standing, [the court] review[s] the sufficiency of the pleadings and 'must accept as true all material allegations of the complaint and must construe the complaint in favor of the plaintiff.' " *Id.* at 286. The court reasoned that the deference paid to plaintiffs on a motion to dismiss counseled against dismissing plaintiff's suit "before [plaintiff] is given the opportunity to establish the alleged violations without significant individual participation." *Id.* To that end, the Third Circuit concluded that because the appeal arose "on a motion to dismiss, the Pennsylvania Psychiatric Society should be allowed to move forward with its claims within the boundaries of associational standing." *Id.*

**\*17** The Court finds the logic expressed in *Pennsylvania*

2012 WL 1135608

*Psychiatric* applicable here where the Associations have made it clear that they are seeking only injunctive relief. (*See* AC ¶ 19) ("The Association Plaintiffs bring this action in an associational capacity on behalf of their members to obtain appropriate injunctive relief ...."); (*see also* Pl. Opp. Br. re: Health Net at 20; Pl. Opp. Br. re: United at 34 n. 18). As in *Pennsylvania Psychiatric,* Defendants here argue that the claims raised by Plaintiffs require a fact-intensive inquiry that necessitates individual participation. However, taking Plaintiff's allegations as true, as the Court must, it appears that the Associations are seeking injunctive relief to address "improper audits, repayment demands and recoupments of benefit payments from Defendants" and for "various other practices employed by United and Optum designed to improperly limit benefits paid for patient treatment." (AC ¶ 19). Further, as Plaintiffs explain in their Opposition Brief, "the Association Plaintiffs here challenge United's general practices, and seek an alteration of the *process* by which it handles repayment demands or applies its preauthorization methodologies with regard to chiropractic services.' " (Pl. Opp. Br. re: United at 21). While the Court is uncertain as to whether the Association Plaintiffs can establish their claims without individual participation, *Pennsylvania Psychiatric* counsels against

dismissing claims based on lack of associational standing at this early stage in the litigation. *Pa. Psychiatric,* 280 F.3d at 286. The Associations should be "given the opportunity to establish the alleged violations without significant individual participation." *Id.* Discovery will reveal if the Associations can meet their burden as to the third prong. Accordingly, the Court finds that the Associations have standing to bring ERISA claims on behalf of their individual members.

**V. Conclusion**

Based on the foregoing, Health Net's motion to dismiss (D.E.29) is GRANTED as to all claims pertaining to Health Net of the Northeast, and as to Count III against Health Net of New York. United's motion to dismiss (D.E.31) is DENIED. An appropriate Order shall follow.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 1135608

Footnotes

1    Defendants UnitedHealth Group, UnitedHealthcare Services, Inc., and OptumHealth Care Solutions, Inc. join in the same motion, (D.E.31), and Defendants Health Net of the Northeast, Inc. and Health Net of New York, Inc. join in the same motion (D.E.29).

2    Plaintiffs generally do not differentiate between UnitedHealth Group, UnitedHealthcare Services, Inc., and OptumHealth Care Solutions, Inc. in this part of the Amended Complaint.

3    Defendant's contention that Premier does not allege that it informed Health Net of the assignments is unavailing. (Health Net Moving Br. at 15). Again, Defendants do not cite to any law to support these contentions. Second, Health Net's argument that it was not provided with notice of the assignments is undermined by its course of dealing with Plaintiffs as described later in this Opinion. Defendants cannot act as though valid assignments exist through course of conduct and then challenge the assignment's very existence in litigation. *Gregory Surgical,* 2007 WL 4570323, at *4 (Greenaway, Jr., U.S.D.J.).

4    *See Briglia,* 2005 WL 1140687, at *4 (D.N.J. May 13, 2005) for a list of courts in other jurisdictions finding that "unambiguous anti-assignment provisions in group health care plans are valid."

5    The Court only mentions Health Net of New York because it has already dismissed all claims against Health Net of the Northeast earlier in this Opinion.

6    Health Net joins the argument made by United on associational standing and does not independently advance an argument on this issue. (*See* Health Net Moving Br. at 27).

---

**End of Document**                                    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

**Premier Health Center, P.C. v. UnitedHealth Group, Not Reported in F.Supp.2d (2012)**

2012 WL 1135608

Exhibit P

Ambulatory Surgical Center of New Jersey v. Horizon..., Not Reported in...

2008 WL 8874292

2008 WL 8874292
Only the Westlaw citation is currently available.
NOT FOR PUBLICATION
United States District Court,
D. New Jersey.

AMBULATORY SURGICAL CENTER OF NEW
JERSEY, Plaintiff,
v.
HORIZON HEALTHCARE SERVICES, INC.,
d/b/a Horizon Blue Cross Blue Shield of New
Jersey, Defendant.

Civil Action No. 07–2538 (SDW)
|
Feb. 21, 2008.

**Attorneys and Law Firms**

Donald A. Ottaunick, Cole, Schotz, Meisel, Forman &
Leonard, Esqs., Leo V. Leyva, Steven I. Adler,
Christopher P. Massaro, Cole, Schotz, Meisel, Forman &
Leonard, PA, Hackensack, NJ, for Plaintiff.

Edward S. Wardell, Kelley, Wardell, Craig, Annin &
Baxter, LLP, Haddonfield, NJ, for Defendant.

**OPINION**

WIGENTON, District Judge.

*1 Before the Court is Defendant Horizon Healthcare
Services, Inc.'s ("Horizon" or "Defendant") Motion to
Dismiss Plaintiff Ambulatory Surgical Center of New
Jersey's ("ASCNJ" or "Plaintiff") Complaint for failure to
state a claim upon which relief may be granted pursuant
to Fed.R.Civ.P. 12(b)(6). The Court, having considered
the parties' submissions and having decided the motion
without oral argument pursuant to Fed.R.Civ.P. 78, and
for the reasons set forth below, **GRANTS** the motion in
part and **DENIES** it in part.

**I. JURISDICTION and VENUE**
The Court has subject matter jurisdiction over this matter
pursuant to § 502 of the Employee Retirement Income
Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132, and

28 U.S.C. § 1331. The Court exercises supplemental
jurisdiction over Plaintiff's common law claims pursuant
to 28 U.S.C. § 1367. Venue is proper pursuant to 28
U.S.C. § 1391(b).

**II. FACTUAL BACKGROUND**
ASCNJ is an ambulatory surgical care provider. Pl.'s
Compl. ¶ 7. Horizon provides health insurance to
subscribers under various health insurance contracts. Id.
at ¶ 9. As an out-of-network provider, ASCNJ has no
contractual agreement with Horizon that governs the
terms under which ASCNJ receives payment for the
services it has been performing since October 2005. Id. at
¶ 8. All Horizon insurance plans incorporate an
"anti-assignment" provision which prohibits patients from
assigning their right to benefits to another individual or
entity. Def.'s Mot. Dismiss at 3.

Before providing services, ASCNJ requires patients to
complete a form stating that the patient assigns to ASCNJ
all insurance benefits covered by Horizon. Pl.'s Compl. ¶
16. After performing its services, ASCNJ submits a claim
form to Horizon. In most cases, Horizon responds by
making payment directly to ASCNJ. Id. at ¶ 22. In some
cases, Horizon sends ASCNJ a form called an
Explanation of Benefits ("EOB") explaining its denial of
the claim, at which point ASCNJ will either contact
Horizon to discuss the claim or initiate a formal appeal.
Id. at ¶ 24. In addition, if Horizon later determines that a
previous payment exceeded the amount of reimbursement
due to ASCNJ, it will adjust its next payment accordingly.
Id. at ¶ 23.

On May 30, 2007, ASCNJ filed a seven count complaint
alleging that Horizon made insufficient payments to
ASCNJ for services rendered to Horizon-insured patients.
ASCNJ's Complaint alleges four federal causes of action:
(1) Horizon breached its contract by failing to pay ASCNJ
under § 502(a) of ERISA, 29 U.S.C. § 1132(a) as a
beneficiary; (2) Horizon violated its fiduciary duty of
loyalty and care under ERISA § 404(a)(1)(B) and (D), 29
U.S.C. § 1004(a) (1)(B) and (D) and ERISA § 406, 29
U.S.C. § 1006; (3) Horizon violated N.J.A.C.
11:21–7.13(a) by providing an inaccurate calculation of
the Usual and Customary Rates ("UCR"), further
violating ERISA; and (4) Horizon violated N.J.A.C.
11:21–7.13(a) by failing to reimburse ASCNJ for actual
charges, further violating ERISA. Id. at 9, 13–16.
Plaintiff's Complaint also contains three state common
law claims against Horizon for: (1) trade libel, (2) tortious
interference with contractual relations and (3) negligent

Ambulatory Surgical Center of New Jersey v. Horizon..., Not Reported in...

2008 WL 8874292

misrepresentation. *Id.* at 10–13.

**\*2** Horizon subsequently filed a motion to dismiss ASCNJ's Complaint pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief can be granted, and for lack of standing under ERISA's preemption provisions.

### III. *LEGAL STANDARD*

The court must review Defendant's Motion to Dismiss according to the standard set forth in Fed.R.Civ.P. 12(b)(6). The court must accept as true all material allegations of the complaint and it must construe the complaint in favor of the Plaintiff. *Warth v. Seldin,* 422 U.S. 490, 501, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975); *Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts, Inc.,* 140 F.3d 478, 483 (3d Cir.1998). Generally, when reviewing a 12(b)(6) motion, the court may only consider the complaint, exhibits attached to the complaint, matters of public record, and undisputedly authentic documents if the plaintiff's claims are based upon those documents. *Pension Benefit Guar. Corp. v. White Consol. Indus.,* 998 F.2d 1192, 1196 (3d Cir.1993). The court, however, may consider documents attached to, integral to, or relied upon by the complaint. *In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1426 (3d Cir.1997). The court may also take judicial notice of relevant legal proceedings. *S. Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Group, Ltd.,* 181 F.3d 410, 426 (3d Cir.1999). A complaint should be dismissed "only if, after accepting as true all of the facts alleged in the complaint, and drawing all reasonable inferences in the plaintiff's favor, no relief could be granted under any set of facts consistent with the allegations of the complaint." *Trump,* 140 F.3d at 483. While the complaint is to be construed in the light most favorable to the plaintiff, the court need not accept the plaintiff's legal conclusions or draw unwarranted factual inferences. *Lewis v. ACB Bus. Serv., Inc.,* 135 F.3d 389, 405–06 (6th Cir.1998). The Court analyzes and adjudicates ASCNJ's motion on this standard.

### IV. *DISCUSSION*

#### A. Standing For ASCNJ's ERISA Claims

1. *Count One Plaintiff's ERISA Breach of Contract Claim*
Horizon contends that, as a threshold matter, ASCNJ lacks standing to sue for breach of contract under ERISA because ASCNJ does not hold a valid assignment of benefits. To support this argument, Horizon points to an anti-assignment provision in its plans which prohibits an insured from assigning to non-participating providers his right to benefits. ASCNJ maintains that Horizon's anti-assignment provision is invalid and unenforceable, and contends that it is a valid plan beneficiary based on patient assignment. ASCNJ further argues that even assuming this Court were to find Horizon's anti-assignment provision enforceable, Horizon waived such provision and is estopped from raising it based on their past dealings and long-standing course of conduct.

ERISA does not expressly state whether beneficiaries may assign their right to receive benefits to medical services providers. Congress' silence on the issue, however, when viewed against ERISA's express pension benefit assignment prohibition, has been construed by this Court as an indication that health care benefits are assignable. *Wayne Surgical Ctr., LLC v. Concentra Preferred Sys., Inc.,* 2007 WL 2416428, at 4 (D.N.J., 2007). Although the Third Circuit in *Pascack Valley Hosp., Inc., v. Local 464A UFCW Welfare Reimbursement Plan,* 388 F.3d 393, 400 (3d Cir.2004) expressed "no opinion" on the benefit assignment validity issue, district courts in this Circuit have explicitly recognized and upheld benefit assignment validity between patient and hospital. *See Israel v. Northern New Jersey Teamsters Ben. Plan,* 2006 WL 2830973, at 5 (D.N.J.,2006) ("[T]he Hospital has met its burden of establishing the existence of a valid assignment"); *see also Englewood Hosp. & Med. Ctr. v. Aftra Health Fund,* 2006 WL 3675261, at 3 (D.N.J., 2006). Additionally, almost every Circuit to have considered this question has recognized and championed a healthcare provider's ability to assert a § 502(a) ERISA claim where the patient has assigned benefits under an ERISA-governed plan. *See, e.g., Tango Transport v. Healthcare Fin. Servs.,* 322 F.3d 888, 891 (5th Cir.2003); *Morlan v. Universal Guar. Lif. Ins. Co.,* 298 F.3d 609, 614–15 (7th Cir.2002); *Sys. Council Em–3 v. AT & T Corp.,* 159 F.3d 1376, 1383 (D.C. Circuit 1998); *City of Hope Nat'l Med. Ctr. v. Healthplus, Inc.,* 156 F.3d 223, 226 (1st Circ.1998); *St. Francis Reg'l Med. Ctr. v. Blue Cross and Blue Shield of Kan.,* F.3d 1460, 1464–65 (10th Cir.1995).

**\*3** In *Wayne,* this Court held that it was disjointed to recognize a defendant as a valid assignee with "the right to receive the benefit of direct reimbursement from its patients' insurers", while not being allowed to judicially enforce this right. 2007 WL 2416428, at 8. Similarly, in the present case, it would be illogical to allow ASCNJ to be a valid reimbursement assignee but not allow it to judicially enforce that right. Therefore, ASCNJ has standing under ERISA due to the validity of its patients's assignment of benefits.

2008 WL 8874292

Secondarily, ASCNJ has standing under ERISA due to Horizon's waiver of its anti-assignment provision based on its course of dealings with ASCNJ. A party is equitably estopped from enforcing a right when it voluntarily conducts itself in a manner that precludes it from asserting that right, and when another person relied in good faith on the party's conduct and was injured as a result. *See Gregory Surgical Svcs. v. Horizon Blue Cross Blue Shield ofN.J., Inc.,* 2006 WL 1541021, at 6 (D.N.J., 2006) (*Citing County of Morris v. Fauver,* 153 N.J. 80, 707 A.2d 958, 969 (N.J.1998)). A waiver occurs when a party performs an act that voluntarily, knowingly, and intentionally relinquishes a known right. *Id.* at 6–7, 707 A.2d 958. Finally, a party may waive an anti-assignment provision "by a written instrument, a course of dealing, or even passive conduct, i.e., taking no action to invalidate the assignment vis-a-vis the assignee." *Garden State Bldgs., L.P. v. First Fid. Bank,* N.A., 305 N.J.Super. 510, 702 A.2d 1315, 1322 (N.J.Super.Ct.App.Div.1997), *cert. denied,* 153 N.J. 50, 707 A.2d 153 (N.J.1998).

ASCNJ describes an extensive course of dealings with Horizon that constitutes a waiver of the anti-assignment provision and estops Horizon from disavowing ASCNJ's ERISA standing. The referenced conduct includes patient coverage discussions under health care policies, direct submission of claim forms, direct reimbursement of medical costs, and engagement in appeal processes. Horizon's history reflects a course of conduct beyond direct reimbursement for medical services, without any mention of Horizon's invocation of the antiassignment clause. Such actions impede Horizon's ability to rely on the anti-assignment provision to challenge ASCNJ's ERISA standing. Moreover, ASCNJ relied on Horizon's conduct in good faith and assumedly was injured when it failed to receive the full amount of benefits purportedly guaranteed in Horizon's contracts. As such, ASCNJ's ERISA § 502(a) breach of contract claim is not subject to dismissal and will be allowed to proceed as a matter of law. Having found that ASCNJ alleged sufficient facts in its complaint to support ERISA standing, this Court will now turn to Horizon's remaining ERISA dismissal arguments.

2. *Count FivePlaintiff's ERISA Breach of Fiduciary Duty Claim*

ASCNJ contends that Horizon breached its fiduciary duty of loyalty and care by failing to pay its actual charges for services. ERISA defines a fiduciary as a person or entity that "exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, ... [or holds] any

discretionary authority or discretionary responsibility in the administration of such plan." 29 U.S.C. § 1002(21)(A); see also *Briglia v.Horizon Healthcare Svcs., Inc.,* 2005 WL 1140687, at 6 (D.N.J., 2005). The Third Circuit has emphasized that "the linchpin of fiduciary status under ERISA is discretion." *Curcio v. John Hancock Mut. Life Ins. Co.,* 33 F.3d 226, 233 (3d Cir.1994). If the person or entity performs mostly ministerial or administrative tasks, such as claims processing and calculation, it likely will not be found to constitute a fiduciary under ERISA. *Confer v. Custom Engineering Co.,* 952 F.2d 34, 39 (3d Cir.1991). A healthcare provider must exercise "more discretion and control than that of a mere claims processor ... [M]aking initial claims decisions and processing claims fails to constitute a fiduciary" *Briglia,* 2005 WL 1140687, at 8. Finally, the Third Circuit has concluded that allowing beneficiaries to assert claims "against non-fiduciary plan administrators ... would upset the uniform regulation of plan benefits intended by Congress." *Kollman v. Hewitt Associates, LLC,* 487 F.3d 139, 150 (3rd Cir.2007) (*quoting Howard v. Parisian, Inc.,* 807 F.2d 1569, 1565 (11th Cir.1987)).

**\*4** Here, ASCNJ alleges that Horizon acted as a fiduciary to plan beneficiaries, as such term is understood under ERISA § 404(a)(1) (B) and (D), 29 U.S.C. § 1004(a)(1)(B) and (D). However, ASCNJ's Complaint alleges no facts supporting a finding that Horizon is a fiduciary, but instead states a legal conclusion that this Court is not bound to accept as true. As a result, the Court will dismiss Plaintiff's breach of fiduciary duty claim without prejudice and allow ASCNJ to replead it with the requisite factual specificity.[1]

**B. ASCNJ's State Law Claims Are Preempted Under ERISA**

1. *Counts Two, Three and FourPlaintiff's Common Law State Claims*

Horizon contends that ASCNJ's second, third, and fourth causes of action for trade libel, tortious interference with contractual relations, and negligent misrepresentation must be dismissed as ERISA preempted.[2] In *Gregory Surgical Services, L.L.C. v. Horizon Blue Cross Blue Shield of New Jersey,* 2006 WL 1541021, at 5, n. 1 (D.N.J., 2006), the Court found that "[e]xcept for state laws regulating insurance, ERISA "supersede[s] any and all State laws insofar as they may now or hereafter relate to any employment benefit plan." 29 U.S.C. § 1144(a). "State laws" include any and "all laws, decisions, rules, regulations, or other State action having the effect of law...." U.S.C. § 1144(c)(1).

Ambulatory Surgical Center of New Jersey v. Horizon..., Not Reported in...

2008 WL 8874292

The Supreme Court provided guidance on the scope of complete preemption under ERISA § 502(a)(1)(B) in *Aetna Health, Inc. v. Davila,* 542 U.S. 200, 124 S.Ct. 2488, 159 L.Ed.2d 312 (2004). "The purpose of ERISA is to provide a uniform regulatory regime over employee benefit plans." *Id.* at 208. Therefore, "ERISA includes expansive preemption provisions ... which are intended to ensure that employee benefit plan regulation would be 'exclusively a federal concern.' " *Id.* Section 502(a) allows "a participant or beneficiary" to bring an action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). "[A]ny state-law cause of action that duplicates, supplements, or supplants the ERISA civil enforcement remedy conflicts with the clear congressional intent to make the ERISA remedy exclusive and is therefore pre-empted." *Davila,* 542 U.S. at 209. Based on *Davila,* the Third Circuit established a two-prong test in *Pascack Valley* for determining whether state law claims brought by plaintiffs, such as ASCNJ, are completely preempted by ERISA. 388 F.3d 393, 400. Under the *Pascack Valley* test, a state claim may be completely preempted only if (1) plaintiff could have brought its state action under § 502(a), and (2) if no other legal duty supports a plaintiff's claim. *Id.*

ASCNJ fulfills the first test prong by acquiring ERISA standing. *See supra,* Part IV(A). ASCNJ fulfills the second test prong as its state law claims do not arise via independent contract terms, but rather from an ERISA governed reimbursement amount dispute for which ASCNJ is a valid patient benefit assignee. In *Pryzboski v. U.S. Healthcare, Inc.,* 245 F.3d 266, 273 (3d Cir.2001), the Third Circuit held that "cases where the claim challenges the administration of, or eligibility for, benefits" are completely preempted by ERISA § 502(a). Symbiotically, the *Wayne* Court ruled that third party beneficiary claims against an insurer sounding in unjust enrichment and tortious interference state law claims essentially served to retrieve "benefits due" and challenged the "administration of benefits", rather than arising from any independent legal duty or contract. 2007 WL 2416428, at 5. Symmetrically, ASCNJ's state law claims essentially serve to retrieve benefits due and challenge Horizon's benefits administration. ASCNJ's state law claims are therefore completely preempted under ERISA § 502(a).

**\*5** ERISA's express preemption provision, § 514(a), provides that "[e]xcept as provided in subsection (b) of this section, the provisions of this subchapter and subchapter III of this chapter shall supersede any and all

State laws insofar as they may not or here after ***relate to*** any employee benefit plan." 29 U.S.C. § 1144(a) (emphasis added). In *Pilot Life Insurance Company v. Dedeaux,* the Supreme Court gave § 514(a) a broad reading, stating: "[T]he phrase 'relate to' [is] given its broad common sense meaning, such that a state law 'relate[s] to' a benefit plan in the normal sense of the phrase, if it has a connection with or reference to such a plan." *Pilot Life Insurance Company v. Dedeaux,* 481 U.S. 41, 47, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987) (quoting *Metro. Life Ins. Co. v. Mass.,* 471 U.S. 724, 739, 105 S.Ct. 2380, 85 L.Ed.2d 728 (1985)) (internal quotation marks omitted). In the instant matter, ASCNJ's state law claims directly question Horizon's actions. This Court thus finds that ASCNJ's state law claims are inextricably entwined and cannot be resolved without detailed reference to Horizon's EOB forms and benefit plans, which are clearly ERISA governed. ASCNJ's state law claims are consequently preempted under ERISA §§ 502(a) and 514(a), and are hereby dismissed with prejudice.

*2. Counts Six and SevenPlaintiff's ERISA State Law Claims.*

ASCNJ alleges in counts six and seven that Horizon's violations of N.J.A.C. 11:21–7.13 constitute ERISA violations. Because these ERISA-based claims refer to N.J.A.C. 11:21–7.13, Horizon argues that these claims are preempted. As already addressed, *infra,* any state-based claim arising under ERISA will be completely preempted if the two prong *Pascack Valley* test is met. 388 F.3d 393, 400. ASCNJ has standing as a valid patient insurance plan assignee under ERISA, fulfilling prong one. *See supra,* Part IV(A). As N.J.A.C. 11:21–7.13 patient insurance plans are explicitly ERISA governed, there is no other independent legal duty to support ASCNJ's state law claims, satisfying prong two. These claims are not only completely preempted under § 502(a) but are also expressly preempted under § 514(a) due to their clear reference to ERISA governed plans. Consequently, ASCNJ's N.J.A.C. 11:21–7.13 claims are hereby dismissed without prejudice as preempted under ERISA §§ 502(a) and 514(a).[3]

**V. CONCLUSION**

For the foregoing reasons, the Court finds that ASCNJ has alleged sufficient facts to establish standing by assignment, and independently, on theories of waiver and estoppel, to sue Horizon as an ERISA beneficiary. The Court further deems Horizon's anti-assignment provision unenforceable as a matter of law. Having resolved this

2008 WL 8874292

threshold issue, the Court declines Horizon's application to dismiss ASCNJ's first cause of action, but grants its application to dismiss ASCNJ's fifth, sixth, and seventh ERISA causes of action without prejudice, and will allow ASCNJ leave to file within 45 days from the date of this Opinion an amended complaint sufficiently alleging its facts, claims and theories for these ERISA causes of action. The Court grants Horizon's application to dismiss ASCNJ's second, third, and fourth state law causes of action with prejudice as §§ 502(a) and 514(a) ERISA preempted.

**\*6 SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2008 WL 8874292

Footnotes

1    In an abundance of caution, this Court grants ASCNJ the opportunity to replead its breach of fiduciary duty claim, but if sufficient facts to support the conclusion that Horizon is an ERISA fiduciary are not alleged in the amended complaint, ASCNJ's fiduciary claim may be subject to dismissal with prejudice.

2    The Court notes that ASCNJ admits in its opposition submission that its negligent misrepresentation claim may be duplicative of its § 502(a)(1)(B) ERISA claim. While ASCNJ correctly asserts that it is entitled to plead alternative theories of relief, in the interest of case efficiency and judicial economy it is not entitled to plead duplicative alternate claims expressly designed to circumvent ERISA's preemption provisions. PL's Opp. Br. 27, n. 7. The Supreme Court did not allow such an attempt in *Aetna Health, Inc. v. Davila,* 542 U.S. 200, 124 S.Ct. 2488, 159 L.Ed.2d 312 (2004), finding that a plaintiff could not relabel claims in order to evade the preemptive scope of ERISA. (citing *Allus–Chalmers Corp. v. Lueck,* 471 U.S. 202, 217, 105 S.Ct. 1904, 85 L.Ed.2d 206, S.Ct. 1904.) As such, ASCNJ's negligent misrepresentation claim is independently subject to dismissal on this basis alone.

3    Notwithstanding, the Court grants ASCNJ the opportunity to replead counts six and seven. However, if the claims fail to be repleaded independently of N.J.A.C. 11:21–7.13, and if sufficient facts are not alleged to support the conclusion that the claims have ERISA standing, counts six and seven may be subject to dismissal with prejudice.

---

**End of Document**                                    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

Exhibit Q

Gregory Surgical Services, LLC v. Horizon Blue Cross..., Not Reported in...

2007 WL 4570323

KeyCite Yellow Flag - Negative Treatment
Declined to Follow by Productive MD, LLC v. Aetna Health, Inc.,
M.D.Tenn., August 28, 2013

2007 WL 4570323
Only the Westlaw citation is currently available.
United States District Court,
D. New Jersey.

GREGORY SURGICAL SERVICES, LLC, Plaintiff,
v.
HORIZON BLUE CROSS BLUE SHIELD OF NEW
JERSEY, INC., Defendant.

Civil Action No. 06-0462 (JAG).
|
Dec. 26, 2007.

**Attorneys and Law Firms**

Bruce Heller Nagel, Robert H. Solomon, Nagel Rice &
Mazie, LLP, Roseland, NJ, for Plaintiff.

Edward S. Wardell, Kelley, Wardell, Craig, Annin &
Baxter, LLP, Haddonfield, NJ, for Defendant.

**OPINION**

GREENAWAY, JR., U.S.D.J.

**\*1** This matter comes before this Court on the motion to
dismiss the Second Amended Complaint (the "Second
Amended Complaint" or "SAC") by Defendant Horizon
Blue Cross Blue Shield of New Jersey, Inc. ("Horizon"),
pursuant to FED. R. CIV. P. 12(b)(6), for failure to state a
claim upon which relief can be granted. For the reasons
set forth below, this Court grants in part and denies in part
Horizon's motion to dismiss.

**BACKGROUND**

Plaintiff Gregory Surgical Services ("GSS"), an
ambulatory surgical center, provides medical services to
individuals who are covered under Horizon insurance
plans. As an out-of-network provider, GSS has no
contractual agreement with Horizon that governs the
terms under which GSS receives payment for the services

it performs. Instead, GSS alleges that some of the Horizon
insurance plans provide for patients to receive
reimbursement for a portion of the cost of the medical
service received from an out-of-network provider. The
plans also provide that Horizon may make direct payment
to out-of-network providers. All of the Horizon plans
incorporate an anti-assignment provision, which prohibits
patients from assigning their right to benefits to another
individual or entity.

Before providing services, GSS requires patients to
complete a form stating that the patient assigns to GSS all
insurance benefits covered by Horizon. After performing
its services, GSS submits a claim form to Horizon. In most
cases, Horizon responds by making payment directly
to GSS. In some cases, Horizon sends to GSS a form
explaining its denial of the claim, at which point GSS will
either contact Horizon to discuss the claim or initiate a
formal appeal. In addition, if Horizon later finds that a
previous payment exceeded the amount of reimbursement
due to GSS, it will adjust accordingly its next payment to
GSS.

In December of 2005, GSS filed a Complaint against
Horizon, alleging that Horizon has made insufficient
payments to GSS for services it provided to patients
insured by Horizon. On January 31, 2006, Horizon
removed this Action to federal court and filed a motion to
dismiss, arguing that Plaintiff did not allege sufficient
facts to support a finding of standing under the Employee
Retirement Income Security Act of 1974 ("ERISA"). The
motion to dismiss was granted on June 1, 2006, without
prejudice. GSS then filed an amended complaint (the
"First Amended Complaint" or "FAC") on July 7, 2006.
In response, Horizon filed a second motion to dismiss. On
December 19, 2006, this Court granted the motion to
dismiss, without prejudice, because GSS's claims were
preempted under ERISA. Thereafter, GSS filed the
Second Amended Complaint, which Horizon seeks to
dismiss through the instant motion.

**ANALYSIS**

**I. Governing Legal Standard**

*Standard for a Rule 12(b)(6) Motion to Dismiss*
"Federal Rule of Civil Procedure 8(a)(2) requires only 'a
short and plain statement of the claim showing that the
pleader is entitled to relief,' in order to 'give the
defendant fair notice of what the claim is and the grounds

Gregory Surgical Services, LLC v. Horizon Blue Cross..., Not Reported in...

2007 WL 4570323

upon which it rests.' " *Bell Atlantic Corp. v. Twombly,* 127 S.Ct. 1955, 1959 (2007) (quoting *Conley v. Gibson,* 355 U.S. 41, 47 (1957),* while abrogating the decision in other respects). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do." *Twombly,* 127 S.Ct. at 1959. "Factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the complaint's allegations are true." *Id.*

**\*2** Under Federal Rule of Civil Procedure 12(b)(6), a motion to dismiss should be granted if the plaintiff is unable to articulate "enough facts to state a claim to relief that is plausible on its face." *Twombly,* 127 S.Ct. at 1960 (abrogating *Conley,* 355 U.S. 41). A complaint should be dismissed only if the alleged facts, taken as true, fail to state a claim. *See In re Warfarin Sodium,* 214 F.3d 395, 397-98 (3d Cir.2000).

On a motion to dismiss for failure to state a claim pursuant to FED.R.CIV.P. 12(b)(6), the court is required to accept as true all allegations in the complaint and all reasonable inferences that can be drawn therefrom, and to view them in the light most favorable to the nonmoving party. *See Oshiver v. Levin, Fishbein, Sedran & Berman,* 38 F.3d 1380, 1384 (3d Cir.1994). A complaint should be dismissed only if the alleged facts, taken as true, fail to state a claim. *See In re Warfarin Sodium,* 214 F.3d 395, 397-98 (3d Cir.2000). The question is whether the claimant can prove any set of facts consistent with his or her allegations that will entitle him or her to relief, not whether that person will ultimately prevail. *Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974); *Semerenko v. Cendant Corp.,* 223 F.3d 165, 173 (3d Cir.2000). While a court will accept well-pled allegations as true for the purposes of the motion, it will not accept bald assertions, unsupported conclusions, unwarranted inferences, or sweeping legal conclusions cast in the form of factual allegations. *Morse v. Lower Merion School District,* 132 F.3d 902, 906 (3d Cir.1997). "The pleader is required to 'set forth sufficient information to outline the elements of his claim or to permit inferences to be drawn that these elements exist.' " *Kost v. Kozakewicz,* 1 F.3d 176, 183 (3d Cir.1993) (quoting 5A Wright & Miller, *Fed. Practice & Procedure:* Civil 2d § 1357 at 340).

The court may consider the allegations of the complaint, as well as documents attached to or specifically referenced in the complaint, and matters of public record. *See Pittsburgh v. W. Penn Power Co.,* 147 F.3d 256, 259 (3d Cir.1998); 5A Wright & Miller, *Fed. Practice & Procedure:* Civil 2d § 1357. "Plaintiffs cannot prevent a court from looking at the texts of the documents on which its claim is based by failing to attach or explicitly cite them." *In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1426 (3d Cir.1997). "[A] 'document *integral to or explicitly relied* upon in the complaint' may be considered 'without converting the motion [to dismiss] into one for summary judgment.' *Id.* (emphasis in original) (quoting *Shaw v. Digital Equip. Corp.,* 82 F.3d 1194, 1220 (1st Cir.1996)). Any further expansion beyond the pleading, however, may require conversion of the motion into one for summary judgment. FED.R.CIV.P. 12(b).

## II. *Defendant's 12(b)(6) Motion To Dismiss*

### A. *Standing*
Horizon contends that, as a threshold matter, GSS lacks standing to sue under ERISA because GSS does not hold a valid assignment of benefits. To support this argument, Horizon points to an anti-assignment provision in its plans, which prohibits an insured from assigning to non-participating providers his right to benefits. (Def.Br.4-5.) GSS does not deny the presence of an anti-assignment provision in these plans, but asserts that (1) health care providers constitute beneficiaries as a matter of law under ERISA and therefore may sue insurers for payments due under a plan; (2) Horizon waived its ability to enforce the anti-assignment provision as a result of its course of dealings with GSS; and (3) Horizon is estopped from enforcing the anti-assignment provision due to its course of dealings with GSS. (Pl.Br.14.)

**\*3** GSS erred in arguing that ERISA mandates recognition of an insured's decision to assign to a medical provider benefits under a health plan. ERISA does not expressly state whether beneficiaries may assign their right to receive benefits to providers of medical services. Congress' silence on this issue, when viewed against ERISA's express prohibition against the assignment of pension benefits, has been construed by courts as an indication that health care benefits are assignable.[1] *Wayne Surgical Ctr., LLC v. Concentra Preferred Sys., Inc.,* No. 06-928, 2007 WL 2416428, at \*4 (D.N.J. Aug. 20, 2007).

However, parties may contractually opt against recognizing an assignment of benefits. *Renfrew Ctr.,* 1997 WL 204309, at \*3. At present, the Third Circuit has not ruled on whether anti-assignment provisions in health care plans are enforceable. Some courts have held that the presence of an unambiguous anti-assignment provision in a plan may preclude insureds from assigning their benefits

Gregory Surgical Services, LLC v. Horizon Blue Cross..., Not Reported in...

2007 WL 4570323

to a health care provider. *See, e.g., LeTourneau Lifelike Orthotics & Prosthetics, Inc. v. Wal-Mart Stores, Inc.,* 298 F.3d 348, 352 (5th Cir.2002); *Wayne Surgical Ctr.,* 2007 WL 2416428, at \*4; *Physicians Multispecialty Group v. Health Care Plan of Horton Homes, Inc.,* 371 F.3d 1291, 1296 (11th Cir.2004); *Briglia v. Horizon Healthcare Svcs., Inc.,* No. 03-6033, 2005 WL 1140687, at \*4-5 (D.N.J. May 13, 2005). Therefore, the presence of an anti-assignment provision in the Horizon plans at issue could negate GSS's standing to sue Horizon for unpaid benefits, unless GSS submits evidence demonstrating that the anti-assignment provision is unenforceable.

GSS asserts that, even if ERISA permits the enforceability of anti-assignment provisions, Horizon should be precluded, under theories of equitable estoppel and waiver, from enforcing the anti-assignment provision. This Court discussed the parameters of "equitable estoppel" and "waiver" in its previous opinion. *See Gregory Surgical Svcs. v. Horizon Blue Cross Blue Shield of N .J., Inc.,* No. 06-462, 2006 WL 1541021, at \*2-3 (D.N.J. June 1, 2006). A party is equitably estopped from enforcing a right when it voluntarily conducts itself in a manner that precludes it from asserting that right, and another person relied in good faith on the party's conduct and was injured as a result. *See County of Morris v. Fauver,* 707 A.2d 958, 969 (N.J.1998).

On the other hand, a waiver occurs when a party performs an act that voluntarily, knowingly, and intentionally relinquishes a known right. *See County of Morris,* 707 A.2d at 970 (citations omitted). A party may waive an anti-assignment provision "by a written instrument, a course of dealing, or even passive conduct, i.e., taking no action to invalidate the assignment vis-a-vis the assignee." *Garden State Bldgs., L.P. v. First Fid. Bank, N.A.,* 702 A.2d 1315, 1322 (N.J.Super.Ct.App.Div.1997), *cert. denied,* 707 A.2d 153 (N.J.1998).

**\*4** GSS describes a course of dealing between itself and Horizon that allegedly constitutes a waiver of the anti-assignment provision and estops Horizon from disavowing GSS's standing. The conduct includes discussions of patient coverage under health care policies, direct submission of claim forms, direct reimbursement of medical costs, and engagement in appeal processes. Horizon contends that its direct payment of reimbursements to GSS conforms with the terms of the plans at issue and thus cannot constitute a waiver. (Def.Br.10.) Although Horizon's direct payments to GSS would not constitute a waiver if authorized under the Horizon plans at issue, *see Zhou v. Guardian Life Ins. Co. of Am.,* No. 01-4816, 2001 WL 1631868, at \*2 (N.D.Ill.Dec. 17, 2001); *Renfrew Ctr.,* 1997 WL 204309,

at \*4, the SAC alleges a course of conduct beyond direct reimbursement for medical services. Indeed, the SAC describes regular interaction between Horizon and GSS prior to and after claim forms are submitted, without mention of Horizon's invocation of the anti-assignment clause. (SAC ¶ 20-27.) Such actions impede Horizon's ability to rely on the anti-assignment provision to challenge GSS's standing.

Having found that GSS alleged sufficient facts in the SAC to support standing under ERISA, this Court will now turn to Horizon's arguments regarding dismissal of each of the five causes of action.

### B. *First Cause of Action*
Horizon posits that GSS's claim under Section 502(a)(1)(B) must fail because GSS did not identify the benefit plan that Horizon allegedly breached. Section 502(a)(1)(B) provides that a beneficiary may bring a civil action to recover benefits due or enforce rights under the terms of a plan. 29 U.S.C. § 1132(a)(1)(B). The SAC states that certain plans require Horizon to reimburse insureds for a portion of the cost of services provided by out-of-network medical providers (SAC ¶ 5), that insureds assigned to GSS their right to receive such reimbursement (SAC ¶ 15), and that Horizon's reimbursement payments "abruptly decreased" on or around October of 2004 (SAC ¶ 28). After accepting as true all facts alleged in the SAC, this Court finds that these statements constitute sufficient facts upon which to state a claim under Section 502(a)(1)(B).

### C. *Second Cause of Action*
The second cause of action raises two arguments: first, GSS alleges that Horizon breached Section 502(c) by failing to provide material information to GSS, and second, GSS alleges that Horizon breached its fiduciary duty by failing to provide material information to GSS. Horizon's motion to dismiss argues that GSS failed to state a cause of action under Section 502(c). ERISA's reporting and disclosure requirements mandate that plan administrators provide plan beneficiaries, upon written request, with certain documents and materials. 29 U.S.C. § 1024(b)(4). ERISA defines an "administrator" as the person designated under the terms of the plan, or, if no such designation exists, the plan sponsor. 29 U.S.C. § 1002(16)(A). The statute defines "plan sponsor" as

> **\*5** (i) the employer in the case of an employee benefit plan established or maintained by a

2007 WL 4570323

single employer, (ii) the employee organization in the case established or maintained by an employee organization, or (iii) in the case of a plan established or maintained by two or more employers or jointly by one or more employers and one or more employee organizations, the association, committee, joint board of trustees, or other similar group of representatives of the parties or who establish or maintain the plan.

29 U.S.C. § 1002(16)(B).

Horizon clearly is not a plan administrator within the meaning of ERISA, and thus is not required to disclose information pursuant to Section 502(c). GSS does not dispute that Horizon is not named in any plan as the plan administrator. Furthermore, Horizon does not fit within the definitions of a "plan sponsor," as set forth in 29 U.S.C. § 1002(16)(B). GSS's claim under Section 502(c) accordingly must be dismissed.

GSS also fails to allege sufficient facts to support its argument that Horizon breached its fiduciary duty by failing to disclose material information. As explained *infra* in Section II, D, the SAC does not set forth facts showing that Horizon is a fiduciary within the meaning of ERISA. Consequently, this Court will dismiss GSS's allegation that Horizon breached its fiduciary duties by failing to disclose to GSS any material changes in its reimbursement policy.

D. *Third Cause of Action*
Horizon asserts that this Court should dismiss the breach of fiduciary duty claim set forth in the SAC because Horizon is not a fiduciary within the meaning of ERISA. ERISA defines a fiduciary as a person or entity that "exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, ... [or holds] any discretionary authority or discretionary responsibility in the administration of such plan." 29 U.S.C. § 1002(21)(A); *see also Briglia v. Horizon Healthcare Svcs., Inc.,* No. 03-6033, 2005 WL 1140687, at *6 (D.N.J. May 13, 2005).

The Third Circuit has emphasized that "the linchpin of fiduciary status under ERISA is discretion." *Curcio v. John Hancock Mut. Life Ins. Co.,* 33 F.3d 226, 233 (3d

Cir.1994). However, if Horizon performs mostly ministerial or administrative tasks, such as claims processing and calculation, it likely will not be found to constitute a fiduciary under ERISA. *Id.* Here, GSS alleged in the SAC that "Horizon acted as fiduciary to beneficiaries ... in connection with the beneficiaries' group health plans, as such term is understood under ERISA § 404(a)(1)(B), (D), 29 U.S.C. § 1104(a)(1)(B), (D)." (SAC ¶ 58.) However, proof of Horizon's fiduciary status is an element of the fiduciary duty claim, and "a formulaic recitation [in the complaint] of the elements of a cause of action will not do." *Twombly,* 127 S.Ct. at 1965. The SAC alleges no facts supporting a finding that Horizon is a fiduciary, but instead states a legal conclusion that this Court is not bound to accept as true. As a result, this Court will dismiss Plaintiff's breach of fiduciary duty claim, without prejudice.[2]

E. *Plaintiff's Fourth and Fifth Causes Of Action*
**\*6** Horizon contends that the fourth and fifth causes of action in the SAC must be dismissed because they are preempted by ERISA in accordance with this Court's previous opinion in *Gregory Surgical Svcs. v. Horizon Blue Cross Blue Shield of N.J., Inc.,* No. 06-462, 2006 WL 3751385, at *2 (D.N.J. Dec. 19, 2006). Both causes of action essentially allege violations of N.J. ADMIN. CODE 11:21-7 .13(a). (SAC ¶ 62-75.) The parties have previously conceded, and this Court has stated, that GSS's claims under N.J. ADMIN. CODE 11:21-7.13(a) are preempted by ERISA. *Gregory Surgical Svcs.,* 2006 WL 3751385, at *2. This Court did not permit GSS to raise these claims in its FAC, and shall not recognize these causes of actions now.

*CONCLUSION*

For the foregoing reasons, this Court finds that the SAC alleges sufficient facts to show that GSS may have standing to sue Horizon under ERISA. Having resolved this threshold matter, this Court grants Horizon's motion to dismiss the fourth and fifth causes of action in the SAC, with prejudice, but declines to dismiss the first cause of action. GSS's third cause of action is dismissed without prejudice.

With respect to the second cause of action, GSS fails as a matter of law to allege a claim under Section 502(c). This claim will be dismissed, with prejudice. However, the allegation that Horizon breached its fiduciary duties by failing to disclose material information to GSS is

2007 WL 4570323

dismissed, without prejudice.

Plaintiff is granted leave to file, within 45 days from the date of this Opinion, an amended complaint alleging the breach of fiduciary duty claims asserted in the second and third causes of action.

**All Citations**

Not Reported in F.Supp.2d, 2007 WL 4570323

Footnotes

1    Horizon incorrectly states that the right to assign benefits does not implicitly incorporate the right to sue. To the contrary, an assignment of benefits under a plan includes the assignment of the right to sue for such benefits, for without the latter, the former would be unenforceable. *See Renfrew Ctr. v. Blue Cross & Blue Shield of Cent. N.Y., Inc.,* No. 94-1527, 1997 WL 204309, at *4 (N.D.N.Y. Apr. 10, 1997).

2    This Court has given GSS the opportunity to replead its allegations, which include this breach of fiduciary duty claim, on two occasions. None of the three iterations of GSS's complaint have alleged sufficient facts to support the conclusion that Horizon is a fiduciary. On two prior occasions, Horizon's motions to dismiss has focused on the issues of standing and preemption. Given the current focus of Horizon's motion to dismiss, and out of an abundance of caution, this Court will allow a final opportunity for GSS, if it so chooses, to replead this breach of fiduciary duty count. If no facts come forth, the dismissal shall be with prejudice.

---

**End of Document**                    © 2016 Thomson Reuters. No claim to original U.S. Government Works.